1
2
3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

4   ROBERT M. KOWALSKI,              )  No. 18 B 09130
                                     )
5                                    )  Chicago, Illinois
                                     )  November 1, 2018
6                                    )  9:30 a.m./10:30 a.m.
                          Debtor.    )  2:15 p.m.
7

8
9

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JACQUELINE P. COX

10
11

 APPEARANCES:

For the Debtor:          Mr. Ernesto D. Borges;
12
13
For the Trustee:         Mr. Devvrat V. Sinha;
                         Mr. James B. Sowka;
                         Mr. Gus A. Paloian;
14
15
For the FDIC:            Mr. Eric S. Rein;
                         Mr. Jason M. Torf;

16   For the U.S. Trustee:  Ms. Katy Gleason;

17   For Martha Padilla:    Ms. Karen J. Porter;

18   For the City of
     Chicago:               Mr. David Holtkamp;
19
For Byline Bank:         Ms. Elka Nelson.
20

21

22
 Court Reporter:         MARY C. KELLY, CSR
23                       United States Courthouse
                         219 South Dearborn Street
24                       Room 661
                         Chicago, Illinois  60604
25

1

2

**I N D E X**

3

4
WITNESS:                      DX    CX    RDX    RCX

5

DIANA ABEL                    45    64     70     72

6

TAMMY DiMENNA                 74    82

7

NATALIE LIRA                  86   95,98  111

8

ERIC S. REIN                 115   120

9

ROBERT THOMPSON              123   129

10

GUS PALOIAN                  139   170    186    192

11

ROBERT KOWALSKI              197   234

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              THE CLERK:  Robert Kowalski.

2              MR. SINHA:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. SINHA:  Dev Sinha for the trustee.

5    This is our motion to take 2004 examination.

6              THE COURT:  Have you heard from the

7    debtor or the debtor's attorney?

8              MR. SINHA:  We've heard no objections,

9    Your Honor.

10             THE COURT:  The matter was set for 9:30.

11   It's now 9:32.

12                  (There was an interruption.)

13             THE COURT:  The motion will be granted.

14             MR. SINHA:  Thank you, Your Honor.

15                  (Which were all the proceedings had

16                   in the above-entitled cause at

17                   9:30 a.m.)

18             THE CLERK:  Calling set 10:30 matter of

19   Robert Kowalski.

20             THE COURT:  From left to right.

21             Go ahead.

22             MS. GLEASON:  Katy Gleason on behalf of

23   the United States Trustee.

24             MR. HOLTKAMP:  Good morning, Your Honor.

25   David Holtkamp for the City of Chicago.
```

1          MS. PORTER:  Karen Porter on behalf of

2     Martha Padilla.

3          MR. TORF:  Good morning, Your Honor.

4     Jason Torf on behalf of the FDIC as receiver.

5          MR. REIN:  Eric Rein also on behalf of

6     FDIC as receiver.

7          MR. PALOIAN:  Your Honor, Gus Paloian,

8     case trustee.

9          MR. SOWKA:  Good morning, Your Honor.

10    James Sowka, counsel for the trustee.

11         MR. BORGES:  Good morning, Your Honor.

12    Ernesto Borges on behalf of Robert Kowalski.

13         MS. NELSON:  Good morning, Your Honor.

14    Elka Nelson for Byline Bank.  I'm merely here to

15    produce a subpoenaed witness.

16         THE COURT:  I'm sorry?

17         MS. NELSON:  Elka Nelson, Byline Bank.

18         THE COURT:  I see.

19         And for the record, the debtor is here.

20         Let's get started.

21         MR. REIN:  Your Honor, I would suggest

22    we start with the order to show cause.

23         MR. SOWKA:  Your Honor, the trustee

24    agrees with that.

25         THE COURT:  Any objection?

1          MR. BORGES:  No objection, Your Honor.

2          THE COURT:  I'm sorry?

3          MR. BORGES:  No objection, Your Honor.

4          THE COURT:  Let's proceed.  Let's start

5   with the rule to show cause.

6          MR. REIN:  So as we said to the court on

7   Tuesday where neither the debtor nor counsel were

8   present, the circumstances surrounding the

9   Rule 2004 examination are unusual, are significant,

10   such that our relief that we are requesting is that

11   the debtor be taken into custody, he be housed in

12   the Metropolitan Correction Center, produced for

13   his Rule 2004 examination until it is completed

14   here in the courthouse with U.S. marshals present

15   in light of the circumstances that went on on

16   October 23 where he accosted the bankruptcy trustee

17   and the deposition could not go forward or the

18   examination.

19          He has not produced records that were

20   requested originally from his bankruptcy counsel in

21   May, also pursuant to subpoena, and as well as I

22   sent an e-mail to counsel last week that has never

23   been responded to.

24          So we need the documents produced.

25   Then, we need to examine.  It should be here.  It

1    should be here so that we can also ask the court to

2    rule on his failure to answer questions.

3             THE COURT:  All right.

4             Swear Mr. Paloian in.  Put Mr. Paloian

5    under oath.  Put Mr. Paloian under oath.

6             THE CLERK:  Raise your right hand.

7               (Gus Paloian was duly sworn.)

8             THE COURT:  Now, I read the transcript,

9    but I'm trying to -- Mr. Paloian, explain what

10   happened.

11            MR. PALOIAN:  Your Honor, at the

12   deposition -- I'm sorry -- at the examination, on

13   the second day, Mr. Kowalski began a heated

14   exchange with Mr. Rein, stood and refused to answer

15   questions and launched into a tirade.

16            At one point, I asked him to sit down

17   and answer the questions.  He turned towards me and

18   walked right up to me face-to-face --

19             THE COURT:  How close?

20            MR. PALOIAN:  Your Honor, this close

21   (indicating).

22             THE COURT:  And you're holding your

23   fingers they are about an inch apart?

24            MR. PALOIAN:  Probably less than an

25   inch.

1          THE COURT:  He was that close.  Mr.

2    Kowalski was that close to you.

3          MR. PALOIAN:  Yes, Your Honor.  And I

4    didn't move towards him.  I was seated.

5          THE COURT:  What, if anything, did he

6    say when he was that close to you?

7          MR. PALOIAN:  He threatened me, Your

8    Honor.

9          THE COURT:  What did he say?

10          MR. PALOIAN:  He said:  Do you want to

11    have at it right now.

12          THE COURT:  Go ahead.

13          MR. PALOIAN:  So, Your Honor, that's it.

14    I stood up, frankly, to defend myself, and I did

15    not move.  I just stood there and stood up, and he

16    continued to approach right at me and got right in

17    my face.

18          At that point, I asked that building

19    security be called.  Within a short time, they did

20    show up.  He continued to rant and rave for a

21    while.  He left the examination room.  He came back

22    in and got into a verbal altercation with the

23    security personnel also.

24          THE COURT:  Did you witness that?

25          MR. PALOIAN:  Yes.

1              THE COURT:  What did you see or hear?

2              MR. PALOIAN:  I saw him demanding to

3     know who the security personnel were and why were

4     they here, and he ranted and raved the whole time.

5              The security personnel asked him to calm

6     down.  They all left the examination room.  I

7     stayed in the examination room.

8              Later on, they came back in.  They

9     mentioned that he kept going into the bathroom.

10    They were concerned he had a bag or potentially

11    something he brought with him.  As far as I know,

12    there was no bag.

13             At one point, everybody came back into

14    the examination room, and at that point, Mr. Rein

15    asked the debtor if he was willing to sit down and

16    continue the examination, and he continued to rant

17    and rave.

18             At one point, he just grabbed a box of

19    documents and turned and left.  And as it was

20    reported to me later, the security guards left with

21    him, and he continued to verbally assault them on

22    the exit from the building.

23             THE COURT:  Any questions of Mr.

24    Paloian?

25             MR. BORGES:  Yes, I do, Your Honor.

1          THE COURT:  Go right ahead.

2          MR. BORGES:  Is it Paloian?

3          MR. PALOIAN:  It is.

4          MR. BORGES:  Mr. Paloian, you said that

5     Mr. Kowalski stood up and approached you.

6          MR. PALOIAN:  Yes.

7          MR. BORGES:  And at any point in time,

8     did he say he was trying to get water or to do

9     anything other than approach you?

10          MR. PALOIAN:  He did say that, but his

11     approach to me and standing less than an inch from

12     me had nothing to do with the water because I

13     wasn't blocking access to the water.

14          MR. BORGES:  I see.

15          You said that he asked you whether --

16     you thought it was threatening.  He said do you

17     want to get it on or --

18          MR. PALOIAN:  Something like that, yes.

19          MR. BORGES:  So that was a question?

20          MR. PALOIAN:  Well, his physical

21     behavior was not a question.  His physical behavior

22     was a definitive assault.

23          MR. BORGES:  Okay.  That's how you took

24     it.

25          MR. PALOIAN:  Without a doubt.  Not only

1    me, but also Mr. Rein.  Because when he was there,

2    he basically admonished the debtor not to hit the

3    trustee because the trustee was a federal officer.

4    Now, why would he do that if he didn't observe

5    threatening behavior?

6              MR. BORGES:  And did Mr. Kowalski at any

7    time say that he thought he had been threatened or

8    he was being attacked by you?

9              MR. PALOIAN:  No.

10             MR. BORGES:  No?

11             MR. PALOIAN:  No.  He wasn't attacked by

12   me.  I didn't move.

13             MR. BORGES:  Verbally attacked?  Any

14   altercation?  Or that you guys were roughing him

15   up?

16             MR. PALOIAN:  No.  No.

17             No, I wasn't roughing him up.

18             MR. BORGES:  And you indicated that you

19   called the guards or you called security?

20             MR. PALOIAN:  I didn't.  I asked that

21   security be called.  I didn't physically call them.

22             MR. BORGES:  And then Mr. Kowalski

23   walked out with the guard?  With the security?

24             MR. PALOIAN:  He was exited from the

25   building.  He was basically thrown out of the

1   building.

2                    MR. BORGES:  Okay.

3                    MR. PALOIAN:  There is an incident

4   report.

5                    MR. BORGES:  All right.  But

6   Mr. Kowalski did not physically touch you.

7                    MR. PALOIAN:  Did he touch me?  No.

8                    MR. BORGES:  Okay.  I see.

9                    But you felt threatened?

10                   MR. PALOIAN:  I certainly did, oh, yes.

11                   MR. BORGES:  Did you threaten him?

12                   MR. PALOIAN:  No.

13                   MR. BORGES:  All right.

14                   I have no further questions, Your Honor.

15                   THE COURT:  Anyone else have any

16  questions of this witness?

17                   Do you have any witnesses, Mr. Borges?

18  Or Mr. Sowka?  You stepped up?

19                   MR. SOWKA:  Yes, Your Honor.

20                   THE COURT:  I'm sorry?

21                   MR. SOWKA:  I would like to ask Mr.

22  Paloian a few questions.

23                   THE COURT:  All right.  Go ahead.

24                   MR. SOWKA:  Mr. Paloian, Mr. Borges

25  commented about Mr. Kowalski's comments on the

1    record about that he was going to get a drink of

2    water.  Do you recall that?

3                MR. PALOIAN:  Yes.

4                MR. SOWKA:  In your experience with Mr.

5    Borges at the meeting of creditors, did you find

6    that Mr. Borges would annotate the record --

7                MR. BORGES:  I'm Mr. Borges.

8                MR. SOWKA:  Or Mr. Kowalski would

9    annotate the record with comments that were

10   deviated from the actual facts in the room?

11               MR. PALOIAN:  Of course, yes.

12               MR. SOWKA:  Nothing further.

13               THE COURT:  Anything further, Mr.

14   Borges?  Any other questions?

15               MR. BORGES:  Not for this witness.

16               THE COURT:  Do you have any witnesses?

17               MR. BORGES:  I have Mr. Kowalski.

18               THE COURT:  Swear him in.

19               THE CLERK:  Would you raise your right

20   hand.

21                    (Mr. Robert Kowalski duly sworn.)

22               MR. BORGES:  Before we begin, Judge, I

23   would just like to say I'd apologize for my

24   absence.  We had a mix up as to who was to be here

25   on Tuesday, and I've been ill, and I apologize for

1    that.

2           But, Mr. Kowalski, you remember this

3    2004 exam that you had on October 23rd, was it?

4           MR. KOWALSKI:  Absolutely.

5           MR. BORGES:  And where was it held?

6           MR. KOWALSKI:  500 West Madison Street,

7    Suite 3700.

8           MR. BORGES:  Okay.  Who was present?

9           MR. KOWALSKI:  There was quite a few

10   people.  Mr. Rein.  The court report.  Mr. Torf.

11   Mr. Paloian.  Several representatives of the

12   FDIC-R.

13           MR. BORGES:  Approximately how many

14   people?

15           MR. KOWALSKI:  Eight or nine.

16           MR. BORGES:  Eight or nine people.  And

17   they questioned you at that time?  How many people

18   questioned you?

19           MR. KOWALSKI:  Well, Mr. Rein

20   exclusively questioned me until such time as Mr.

21   Paloian wanted --

22           THE COURT:  Did you answer any

23   questions, Mr. Kowalski?

24           MR. KOWALSKI:  I answered Mr. Rein's

25   questions, but the --

1        THE COURT:  I read the transcript.  I

2    didn't see a lot of answers in there, sir.

3        MR. KOWALSKI:  Well, you might notice

4    there was quite a few interruptions, Judge.  Mr.

5    Rein continually talked across me and --

6        THE COURT:  Did you interrupt with the

7    answer?

8        MR. KOWALSKI:  He posed a question -- a

9    very general question.  And when he didn't like the

10   answer, even though he asked a very general

11   question, he would cut across me, and I don't know

12   if it was just an attempt to make me forget what I

13   was answering or to make me unsettled or antagonize

14   me, and he certainly did.

15       I was very -- every question he asked,

16   he would cut across, and the record does reflect

17   all these host of interruptions.  For 47 questions,

18   there was 46 interruptions.  I couldn't get a word

19   in edgewise.

20       And, nevertheless, Mr. Paloian wanted to

21   help.  I don't know what he was doing there.  He

22   was a witness.  He was not a participant.  I don't

23   know why he needed to bar my access to getting a

24   drink of water.

25       After there being very heated exchanges

1   with Mr. Rein, I didn't want to fight with anybody.

2   I wanted to step out of the room, regain my

3   composure, get a glass of water, and there was Mr.

4   Paloian inserting himself in -- it was the FDIC-R's

5   deposition.  It wasn't Mr. Paloian's deposition.

6   He had no business asking me questions.  He had no

7   business admonishing me.  He had no business

8   whatsoever.

9          He wanted to be there.  He was entitled

10  to be there.  But I don't know why he had to make

11  it a --

12          THE COURT:  So he deserved to have you,

13  basically, get in his face and start threatening --

14  and act threatening towards him?  Because you

15  disagreed that he had authority to ask a question,

16  so your remedy was to get in his face and act

17  hostile?

18          MR. KOWALSKI:  No, to the contrary, Your

19  Honor.  Mr. Paloian was seated, but for reasons I

20  don't understand --

21          THE COURT:  Did you get in his face

22  within an inch?

23          MR. KOWALSKI:  We were very close to

24  each other, Your Honor.

25          THE COURT:  And you approached him and

1    got in his face within an inch, is that correct?

2              MR. KOWALSKI:  I was trying to exit the

3    room and --

4              THE COURT:  Did you do that, Mr.

5    Kowalski?

6              MR. KOWALSKI:  I didn't make him stand

7    up.  I was trying to exit the room.

8              THE COURT:  Did you approach Mr. Paloian

9    and get within an inch of his face during this

10   exchange?

11             MR. KOWALSKI:  I did not approach him.

12   He got out of his chair to approach me.

13             THE COURT:  Did you find yourself within

14   an inch of his face?

15             MR. KOWALSKI:  I did find myself within

16   an inch of his face.

17             THE COURT:  Did you approach him?

18             MR. KOWALSKI:  He got out of his chair

19   and approached me.

20             THE COURT:  He walked up to you?

21             MR. KOWALSKI:  He got out of his chair.

22   He was seated.  But he didn't want to remain

23   seated.  He stood up.

24             THE COURT:  And so you went to where he

25   was?

1          MR. KOWALSKI:  Well, no.  I was trying

2     to leave the room.  And that was the seating.

3     There was the traffic there of the room.

4          I wasn't there to fight anybody,

5     especially when the room was filled with eight

6     people.  I wasn't going to -- I wasn't there to

7     fight.

8          I wanted to get a drink of water.  The

9     questions were very brutal and very -- I was very

10    exasperated because I wasn't allowed a chance to

11    fully answer a question.  I don't think that's

12    fair.  I don't think the rules provide for that.  I

13    think a witness is allowed to explain an answer,

14    especially since some of the questions that were

15    asked of me were very general.

16          What did you do in 2014?  Well, you know

17    what?  I did a lot of things in 2014.  Or a

18    question why is a builder very important to a bank?

19    Well, there is a host of reasons why a builder is

20    important to a bank.

21          And I'm certain Mr. Rein --

22          THE COURT:  Did you answer with those

23    hosts of reasons?

24          MR. KOWALSKI:  You know, I tried to, but

25    Mr. Rein in the record incessantly cut me off, and

1    it was very -- I'm not sure what the witness can

2    do.  I want to answer the question fully, but the

3    minute the answer was not what Mr. Rein wanted

4    forthcoming, both he and Mr. Paloian began

5    admonishing me, telling me to sit down.

6           I wasn't there to be admonished like a

7    child.  I'm a witness.  I'm an attorney.  I thought

8    I would be treated in a cordial manner, not this

9    hostile environment that was created.

10          I certainly wanted to step out of the

11   room and let all the tempers die, but for what

12   reasons I don't understand, Mr. Paloian, amongst

13   all the people in that room, jumped up and wanted

14   to get in my face.

15          And, no, we did not push each other or

16   have a little private conversation.  I just simply

17   wanted to get a drink of water and go outside and

18   just cool my heels a little bit.

19          THE COURT:  Mr. Borges, any other

20   questions?  Go ahead with your examination.

21          MR. BORGES:  Yes.

22          Mr. Kowalski, so when you stood up, Mr.

23   Paloian was seated, is that correct, and you stood

24   up and walked towards him in his direction?

25          MR. KOWALSKI:  Yes, I turned, and it was

1    the entrance to the conference room that we were

2    in, and he immediately stood up.  And even before

3    that, he started to interject.  The record reflects

4    he has quite a few interjections into the record.

5    I'm not sure why he -- it wasn't his exam -- why he

6    needed to say anything on the record at all.  He

7    was a witness.  Why couldn't he maintain -- not

8    even a witness.  He was just witnessing the

9    proceeding.  I don't know why he couldn't sit in

10   his chair.

11            Mr. Rein was directing questions at me.

12   It wasn't Mr. Paloian's opportunity to ask me

13   anything at that particular point in time.

14   Nevertheless, he wanted to stand up, and he wanted

15   to bully me with the rest of them in the room.

16            I just wanted to be left at peace to

17   gather my thoughts, get a drink of water and resume

18   the deposition.

19            MR. BORGES:  So it's your testimony that

20   you were just standing up to leave the room and get

21   some water, and Mr. Paloian stood up as you were

22   approaching?

23            MR. KOWALSKI:  Yes.  I didn't make him

24   stand up.  I wasn't -- there wasn't any -- the

25   reporter would have caught any kind of commentary I

1    made.  I didn't make any commentary.  I wasn't

2    there to approach Mr. Paloian.  I don't know why he

3    had to get up and interpose himself in this exam.

4    It wasn't his -- he has a request for a 2004 exam.

5    This was not his 2004 exam, and yet he wanted to

6    like tag team with Mr. Rein.

7              MR. BORGES:  Your Honor, Mr. Kowalski

8    attended that meeting.  He thought that he could

9    attend it without the assistance of counsel.

10             I would suggest, Judge, that he be

11   allowed to attend the continued meeting with

12   counsel to make sure that there's no altercations.

13             THE COURT:  Are the parties aware that

14   the executive committee of the District Court

15   entered an order yesterday or Tuesday, I think it

16   was the 30th, that Mr. Kowalski is no longer

17   allowed in the building unless he's escorted by

18   U.S. marshals?  Are you all aware of that?

19             MR. BORGES:  Yes.  Yes, Judge.

20             THE COURT:  I don't even know if it's on

21   my docket.

22             Are you aware of that, Mr. Kowalski?

23             MR. KOWALSKI:  Yes, Your Honor.  I have

24   that order.

25             MR. BORGES:  He checked in as soon as he

 1    entered the building.  I was with him.

 2             THE COURT:  Yes.  I don't think that

 3    Judge Castillo's order is on my docket.  I have

 4    seen that.  I'll have my clerk make a copy of it

 5    available to everybody.

 6             Any other questions of Mr. Kowalski?

 7             MR. REIN:  I do, Your Honor.

 8             THE COURT:  Go right ahead.

 9             MR. REIN:  Mr. Kowalski, the room where

10    the examination was taken had two entrances and

11    exits, right?

12             THE COURT:  Had how many, I'm sorry?

13             MR. REIN:  Two.

14             Correct?

15             MR. KOWALSKI:  It did, yes.

16             MR. REIN:  One was right behind you

17    where you were seated where the examination was

18    going on, correct?

19             MR. KOWALSKI:  No, that's not correct.

20    It was behind me but to the left, and there was

21    another exit that was behind me and to the right.

22             MR. REIN:  And the one to the --

23             MR. KOWALSKI:  I was --

24             MR. REIN:  And the one to the right --

25             MR. KOWALSKI:  I --

1           MR. REIN:  Oh, go ahead.  Are you

2    finished with the answer?

3           MR. KOWALSKI:  No, I wasn't finished.

4           The one to the right was where the water

5    jug was in that conference room.  I wanted to get a

6    drink of water, and I wanted to step outside for a

7    minute to let all of us be calm and be at peace.

8           MR. REIN:  So you could have stepped out

9    to be calm by just exiting to the exit immediate to

10   your left behind you where the examination was

11   taking place, correct?

12          MR. KOWALSKI:  Well, that would've

13   alleviated the blockade that Mr. Paloian was

14   standing up to impose upon me, yes.  That would

15   have -- that would have helped.

16          I did want to get a drink of water, and

17   I wasn't expecting to be accosted.  I don't know

18   why Mr. Paloian had to stand up.  I don't know if

19   he wanted to bar the way for me.  I wanted to get a

20   drink of water, go to the bathroom and then calm

21   down.

22          MR. REIN:  So you walked the length of

23   the room.

24          You never reached for a water glass,

25   correct?

1      MR. KOWALSKI:  No, that's not true.  I

2  did reach for a water glass.  That was my

3  intention.

4      MR. REIN:  You never reached and picked

5  up a water glass, correct?

6      MR. KOWALSKI:  I was intercepted before

7  I got to that point by Mr. Paloian.

8      MR. REIN:  So the water and the water

9  glass was across the room across from where Mr.

10  Paloian was sitting, correct?

11      MR. KOWALSKI:  No.  It was directly

12  behind Mr. Paloian and maybe a little bit to his --

13  behind him and to his right.

14      MR. REIN:  Okay.  Behind him by your

15  description, and you could get to the water and the

16  water glass without coming into contact with Mr.

17  Paloian, correct?

18      MR. KOWALSKI:  Absolutely not.  Mr.

19  Paloian wanted to accost me, and he succeeded in

20  doing so.

21      MR. REIN:  What he wanted to do doesn't

22  answer my question.

23      You could get to the water and the water

24  glass unimpeded without needing to step around or

25  go around any person in that room, correct?

1          MR. KOWALSKI:  That's absolutely not

2     correct.

3          MR. REIN:  And did you read the

4     transcript?

5          MR. KOWALSKI:  Parts of it I have, yes.

6          MR. REIN:  Did you see how many people

7     were in attendance as recorded by the court

8     reporter?

9          MR. KOWALSKI:  I don't recall

10    specifically, but the room was full.

11         MR. REIN:  The room was full.

12         The room had Mr. Torf and myself

13    representing the FDIC receiver, and Mr. Paloian,

14    and one representative from the FDIC, correct?

15         MR. KOWALSKI:  I don't believe that's

16    correct, no.

17         MR. REIN:  And it is a large conference

18    room with a large five-foot table, right?

19         MR. KOWALSKI:  No.  The table is quite

20    long.  Very long.

21         MR. REIN:  Quite long?  How long do you

22    think it is?

23         MR. KOWALSKI:  It's about as long as the

24    bench (indicating).  Maybe 14-feet long.

25         MR. REIN:  And you and I were seated

1  across from each other, let's say where the court

2  reporter is sitting, right?

3         MR. KOWALSKI:  I think a little further.

4         MR. REIN:  Little further.

5         And Mr. Paloian was at the opposite end

6  probably past where the clerk is sitting, correct?

7         MR. KOWALSKI:  No, you're not correct.

8         MR. REIN:  Where was -- explain to the

9  court where he was seated in relation to where you

10  were seated for the examination?

11         MR. KOWALSKI:  About the middle of the

12  table.  Maybe a little bit to the right.  As I'm

13  looking here, to the right center of the table.  It

14  was maybe two chairs distant from me.

15         MR. REIN:  You're sure that's where he

16  was sitting?

17         MR. KOWALSKI:  He wasn't my primary

18  focus, but, yes, I'm sure he was in that general

19  area.

20         MR. REIN:  Mr. Torf and, I'm sure, Mr.

21  Paloian will testify that he was at the far end

22  where the FDIC representative was at the end of the

23  table, right?

24         MR. KOWALSKI:  I'm sorry.  I don't

25  understand your question.

1        MR. REIN:  Okay.

2        Mr. Torf sat in the middle of the

3    conference table across from you.

4        MR. KOWALSKI:  No, I thought you did.

5        MR. REIN:  Mr. Torf was in the middle of

6    the room on the same side as I was in the middle of

7    the table.

8        MR. KOWALSKI:  More or less.

9        MR. REIN:  And Mr. Paloian was down

10   towards the far end on the opposite side of Mr.

11   Torf.

12       MR. KOWALSKI:  No.  He was seated to the

13   center of the table more or less, a little bit to

14   the right as I -- in my orientation.

15       MR. REIN:  Are you saying he was seated

16   across from Mr. Torf?

17       MR. KOWALSKI:  More or less, but not

18   exactly.

19       MR. REIN:  So he was farther down

20   towards the end of the table?

21       MR. KOWALSKI:  No, I disagree with that.

22   Moreover, my attention was drawn to you and the

23   court reporter.  I wasn't, like, monitoring the

24   activities of the people in the peanut gallery.

25       MR. REIN:  And the water and the glasses

1   were down towards the end of the table on the

2   credenza right across from where Mr. Paloian was

3   sitting, right?

4           MR. KOWALSKI:   No.  From my perspective

5   and from where I was sitting, I had to cross paths

6   where Mr. Paloian was seated to get a drink of

7   water.

8           MR. REIN:   I have nothing further.

9           THE COURT:   Any other questions of

10  Mr. Kowalski?

11          MR. BORGES:   Just one question.

12          When you approached or walked in the

13  direction of Mr. Paloian, he's the one who stood

14  up, is that right?

15          MR. KOWALSKI:   Absolutely.  He began

16  questioning on the record, and he popped up.

17          MR. BORGES:   And he stood up in your

18  face?

19          MR. KOWALSKI:   Absolutely.  I don't know

20  what his intentions were other than to be

21  provacative.

22          THE COURT:   When you say stood up in

23  your face, how far were you from Mr. Paloian when

24  he stood up?

25          MR. KOWALSKI:   Well, we were several

1    feet away.

2              THE COURT:  Several feet away?

3              MR. KOWALSKI:  Yes.  I was going to get

4    the water, and then he maintained contact.

5              THE COURT:  I see from this transcript

6    that you say that you refused to produce boxes,

7    produce records, until two boxes you brought on

8    Monday are copied.  What was that about?

9              MR. KOWALSKI:  Well, I brought --

10             THE COURT:  Have you produced all

11   records required?

12             MR. KOWALSKI:  I have additional boxes

13   here, Your Honor.

14             THE COURT:  So you have not produced all

15   records?

16             MR. KOWALSKI:  I have many more boxes

17   here, yes.

18             THE COURT:  To date, have you given the

19   FDIC and/or the trustee all required documents?

20   Yes or no.

21             MR. KOWALSKI:  No.  I think I am still

22   missing a few.

23             THE COURT:  Why?

24             MR. KOWALSKI:  I can only carry so many

25   boxes with me, Your Honor.  I have five boxes.

1      THE COURT:  I thought they went to your

2  office to get the records.

3      MR. KOWALSKI:  No.  We didn't meet for

4  that purpose, no.

5      THE COURT:  They went to your office.

6  You wouldn't let them in or you wouldn't do

7  something as I recall.

8      MR. KOWALSKI:  No, that's not true, Your

9  Honor.  They wanted to go through the office, which

10 I'm an attorney --

11      THE COURT:  Mr. Kowalski, it looks to me

12 like I'm going to have to take you in custody.

13 You're going to have to get somebody to produce all

14 those records.  You're going to be interrogated in

15 this building under security.

16      I've been a judge a long time.  I have

17 prided myself on not holding people in contempt.

18 You have to be held in contempt.  If you expect me

19 to believe that Mr. Paloian stood up several feet

20 away from you and that required you to get within

21 an inch of his face --

22      MR. KOWALSKI:  No.  No, he initiated it.

23      THE COURT:  Mr. Kowalski, I'm going to

24 suggest you not interrupt me.  You are just digging

25 a deeper hole.

1        You have to comply with the request for

2    information.  I'm not going to tolerate you going

3    into an office building and clowning.

4            MR. KOWALSKI:  I would never clown.

5            THE COURT:  It's unacceptable.

6            MR. KOWALSKI:  I would never clown.

7    That's unfair.

8            THE COURT:  But you did.  You didn't

9    answer the questions.  Instead, you're threatening

10   people.

11           MR. KOWALSKI:  I didn't threaten --

12           THE COURT:  Refusing to produce

13   information.

14           It's right in the transcript.

15           The only issue is how long you are going

16   to be in custody.

17           Any suggestions how to get this 2004

18   exam conducted and completed and all the records?

19   I'm not going to sit here and say you don't have to

20   comply with the law.

21           MR. BORGES:  Judge, may I speak?

22           THE COURT:  I just said any suggestions.

23           MR. BORGES:  Okay.  I have a suggestion.

24           We have five boxes here today in the

25   courtroom.  We have a few more boxes --

1          THE COURT:  That to date have not been

2    tendered.  They should have been at the exam.  They

3    have a right to review those matters before the

4    2004 exam starts.

5          MR. BORGES:  Well, Judge, they were

6    going back a long way.  Mr. Kowalski is an

7    attorney.  He does have certain --

8          THE COURT:  That's what makes it even

9    worse is that he's an officer of the court.

10         MR. BORGES:  But he has other cases.  He

11   has other matters that are in his filing cabinets,

12   and it takes time to produce all those and to

13   segregate those matters that have nothing to do

14   with this.

15         We can have -- I spoke with Mr. Kowalski

16   yesterday.  We can -- I told him to bring as much

17   as he could bring today.  We can have the rest of

18   it by tomorrow.

19         THE COURT:  But we still don't have a

20   complete production.

21         MR. BORGES:  We can have -- well, there

22   are a few other things.  It takes time to separate

23   cases that have nothing to do with this and the

24   confidentiality of clients.

25         We can have this tomorrow.  I'll go back

1  to his office with him, Judge.  We --

2          THE COURT:  You're going to probably

3  have to go back by yourself.

4          Mr. Paloian?

5          MR. PALOIAN:  Your Honor, these --

6          THE COURT:  I'm sorry, Mr. Borges.  I

7  shouldn't have cut you off.  I'm sorry.

8          MR. BORGES:  Judge, we're just trying to

9  get to the bottom of this.  He needs to go through

10  it.  I will go with him today, bring back

11  everything tomorrow, deliver it to Mr. Paloian.  I

12  will spend the rest of this day or --

13          THE COURT:  To Mr. Rein.

14          MR. BORGES:  To Mr. Rein.  To Mr. Rein.

15  And produce everything he needs tomorrow.  Change

16  my whole schedule, Judge, and bring everything to

17  them.  I'll go with Mr. Kowalski, Judge, if Your

18  Honor will allow us to do this.  Bring all the

19  boxes.

20          THE COURT:  We are all subject to the

21  laws of the United States of America.  We're all

22  subject to the rules of court, the Bankruptcy Code,

23  and if you come into court and ask for relief, you

24  have to make disclosures.  You don't have the right

25  to say I'm not talking about that.

1        MR. BORGES:  Judge --

2        THE COURT:  I'm not going to cooperate.

3    I don't like the trustee.  They're being mean to

4    me.  It may feel mean that you have to disclose

5    information.  It's not unusual.

6        MR. BORGES:  Judge, let us get to --

7        THE COURT:  It's not harassment.

8        Go ahead, Mr. Borges.

9        MR. BORGES:  We want to get to the

10   bottom of this.  We want to make sure that

11   everybody has all the information that they need,

12   all the documents they need so that we can resolve

13   this matter, Your Honor, but I think that Mr.

14   Kowalski --

15       THE COURT:  It's a travesty that the

16   exam had to start without full production.

17       MR. BORGES:  I agree, Judge.

18       THE COURT:  People are incurring

19   expenses unnecessarily, wasting time --

20       MR. BORGES:  Judge, we can have it all

21   tomorrow.  I will spend the rest of the day with

22   Mr. Kowalski.

23       THE COURT:  He couldn't even come to

24   court and say, I'm standing here in compliance.

25   Here.  These are all the records.  And I promise to

1    do everything.  I mean, this is the hearing where

2    there is a decision to be made whether he's in

3    contempt.

4            What do you suggest, Mr. Rein?  Go

5    ahead.

6            MR. REIN:  I'd make a couple

7    suggestions.

8            Number 1, all the documents need to be

9    produced to my office.  It's going to take time now

10   for us to go through 5 or 6 boxes of documents.

11           And by the way, I asked Mr. Kowalski two

12   things.  Are you going to have a lawyer here?

13   Because you wanted -- you continued the

14   examination, and that was one of your bases to get

15   a further continuance in September, because you

16   wanted counsel present, and I had said back at the

17   time there is no counsel of record.

18           So Mr. Borges was of record, and he

19   walks in alone.  I said, are you going to have

20   counsel?  He said, no, I'm a lawyer.  I don't need

21   counsel.

22           So he comes in with these two boxes of

23   documents.  I said, do you have more?  He says,

24   yes.  When are you producing them?  Well, you need

25   to copy these and then get them back to me before I

1    give you anything more.

2            Okay.  So I started the examination not

3    having seen these two boxes because I -- we had a

4    court order, and we could start the examination.  I

5    wasn't going to finish it.  I said, what more do

6    you have?  He says, I can't tell you.  I said, why

7    can't you tell me?  He said, because I'm an

8    attorney.  I said, okay.  I have client files.  I

9    said, who are your clients?  I can't tell you.  I

10   said, what's your basis for refusing to tell me?

11   Attorney-client privilege?  He says, yes.  I said,

12   okay, I'll discuss that with the court eventually.

13   Mark that on the record.

14            So I got two boxes of documents, which

15   now I've gone through, but it took me two days to

16   go through his two boxes.  I don't know how long

17   it's going to take for me to go through the

18   additional six or so.  So I need to go through the

19   boxes first before I take --

20            THE COURT:  Do you suggest I take Mr.

21   Kowalski into custody?

22            MR. REIN:  Yes, absolutely.

23            MR. PALOIAN:  Yes, Your Honor.

24            MR. REIN:  Absolutely.

25            MR. PALOIAN:  Yes.

1          MR. REIN:  And the examination is

2     probably not going to be able to start, because I'm

3     out of town on Tuesday and Wednesday and because I

4     have to coordinate schedules with everybody, too,

5     so at the earliest probably Thursday or Friday of

6     next week, and it's going to go for probably three

7     or four days, and so, you know, he's going to have

8     to be brought back and forth.

9          We need to finish the examination.  We

10    tried to do it consensually.  This could have been

11    done in September.  We tried.  We started in

12    October.  Here we are, and now we're at a

13    disadvantage, but we need his -- this examination.

14         And I'm sure, by the way, I'm not going

15    to be the only one examining him.  I'm sure the

16    trustee will examine him.  I would think that Ms.

17    Padilla's lawyer will want to examine him.  So this

18    is going to take a long period of time, and we need

19    the opportunity to do it, and we need him here to

20    do so.

21         MR. PALOIAN:  Your Honor?

22         THE COURT:  Mr. Borges.

23         MR. BORGES:  That's even more reason why

24    we shouldn't incarcerate Mr. Kowalski.  We need to

25    get --

1          THE COURT:  Mr. Kowalski came to court

2     for a contempt hearing without even full disclosure

3     of records.

4          MR. BORGES:  Judge, we need to get all

5     the records.  We need to get to the bottom of it.

6     I will go with Mr. Kowalski now and provide all the

7     boxes by tomorrow.  If he's locked up, we are not

8     going to be able to get to the bottom of this.

9          I mean, it just makes sense that we need

10    his assistance because there are other matters that

11    are private for other -- for other clients that he

12    may have.  He has file cabinets.  We need to

13    segregate those.

14          THE COURT:  The lady from the bank?  I'm

15    sorry?

16          MS. NELSON:  Elka Nelson.

17          THE COURT:  I'm sorry?

18          MS. NELSON:  Elka Nelson.

19          THE COURT:  And you -- are you here to

20    produce records?

21          MR. SOWKA:  No.  She's a witness, Your

22    Honor.  She's been called by the trustee.

23          MR. PALOIAN:  Your Honor --

24          MS. NELSON:  For clarification, Your

25    Honor, I'm counsel from the bank.  I brought the

1    witness with me.

2             THE COURT:  Yes, I understood that.

3             MS. NELSON:  Okay.

4             THE COURT:  I just see you standing

5    there, and I'm trying to --

6             MS. NELSON:  If you would like me to sit

7    down.

8             THE COURT:  No, I'm just trying to

9    expedite consideration of your concerns or

10   whatever.

11            But go ahead, Mr. Paloian.

12            MR. PALOIAN:  Your Honor, Mr. Kowalski

13   has stood before you today and lied.  He has

14   thumbed his nose at the judicial process and now at

15   you directly.  He has lied before you about the

16   events that occurred in the conference room at Mr.

17   Rein's office.  He has straight out lied to you.

18            THE COURT:  All right.

19            MR. PALOIAN:  He has no respect for the

20   law, and he -- now he has demonstrated he has no

21   respect for you.

22            He and his counsel have suggested that I

23   accosted him.  That couldn't be further from the

24   truth.  That's just not my testimony.  You can ask

25   Mr. Rein.

1          THE COURT:  All right.

2          MR. PALOIAN:  You can ask Mr. Torf who

3     was there.

4          THE COURT:  This is what I'm going to

5     do.

6          MR. PALOIAN:  This is a gentleman who

7     has no concern for the court --

8          THE COURT:  Do you plan to call this

9     young lady as a witness this morning?  I'm not

10    sure.

11         MS. NELSON:  Diana Abel is present.

12         MR. PALOIAN:  Yes, somebody else from

13    the bank.

14         MR. SOWKA:  For a separate matter.  Not

15    for this matter, Your Honor.

16         THE COURT:  All right.

17         MR. PALOIAN:  This is on the motion to

18    convert, Your Honor.

19         THE COURT:  This is -- oh, on the motion

20    to convert.

21         MR. PALOIAN:  On the motion to convert.

22         THE COURT:  Are you all planning to call

23    witnesses today?

24         MR. PALOIAN:  Well, Your Honor, --

25         THE COURT:  That's right.  It is here

1    for hearing.

2           MR. PALOIAN:  -- Mr. Kowalski has

3    converted assets of the estate.  He has stolen

4    rents from the estate.

5           THE COURT:  Here's what I'm going to do

6    on the contempt matter.

7           Mr. Kowalski, an order was entered.  You

8    were required to cooperate with this examination.

9    You were told to produce records.  You didn't do

10   it.

11          You are hereby held in civil contempt of

12   this court.  You will be put into custody starting

13   this minute.  You will not be released until there

14   has been full compliance, first, with the

15   requirement to produce records.

16          Once that is done, I'll see whether --

17   I'll look at the custody issue.  We'll see.  But as

18   of now, you're going to go into custody.  You are

19   held in civil contempt.  You hold the keys to your

20   cell.  You get compliance done.  Satisfy me that

21   it's done.  It's horrible to start a 2004 exam

22   without it.

23          I'm just not going to tolerate a

24   piecemeal 5-month examination because you want some

25   boxes first before you can bring in some others.

1    That's just -- we provide extraordinary relief in

2    bankruptcy.  Phenomenal relief.  Discharge of

3    debts.  Change contracts.  I'm not going to sit

4    here and beg you to comply to get such great relief

5    under federal law.

6         The order will be to take him into

7    custody.  We'll have a hearing reviewing your

8    situation sometime -- I don't know when because I

9    have some things, and I'm going to be out for a

10   while, although hopefully I can get away from them

11   and be available in the afternoons next week.

12        We'll see where we are, but he's going

13   to have to be held in custody.  But as of now,

14   we're going to finish the hearing on the motion to

15   convert, but you're in custody.

16        MR. KOWALSKI:  Your Honor --

17        THE COURT:  We'll bring him back in a

18   little while for the other hearing.

19        MR. KOWALSKI:  May I ask for some mercy,

20   Your Honor?  My --

21        THE COURT:  May you ask what?

22        MR. KOWALSKI:  May I ask for -- may I

23   beg the court's mercy.  I'm having a child in a few

24   days.  I would like to be present.  I'm 56-years

25   old, and I would like to be present when my child

1    is born.

2              THE COURT:  You knew what was at risk,

3    sir.  You knew full well.  You're a lawyer.  You

4    knew full well what was at risk.  I told you

5    before.  I said, Mr. Kowalski, you have to comply

6    with the requests for information.

7              MR. KOWALSKI:  Your Honor, I'm never

8    going to have another child again.  I would like to

9    be there.

10             THE COURT:  I am being merciful on

11   everybody in this entire system.  Nobody should

12   have to beg you for information.  Nobody should

13   have to beg you more than -- ask you more than once

14   to comply with legitimate requests.

15             MR. BORGES:  Your Honor --

16             THE COURT:  I don't see you complying

17   with anything until you -- I just don't see you

18   doing it.  You are in civil contempt.

19             He's to be taken into custody, but he

20   needs to be brought back later this morning for

21   this hearing.

22             I'm going to go back to my other

23   Chapter 11 I think.

24             All right.  Take him into custody,

25   please.  We'll finish the motion to convert.  Mr.

1    Kowalski will be in custody for that part of it.

2                      (Matter passed and later recalled.)

3              THE CLERK:  Recalling the Robert

4    Kowalski matter.

5              THE COURT:  All right.  We are here on

6    the Robert Kowalski hearing.  We're going to have

7    to have them bring Mr. Kowalski back.

8              MR. SOWKA:  Well, Judge, I think they

9    would be --

10             THE COURT:  I'm sorry?

11             MR. SOWKA:  We have witnesses for the

12   hearing next, and with your other case and lunch, I

13   don't know what you want to do vis-a-vis scheduling

14   when we start with the witnesses.

15             THE COURT:  How many witnesses do you

16   have?

17             MR. SOWKA:  Well, at least four, maybe

18   five or six.

19             THE COURT:  Any of them short?

20             MR. SOWKA:  There will be some that are,

21   yes, less than half an hour.

22             THE COURT:  Let's at least get one of

23   them done.

24             MR. SOWKA:  Okay.  Did you want Mr.

25   Kowalski then brought back?

1           THE COURT:  Yes.  The phone call is

2     being made to bring the debtor down.

3           And we'll at least get one witness done

4     and break for lunch.

5           MR. SOWKA:  Okay.

6                 (A recess was had.)

7           THE CLERK:  Recalling Robert Kowalski.

8           THE COURT:  All right.  Let's proceed on

9     the motion to convert.

10          MR. SINHA:  Good afternoon, Your Honor.

11    Dev Sinha for the Chapter 11 trustee.

12          Your Honor, it's our motion.  We're

13    prepared to begin the evidentiary hearing.  We have

14    a witness to call.  We'll call Byline Bank's Diana

15    Abel as the first witness.

16          THE COURT:  All right.  Let's proceed.

17          MR. TORF:  Your Honor, may I speak

18    briefly on behalf of the FDIC?  We filed a joinder

19    and reply yesterday, Your Honor, and particularly

20    to respond to certain allegations made in the

21    response and objection filed by Mr. Kowalski.  A

22    lot of that has to do with FDIC's claims.  So in

23    light of the fact that we filed a joinder, we would

24    ask that we be permitted to participate as

25    necessary in the hearing.

```
1            THE COURT:  Can the two of you work
2   together?
3            MR. BORGES:  I would object, Your Honor.
4            THE COURT:  There's no objection.
5            Let's proceed.
6            For the record, the debtor has been
7   returned to the courtroom.
8            Is this your witness?
9            MR. SINHA:  Yes.
10           THE COURT:  Have a seat right here.
11           THE CLERK:  Ma'am, would you please
12  stand and raise your hand to be sworn, and then you
13  may be seated.
14               (Witness sworn.)
15           THE CLERK:  Please state your name and
16  spell it for the record.
17           THE WITNESS:  Diana Abel, D-I-A-N-A,
18  A-B-E-L.
19           THE COURT:  Let's proceed.
20           Just have a seat.
21         DIANA ABEL, WITNESS, DULY SWORN,
22               DIRECT EXAMINATION
23  BY MR. SINHA:
24      Q.   Ms. Abel, you should have a binder in
25  front of you, a binder of exhibits.  Do you see
```

1    that?

2         A.    Yes, I do.

3         Q.    What do you do, Ms. Abel?

4         A.    I work for Byline Bank.  Deposit

5    operations.  I do the legal work.

6         Q.    Okay.  And how long have you been at

7    Byline Bank?

8         A.    I've worked at Byline Bank since 2007.

9         Q.    What is your current title there?

10        A.    I'm deposit operations coordinator,

11   legal.

12        Q.    Okay.  Have you had any other titles

13   since 2007 at Byline Bank?

14        A.    Oh, assistant branch manager.

15        Q.    Before Byline Bank, where did you work?

16        A.    Standard Bank.

17        Q.    How long have you been in banking?

18        A.    Since 1983.

19        Q.    And you were served with a subpoena to

20   come in and testify for this case today?

21        A.    Yes.

22        Q.    When was the first time you heard of the

23   name Robert Kowalski?

24        A.    Not too long after I started in the

25   legal department, which was in 2013.

1        Q.      Okay.

2        A.      We started getting divorce subpoenas.

3        Q.      You got subpoenas from Kowalski's

4   creditors.  Do you remember the name of Martha

5   Padilla?

6        A.      Yes.  Those were the subpoenas that we

7   received.  Divorce subpoenas.

8        Q.      Okay.

9                At one point, did you get an information

10  request from the Chapter 11 trustee in this case,

11  Mr. Gus Paloian?

12       A.      Yes.

13       Q.      And did that information request ask for

14  bank account statements related to Mr. Kowalski or

15  entities related to Mr. Kowalski?

16       A.      Yes.

17       Q.      And did you compile those statements and

18  forward them to the Chapter 11 trustee?

19       A.      Yes.

20       Q.      Will you take that exhibit book and open

21  that to Exhibit 13-A.

22               Do you see the first page of

23  Exhibit 13-A?

24       A.      Yes.

25       Q.      Is that the bank account for

1    Indomitable, LLC?

2         A.    Correct.

3         Q.    How is Indomitable, LLC, related to Mr.

4    Kowalski?

5         A.    Mr. Kowalski is the authorized signer,

6    AUS, is the only signer on this account.

7         Q.    There is no other signer for

8    Indomitable, LLC, other than Mr. Kowalski?

9         A.    Correct.

10        Q.    Now, if you'll flip within 13-A, on the

11   bottom you'll see a Bates stamp listing TE and

12   numbers.

13        A.    Yes.

14             MR. SINHA:  Your Honor, the Byline Bank

15   statements, which is Exhibit 13-A, B and C, there

16   is stipulation from counsel for those to be

17   admitted into evidence.

18             THE COURT:  You say from counsel.  Which

19   counsel?

20             MR. SINHA:  Debtor's counsel.

21             MR. BORGES:  13-A, B and C?

22             THE COURT:  So stipulated?

23             MR. BORGES:  So stipulated, Judge.

24   BY MR. SINHA:

25        Q.    Are you looking at Exhibit 13-A with 232

1   on the bottom, Ms. Abel?

2        A.    232?

3        Q.    Correct.

4        A.    Yes.

5        Q.    And those are two checks written to

6   Indomitable, LLC, on June 11, 2018, for $825 each?

7   Do you see that?

8        A.    You said 232?

9        Q.    231.

10        A.    Yes.

11        Q.    Correct.

12              And if you flip over to Page 232 now, --

13        A.    Yes.

14        Q.    -- do you see the batch number listed on

15   the right-hand side for each particular check?

16        A.    Yes.

17        Q.    And is that Batch Number 14627358?

18        A.    Yes.

19        Q.    And what does it mean that there's a

20   batch number there?

21        A.    Basically, this was a group transaction,

22   and so what they would consider at the teller line,

23   it's the whole -- the debits, the credits, the

24   whole transaction is considered one batch.

25        Q.    So if you look at Exhibit 13-B, 232 --

1      A.      And 233.  They're all one transaction.

2      Q.      They're all part of one transaction,

3 right?

4      A.      Correct.

5      THE COURT:  I'm sorry, 231 and 232 are

6 one transaction?

7      THE WITNESS:  232 and 233.

8      THE COURT:  I see.  All right.

9 BY MR. SINHA:

10     Q.      So the very first entry on 232, that's a

11 cashier's check fee for $5, right?

12     A.      Those are the cashier's checks.

13 Correct.  Those two.

14     Q.      And there's a withdrawal from the bank

15 account for $5,000?

16     A.      Yes.

17     Q.      And if you turn the page to 233, there's

18 a cashier's check that's written out to Natalie

19 Lira?

20     A.      Correct.  That's the bank's copy.

21 That's what we keep.  This isn't quite the check.

22 This is the purchase order.

23     Q.      Correct.

24      And if you look below, there's a

25 cashier's check for Robert Kowalski -- that's made

1    from Robert Kowalski, and it's paid to Robert

2    Kowalski?

3          A.    Correct.

4          Q.    Right?

5          A.    That's correct.

6          Q.    Can you walk me through what happened in

7    that transaction?

8          A.    Uhm, well, this -- like I said, this

9    would be a group transaction.  They processed two

10   checking withdrawals.  That would be on Page 232

11   and 233.  And then the $3,000 cashier's check to

12   Robert.  Those were basically your debits.  They

13   were used to purchase the $5,000 cashier's check

14   ending in 295 and the other $5,000 cashier's check

15   ending in 294 to Natalie.  And then the cash out

16   ticket, that would be the cash out that was given

17   to the customer.

18         Q.    Okay.

19         A.    And then there's a $5 fee per check,

20   which is the two --

21         Q.    Okay.

22               So as part of this transaction, there

23   were two separate withdrawals of $5,000.

24         A.    Correct.

25         Q.    And two separate cashier's checks were

1    made to Natalie Lira.

2         A.    Correct.

3         Q.    Correct?

4               And there was a cashier's check that was

5    made by Robert Kowalski to himself --

6         A.    Right.

7         Q.    -- which was deposited --

8         A.    Cash --

9         Q.    -- and then cash -- and then it was cash

10   out for $2,990, right?

11        A.    It was cash out, right.

12              Basically how a group transaction works

13   is they process them all together.  All the debits

14   would have been processed and then the credits.  So

15   they -- there were the two withdrawals and the

16   debit.  They would have summed them up to $13,000,

17   subtracted the two checks, the fees, and then the

18   cash out, the 2,990, would have been given to the

19   customer.  So it was never deposited.

20        Q.    Okay.  Now, if you'd turn back to

21   Page 231.

22        A.    Um-hum.  Yes.

23        Q.    Those are two checks for $825 each,

24   right?

25        A.    Correct.

1        Q.      And those were deposited into the

2   Indomitable bank account?

3        A.      Correct.  Yes.

4        Q.      And if you look and turn the page to

5   page 230, there's an additional two checks.

6        A.      Yes.

7        Q.      And those are made to Robert Kowalski.

8        A.      Correct.

9        Q.      But those have been deposited into the

10  Indomitable bank account.

11       A.      Those were cashed.

12       Q.      Okay.  But does Byline Bank let somebody

13  who is an authorized signatory deposit checks made

14  out solely to their name?

15       A.      As long as they are the signer on the

16  account, yes.

17       Q.      So if there is a check made out to

18  Robert Kowalski, it can be deposited into the

19  Indomitable account?

20       A.      Correct.

21       Q.      And there is nothing at Byline Bank to

22  prevent that?

23       A.      No.

24       Q.      And if Robert Kowalski then wants to

25  take cash out of that account, he can do that,

1    too, --

2         A.    Yes.

3         Q.    -- correct?

4               And that's true for Indomitable, LLC, is

5    that correct?

6         A.    Correct.

7         Q.    And that's also true for 13-B, which is

8    Burros Blancos, LLC, another LLC that's associated

9    solely with Mr. Kowalski, correct?

10        A.    Correct.

11        Q.    And so he could take checks to his name

12   and deposit into that entity as well?

13        A.    Yes.

14        Q.    If you'd flip to Exhibit 14.

15              Now, Exhibit 14 is a cashier's check

16   made out to Ms. Natalie Lira for $11,000, right?

17        A.    Yes.

18        Q.    And that's dated July 24, 2018?

19        A.    Correct.

20        Q.    How do you know that check was cashed?

21        A.    The check -- I know the check was

22   processed by the spray on the back of the check.

23        Q.    Okay.  And that's the image you're

24   looking at at the bottom of the page?

25        A.    Right.  The bottom image.

1        Q.      So it shows you the check was deposited
2   at a JPMorgan Chase bank account, correct?
3        A.      Correct.  Right.
4        Q.      Okay.
5                Turn the page.  That's a check that's
6   dated June 18, 2018?
7        A.      Yes.
8        Q.      And that is also for $5,000?
9        A.      Yes.
10       Q.      And that was deposited on August 1,
11   2018?
12       A.      Correct.
13       Q.      Right?
14               If you turn the page, that's another
15   cashier's check made from Robert Kowalski to
16   Natalie Lira?
17       A.      Yes.
18       Q.      And that's also for $5,000?
19       A.      Yes.
20       Q.      And that was also made out on June 18,
21   2018?
22       A.      Yes.
23       Q.      And it was cashed out on August 1, 2018?
24       A.      Yes.
25       Q.      Ms. Abel, did you compile these

1    cashier's checks that are Exhibit 14?

2         A.    Yes.

3         Q.    How did you come about compiling them?

4         A.    Per the bankruptcy trustee's request

5    through the subpoena that we received.

6         Q.    Okay.  And then you transmitted these

7    documents to the Chapter 11 trustee?

8         A.    Correct, yes.

9         Q.    And these are kept by Byline Bank in the

10   ordinary course of their business?

11        A.    Yes, they are.

12        Q.    And these particular checks were also

13   kept --

14        A.    Yes.

15        Q.    -- within the procedures?

16        A.    Yes.

17             MR. SINHA:  Your Honor, I would ask

18   Exhibit 14 be admitted into evidence.

19             THE COURT:  Response?

20             MR. BORGES:  No objection.

21             THE COURT:  I'm sorry?

22             MR. BORGES:  No objection.

23             THE COURT:  14 will be admitted into

24   evidence.

25   BY MR. SINHA:

1      Q.    Ms. Abel, will you turn to Exhibit 15?

2      A.    Yes.

3      Q.    And that's a cashier's check made from

4    Robert Kowalski to Premium Title?

5      A.    Yes.

6      Q.    What is the amount of that?

7      A.    $64,084.35.

8      Q.    And when was that deposited?

9      A.    10-1-2018.

10     Q.    First of this month.

11           THE COURT:  It would be last month now.

12           MR. SINHA:  Oh, correct, Your Honor.

13           THE COURT:  We're already November.  But

14    that's okay.  Go ahead.

15    BY MR. SINHA:

16     Q.    If you turn the page, Ms. Abel, that's

17    another cashier's check made to Premium Title,

18    right, for $3,000?

19     A.    Yes.

20     Q.    Okay.

21     A.    That's the inside copy.

22     Q.    Okay.  And the $64,000 check said it was

23    made out August 13, 2018, right?

24     A.    Yes.

25     Q.    If you turn back to Exhibit 13-C page --

1      I mean 13-B to Trustee's Exhibit 262.  It's 262 on

2      the bottom.

3           A.    Yes.

4           Q.    The very first check, that's a check

5      from Janet Garcia dated August 10, 2018?

6           A.    Yes.

7           Q.    And that was paid to the order of Robert

8      Kowalski?

9           A.    Yes.

10          Q.    And it was deposited in this bank

11     account of Burros Blancos, LLC?

12          A.    It was cashed.

13          Q.    It was cashed?

14          A.    Yes.

15          Q.    Why do you say that?

16          A.    Well, this also was another group.  It's

17     basically a group transaction.  They took this

18     checking withdrawal that is at the bottom of the

19     page for $3,000, and then he cashed that check.  So

20     the 3,000 and the 1,900.  And then you have the

21     cash out for $4,900.

22          Q.    I want to talk about this cash out

23     ticket.

24          A.    Yes.

25          Q.    What does that mean?  What does that

1   represent for the bank record?

2       A.    That basically says that the cash --

3   that $4,900 was given to the customer.

4       Q.    Okay.  Let's turn back to Trustee's

5   Exhibit 244.

6           MR. BORGES:  What page is that, counsel?

7           MR. SINHA:  244.

8   BY MR. SINHA:

9       Q.    And that also has a cash out ticket

10  Number 0198 for $6,599?

11      A.    Yes.

12      Q.    And that happened on August 6, 2018,

13  right?

14          THE COURT:  I'm sorry?  0198?  I'm

15  sorry?

16          MR. SINHA:  On Trustee's Exhibit 244,

17  there is a cash out ticket.

18          THE COURT:  Yes.

19          MR. SINHA:  And there's a particular

20  till number associated with that, and that is 0198.

21          THE COURT:  I see.

22          MR. SINHA:  And the amount for that cash

23  out is $6,599.

24  BY MR. SINHA:

25      Q.    Ms. Abel, will you walk me through that

1    transaction?

2         A.    This transaction.  Let me see what

3    happened here.

4              So he had -- took -- he withdrew -- the

5    top, the checking withdrawal, he withdrew $1,650.

6    There was two checks.  4,999 -- or $499.  One for

7    $4,450.  And these were also cashed, and the

8    cashout ticket that he walked out with the cash.

9         Q.    Okay.

10        A.    So these were cashed checks.

11        Q.    And if you'd flip the page to 245, --

12        A.    Yes.

13        Q.    -- is that a deposit and then an

14   immediate cash out as well?

15        A.    That was just a deposit.  Straight

16   deposit.

17        Q.    And if you turn the page to 246, do you

18   see the cash out ticket till number there?

19        A.    Yes.

20        Q.    Can you walk me through that transaction

21   as to how that cash was taken out?

22        A.    So this looks like it is also part of

23   247.  Let's see.  Oh, okay.  No, it's not.  This is

24   one transaction.

25             You have the $2,000 checking withdrawal.

1    The bank issues checking withdrawals at the branch

2    instead of checks.  So the customer can walk in.

3    Like a savings withdrawal.  So he took a savings

4    withdrawal and -- or a checking withdrawal.

5    Withdrew from Indomitable $2,000.  It looks like

6    had two checks purchased.

7            THE COURT:  Two what purchased, I'm

8    sorry?

9            THE WITNESS:  Cashier's checks

10   purchased.

11   BY THE WITNESS:

12       A.    Because these are $5 fees with $1,990

13   out, but I don't see where the checks are.  Let me

14   go back further.  There should be cashier's checks

15   with this.

16           MR. BORGES:  I'm sorry, what page?

17           MR. SINHA:  246.

18           THE WITNESS:  246.

19   BY THE WITNESS:

20       A.    Yes, there should have -- it seems there

21   is a page missing or something missing here.

22   BY MR. SINHA:

23       Q.    There should have been a check made, and

24   then there was a cash out, right?

25       A.    Correct.  So I believe that the

1   next actually is the same?  Same batch?  No, it's

2   not the same batch.

3              This one seems like there is something

4   missing.  There are two checks that were purchased.

5   The checks are numbered on the general ledger

6   credits on that page, and it gives the check

7   numbers.  It does not give the dollar amounts

8   though.

9        Q.    Right.

10             Let's turn the page to 262.  Do you see

11   a cash out ticket there, Ms. Abel?

12       A.    Yes, I do.

13       Q.    Is that part of a group transaction?

14       A.    Yes, it is.

15       Q.    And what is going on in that

16   transaction?

17       A.    In this transaction, this was the $3,000

18   checking withdrawal from Burros Blancos, and then

19   he cashed the check from Janet Garcia and withdrew

20   $4,900 in cash.

21       Q.    And the Janet Garcia check was not paid

22   to Indomitable, right?  It was paid to Robert

23   Kowalski?

24       A.    It was paid to Robert Kowalski.

25       Q.    And it was deposited in Indomitable?

1       A.      It was just cash out, and it looks like

2   it used a Burros Blancos account to cash it.

3       Q.      Sure.

4               And then Mr. Kowalski walked out that

5   day with $4,900?

6       A.      From this transaction, that is what --

7   it doesn't tell us if he did something else

8   separately.  But this transaction right here, yes,

9   he was given $4,900.  If he turned around and

10  handed it back and said I want to do something

11  else, that -- we wouldn't know.

12      Q.      And Byline Bank took that check, the

13  check made by Janet Garcia to Robert Kowalski?

14      A.      And cashed it.

15      Q.      You cashed it.  So Mr. Kowalski didn't

16  have that check.

17      A.      No.

18      Q.      He had $4,900.

19      A.      Yes.

20      Q.      Going to Page 263, that's another cash

21  out ticket for $2,500?

22      A.      Actually, this was cash deposited.

23      Q.      Cash deposited?

24      A.      In Burros Blancos.

25      Q.      Okay.

1          And do you know the source of that

2    money?

3          A.    I do not.  Just that it was cash.

4          Q.    It was just cash.

5                Let's go to Trustee's Exhibit 13-C, and

6    the Bates stamp is 286.

7                Are you there, Ms. Abel?

8          A.    Yes.

9          Q.    On the top, there is a checking

10   withdrawal of $3,000, correct?

11         A.    Yes.

12         Q.    And below that, there's a check.  It

13   says cashier's check, pay to the order of Phoenix

14   Bond and Indemnity for $44,084.  Do you see that?

15         A.    Yes, I do.

16         Q.    And to its right, is that a deposit

17   slip?

18         A.    That would be the back of the check.

19         Q.    That would --

20         A.    Yes.

21         Q.    Okay.  And there is a legend by the bank

22   that says not used for purpose intended.

23         A.    Yes.

24         Q.    What does that mean?

25         A.    That means --

1     THE COURT:  I'm sorry?  Where do you see

2  that?

3     Oh, I see.  I see it.  Go ahead.

4  BY THE WITNESS:

5     A.    That means that the purchaser of the

6  item brought it back in with his receipt copy.

7     There would be three copies to a

8  cashier's check.  The check, the bank's copy and

9  then the customer receives a receipt.  He would

10  bring it back in and say I did not use this check

11  for the purpose I needed it for, and he could

12  either deposit it or turn around and purchase more

13  checks with it.

14  BY MR. SINHA:

15     Q.    Okay.  And the check below that, that's

16  a cashier's check to Martha Padilla --

17     A.    Yes.

18     Q.    -- for $20,000?

19     A.    Yes.  Correct.

20     Q.    And it bears the same legend not used

21  for purpose intended?

22     A.    Yes.

23     Q.    And does the same thing apply for that

24  check as well?  That it was brought back by Mr.

25  Kowalski?

1     A.     Yes.

2     Q.     So on that day, $64,084.35 were

3  deposited back into that account, right?

4     A.     Actually, it looks like he didn't

5  deposit it back into the account.  It looks like

6  what he did was take in these two checks and

7  purchase these two checks (indicating).

8     Q.     So he exchanged cashier's checks?

9     A.     Yes, he did.  He exchanged the cashier's

10 checks for two new cashier's check.

11          THE COURT:  And the two new cashier's

12 checks are the ones made out to Premium Title?

13          THE WITNESS:  Yes.

14 BY MR. SINHA:

15    Q.     And you see that cashier's check, right?

16 It's a cashier's check made out to Premium Title --

17    A.     Yes.

18    Q.     -- with Check Number 10227384?

19    A.     384 and 385.

20    Q.     Now, we looked over these checks in

21 Exhibit 15, right?

22          Flip to Exhibit 15.

23    A.     Yes.  Yes.

24    Q.     So this check was exchanged.  There were

25 two cashier's checks made out to Phoenix Bond and

1    Martha Padilla, and instead Mr. Kowalski cashed

2    that and made a cashier's check to Premium Title,

3    right?

4         A.    Yes.

5         Q.    And then that check itself was cashed on

6    October 1st, 2018?

7         A.    It was negotiated on October 1st,

8    correct.

9         Q.    But it was actually made on August 13,

10   2018, right?

11        A.    Correct.

12        Q.    So this -- he just held this check until

13   it was actually negotiated on October 1, 2018?

14        A.    Either he did or Premium Title.  Whoever

15   received it.

16             MR. SINHA:  Your Honor, my colleague

17   reminded me I did not move Exhibit 15 in evidence.

18   I would ask Exhibit 15 be moved into evidence as

19   well.

20             THE COURT:  Any objection?

21             MR. BORGES:  No objection.

22             THE COURT:  Admitted.

23   BY MR. SINHA:

24        Q.    Ms. Abel, let's move to -- let's move

25   back to Trustee's Exhibit 13.  I'm looking at the

1    Bates Stamp 240.

2             And 240 is a cashier's check that was

3    made out to Natalie Lira, right?

4        A.    Yes.

5        Q.    And it was made out of the account of

6    Indomitable, LLC?

7        A.    Yes.

8        Q.    If you go back to 237, you see a check

9    made from Almeta Gardner to Robert Kowalski for

10   $499?

11       A.    Yes.

12       Q.    And that check was deposited into the

13   Indomitable account?

14       A.    That check was cashed.  To the right of

15   it, at the back of the check, it says cash.

16       Q.    Sure.  Is the cash out ticket, which is

17   also on that page for 494, --

18       A.    Yes.

19       Q.    -- is that a cash out from that

20   particular check?

21       A.    It would be part of the whole group

22   transaction.

23       Q.    And what is going on in that group

24   transaction?

25       A.    Let me take a second to -- basically, he

1    withdrew $2,000 from Indomitable.  Took the

2    cashier's -- took the check from Almeta Gardner for

3    499.  Those were cashed.  He purchased the check to

4    Burnham Park Yacht Club in that amount of $2,000.

5    The cash out was 494.  And the $5 difference went

6    to pay for the cashier's check fee.

7         Q.    So he deposited the 499.  There is a $5

8    fee for a cashier's check.  He took out 494, and he

9    wrote a cashier's check made out to Burnham Park

10   Yacht Club.  Right?

11        A.    The check wasn't deposited.  It was just

12   cashed out.

13        Q.    It was just cashed out.  Pardon me.

14             If you go to Trustee's Exhibit 262, 262

15   and 263 also reflect cash out transactions,

16   correct?

17        A.    262.  263 was a deposit.  Was a cash in

18   deposit.

19        Q.    And the cash out ticket for $4900, that

20   happened on August 10, 2018?

21        A.    Correct.  Yes.

22        Q.    Ms. Abel, let's flip to Trustee's

23   Exhibit 274.  That's the Bates stamp on the bottom.

24   It would be 13-C.

25        A.    Yes.

1      Q.      And 274 is a deposit of $499, right?

2      A.      Yes, into Piorun Properties' account.

3      Q.      And that's a check made out to Robert

4  Kowalski by Almeta Gardner?

5      A.      Correct.

6      Q.      And that was deposited into Piorun

7  Properties, correct?

8      A.      Yes.

9      Q.      And if you turn to Page 275, that's a

10  branch check from Marilyn Sharko?  Do you see that?

11     A.      Yes.

12     Q.      For $1,100?

13     A.      Yes.

14     Q.      And it was payable to Robert Kowalski?

15     A.      Yes.

16     Q.      If you'd turn to Page 276.  If we walk

17  through that transaction, it looks like there's a

18  cashier's check made out to Natalie Lira, right?

19     A.      Yes, at the top, for $5,000.

20     Q.      And there's a cashier's check made to

21  Robert Kowalski for $3,000?

22     A.      That was a check that was previously

23  purchased.

24     Q.      And it was deposited.

25     A.      It was cashed.

```
 1              Q.      It was cashed.

 2                      And that check was made out on June 2,

 3      2017?

 4              A.      Correct.

 5              Q.      Not 2018, but 2017?

 6              A.      2017.   June 2, 2017.

 7              Q.      And it was deposited or cashed on

 8      June 18, 2018?

 9              A.      Yes.

10              Q.      But this is a group transaction, right?

11              A.      Yes, it is.

12              Q.      What else is going on in this

13      transaction?

14              A.      It looks like he also withdrew money

15      from Indomitable $5,000, and $5,000 from Piorun

16      Properties, and then he cashed a $3,000 check.

17                      And then if you turn to Page 277 --

18              Q.      So he deposited five -- he withdrew

19      $5,000 from Piorun?  Withdrew $5,000 from

20      Indomitable?

21              A.      Correct.  And he cashed a $3,000 check.

22              Q.      Yes.

23              A.      And then he purchased the $5,000 check

24      on Page 277, Number 294, to Natalie Lira for 5,000.

25              Q.      Yes.
```

1          A.      And he purchased the check 295 on

2     Page 276 to Natalie Lira.

3                  And then there was two $5 fees.  And

4     then the teller would have given him $2,990 cash

5     back.

6          Q.      Okay.  Check Number 295, which is

7     Trustee's Exhibit 276, and Check Number 294,

8     10227294, which is the cashier's check to Natalie

9     Lira on the next page, --

10         A.      Correct, yes.

11         Q.      -- those are both for $5,000 each,

12    right?

13         A.      Yes.

14         Q.      Those were made out on that day --

15         A.      June 18th.

16         Q.      -- and there was a cash out for $2,990?

17         A.      Yes.

18         Q.      And these two checks for -- to Natalie

19    Lira, those were the checks that we saw in

20    Exhibit 14, right?

21                 Can you flip to Exhibit 14?  There's a

22    cashier's check --

23         A.      294.

24         Q.      -- the same number 94 and 95.

25         A.      Yes.

1    Q.    The checks were made from Robert

2    Kowalski to Natalie Lira on June 18th and then

3    cashed out on is it August 1, 2018?

4    A.    Yes.  They were negotiated on August 1,

5    2018.

6    Q.    Okay.

7    MR. SINHA:  I don't have any further

8    questions for this witness, Your Honor.

9    THE COURT:  Any cross examination of

10   this witness?

11   MR. BORGES:  May I have a minute, Your

12   Honor?

13   THE COURT:  Go right ahead.

14   MR. BORGES:  No questions, Your Honor.

15   THE COURT:  Mr. Torf, you don't have any

16   questions?  You said you were joining in on this

17   response?

18   MR. REIN:  No questions.

19   THE COURT:  All right.  Thank you for

20   testifying.

21   THE WITNESS:  Thank you.

22   THE COURT:  How many other witnesses?

23   You have three other witnesses?

24   MR. SINHA:  Yes, Your Honor.  We need --

25   can we possibly call one more if that's okay?

1           THE COURT:  How long?  How long will it

2    take?

3           MR. SINHA:  It shouldn't take more than

4    20 minutes.

5           THE COURT:  All right.  Then we'll

6    probably take a break.

7           All right.  Call your witness.  Let's

8    see how far we get.

9           MR. SINHA:  All right.

10          Your Honor, we'll call Tammy DiMenna.

11          THE COURT:  Why don't you swear in the

12   witness.

13          THE CLERK:  Okay.  Please raise your

14   right hand.

15               (Witness sworn.)

16          THE CLERK:  Please state your name and

17   spell it for the record.

18          THE WITNESS:  Tammy DiMenna.

19          THE COURT:  How do you spell your last

20   name?

21          THE WITNESS:  D-I-M-E-N-N-A.

22     TAMMY DiMENNA, WITNESS, DULY SWORN,

23            DIRECT EXAMINATION

24   BY MR. SINHA:

25      Q.   What do you do, Ms. DiMenna?

1        A.      I'm a real estate paralegal.

2        Q.      Where are you a real estate paralegal?

3        A.      Horwood, Marcus & Berk.

4        Q.      Is that a law firm?

5        A.      Yes.

6        Q.      And how long have you been there?

7        A.      Four years.

8        Q.      What's exactly your precise title?

9        A.      Real estate paralegal.

10       Q.      Were you a paralegal before you joined

11   this particular law firm?

12       A.      Yes.  I was a paralegal at another law

13   firm for 21 years.

14       Q.      For 21 years?

15       A.      Um-hum.

16       Q.      What are some of your daily

17   responsibilities as a real estate paralegal?

18       A.      I handle real estate acquisitions,

19   purchases, sales, and I also assist in outside

20   group's --

21            THE COURT:  Can you keep your voice up a

22   little bit?

23            THE WITNESS:  Oh, I'm sorry.

24   BY THE WITNESS:

25       A.      And I also assist in other real estate

1    practices -- or group practices in our firm.

2    BY MR. SINHA:

3         Q.    Okay.

4               As part of your daily responsibilities,

5    do you run property tax searches for properties

6    located in Cook County?

7         A.    Yes.  Almost on a daily basis.

8         Q.    Almost on a daily basis?

9         A.    Um-hum.

10        Q.    How many do you estimate you have done

11   in the last week or so?

12        A.    Probably 10 or 20.

13        Q.    Okay.  And how do you go about doing the

14   property tax search?

15        A.    If I'm provided with just an address and

16   I don't know the PIN number, I have to locate the

17   PIN, which I can do by going to the Cook County

18   Assessor's website or Cook County Treasurer's

19   website.

20               Once I get the PIN number, I go to the

21   Cook County Treasurer's website, and that will give

22   me the status of the Cook County real estate taxes.

23        Q.    Okay.  Are these searches that are done

24   online?

25        A.    Correct.

1    Q.    Are you involved in the Robert Kowalski

2    case?

3    A.    Yes.  Eric Rein at the firm in the

4    litigation group had asked me to assist in the

5    process in that case.

6    Q.    And what did that entail?

7    A.    He provided me with a list of addresses

8    and asked me to look up real estate tax status of

9    each property.

10    Q.    And when you are looking at these

11    results, do they show whether taxes have been paid

12    or not paid for a particular piece of property?

13    A.    Correct.

14    Q.    Okay.

15    A.    Yes.

16    Q.    And did you do a search for the real

17    estate list of properties given to you?

18    A.    Yes, I did.

19    Q.    And who gave you the list?

20    A.    Eric Rein.

21    Q.    And did you do a search for every single

22    property on that list?

23    A.    Yes, I did.

24    Q.    And did you make a note or prepare a

25    report for the search that you did?

1          A.    Yes.  I create a report for every

2     address I was given and kept notes.

3          Q.    And do you accurately and fully remember

4     the results of that research?

5          A.    No, not off the top of my head.

6          Q.    But you did prepare a report, is that

7     right?

8          A.    Yes, I did.

9          Q.    Would you flip to Exhibit 25?  Is that

10    the report you prepared?

11         A.    Yes, it is.

12         Q.    Okay.

13               Now, I want to go over some of the

14    properties that were listed in the debtor's

15    schedules.

16               1512 West Polk?

17         A.    Yes.

18         Q.    That shows that there is no outstanding

19    tax amount due for that --

20         A.    That's correct.

21         Q.    For that property.  Right?

22         A.    Correct.

23         Q.    And the most recent tax installment that

24    is due would be the 2017 installment?

25         A.    That is correct.

1     Q.    Now, if you look at 5307 West Leland

2   Avenue?

3     A.    Yes.

4     Q.    That says the 2017 taxes were paid, but

5   the 2015 taxes were sold?

6     A.    That's right.

7     Q.    And for 5301 West Leland, the same

8   result, that the 2017 taxes were paid, and the 2015

9   taxes were sold?

10    A.    Right.  Which means they were not paid.

11    Q.    Okay.

12          THE COURT:  That means they I'm sorry?

13          THE WITNESS:  They were not paid.

14  BY MR. SINHA:

15    Q.    On the amount paid column, you don't

16  have an amount listed for 5301 West Leland?

17          THE COURT:  Leland.

18  BY MR. SINHA:

19    Q.    Leland.

20          Why is that?

21    A.    For which address?

22    Q.    5301 West Leland?

23    A.    Oh.  The taxes were paid.  I must have

24  just not put the amount in there, but they were

25  paid.

1      Q.      And where it's 2015 taxes sold, can you

2   determine the precise amount that is owed to the

3   tax purchaser?

4      A.      No, you have to get an estimate of

5   redemption in order to find out what the amount is

6   that you would owe for 2015 for the taxes that were

7   sold.

8      Q.      Okay.  Let's look at 1918 West Cermak,

9   Unit 3, which is a property listed on the debtor's

10   schedules.  What did your research show?

11      A.      The 2017 taxes are unpaid, and they are

12   currently delinquent.  The amount currently due is

13   $5,443.23, but that amount will change because

14   every month that the taxes aren't paid there are

15   penalties.

16      Q.      Okay.  Turn the page and go to 2547 West

17   59th.

18      A.      Okay.

19      Q.      That's a property listed on the debtor's

20   schedules.  What did your research show?

21      A.      The 2017 taxes were paid in the amount

22   of $3,329.37.  It appears that the 2015 taxes were

23   sold.  And the column all the way to the right

24   where it says $18.86 for 1997, they are -- they're

25   due a refund for that year in the amount of $18.86.

1      Q.    Okay.  And where it says TBD, those are

2      the sold for taxes, right?

3      A.    Right.  So the amount is to be

4      determined based upon what the tax and redemptions

5      are.

6      Q.    And for 5340 South Rockwell, the 2015

7      taxes were sold as well?

8      A.    Correct.

9      Q.    Do you know if those were redeemed at

10     any point?

11     A.    According -- or my research that I did

12     when I prepared this, as of October 29th I think I

13     did this, they had not been redeemed.

14          THE COURT:  They were what?  I'm sorry?

15          THE WITNESS:  They had not been

16     redeemed.

17     BY MR. SINHA:

18     Q.    Now, let's look at 1711 Newberry.

19     A.    Which page is that on?

20     Q.    That's actually back on the first page,

21     Trustee's Exhibit 434, 1711 South Newberry, Unit 1.

22     A.    Yes.

23     Q.    And for that, the 2014 taxes were sold?

24     A.    That is correct.

25     Q.    This list is lengthier than the

1    schedules that were listed by the debtor.  Did you

2    do a search to determine which properties were

3    owned by Mr. Kowalski or were related to Mr.

4    Kowalski?

5         A.    No, I only did a search on the property

6    addresses I was provided.

7         Q.    And who provided you a list of

8    properties?

9         A.    Eric Rein.

10             MR. SINHA:  No further questions of this

11   witness.

12             THE COURT:  Any interrogation of this

13   witness?

14             Mr. Borges?

15             MR. BORGES:  Yes.

16                  CROSS EXAMINATION

17   BY MR. BORGES:

18        Q.    I would like to ask you, to your

19   knowledge, has the redemption period expired on any

20   of these to your knowledge?

21        A.    I don't know.  They don't give that

22   information on the Cook County Treasurer's website.

23   You'd have to apply for a redemption in order to

24   determine that.

25        Q.    So when we talk about some of these

1    properties that were -- when the taxes were sold,

2    unless the tax redemption period has expired, the

3    owner has a right to redeem these, is that right?

4         A.    Correct.

5         Q.    So these properties have not been lost

6    to your knowledge?

7         A.    No, they have not.

8         Q.    Now, there's a 2648 West Luther, which

9    is on Page 435.  Do you know whether Luther went to

10   deed?  Whether they went to deed on this?  Would

11   your research be able to indicate that?

12              THE COURT:  Whether it went to tax deed?

13   BY MR. BORGES:

14        Q.    Whether a tax deed was issued?

15        A.    That I don't know.  All this information

16   on here is only what I obtained from the Cook

17   County --

18        Q.    I see.

19              And 2120 Lockwood, which is right below

20   the property on Luther, you don't know whether that

21   went to deed or not?

22        A.    No, that I don't know.

23        Q.    I see.

24              MR. BORGES:  No further questions.

25              MR. SINHA:  Your Honor, no further

```
 1    questions.
 2              THE COURT:  Anybody else have any
 3    questions of this witness?
 4              MR. REIN:  No questions.
 5              MR. SINHA:  Your Honor, I would like to
 6    move Exhibit 25 into evidence.
 7              THE COURT:  Any objection?
 8              MR. BORGES:  No objection.
 9              THE COURT:  I'm sorry?
10              MR. BORGES:  No objection.
11              THE COURT:  It's admitted into evidence.
12              All right.  Thank you for testifying.
13              THE WITNESS:  Thank you.
14              THE COURT:  We're going to take a break.
15    We'll get back to you.  I'll probably take a lunch
16    break.  It's 1:00 o'clock now.  I probably will not
17    get back to this until quarter after 2:00
18    hopefully.
19              I'm going back to Morgan Administration
20    hopefully for just a few minutes.
21              But we'll be back to you all at 2:15.
22              MR. SINHA:  Thank you, Your Honor.
23              MR. REIN:  Thank you, Your Honor.
24              THE COURT:  If you all can bring him
25    back at that time.
```

1          THE CLERK:  Recalling --

2          MR. BORGES:  Your Honor, I would like an

3     opportunity to speak to my client.

4          THE COURT:  You have to speak to the

5     people who have him in custody.

6          MR. BORGES:  If they decline, then --

7          THE COURT:  I'm sorry?

8          MR. BORGES:  If they decline to allow me

9     to --

10          THE COURT:  If they decline, you can

11     talk to him at 2:15.  I can't --

12          MR. BORGES:  I understand.

13              (A recess was had.)

14          THE CLERK:  Continuing the hearing of

15     Robert Kowalski.

16          MR. SOWKA:  Good afternoon, Your Honor.

17          The trustee would like to call Natalie

18     Lira to the stand.

19          THE CLERK:  Raise your right hand.

20          MR. BORGES:  Your Honor, we would

21     object.  We would object, Your Honor.

22          THE COURT:  What is the objection?

23          MR. BORGES:  She is the wife of Mr.

24     Kowalski.

25          MS. PADILLA:  He only has one wife.

```
 1           MR. BORGES:  She's not?  Oh, girlfriend.
 2    Okay.
 3           THE COURT:  She can take the stand.
 4    We'll decide -- take the stand, please.  Take the
 5    witness stand, please.
 6           If there is an objection, I will hear
 7    it, and we'll resolve it.
 8           MR. BORGES:  Oh, no.
 9           THE CLERK:  Please raise your right hand
10    to be sworn.
11                (Witness sworn.)
12           THE CLERK:  Please state your name and
13    spell it for the record.
14           THE WITNESS:  Natalie Lira.
15           THE COURT:  Have a seat.
16           THE WITNESS:  N-A-T-A-L-I-E.  L-I-R-A
17    last name.
18        NATALIE LIRA, WITNESS, DULY SWORN,
19                DIRECT EXAMINATION
20    BY MR. SOWKA:
21        Q.    Ms. Lira, do you know Mr. Kowalski?
22        A.    Yes.
23        Q.    And what is your relationship with Mr.
24    Kowalski?
25        A.    He's my boyfriend.
```

```
 1          Q.    Okay.  Approximately how long has he

 2    been your boyfriend?

 3          A.    A year now.

 4          Q.    And what is your residence?

 5          A.    Where do I live?

 6          Q.    Yes.

 7          A.    1707 South Newberry Avenue.

 8          Q.    And do you live with Mr. Kowalski?

 9          A.    Yes.

10          Q.    Are you currently employed?

11          A.    Not right now because I'm nine months

12    pregnant.

13                THE COURT:  I can't hear you.

14    BY THE WITNESS:

15          A.    Not right now.  I'm nine months

16    pregnant.

17    BY MR. SOWKA:

18          Q.    When was last time you were employed?

19          A.    July.  July 22nd.

20          Q.    Of this year?

21          A.    Yes.

22          Q.    Do you own any vehicles?

23          A.    I own a vehicle, yes.

24          Q.    What kind of vehicle?

25          A.    Two of them I do.
```

1        Q.      What kind of vehicles?

2        A.      A Jeep Wrangler 2015 and also a Mercedes

3    Benz.

4        Q.      What year is the Mercedes?

5        A.      I believe it's 2015.

6        Q.      When did you get the Mercedes?

7        A.      Last year.

8        Q.      And how did you --

9                THE COURT:  I'm sorry, I didn't hear

10   you.

11               THE WITNESS:  Last year I got it.

12   BY MR. SOWKA:

13       Q.      Approximately when last year?

14       A.      I believe November.

15       Q.      So November of 2017?

16       A.      Yes.

17       Q.      And where did you acquire the funds to

18   buy the Mercedes?

19       A.      Uhm, I actually bought it with cash

20   money and the money that I had.

21       Q.      And where did you get the cash money

22   that you had?

23       A.      From my job I was working.

24       Q.      And what was the purchase price for the

25   Mercedes?

1        A.    I don't remember.

2        Q.    Was it more or less than 50,000?

3        A.    No.

4        Q.    Was it more than 50,000 or less?

5        A.    I honestly -- I -- I don't even

6    remember.

7        Q.    Do you remember if it was more or less

8    than a hundred thousand?

9        A.    I don't remember.

10       Q.    Do you remember if it was more or less

11   than 500,000?

12       A.    It was -- I don't even remember.

13       Q.    Where did you buy it from?

14       A.    From a woman.

15             THE COURT:  From where?

16             THE WITNESS:  From a woman that was

17   Bob's friend's -- his wife's name is Jennie.

18   BY MR. SOWKA:

19       Q.    What's the last name?

20       A.    I don't recall.  I don't remember.

21       Q.    But this was Bob's friend?

22       A.    I know the wife.  The friend's wife.

23   Her name is Jennifer.

24       Q.    And what's the friend's name?

25       A.    Jorge.

1    Q.    What's the last name?

2    A.    I don't know his last name.

3    Q.    And how does Bob know Jorge?

4    A.    They knew each other before I met Bob.

5    When I met Bob, that's when I met his friend Jorge.

6    They were already friends.  I don't --

7    Q.    And you don't know Jorge's last name?

8    A.    No, I don't.

9    Q.    And you don't know Jennie's last name?

10   A.    No, I don't.

11   Q.    And you bought the car with cash?

12   A.    Yes.

13   Q.    And you don't remember how much?

14   A.    Yes.

15   Q.    Is Jorge's last name Sanchez?

16   A.    That -- that does -- yeah.  It sounds

17   like it could be, yeah.

18   Q.    And do you know if Jennie has the same

19   last name?

20   A.    I think so, yeah.  Sanchez.  It does

21   sound familiar.

22   Q.    Okay.

23         There's an exhibit binder in front of

24   you.  Could you open it up and turn to Exhibit 14,

25   please?

1      A.     Okay.

2      Q.     Do you see, on the bottom of the page,

3   there is numbers that say TE, and then it ends in

4   290?  Do you see that?

5      A.     Yes.

6      Q.     Okay.  So the top of this page is a

7   cashier's check, and it said it was -- remitter it

8   says Robert Kowalski and pay to the order of

9   Natalie Lira.  Do you see that?

10     A.     Yes.

11     Q.     And this is in the amount of $11,000?

12     A.     Yes.

13     Q.     And do you see below that is a copy of

14   the back of the check?

15     A.     Yes.

16     Q.     Is that your signature on the back?

17     A.     Yes, it is.

18     Q.     And did Mr. Kowalski give you this

19   money?

20     A.     Yes.

21     Q.     What was the reason that he gave you

22   this money?

23     A.     Well, I had spent all my money from the

24   time I was with him.  Like, since I had been

25   working, I had money saved up.  So when I bought

1   things, I used my money to pay for my expenses.

2   And since now that we're having a baby on the way,

3   it was something that -- you know, from him so we

4   can start raising a baby and a family and have a

5   house to live in.

6       Q.    And if you look in between the two

7   images, it says check deposited at JPMorgan Chase

8   NA, Indianapolis, Indiana.  Do you see that?

9       A.    Yes.

10      Q.    Was this deposited into your bank

11  account?

12      A.    Yes.

13      Q.    And you bank at JPMorgan Chase?

14      A.    I do.

15      Q.    And do you remember where you actually

16  deposited the check at?

17      A.    Canal Street.  Roosevelt and Canal.

18      Q.    Canal Street.

19            Please turn the page to the next page

20  marked TE291.  This is a copy of another cashier's

21  check made by Mr. Kowalski to you, is that correct?

22      A.    Yes.

23      Q.    And this is in the amount of $5,000?

24      A.    Yes.

25      Q.    And this one is dated June 18, 2018?

1        A.     Yes.

2        Q.     And it indicates that this check was

3   deposited on August 1st, is that correct?

4        A.     Yes.

5        Q.     And below that is a notation that

6   indicates it was deposited at JPMorgan Chase Bank?

7        A.     Yes.

8        Q.     Was that the same account?

9        A.     Yes.

10       Q.     And is that your signature on the back

11  of the check?

12       A.     Yes.

13       Q.     Please turn to the next page.  This is a

14  copy of another cashier's check also dated

15  June 18th in the amount of $5,000 payable to you

16  from Mr. Kowalski, correct?

17       A.     Yes.

18       Q.     And this was also deposited on

19  August 1st?

20       A.     Yes.

21       Q.     And that's your signature on the check?

22       A.     Yes, it is.

23       Q.     And this was deposited into your account

24  at JPMorgan Chase?

25       A.     Yes, it was.

1    Q.    Does Mr. Kowalski have access to this
2    account?
3    A.    No.
4    Q.    He's not a signatory?
5    A.    No.
6    Q.    And what were these funds used for?
7    A.    For the house.
8    Q.    For the house.
9          MR. SOWKA:  No further questions, Your
10   Honor.
11         THE COURT:  You say you last worked in
12   July or something?
13         THE WITNESS:  July of this year.
14         THE COURT:  Where did you work?
15         THE WITNESS:  Twisted Spoke, Ogden and
16   Grand.
17         THE COURT:  I'm sorry?
18         THE WITNESS:  Ogden and Grand, Twisted
19   Spoke.
20         THE COURT:  What kind of establishment
21   is that?
22         THE WITNESS:  It's a whiskey bar.
23         THE COURT:  A what?
24         THE WITNESS:  A whiskey bar.
25         THE COURT:  A whiskey bar?

```
 1                THE WITNESS:  Yes.

 2                THE COURT:  I see.

 3                THE WITNESS:  It's very popular and

 4      known as a whiskey bar.

 5                THE COURT:  I see.

 6                Any cross examination of this witness?

 7                MR. BORGES:  Yes, Your Honor.  If I may

 8      have a few seconds?

 9                THE COURT:  Go right ahead.

10                    (Pause.)

11                  CROSS EXAMINATION

12      BY MR. BORGES:

13           Q.    So, Ms. Lira, you indicated you are

14      pregnant?

15           A.    Yes.

16           Q.    When is your due date?

17           A.    The 14th of this month.  November 14th.

18           Q.    Now, do you live with Mr. Kowalski?

19           A.    I do.

20           Q.    And did you live with him at the time

21      that these checks were cashed?

22           A.    Yes.

23           Q.    And did you have a break-in at your

24      home?

25           A.    I did.
```

1    Q.    And did you have to use money to replace

2  things because things were stolen or broken?

3    A.    I still haven't been able to replace

4  things, no.

5    Q.    So some of these monies were used for

6  these purposes?

7           Is it fair to say some of these monies

8  were used for those purposes?

9    A.    For, like, baby stuff, you know.  For

10  like the stuff that's going to be used for the

11  baby.

12    Q.    I see.

13           And you lived together, and things had

14  to be repaired after this happened?

15    A.    Yes.

16    Q.    What in particular?

17    A.    The door and the locks.

18    Q.    So some of these monies were used for

19  that purpose?

20    A.    Some of the money just to replace, like,

21  the door and the locks, yeah.

22    Q.    Okay.

23    A.    All of the locks needed to be changed on

24  the doors.

25    Q.    Yes.

1          Now, let me ask you.  You said that you

2    had been employed in a whiskey bar was it?

3          A.    Yes.

4          Q.    And then you stopped your -- your

5    employment ended at what time?  When?  What month?

6          A.    Right after that.  As soon as I --

7          Q.    Right after the break-in?

8          A.    No.  I stopped working July 22nd because

9    I was involved in a car accident, and I had to go

10   for therapy.  My doctor recommended that I stop

11   working right away and start therapy as soon as I

12   could.

13         Q.    I see.

14         A.    And, uhm, yeah.

15         Q.    And the monies -- you said some of the

16   monies that you had saved you used to purchase

17   these vehicles that you have?  These two vehicles?

18         A.    Just one.  The other one was a gift to

19   me.

20         Q.    Which was a gift?

21         A.    The Jeep Wrangler.

22         Q.    Okay.

23         A.    It was before I even met Robert.

24         Q.    I see.

25               And the Mercedes you bought from some of

1    your savings, is that correct?

2        A.    Yes.

3              MR. BORGES:  Okay.  I have no further

4    questions, Your Honor.

5              THE COURT:  What kind of work did you do

6    at the Twisted Spoke?

7              THE WITNESS:  I was a server.

8              THE COURT:  I see.  How long had you

9    worked there?

10             THE WITNESS:  Going on three years.  And

11   then, also, I was a server at a pool hall before

12   that.

13             THE COURT:  I see.  All right.

14             Any other questions?

15             MR. REIN:  I have a few questions, Your

16   Honor.

17                   CROSS EXAMINATION

18   BY MR. REIN:

19        Q.    Ms. Lira, I'm Rick Rein.  I represent

20   the FDIC as receiver.

21             Let me ask about the Twisted Spoke.

22        A.    Yes.

23        Q.    How much were you making on a weekly

24   basis?

25        A.    I was making $150 in credit card tips

1    and almost $200 in cash tips every night that I

2    worked there.

3        Q.    And how often were you working on a

4    weekly basis?

5        A.    Three nights.  Sometimes two nights.

6    And then when I got pregnant, sometimes it would be

7    either one night or two nights.

8        Q.    So when did it change to one night or

9    two nights from two or three?

10       A.    When I got pregnant in February.

11       Q.    February of 2018?

12       A.    Yes.

13       Q.    So between February and July, you're

14   working one to two nights?

15       A.    Yes.

16       Q.    And you had been there for three years.

17   In those prior three -- let's say in 2017, did you

18   file a tax return?

19       A.    Yes.

20       Q.    Did your tax return indicate how much in

21   wages you earned and tips at the Twisted Spoke?

22       A.    Yes.

23       Q.    How much did you make in 2017?

24       A.    From my income tax?

25       Q.    Right.

```
 1           A.    I just -- from working at the Twisted
 2     Spoke?
 3           Q.    Twisted Spoke.
 4           A.    I'm not sure.  I'm always making good
 5     money because I'm in a busy area where I work.
 6           Q.    10,000?
 7           A.    I don't know.
 8           Q.    More than 10,000?
 9           A.    I'm not sure.
10           Q.    Did you work anywhere else in 2017?
11           A.    No.
12           Q.    And in 2017, where were you living?
13           A.    I was living at 1634 West 38th Street.
14           Q.    1634 West 38th.
15           A.    Before I moved in with Robert.
16           Q.    And you moved in with Robert on Newberry
17     when?
18           A.    Maybe October of 2017.
19           Q.    So you've been there about a year now?
20           A.    Yes.
21           Q.    So prior to October, you were living at
22     1634 West 38th.  Was that an apartment?
23           A.    Yes, it was an apartment.
24           Q.    Were you paying rent?
25           A.    No, I was not.  I was with my
```

ex-boyfriend.

Q.    So in 2017, did you ever pay rent?

A.    No.  My sons' father was.

Q.    I'm sorry?  Your?

A.    My sons' father.  I have twin boys.  And he was the one that was paying rent when I was living with him.

Q.    So the money that you're earning at Twisted Spoke, is that going to support your twins?

A.    Some of it, yeah, when it needed to be. But I was saving up because my boyfriend at the time was -- he was paying rent and whatever else that we needed.

Q.    So when you moved in with Robert in October of 2017, how much had you saved up?

A.    A good amount.

Q.    More than 10,000?

A.    Yeah, 'cuz I had claimed my kids every year for the income taxes, and I was saving that up to get a house while my boyfriend was paying the rent at the time.  So I was saving up my income tax money so we could buy a house in the future.

Q.    And did you use the money to buy a house?

A.    Couldn't.  I had some left over after

1    the car.

2          Q.    How much did you have left over after

3    you bought the car?

4          A.    Maybe --

5                MR. BORGES:  Objection, Your Honor.

6    What's the relevance of this?  She testified that

7    she used her money to buy a car, and so she had

8    some money left over.  So what?

9                THE COURT:  Response to the objection.

10               MR. REIN:  This all goes towards whether

11   she really bought the Mercedes and had the income

12   to do so.

13               THE COURT:  I'll overrule the objection.

14   BY THE WITNESS:

15         A.    I would say -- I'm not -- seventeen.

16   Twenty.

17   BY MR. REIN:

18         Q.    How much?

19         A.    17, 20,000.

20         Q.    17 or 20,000.

21               Do you pay the car insurance on both the

22   Mercedes and the Wrangler?

23         A.    No, I don't.

24         Q.    Who pays the car insurance?

25         A.    So from the first -- my Jeep that I had

1    before I met Robert, it's not in my name.  It's in

2    the person who got it for me.  He pays the payment,

3    and he pays the insurance.

4         Q.    Who is that person?

5         A.    My friend Jorge.

6         Q.    Jorge Sanchez?

7         A.    No.

8         Q.    Jorge who?

9         A.    Jorge Alvarez.

10        Q.    Alvarez?

11        A.    Yeah.

12        Q.    Was he the babies' father?

13        A.    No.

14        Q.    Just a friend bought the car for you,

15   and he pays the insurance?

16        A.    It was somebody that I -- I mean, I was

17   with.  Just seeing him, you know, dating him, but

18   not in a serious relationship with him, you know.

19   It was a gift from him.  Yes, it was.

20        Q.    So in 2018, he's been paying the car

21   insurance?

22        A.    He still pays it.

23        Q.    What about the gas?

24        A.    The gas?

25        Q.    Do you drive it?

1     A.     Yes.  He works at a -- he's a manager at

2  a gas station.  He puts gas in there.

3     Q.     So is that Wrangler the primary car you

4  drive?

5     A.     Yes.  Yeah.  Some -- yeah.  I mean, I've

6  had it longer, and I feel more comfortable driving

7  that one because it's a bigger truck, and it's

8  bigger for my twins because they're big boys, so we

9  have no problem getting in and out of there, you

10  know.  The car is a little bit smaller.  I just

11  take that out once in a while.  But the truck is

12  more -- more -- we drive the truck more.

13     Q.     The Mercedes, who pays the insurance on

14  the Mercedes?

15     A.     My boyfriend.

16     Q.     Robert?

17     A.     Yes.

18     Q.     How long has he been paying the

19  insurance?

20     A.     For a couple months now.

21     Q.     So a couple months.  This is the

22  beginning of November.

23     A.     Yes.

24     Q.     So did he pay it in October?

25     A.     I don't believe so because they've been

1    calling me to renew the insurance.

2         Q.    When did he last pay the insurance?

3         A.    Uhm, I'm not sure.

4               I haven't been driving it because I'm

5    not sure it has insurance because they -- since

6    they've been calling me to renew the insurance.  I

7    haven't been driving it because I haven't even

8    wanted to ask him to get insurance on it or to buy

9    me insurance for it, so I just been driving my Jeep

10   in the meantime.

11        Q.    Who is the insurance company?

12        A.    Me.

13        Q.    No.  Who was the insurance company that

14   has been calling you?

15        A.    Geico.

16        Q.    Sorry?

17        A.    Geico.

18        Q.    The insurance policy with Geico, was

19   that in your name or Robert's?

20        A.    It's in my name.

21        Q.    And the insurance -- you're aware that

22   Robert filed bankruptcy, right?

23        A.    No.

24        Q.    You didn't know he filed bankruptcy?

25        A.    I didn't know until today until I came

1    here, and, I mean, he asked me to be here, and then

2    I showed up, and now I'm here.

3        Q.    So do you know if the insurance on the

4    car was paid by Robert in March of 2018?

5        A.    When I first got the car, I was paying

6    for insurance, but it was only for like three

7    months.  I had only got it for three months, and

8    then it expired, and then he started paying it.

9    And now that they're calling me to see if I want to

10   renew it, I just figured that he hasn't renewed it.

11       Q.    So you said you got the car in October

12   of 2017, is that right?

13       A.    Like October, November, yeah.

14       Q.    So three months takes us to January and

15   February of 2018, right?

16       A.    (Indicating).

17       Q.    Correct?

18       A.    Yes.

19       Q.    So since that time, Robert has been

20   paying the insurance on the Mercedes?

21       A.    Yes.

22       Q.    Does he pay it on a monthly basis?

23       A.    I'm not sure.

24       Q.    Do you know how much the insurance is on

25   a yearly basis?

1          A.     On a yearly basis?

2          Q.     Yeah, how much the policy -- how much

3     the policy costs?

4          A.     No, I just -- I mean, I just had it for

5     like a couple of months, and it was only $170 a

6     month, $180 a month.

7          Q.     Do you have the old insurance policy?

8          A.     No.

9          Q.     Who has the old insurance policy?

10    Robert?

11         A.     Maybe.

12         Q.     The gas, who pays for the gas on your

13    Mercedes?

14         A.     Well, I barely drive it.  I do 'cuz my

15    kids' father -- my sons' father gives me child

16    support money.  So when he gives me that, like, I

17    don't drive it all the time, but I only put a

18    little bit of money in there for gas because I

19    mainly drive the Jeep around with the kids.

20         Q.     What about oil changes?  Do you have oil

21    changes on the Mercedes?

22                MR. BORGES:  Your Honor, I would object.

23    I don't know what the relevance is of all of this.

24    Who does an oil change?  Who pays for an oil

25    change?  Where is counsel going with this?

1           THE COURT:  Response.

2           MR. REIN:  Is he using assets of the

3    estate to pay for this automobile?

4           THE COURT:  It has some relevance.  I'll

5    overrule the objection.

6    BY MR. REIN:

7        Q.    I asked you about the oil changes.  Have

8    you had oil changes in 2018?

9        A.    My car said it needed an oil change.  He

10   took the car, but I don't know where he went.

11       Q.    "He" Robert?

12       A.    Robert.  He said he knew somebody that

13   could do the oil change.  Because I know that oil

14   changes like that for that kind of car are really

15   expensive.  And I was going to take it to one of my

16   friends that does oil changes on cars, and he said

17   that he might know somebody that he could take it

18   to that could do it, also, that can do an oil

19   change.

20       Q.    So he took -- he paid for the oil

21   change?

22       A.    Yeah.  He took it --

23           MR. BORGES:  Objection.  She didn't say

24   he paid for it.

25   BY MR. REIN:

1    Q.    How long -- how long ago?

2          THE COURT:  Just a second.

3          Response to the objection?

4          MR. BORGES:  Counsel put words in her

5    mouth, he paid for it.  I don't know whether he

6    paid for it.

7          THE COURT:  I'm sorry, Mr. Borges?

8          MR. BORGES:  Counsel said he paid for

9    the oil change.  There is no testimony he paid for

10   the oil change.

11         THE COURT:  You want to clarify it?

12         MR. REIN:  Sure.

13   BY MR. REIN:

14   Q.    When he took the car for the oil change,

15   Robert paid for that oil change?

16   A.    He just took it, and he brought it back.

17   Q.    Did you pay for it?

18   A.    No, I didn't.  I just -- I knew it

19   needed an oil change, and I told him, hey, it keeps

20   coming up on the dashboard saying it needs an oil

21   change.  And I can take it to one of my friends

22   that can do it because I know people that do that

23   on my truck, also, on my Jeep Wrangler.

24   Q.    And when did this take place?  This

25   taking the car for the oil change?

1    A.    Maybe like -- maybe like four months

2    after I had the car.

3    Q.    So we're talking about March 2018?

4    A.    Just like a couple months right after I

5    got the car, it needed an oil change.

6    Q.    When you bought the car from Sanchez,

7    was it a new or used car?

8    A.    It was used.

9    Q.    How old was it?

10    A.    So it's a 2015, and I got it in 2017.  I

11    don't know if there was any previous owners before

12    her, but it was used when I got it off of her.

13    Q.    Are you aware of any business

14    relationship between the debtor Robert and Jorge

15    Sanchez?

16    A.    No.  I don't -- I don't really see

17    Jorge.

18    Q.    You just see Jennifer?

19    A.    When I do see Jorge, I see him with his

20    wife.  That's the only time.

21    Q.    Okay.

22          MR. REIN:  No further questions.

23          THE COURT:  Any questions?

24          MR. BORGES:  I don't have any questions,

25    Judge.

1          MR. SOWKA:  I have a couple more

2     questions.

3          THE COURT:  Go right ahead.

4               REDIRECT EXAMINATION

5     BY MR. SOWKA:

6          Q.    Ms. Lira, please turn to what has been

7     marked as Exhibit 15 in the trial book, and you see

8     the page marked at the bottom TE ending in 294?

9          A.    Yes.

10         Q.    Please look at the -- this is a picture

11    of a cashier's check made payable to Premium Title

12    in the amount of $64,084.35.

13         A.    Okay.

14         Q.    Have you ever seen this check before?

15         A.    No.

16         Q.    Do you have a bank account at Bank of

17    America?

18         A.    No.

19         Q.    Have you ever had a bank account at Bank

20    of America?

21         A.    Never.

22         Q.    Have you and Mr. Kowalski purchased a

23    house?

24         A.    Have we?

25         Q.    Yes.  Since you've been together, have

1    you purchased a house?

2         A.    Yeah.  With me, yeah.

3         Q.    What is the address of the house that

4    you purchased?

5         A.    I just know that it's Oak Lawn.  I don't

6    got the address.

7         Q.    So the two of you bought a house in Oak

8    Lawn someplace, but you're not living in it yet?

9         A.    No.

10        Q.    Why not?

11        A.    Well, I was going to have the baby first

12   and then move in there.

13        Q.    When did you buy the house in Oak Lawn?

14        A.    Uhm, maybe a month ago.

15        Q.    A month ago.

16              Do you know where Mr. Kowalski got the

17   money to buy a house in Oak Lawn a month ago?

18        A.    No, I don't.

19        Q.    Do you think maybe this check to Premium

20   Title for $64,000 could have possibly been to

21   purchase the house?

22        A.    Well, he told me that he rents

23   apartments and he owns buildings, and that's his

24   job.  That's how he gets money is from renting to

25   people and the buildings that he's had for a long

1    time now.

2         Q.    Other than the checks that you and I

3    looked at earlier, has he given you any money in

4    the last six months?

5         A.    I've always had my own money.

6         Q.    So since you stopped working, how are

7    you getting money?

8         A.    I have my credit cards.  I'm waiting on

9    a settlement.  So I've just been using all my

10   credit cards instead of asking him for money.  I

11   don't feel comfortable even asking him for money.

12   I don't like doing that.  So I use my credit cards

13   and the money I get from my twins' father.  He

14   gives me money.

15        MR. SOWKA:  Just a moment, Your Honor.

16   BY MR. SOWKA:

17        Q.    Have you visited the house in Oak Lawn

18   that you purchased?

19        A.    I seen it, but it was -- it's -- it

20   needs a lot of work.  It's pretty beaten up.

21        The previous owners that lived there

22   were like hoarders, so they left a lot behind.  So

23   it's -- I can't move in there when it's like that.

24        Q.    And when was the last time you saw it?

25        A.    Probably like two weeks ago.

1    Q.    And do you know if Mr. Kowalski has

2    started any work renovating the home yet?

3    A.    I don't know.

4    Q.    Have you discussed with him whether he

5    has any plans to renovate the home so you can move

6    in?

7    A.    I told him when I get the money from the

8    settlement, that I will go ahead and use that to

9    fix up the house after the baby is born.

10    MR. SOWKA:  No further questions, Your

11    Honor.

12    THE COURT:  Any other questions of this

13    witness?

14    MR. BORGES:  No questions, Your Honor.

15    THE COURT:  Thank you for testifying.

16    THE WITNESS:  Thank you.

17    THE COURT:  Any other witnesses?

18    MR. SOWKA:  Yes, Your Honor.  The

19    trustee has a few other witnesses.  Mr. Sinha will

20    handle the next one.

21    THE COURT:  How many more?

22    MR. SOWKA:  Your Honor, I think three,

23    but they're going to move pretty quickly.

24    THE CLERK:  Raise your right hand, sir.

25                (Witness sworn.)

1        THE CLERK:  Thank you.

2        ERIC S. REIN, WITNESS, DULY SWORN,

3              DIRECT EXAMINATION

4    BY MR. SINHA:

5        Q.    Mr. Rein, you are a lawyer representing

6    the FDIC in this case, right?

7        A.    I am.

8        Q.    And you work with Tammy DiMenna?

9        A.    She is a paralegal for my firm.

10       Q.    What is the name of your law firm?

11       A.    Horwood, Marcus & Berk.

12       Q.    Please turn to what's marked as

13   Exhibit 25 in the exhibit binder in front of you.

14       A.    Give me a second to move all these

15   pages.

16             Okay.  I have it in front of me.

17       Q.    And Exhibit 25 lists over three pages of

18   property addresses and real estate information

19   about the -- real estate tax information about

20   those properties, correct?

21       A.    Correct.

22       Q.    Did you provide the addresses themselves

23   to Ms. DiMenna to do a property tax search record?

24       A.    I did.

25       Q.    Why is it that you gave this list of

1  properties to Ms. DiMenna?

2      A.    Because the FDIC and the trustee were

3  interested in determining what taxes were owed on

4  real estate in which the debtor had an interest.

5      Q.    And there's properties listed in this

6  spreadsheet that go above and beyond what's been

7  listed in the debtor's Schedule A and B.  How did

8  you come up with those additional properties that

9  are not listed on Schedule A?

10     A.    So the properties were compiled from 341

11  examinations, the monthly operating reports that

12  were filed by the debtor that -- where his initial

13  schedules did not reveal the limited liability

14  companies that he owned and the properties that

15  they owned, those properties were then somewhat

16  disclosed in the operating statements, and at the

17  341 meetings, we drilled down as to the specific

18  properties that were referenced.

19          For instance, there's an LLC by the name

20  of Indomitable, and if I remember, the operating

21  statements said it owned three vacant lots and six

22  or seven multi-family residential housing with no

23  addresses, so we inquired at the 341 meeting as to

24  the addresses of the properties.

25          In addition --

1     Q.     Did you do that?  Did you go through

2   that for each specific LLC?

3          In addition to Indomitable, there is,

4   for example, Piorun Properties?

5          THE COURT:  What properties?  I'm sorry.

6          MR. SINHA:  Piorun Properties.  That's

7   spelled P-I-O-R-U-N and then properties.  That's a

8   limited liability company.

9          THE COURT:  I just didn't understand.

10  Go ahead.

11  BY THE WITNESS:

12     A.     Initially in the operating statements,

13  there were three LLCs identified, Indomitable,

14  Piorun Properties and Invincible which had been

15  involuntary dissolved.  It owned one piece of real

16  estate.

17          I believe in the May operating report,

18  it now listed Burros Blancos, but we were told

19  Burros Blancos owned no assets in 2018 as of the

20  filing.

21          And then there was a further amendment,

22  and Alta Vista Properties was added as a fifth LLC

23  owning two properties.

24          So it was a -- we continued to

25  investigate and investigate both at the 341

1    meetings and independently to identify properties

2    and to ask the debtor if those are properties in

3    which he had an interest.

4         If I recall, there's one property on

5    this list in Alsip that we independently

6    identified.  It's an apartment that Mr. Kowalski

7    and his son own that is not disclosed in the

8    schedules.

9         But all these properties on the summary

10   Exhibit 25, in our opinion, Mr. Kowalski has an

11   interest.

12   BY MR. SINHA:

13       Q.    And for these properties is title held

14   directly through these limited liability companies

15   or is title held through a land trust?

16       A.    They're all -- well, some are owned

17   individually.  Some are owned in a land trust in

18   which Mr. Kowalski is the beneficiary.  Some of

19   them are in a land trust in which the limited

20   liability companies are the beneficiary, but Mr.

21   Kowalski is the sole member.

22       Q.    And is that true for every single

23   limited liability company?  For example,

24   Indomitable, is Mr. Kowalski the sole member and

25   manager of that entity?

1      A.      Based upon 2004 subpoenas that were sent

2   to the land trusts, the documents that were

3   produced indicate that when Indomitable is the

4   beneficiary, that Mr. Kowalski is the managing

5   member, has the power of direction to control the

6   land trust.

7      Q.      And was that same information received

8   for different limited liability companies; for

9   example, Invincible, LLC?

10      A.      Invincible, according to Mr. Kowalski's

11   testimony at the 341 meeting, was a limited

12   liability company in which he was the sole member.

13      Q.      Okay.

14             Alta Vista Properties?

15      A.      Same testimony.  He said he was the sole

16   member, but I will suggest that the public filings

17   for Alta Vista shows that the member is Caesar

18   Sanchez.

19      Q.      Okay.

20             Burros Blancos?

21      A.      Burros Blancos Mr. Kowalski testified at

22   the 341 meeting he was the sole member.

23      Q.      And Exhibit 25 then is a list of all the

24   entities that you have identified, but are you

25   certain that it is exhaustive?

1      A.    No.   These are -- these are based upon

2  the filings, the public records and the testimony

3  of Mr. Kowalski.

4           MR. SINHA:  No further questions, Your

5  Honor.

6           THE COURT:  Any examination of this

7  witness?

8           MR. BORGES:  Yes.

9           THE COURT:  Go ahead, Mr. Borges.

10                CROSS EXAMINATION

11  BY MR. BORGES:

12      Q.    So, Mr. Rein, you've indicated that Mr.

13  Kowalski had is it five LLCs?

14      A.    Yes.

15      Q.    And --

16      A.    Well, he had more.

17      Q.    He had more?

18      A.    Sure.  They're not --

19      Q.    I see.

20      A.    -- in operation.

21      Q.    So did you ever determine what happened

22  to those?  Were they dissolved?

23      A.    Sure.  We did corporate searches, and

24  they were involuntarily dissolved.

25      Q.    Dissolved.

1          You also indicated that is it Piorun was

2     involuntary dissolved also?

3          A.     No, Invincible, but --

4          Q.     Invincible was --

5          A.     -- but it is still listed on his

6     schedules and operating report as still operating a

7     piece of property on Bissell.  As I understand the

8     law, just because a company is involuntarily

9     dissolved doesn't mean that it doesn't own the real

10    estate.

11         Q.     I see.  So you don't know whether he

12    owns it or not.

13         A.     It's in his schedules.

14         Q.     It's in his schedules.

15         A.     You can ask him.

16         Q.     It's in his schedules.

17         A.     He says he owns it.

18         Q.     Okay.  And then Alta Vista, you

19    indicated that Mr. Kowalski said that he was the

20    sole member of the LLC, but there was a Caesar, is

21    it, Sanchez?

22         A.     What I said was his bankruptcy filings

23    says that he's the managing member of Alta Vista

24    Properties.

25              In records with the Secretary of State,

1    it shows that the member is Caesar Sanchez.

2         Q.    Okay.  So on his bankruptcy, though, his

3    petition, he has listed these LLCs?

4         A.    He amended to list them, yes.

5         Q.    He amended to list them.  He didn't

6    initially list them?

7         A.    First three, then four, then five.

8         Q.    So they were proper amendments then,

9    right?

10        A.    I don't know if they're proper or not.

11        Q.    I see.

12             MR. BORGES:  I have no further

13    questions.

14             THE COURT:  Any other questions for this

15    witness?

16             MR. SOWKA:  No, Your Honor.

17             MR. SINHA:  No, Your Honor.

18             THE COURT:  Thank you, sir, for

19    testifying.

20             THE WITNESS:  You're welcome.

21             THE COURT:  Any other witnesses?

22             MR. SOWKA:  Yes, Your Honor.  The

23    trustee would like to call R. Baker Thompson.

24             THE CLERK:  Please raise your right hand

25    before you are seated.

1                    (Witness sworn.)

2              THE CLERK:  Thank you.  Please state

3     your name and spell it for the record.

4              THE WITNESS:  Robert Thompson,

5     R-O-B-E-R-T, T-H-O-M-P-S-O-N.

6          ROBERT THOMPSON, WITNESS, DULY SWORN,

7                    DIRECT EXAMINATION

8     BY MR. SOWKA:

9          Q.    Mr. Thompson, did you bring some other

10    papers up with you?

11         A.    I did.

12         Q.    Why don't you hand those to me?

13    Everything you brought up, anything you look at,

14    you need to share with everybody else.

15         A.    This is something else (indicating).

16         Q.    Yes.  You can just set that somewhere

17    else.

18              Are you currently employed?

19         A.    Yes.

20         Q.    And what is your employment?

21         A.    I'm the principal at a property

22    management company.

23         Q.    And what company is that?

24         A.    Two Blue Property Management.

25         Q.    And what is the business of Two Blue?

1      A.     Two Blue manages properties in the

2      greater Chicago area, residential, mixed use,

3      multi-family.

4           Q.     And tell me a little bit about your

5      personal resumé?

6           A.     I've been in real estate for 15 years.

7      I've been a court appointed receiver for the last

8      10 years.  I've got an advisory business that

9      advises on real estate, as well as a property

10     management company, which is Two Blue.

11          Q.     And do you have experience dealing in

12     distressed properties?

13          A.     I do.  As my time as a receiver, I've

14     dealt with many distressed properties all over

15     Chicago and out of state as well.

16          Q.     And in your experience dealing with

17     distressed properties, have you also dealt with

18     residential distressed properties?

19          A.     I have.

20          Q.     And you've been retained -- you and Two

21     Blue have been retained as the property manager in

22     this case, correct?

23          A.     Two Blue has been retained by the

24     trustee, yes.

25          Q.     Tell me a little bit about the services

1    that you're providing to the trustee in this case.

2         A.    Two Blue is a full service property

3    management company.  We provide rent collection,

4    maintenance at the facility, at the properties.  We

5    have an integrated system to allow tenants to

6    contact us 24-7.  I can go into other details, but

7    general property management services.

8         Q.    Okay.  And since you've been retained,

9    what specific tasks have you done pursuant to your

10   duties with the trustee?

11        A.    For the properties we've been given, we

12   sent notice to all those properties.  Tried to

13   locate tenants.  We have collected rent.  We have

14   afforded maintenance upon request or if there is

15   anything we see as a life safety issue with regards

16   to the property.  Someone on my team has visited

17   all the properties that have been listed.  That's

18   about it.

19        Q.    Approximately how many properties is in

20   the portfolio at this time?

21        A.    Off the top of my head, I would say

22   30-plus properties.

23        Q.    And have you been -- how successful have

24   you been in collecting rents from these tenants?

25        A.    Uhm, we've had some success.  We're

1    still trying to locate some tenants.  We've had

2    some tenants that have not gotten back to us on our

3    notice.  We hand delivered notice.  If we're able

4    to get somebody to call us back, we take their

5    e-mail.  We log them into our system.  We then can

6    e-mail them with property related issues.  They can

7    contact us that way.

8          I'd say we've had varying success.

9    We've collected some rent, but not all rent, and

10   we're still locating some of the tenants.

11       Q.    And when was Two Blue retained in the

12   case?

13       A.    I don't remember the exact date, but I

14   believe the trustee brought us in in August.

15       Q.    And had -- based on Two Blue's services

16   in the case, have you come to form an opinion about

17   the status of repair or disrepair of the

18   properties?

19       A.    There's quite a few properties that need

20   work.  We've had issues with plumbing, heat, more

21   recently heat, boilers.  We've had some issues with

22   mold, ceilings falling down.  You know, there's

23   different levels of disrepair depending on the

24   property.

25       Q.    Overall, how would you describe the

1    maintenance and care of the properties when you

2    came in?

3         A.    The properties are in continual need of

4    maintenance, and we're doing everything we can to

5    remedy the issues that are in front of us.

6         Q.    And when you were retained, did you feel

7    that the maintenance was up to date and current on

8    the properties?

9         A.    I'd say the majority of the properties

10   had deferred maintenance dating back it's hard to

11   say, but well before we took over.

12        Q.    Okay.  And so let's talk about some of

13   the deferred maintenance.  You mentioned some

14   issues.

15              So there were some leaky pipe water

16   issues, is that correct?

17        A.    We had water in the basements.  We had

18   mushrooms growing in the basement, in particular,

19   that we needed to remediate.

20        Q.    Hold on.  When you say mushrooms growing

21   in the basement, can you elaborate why were

22   mushrooms growing in the basement?

23        A.    I mean, there appeared to be water on

24   the rug, and then untreated water will eventually

25   grow some sort of fungus or mold, and that's what

1     was happening in this particular basement.

2              I'm trying to think.

3              Several of the properties had German

4     cockroaches, so those would need to be remediated

5     through a pest control.  Up to today, we don't have

6     any contact that there was any previous pest

7     control, so we've tried to go through

8     systematically and deal with the pests and the

9     bugs.

10             Various plumbing issues.  A couple

11    disconnected pipes in kitchens and bathrooms that

12    were leaking on to the floor.

13             We've had a few tenants move out.

14        Q.   Why did the tenants move out?

15        A.   They claim that the units were

16    uninhabitable.

17        Q.   So they moved out since the time you

18    were managing --

19        A.   That's correct.  I believe there's at

20    least two.

21        Q.   And they moved out because of

22    preexisting issues?

23        A.   That's correct.

24             MR. SOWKA:  Nothing further, Your Honor.

25             THE COURT:  Any examination of this

1    witness?

2              MR. BORGES:  Yes, Your Honor.

3                   CROSS EXAMINATION

4    BY MR. BORGES:

5         Q.    Mr. Thompson.

6         A.    Yes.

7         Q.    So you've been a receiver -- court

8    appointed receiver for some years, right?

9         A.    That is correct.

10        Q.    And you've handled commercial and

11   residential properties?

12        A.    That's correct.

13        Q.    And, in particular, distressed

14   properties?  You handle a lot of distressed

15   properties?

16        A.    That's correct.  I have.

17        Q.    Okay.  And you said you've -- how many

18   properties are you handling for the trustee?  You

19   said about 30?  A little more than 30?

20        A.    I think so, yeah.

21        Q.    And are all of these properties

22   inhabited?  Do they have tenants in all the

23   properties or did they?

24        A.    Some of the -- some -- we were just

25   given a list of addresses.

1      Q.      I see.

2      A.      So we're left to sort of scavenge the

3   addresses and find out what's there.  There is some

4   vacant land included in those addresses.  That's

5   why it's difficult for me to tell how many units

6   and how many exact buildings.  I would say the

7   majority of them have tenants.  There are some that

8   are vacant.  As I said, we're still trying to track

9   tenants to see if they are vacant.

10     Q.      So you said you were having problems

11  with rent collection, right?

12     A.      In some cases, yes.

13     Q.      In some cases.

14             Well, you have 30-plus properties.  Is

15  this because you couldn't find the tenants?  You

16  couldn't find them at home or what?

17     A.      Yes.  Typically, our protocol is to hand

18  deliver notices when we take over a property if we

19  don't have any other prior information.  So we'll

20  post notice on -- if we have -- if we're able to

21  enter the front door of the property, depending on

22  if it is a condo building or a multi-family, we'll

23  post notice on the front door.  If it's a condo

24  building, if we can get past the front door, one of

25  our team members will find a unit door, post

1    something on that door saying -- giving all the

2    information what Two Blue is, our contact

3    information both online and via phone, and our hope

4    then is they'll contact us.

5             We also provide the order that the

6    trustee provided to us showing that we are now the

7    responsible party for those particular buildings

8    along with that notice.

9             So in the cases where we haven't, what

10   we'll typically do is notice them again.  And then

11   we'll notice them for potential lock change.  And,

12   typically, if there is a tenant in there and they

13   think we're going to change any locks, they'll find

14   us at that point.  Because if they have belongings

15   in there, they may want to get into the unit.  And

16   then, from there, we try to collect as much as we

17   can.  Their phone number.  Their lease.  Their

18   e-mail address is very important to us because

19   that's integrated directly into our system.

20        Q.    Sometimes you don't get into the

21   building you said?

22        A.    I typically would try to get into every

23   building, but I'm sure there are cases where the

24   front door is locked, and we have to go back.

25        Q.    And what?  Do you tell them to submit

1     rent to you?

2          A.     Correct.

3          Q.     Do you know if people are accustomed to

4     doing that or paying the landlord directly?

5          A.     I'm confused by the question.

6          Q.     You don't know whether people are

7     accustomed to just paying the rent when the

8     landlord comes by or whether they always send it

9     in?

10         A.     I --

11         Q.     You're not familiar?

12         A.     Yes, I would assume they would pay their

13    rents.  But we try to do everything electronically.

14    Our system is that way.  If they have an e-mail

15    address and they are able to log in, they can pay

16    their rent online.

17         Q.     Let's say they don't have the Internet

18    or they don't have a computer?

19         A.     Then they're able to mail us rent.

20    Also, if they need somebody to go by, and they

21    indicate they are not able to come by our office.

22    If they can't mail a rent -- the notice has our

23    full address on it as well.  So there's three

24    different ways to pay rent, either in person, via

25    the mail or --

1     Q.     Sometimes people don't comply?

2     A.     Sure, that's correct.

3     Q.     And do you know whether they complied

4   when Mr. Kowalski was the collector before you were

5   appointed?

6     A.     I do not know that.

7     Q.     So you don't know their rent history?

8     A.     I -- no.  Unless they provided it to me

9   or gave me a lease showing a ledger of some sort, I

10  do not know that.

11    Q.     I see.

12    A.     I was not given that information.

13    Q.     Now, you talked about maintenance, and

14  these buildings -- I mean, do you know or do you

15  just -- you send people out.  When you talked about

16  mushrooms growing in the basement, do you know

17  whether that was an inhabited building?

18    A.     That was an inhabited building.  And I

19  have team members that go to these properties.  I

20  may visit a handful on my own, but that's it.

21    Q.     So you don't know --

22    A.     But it's a property management company

23  which has team members going out to visit all these

24  properties, so I have pictures of all the stuff --

25  all the things that were issues.

1    Q.    And do people make complaints to you

2    since you've been appointed as the receiver?

3    A.    Yes.  So we have a -- I'm not the

4    receiver in this particular deal or in this

5    particular case.

6          But what we like to do is if they do

7    have an e-mail address and have some ability to get

8    on the Internet, they can -- they can submit work

9    orders to our staff and then have those work orders

10   answered via the staff, and then we can send out

11   maintenance personnel based on their work orders.

12   That's the ideal way our system works.

13         They can also call the property managers

14   and then put in work orders that way.

15   Q.    And have you done that?

16   A.    Yes.

17   Q.    So the mushrooms are gone?

18   A.    They should be gone, yes.

19   Q.    They should be.  You don't know though?

20   A.    I don't have a picture of them gone, but

21   they should be gone.  I think we remediated them.

22   I could find out.

23   Q.    Um-hum.

24         You said you're having varying success

25   with rent collection.

1          You have got ceilings, you think, that
2  are falling in.
3          A couple people have moved out.
4          Out of how many units?
5      A.    Well, like I said, we've got 30-plus
6  buildings.  It's unverified how many units.  We
7  have some addresses that are just front door units.
8  We don't know if they're condos or if there are two
9  or three condos within there.  I mean, there's --
10      Q.    Is it fair to say over 50 units?
11      A.    Yes, I would say there's over 50 units.
12      Q.    So you've had two people move out out of
13  50 units?
14      A.    We've had two people move out.
15      Q.    Out of 50-plus units?
16      A.    Sure.
17      Q.    That might be normal anyway, don't you
18  think?
19      A.    I mean, there are complaints that it's
20  uninhabitable so I --
21      Q.    Yeah.
22      A.    I'm sure there's normal turnover.
23      Q.    Did you see low rent at the time they
24  moved out?  Did you know?
25      A.    I'm not sure.  I'd have to look.

1      Q.     When you have to change the locks, do
2  you have to get a court order to do that?
3      A.     We typically give 10-days notice before
4  we change locks.
5      Q.     Do you need a court order though?
6      A.     No, we don't need a court order to
7  change locks.
8      Q.     Really.
9      A.     That's my understanding.  If they're
10  given proper notice --
11      Q.     You have certain powers that a normal
12  landlord doesn't have?  You can change locks
13  without getting a court order?
14      A.     If we can't locate somebody on the other
15  side of the wall, then we need to have access to
16  see what the other side of the door looks like.  So
17  if we give a tenant --
18      Q.     A 10-day notice, but you don't have to
19  go to court you're saying?
20      A.     If I can't find anybody on the other
21  side of the wall, then I need to be able to see
22  what is on the other side of the wall.  So if I
23  have given them notice and let them know that we
24  are the manager, and they haven't responded to us,
25  and I give them notice again that we are the

1    manager, please respond, then I send out a notice

2    saying we will change your locks so we can have

3    access.  We will provide you with a key to that

4    door as soon as you reach out to me.

5         Q.    So you can constructively evict people

6    without a court order?

7         A.    No.  No, it's --

8         Q.    You just said --

9         A.    -- not an eviction.  That's not correct.

10   What it is is a lock change, meaning we need to get

11   access to that unit.

12              So we provide them with a notice, and

13   within that notice it states if you come home and

14   your lock or key is changed, dial this number,

15   we'll give you a key, but we need to know what's on

16   the other side of the wall.

17              It's not an eviction.

18        Q.    Okay.  So how much renovation have you

19   done?  You talked about German cockroaches?  Pest

20   control?

21        A.    We have quotes to -- there's been no

22   renovation.  There's been maintenance repairs.  So

23   we really just try to repair where there are

24   issues, and we try to handle the most important

25   issues first and go then from there.

1          So if somebody has a leaking faucet, a

2     leaking drain pipe, a leaking bathtub, and there is

3     water on the floor or in the unit, we try to repair

4     that as needed.

5          There's --

6          Q.     Let me ask you --

7          A.     Sure.

8          Q.     -- Mr. Thompson.  Out of these 50-plus

9     units -- there might be 60 or 70 -- how many people

10    have made complaints to you?

11         A.     I'd have to look.  We have several -- I

12    mean, several pages of work orders that have come

13    in of the tenants we've been able to contact.

14         Q.     How many people?  Do you know how many?

15    Several pages?

16         A.     I can't tell you that exact number, but

17    I would say most of the majority of the units have

18    something they would like fixed in their unit.

19         Q.     On your experience -- in your

20    experience, when you've got 50, 60, 70 units, you

21    do get complaints from tenants about --

22         A.     Sure.

23         Q.     -- the units, do you not?

24         A.     Sure.

25         Q.     Okay.

1         MR. BORGES:  No further questions, Your

2    Honor.

3         THE COURT:  Any other questions?

4         MR. SOWKA:  Nothing further, Your Honor.

5         THE COURT:  Thank you for testifying,

6    sir.

7         THE WITNESS:  Thank you, Your Honor.

8         THE COURT:  Any other witnesses?

9         MR. SOWKA:  Your Honor, I call the

10   Chapter 11 trustee Gus Paloian.

11        THE COURT:  Will he be a long witness?

12        MR. SOWKA:  A bit longer than the last

13   witnesses.

14        THE COURT:  Let's see how far we get.

15        THE CLERK:  Would you please raise your

16   right hand.

17              (Witness sworn.)

18        GUS PALOIAN, WITNESS, DULY SWORN,

19              DIRECT EXAMINATION

20   BY MR. SOWKA:

21      Q.    Please state your name for the record.

22      A.    Gus Paloian.

23      Q.    And what is your involvement in this

24   bankruptcy case?

25      A.    I'm the appointed Chapter 11 trustee.

1      Q.      And what is your current profession?

2      A.      I'm an attorney.

3      Q.      And what area of law do you specialize

4   in?

5      A.      Bankruptcy, insolvency, reorganization.

6      Q.      And how did you come to be appointed as

7   the Chapter 11 trustee?

8      A.      I was appointed by the U.S. Trustee's

9   Office and confirmed by order of court.

10      Q.      And in addition to being an attorney, do

11   you serve in any other professional capacity?

12      A.      I regularly serve as a trustee in

13   bankruptcy matters.  I'm appointed to cases every

14   month as a Chapter 7 trustee.  I've served on the

15   panel of trustees for decades.  I've served in

16   thousands of cases over that time.

17      Q.      And have you previously served as a

18   Chapter 11 trustee?

19      A.      Yes, I have.

20      Q.      And have you previously served as a

21   trustee in real estate cases?

22      A.      I have.

23      Q.      And we're here today because you filed a

24   motion to convert this case to Chapter 7, correct?

25      A.      That's correct.

1    Q.    What were the reasons for filing the

2    motion?

3    A.    Well, the primary reason is that there

4    can be no confirmed Chapter 11 plan in this case.

5    The creditors in this case support conversion of

6    the case.  Do not support a Chapter 11.  And, in

7    fact, any plan proponent would have to be a good

8    faith plan proponent, and Mr. Kowalski, based upon

9    his conduct in this case, could not satisfy the

10   good faith plan proponent requirement.

11   Q.    And why do you say that?

12   A.    Because he has refused to turn over --

13   to comply with any request for turnover of

14   information.  I requested rent rolls.  They were

15   never turned over.  I requested information about

16   real estate taxes that was never turned over.

17   Mr. Kowalski postpetition has collected

18   rents and refused to turn them over.  He has

19   converted property postpetition by taking numerous

20   cash withdrawals in his name, turned them to cash,

21   and the cash has been used for his own purposes.

22   The same requests I made of Mr. Kowalski

23   for the turnover of information I've made the same

24   request to his counsel Mr. Borges.  Neither of them

25   have responded to any of those requests.

1          At the meeting of creditors, the

2     formation -- at a meeting of creditors at which Mr.

3     Kowalski requested the election of a trustee, I

4     questioned him briefly.  He was combative on the

5     record.

6          I asked for the opportunity to come to

7     his business location so I could see the volume of

8     records that he had and so that we could arrange

9     for a subsequent production of records.  He agreed

10    on the record to a date certain and a time certain.

11    On that date, he manufactured reasons to not be

12    available and then just simply said he wasn't going

13    to comply and since that date has made no effort to

14    turn over the documents.

15         Q.    Mr. Paloian, please turn to what has

16    been marked for identification as Trustee's Exhibit

17    Number 20.  This is Bates labeled TE419.  Do you

18    see that?

19         A.    I do.

20         Q.    Are you familiar with this document?

21         A.    I am.

22         Q.    What is this?

23         A.    This is an e-mail from myself to Mr.

24    Kowalski dated August 8th requesting a copy of all

25    the tax bills for all of the properties in which he

1    had either a direct or indirect interest.  This

2    includes all of the LLCs, land trusts,

3    partnerships, joint ventures, settlor trusts,

4    anything that he had any ownership or control over.

5         Q.    Did you receive those documents?

6         A.    I didn't receive any of those documents.

7              MR. SOWKA:  Your Honor, I move that

8    Trustee's Exhibit 20 be admitted into evidence.

9              MR. BORGES:  No objection.

10             THE COURT:  Admitted.

11   BY MR. SOWKA:

12        Q.    Please turn to what has been marked for

13   identification as Trustee's Exhibit Number 21.

14        A.    Yes.

15        Q.    Are you familiar with that document?

16        A.    I am.

17        Q.    What is it?

18        A.    It's an e-mail I wrote on August 9th of

19   this year to Mr. Kowalski informing him that the

20   order of appointment -- the order appointing me as

21   trustee was effective regardless of his appeal of

22   that order.  And I reminded him at that point, that

23   he was not authorized to collect any rents; that

24   any rents that he had collected since the trustee

25   order was entered needed to be immediately turned

1    over to me; and then I asked him when turning over

2    those rents to also note the tenant's name and the

3    related property for the collection.

4          Q.    And did he provide any of the requested

5    information or funds?

6          A.    He did not.

7               MR. SOWKA:  Your Honor, I move that

8    Trustee's Exhibit 21 be admitted into evidence.

9               MR. BORGES:  No objection.

10              THE COURT:  Admitted.

11   BY MR. SOWKA:

12         Q.    Please turn to what has been marked for

13   identification as Trustee's Exhibit Number 22.

14         A.    Yes.

15         Q.    Are you familiar with this document?

16         A.    I am.

17         Q.    What is it?

18         A.    It's an e-mail I wrote to Mr. Kowalski

19   on September 6th of this year in which I informed

20   him that he was terminated in any capacity held in

21   a number of LLCs, Indomitable, Invincible, Piorun,

22   Burros Blancos and Alta Vista, and/or any other

23   limited liability company where he was the owner or

24   had interest, and that he had no authority to

25   conduct any business on behalf of those LLCs, and

1    to remind him, again, that he has no authority to

2    collect rents for properties owned by him or by

3    those LLCs.

4            I again made a demand that he

5    immediately turn over to me all the rents collected

6    from any properties that he owned either directly

7    or indirectly, and I let him know if he had

8    questions just to let me know but please respond in

9    writing.

10           Q.    Did you receive any response?

11           A.    None.

12           Q.    Why did you feel it necessary to send

13    this e-mail communication?

14           A.    Because Mr. Kowalski had made a comment

15    that he -- a comment that he -- that his limited

16    liability companies weren't in bankruptcy so that

17    he was free to do whatever he wanted to do with the

18    revenues from those companies.  In other words, he

19    could take them and convert them to his own use,

20    and that's just simply wrong.

21           The estate owns 100 percent of the

22    ownership interest of those LLCs, and so the estate

23    is the owner of the economic value of those LLCs,

24    including the rents.  Any time he chooses to take

25    money from those LLCs, that's a distribution to Mr.

1    Kowalski.  That's an asset of this estate.

2            MR. SOWKA:  Your Honor, I move that

3    Trustee's Exhibit 22 be admitted into evidence.

4            THE COURT:  Any objection?

5            MR. BORGES:  No objection.

6            THE COURT:  Exhibit 22 is admitted into

7    evidence.

8            MR. SOWKA:  Thank you, Your Honor.

9    BY MR. SOWKA:

10       Q.    Mr. Paloian, please go to what's been

11   marked for identification as Trustee's Exhibit

12   Number 23.

13       A.    Yes.

14       Q.    Are you familiar with this document?

15       A.    Yes.

16       Q.    What is it?

17       A.    This is an e-mail I wrote to Mr.

18   Kowalski on September 13th.

19       Q.    And what does it relate to?

20       A.    It relates to the agreed upon office of

21   -- well, I indicated before that at the meeting of

22   creditors or the election meeting, Mr. Kowalski

23   agreed to provide access to his office for me so I

24   could come by and see the documents at his office

25   so that I could at least see the volume of

1    documents involved.

2              And on that day, he -- I sent him an

3    e-mail to confirm that I was coming over.  The

4    e-mail chain starts earlier in the day.  And if you

5    turn to Trustee Bates Page 426 at the bottom,

6    you'll see that I'm e-mailing him at 11:15 in the

7    morning to remind him that pursuant to our

8    discussion at the meeting of creditors, I'm

9    scheduled to visit your office at 1:00 p.m. today.

10   Please confirm that you will be there and provide

11   access to me.

12             He responded then a short while later,

13   about half an hour later at 11:47, and his response

14   was this is to confirm that I'm continuing to

15   cooperate.

16             Then, you know, at 12:12, essentially

17   just after noon, I responded, thanks, leaving

18   shortly, I look forward to your cooperation.

19   Please have the rent collection available for me.

20             Then he sent me an e-mail within four

21   minutes at 12:16, may we speak.  My girlfriend has

22   been experiencing a medical condition this morning.

23   She is seven-and-a-half months pregnant.  I have to

24   take her to the physician.

25             So somehow between the time he wrote to

1    me at 11:46 and 12:16, an issue came up.  I asked

2    him to call me, and then I asked him what he -- he

3    didn't.

4            Then I asked him what his cell number

5    was so I could call him.  He phoned.  We spoke.  He

6    said that he was not going to allow me access to

7    the property, and that that was it.  He just simply

8    wasn't going to do it.

9            He shares office space with Jan

10   Kowalski.  They office at 1918 West Cermak at the

11   street level.  Ms. Kowalski has been here.  She's

12   been involved in these matters.  And I simply asked

13   him to have her be available to simply let me in so

14   I could see the premises and the volume of

15   documents, and he absolutely flat out refused.

16           And since that day, he has never made

17   any efforts to provide access to the facilities or

18   turn over any of the requested information.

19       Q.    Thank you, Mr. Paloian.

20           MR. SOWKA:  I move Trustee's Exhibit 23

21   be admitted into evidence.

22           THE COURT:  Any objection?

23           MR. BORGES:  No objection.

24           THE COURT:  I'm sorry?

25           MR. BORGES:  No objection, Your Honor.

1          THE COURT:  Exhibit 23 has been admitted

2     into evidence.

3     BY MR. SOWKA:

4          Q.     Please look at what has been marked for

5     identification as Exhibit Number 24.

6          A.     Yes.

7          Q.     Are you familiar with this document?

8          A.     I am.

9          Q.     And what is this?

10         A.     This is an e-mail I wrote to Mr. Borges,

11    Mr. Kowalski's lawyer, on October 17.

12         Q.     And in the e-mail, what did you request?

13         A.     So what I did is I forwarded to Mr.

14    Borges my prior requests to Mr. Kowalski, and

15    you'll see that below is my August 9th

16    communication to Mr. Kowalski letting him know that

17    he's not authorized to collect rents, and he's

18    required to turn over the rents.  And I wanted Mr.

19    Borges and Mr. Wu to know that I've made this

20    demand upon Mr. Kowalski, and that he had failed or

21    refused to do so, and I wanted them to attend to

22    this issue.

23         Q.     And did you receive any response?

24         A.     Neither Mr. Wu nor Mr. Borges returned

25    my call.

1          MR. SOWKA:  Your Honor, I move that

2     Trustee Exhibit 24 be admitted into evidence.

3          THE COURT:  Any response?

4          MR. BORGES:  You said your call.

5          THE WITNESS:  I'm sorry.  My e-mail.

6          MR. BORGES:  You said your call.

7          THE WITNESS:  You're absolutely correct.

8          MR. BORGES:  No objection, Your Honor.

9          THE COURT:  Exhibit 24 is admitted.

10    BY MR. SOWKA:

11         Q.    Mr. Paloian, please turn to Exhibit 13A.

12         A.    Yes.

13         Q.    And we're going to look at the page

14    Bates labeled 241.

15         THE COURT:  241 you said?

16         MR. SOWKA:  Yes, Your Honor.

17    BY THE WITNESS:

18         A.    Yes, I see that.

19    BY MR. SOWKA:

20         Q.    And this is a Byline Bank account

21    statement for Indomitable, LLC?

22         A.    It is.

23         Q.    And this is dated August 31, 2018, is

24    that correct?

25         A.    Correct.

1          Q.      Please turn to the page Bates labeled

2     244.

3          A.      Yes.

4          Q.      On the bottom left-hand corner of the

5     page, there is a check from a Mr. Eric Hibbard to

6     Robert Kowalski.  Do you see that?

7          A.      I do.

8          Q.      And the memo indicates rent for August,

9     correct?

10         A.      Correct.

11         Q.      Do you have any understanding or

12    knowledge of where Mr. Hibbard rents from?

13         A.      Mr. Hibbard rents from a property that

14    is a property directly owned by the estate.

15         Q.      And he made his rent check payable to

16    Mr. Kowalski here, correct?

17         A.      He did, yes.

18         Q.      However, this was deposited into the

19    account for Indomitable, correct?

20         A.      It was.

21         Q.      And the deposit is dated August 6th, is

22    that correct?

23         A.      That's correct.  That's after the

24    appointment of the trustee.

25         Q.      Okay.  And let's look at the check right

1    above that.  There's another check where the memo

2    indicates August rent.

3        A.    Correct.

4        Q.    For it looks like -- it's a little hard

5    to read -- 6505?

6        A.    6500 South Drexel.

7        Q.    Okay.  And that's from Almeta

8    Gardner, --

9        A.    Yes.

10       Q.    -- is that correct?

11             And that's made payable to Mr. Kowalski

12   as well?

13       A.    It is.

14       Q.    And is that for rent for property owned

15   by the estate?

16       A.    I don't recall specifically whether

17   that's a property of the estate.  There's too many

18   for me to remember all of them.

19       Q.    But, again, this deposit was diverted

20   and deposited on August 6th after the trustee's

21   appointment?

22       A.    Yes.

23             And the first one we referred to, the

24   Eric Hibbard check, this was a cash out.  He used

25   the Indomitable account to wash an estate check,

1    and he walked out with the cash.  He didn't deposit

2    and leave it in the account.  He took the cash.

3        Q.    And that's indicated by the notation on

4    the right side?

5        A.    Cash not on us.

6        Q.    Not on us.

7        A.    That means that's not a Byline Bank

8    check.  It just means that Byline honored that

9    check and paid cash on a check that wasn't their

10   check.

11       Q.    Thank you.

12             Please turn to Exhibit 13B.

13       A.    Yes.

14       Q.    And we're going to look at the page

15   marked ending in 251.

16       A.    Correct.

17             Yes.  This is a Burros Blancos bank

18   account at Byline Bank.

19       Q.    And --

20             MR. BORGES:  I'm sorry, which page?

21             MR. SOWKA:  251.

22   BY MR. SOWKA:

23       Q.    And this statement is dated April 30,

24   2018, correct?

25       A.    Correct.

1    Q.    Please turn to Page 256 and the second

2    check from the bottom on the left-hand side.  Do

3    you see that?

4    A.    I do.

5    Q.    And that's a check from a Jorge Sanchez

6    to Mr. Kowalski in the amount of 5,000.  You see

7    that?

8    A.    Yes.  Jorge Sanchez, Check Number 158 in

9    the amount of $5,000 made payable to Mr. Kowalski.

10   Q.    And do you have any understanding of

11   Mr. Sanchez' relationship with Mr. Kowalski?

12   A.    I believe Mr. Sanchez is a business

13   associate of Mr. Kowalski.

14   Q.    And as previously testified by Ms. Lira,

15   Mr. Sanchez' wife sold Mr. Kowalski -- allegedly

16   sold him a Mercedes Benz last year?

17   A.    Yes, I understand that to be the

18   testimony.

19   Q.    All right.  Let's turn to 13C,

20   Bates labeled page 270.

21   A.    Yes.

22   Q.    And this is a Byline Bank account

23   statement in the name of Piorun Properties, LLC?

24   A.    It is.

25   Q.    And it's dated June 30 of 2018?

1    A.    It is.

2    Q.    Okay.  Let's turn to Page 274.

3    A.    Yes.

4    Q.    And on the bottom left-hand side, this

5    is another rent check from Almeta Gardner, is that

6    correct?

7    A.    Almeta Gardner.

8    Q.    Almeta.

9    A.    Yes.

10   Q.    And this is made payable to Mr.

11   Kowalski?

12   A.    It is.

13   Q.    And this was deposited into the Piorun

14   account?

15   A.    It was.

16   Q.    And this was postbankruptcy?

17   A.    It was.

18   Q.    Okay.  Let's turn to the following page.

19   A.    Yes.

20   Q.    And on the bottom right-hand side, there

21   is a check from a Marilyn Sharko that indicates

22   it's -- the memo line says 5301 West Leland?

23   A.    Correct.

24   Q.    Do you have an understanding of what

25   this is?

1      A.    Yes.   This is a rent check.   This is an

2   estate rent check.   Marilyn Sharko is a resident at

3   5301 West Leland.   This is a property directly

4   owned by the estate, not through an LLC, and this

5   is a rent check by her for $1,100.

6      Q.    So this check should have been deposited

7   into the debtor-in-possession bank account,

8   correct?

9      A.    Yes.

10      Q.    Let's turn to the next page.

11      A.    Yes.

12      Q.    And there's a cashier's check indicated

13   in the top right-hand corner payable to Natalie

14   Lira.  Do you see that?

15      A.    I do.

16      Q.    And the date indicates June 18th?

17         THE COURT:  I'm sorry, you're looking at

18   what now?

19         MR. SOWKA:  The top left-hand corner,

20   Your Honor, a cashier's check made payable to

21   Natalie Lira.

22         THE COURT:  Now I see it, yes.

23   BY THE WITNESS:

24      A.    Yes.   This is the check number that ends

25   in 295.

1  BY MR. SOWKA:

2       Q.    Yes.

3       A.    And it is a check in the amount of

4  $5,000.

5       Q.    And the check date is June 18th?

6       A.    That's the date that the check cleared

7  this account.

8       Q.    And that's also postbankruptcy, correct?

9       A.    It is.

10            And then the next check below it is

11  another cashier's check for $3,000, and that's a

12  cashier's check again drawn on Byline Bank that

13  ends in 728.  That's payable to Mr. Kowalski

14  himself in the amount of $3,000.  That is an asset

15  of the estate, and he deposited or negotiated it.

16            He actually cashed this check.  Because

17  if you look across from it, you can see the back of

18  the check.  It says cash on us, which means he took

19  this check payable to him, an asset of the estate,

20  and he washed it through the account of Piorun and

21  walked out of the bank with $3,000.

22       Q.    Thank you, Mr. Paloian.

23            Please turn to what has been marked for

24  exhibit purposes as Exhibit 10A.

25       A.    Yes.

1    Q.    Are you familiar with this document?

2    A.    I am.

3    Q.    And what is this?

4    A.    It's a proof of claim filed by the City

5    of Chicago.

6    Q.    And what is the amount of this claim?

7    A.    Hold on one second.

8    The amount of this claim is $187,625.22.

9    Q.    And what is the basis for this claim?

10   A.    The basis of this claim is unpaid

11   utility charges provided to buildings owned or

12   controlled by Mr. Kowalski, and if you go to Page 3

13   of 4 of this proof of claim, you'll see a list of

14   properties, the dollar amounts for unpaid

15   utilities.

16   So these properties are properties owned

17   either directly by Mr. Kowalski or owned and of the

18   estate through the LLCs where he's the 100 percent

19   owner.

20   Q.    And the list of properties begins on the

21   Bates labeled Page 103, is that correct?

22   A.    Correct.

23   Q.    So when you say utilities, what do you

24   have an understanding of what this encompasses?

25   A.    I understand this to be principally, but

1   not exclusively, water bills.

2        Q.    Do you know if the City of Chicago is

3   listed as a creditor in the debtor's schedules?

4        A.    They were not.

5             MR. SOWKA:  Your Honor, I would like to

6   move Exhibit 10A into evidence.

7             MR. BORGES:  No objection.

8             THE COURT:  Admitted.

9   BY MR. SOWKA:

10        Q.    Mr. Paloian, please turn to Exhibit 10B

11   as in boy.

12        A.    Yes.

13        Q.    Are you familiar with this document?

14        A.    Yes.  This is another proof of claim

15   filed by the City of Chicago.

16             THE COURT:  I'm sorry, where are you at

17   now?  I'm sorry.

18             MR. SOWKA:  10B, Your Honor.

19             THE COURT:  All right.  Go ahead.

20   BY MR. SOWKA:

21        Q.    And what's the basis for this claim?

22        A.    The basis -- the amount of the claim is

23   $59,774.75.  The basis of this claim are

24   administrative hearing judgments entered against

25   Mr. Kowalski for code violations, building

1    violations, and these were judgments against him

2    for his properties for unresolved issues.

3         Q.    And were these claims listed in the

4    debtor's schedules?

5         A.    They were not.

6         Q.    And do you know if these claims are

7    provided for in the debtor's plan that's on file?

8         A.    They are not.

9         Q.    Please turn to Exhibit 27.

10        MR. SOWKA:  Your Honor, before we move

11   on, I would move to admit Exhibit 10B into

12   evidence.

13        THE COURT:  Any objection?

14        MR. BORGES:  No objection.

15        THE COURT:  Admitted.

16   BY MR. SOWKA:

17        Q.    Are you familiar with Exhibit 27, Mr.

18   Paloian?

19        A.    I am.

20        Q.    And what is this?

21        A.    This is a proof of claim filed by the

22   Department of Treasury of the IRS.

23        Q.    And what is the amount of the claim?

24        A.    The amount of the claim is $426,796.61.

25        Q.    And what is the basis for this claim?

1        A.    Unpaid taxes.

2        Q.    And was this claim listed in the

3    debtor's schedules?

4        A.    No, it was not.

5        Q.    And does the debtor's plan provide for

6    payment of this claim?

7        A.    It does not.

8        Q.    Please turn to what has been marked

9    as -- I'm sorry.

10            MR. SOWKA:  I would like to move

11   Exhibit 27 into evidence, Your Honor.

12            MR. BORGES:  No objection.

13            THE COURT:  Exhibit 27 admitted.

14   BY MR. SOWKA:

15       Q.    Mr. Paloian, please turn to what has

16   been marked for identification as Exhibit 18.

17       A.    Yes.

18       Q.    Are you familiar with this document?

19       A.    I am.

20       Q.    And what is this?

21       A.    It's the debtor's objection to the

22   motion to convert the case to a Chapter 7.

23       Q.    And please turn to Page 373 of this

24   exhibit.

25            THE COURT:  I'm sorry, what page now?

1          MR. SOWKA:  373, Your Honor.

2     BY THE WITNESS:

3          A.    Yes.

4     BY MR. SOWKA:

5          Q.    And do you see Paragraph 69?

6          A.    Yes.

7          Q.    Can you read the first sentence?

8          A.    In this case, no creditor has come

9     forward with a preference with the exception of the

10    FDIC-R which seeks conversion.

11         Q.    Do you have an understanding of whether

12    the statement is correct?

13         A.    It's a false statement.  In open court

14    when the motion was presented, the judge asked all

15    of the parties who were in attendance what their

16    position was on the conversion motion, and everyone

17    in attendance supported conversion.

18         Q.    And do you recall who was in attendance?

19         A.    So that was the City of Chicago, the

20    FDIC, Ms. Padilla, and I'm drawing a blank as to

21    whether somebody else was in attendance.

22         Q.    Do you recall if the Office of the U.S.

23    Trustee was present?

24         A.    Yes, the U.S. Trustee's Office was also

25    in attendance, and they supported conversion.

1        MR. SOWKA:  Your Honor, I move that

2    Exhibit 18 be admitted into evidence.

3        MR. BORGES:  No objection.

4        THE COURT:  Admitted.

5    BY MR. SOWKA:

6        Q.    Mr. Paloian, please turn to what has

7    been marked for identification as Exhibit 11, 11A

8    specifically.

9        A.    Yes, I see it.

10       Q.    Are you familiar with this document?

11       A.    I am.

12       Q.    And what is this?

13       A.    This is a proof of claim filed on behalf

14   of Martha Padilla.

15       Q.    And what is the amount of this claim?

16       A.    The amount of this claim -- it has

17   varying amounts.  It says $1,703,425.

18       Q.    And what is the basis for this claim?

19       A.    It's an estimate -- it's an estimate of

20   the -- of Ms. Padilla's marital interest.

21            Ms. Padilla and Mr. Kowalski are

22   involved in a dissolution proceeding, and this is

23   an estimate of what she believes she may be

24   entitled to in a marital division.

25       Q.    And do you have an understanding of

1    whether the debtor's plan provides for payments of

2    this claim?

3         A.    It does not.

4              MR. SOWKA:  Your Honor, I move that

5    Exhibit 11A be admitted into evidence.

6              THE COURT:  Any objection?

7              MR. BORGES:  No objection.

8              THE COURT:  Admitted.

9    BY MR. SOWKA:

10        Q.    Mr. Paloian, please turn to Exhibit 11B

11   as in boy.

12        A.    Yes.

13        Q.    Are you familiar with this document?

14        A.    Yes.  This is a proof of claim on behalf

15   of Martha Padilla.

16        Q.    And what's the amount of this claim?

17        A.    This is $63,000.

18        Q.    And what is the basis for this claim?

19        A.    This is another aspect of her claims

20   against Mr. Kowalski.  If you go to the attached

21   exhibit, the amounts -- Ms. Padilla claims amounts

22   that are due from Mr. Kowalski for alimony,

23   maintenance or support pursuant to the court order.

24        Q.    And do you have an understanding of the

25   current posture of the divorce proceeding?

1      A.    I don't have an intimate knowledge other

2   than I know it's gone on for four years and that

3   issues need to be resolved there so that, you know,

4   we can do what we need to do and finish what we

5   need to do here, also.

6              MR. SOWKA:  Your Honor, I move that

7   Exhibit 11B be admitted into evidence.

8              MR. BORGES:  No objection.

9              THE COURT:  Admitted.

10  BY MR. SOWKA:

11     Q.    Mr. Paloian, please turn to Exhibit 19.

12     A.    Yes.

13     Q.    This is a copy of the case docket,

14  correct?

15     A.    It is.

16     Q.    Okay.  Can I ask that you turn to what

17  has been Bates labeled as Page 401?

18     A.    Yes.

19     Q.    And the Docket entry 95 entered on

20  July 26, 2018, do you see that?

21     A.    Yes.

22     Q.    That's the order appointing a trustee in

23  this case, correct?

24     A.    That's correct.

25     Q.    Please turn to Page 403.

1        A.    Yes.

2        Q.    Do you see Docket entry 106?

3        A.    I do.

4        Q.    And that's the docket entry where you

5    were selected as trustee?

6        A.    Yes.  That's the docket entry of August

7    7, 2018.

8        Q.    Okay.  Let's turn to Page 408, please.

9        A.    Yes.

10       Q.    Do you see Docket entry 151?

11       A.    I do.

12       Q.    And this indicates an adversary case was

13   commenced based on the notice of removal that was

14   filed.

15       A.    That's correct.

16       Q.    And do you have an understanding of the

17   reason for the filing of the notice of removal?

18       A.    Yes.  This was the removal of the state

19   court lawsuit filed by Mr. Kowalski and prosecuted

20   by Mr. Kowalski during the course of his bankruptcy

21   case.

22       Q.    So just to clarify, was the state court

23   case filed before or after the bankruptcy petition?

24       A.    I'd have to -- I think it was -- I'd

25   have to go back and confirm it.  At the present

1    time, without looking at the face of the complaint,

2    my belief is it was filed postbankruptcy.  I know

3    with certainty it was prosecuted postbankruptcy.

4         Q.    And what is the allegations asserted in

5    that complaint?

6         A.    Mr. Kowalski, in that complaint, asserts

7    that he is trying to recover a number of real

8    estate properties that were owned by Mountain Duck,

9    LLC, and he alleges in that complaint that he

10   placed those properties in that LLC and placed his

11   daughter as the managing member, Angela as the

12   managing member, and he did that to put those

13   properties beyond the reach of his creditors.

14        Q.    And what is the relief sought in the

15   complaint?

16        A.    He wants to get those properties back to

17   himself.

18        Q.    And were these transfers disclosed in

19   the statement of financial affairs?

20        A.    No.

21        Q.    And were these assets disclosed in the

22   schedules at any point?

23        A.    No.

24        Q.    Based on your personal experience as a

25   trustee and your firsthand knowledge regarding the

1    debtor's bankruptcy case, in your opinion, is it

2    possible for the debtor to confirm a Chapter 11

3    plan in this case?

4         A.    It's impossible.

5         Q.    Why is that?

6         A.    Well, as I mentioned before, there is no

7    good faith plan proponent before the court.  None

8    of the creditors seek to confirm a plan of

9    reorganization.  Mr. Kowalski, given the number of

10   acts or failures to disclose or conversions of

11   property, can never be a good faith plan proponent.

12         Besides that, there is no realistic plan

13   of reorganization here because these properties

14   simply have too many liens between real estate

15   taxes, unpaid water bills, administrative

16   judgments, the condition of the properties, they

17   simply cannot generate enough cash to pay off all

18   these creditors.

19         In the handful of months if you go back

20   and look at the Byline Bank documents that we've

21   talked about today, the Byline Bank documents of

22   the three LLCs into which Mr. Kowalski was washing

23   money, if you totaled the deposits in those

24   accounts, there's about $41,000 in deposits, but

25   there was about $35,000 in withdrawals, so at most

1  they created net cash of $6,000. That's without

2  payment of any of these IRS obligations,

3  outstanding real estate taxes, any of the water

4  bills. If he's going to create $6,000 in net cash

5  from operations in a quarter, what are we talking

6  about? $25,000 in net cash over a year? It would

7  take him 20 years to pay off just the principal

8  balance of the IRS claim without the accrual of any

9  penalties or interest. It's virtually impossible.

10          MR. SOWKA: Your Honor, I would like to

11  move Exhibit 19 into evidence.

12          THE COURT: Any objection?

13          MR. BORGES: No objection.

14          MR. SOWKA: No further questions, Your

15  Honor.

16          THE COURT: Any questions?

17          MR. BORGES: Yes.

18          Your Honor, we would -- in that we're

19  seeing some of these exhibits for the first time,

20  we'd ask for a few minutes to be able to --

21          THE COURT: All right. I'll take a

22  10-minute break.

23          THE CLERK: Everyone please rise.

24          The court will be in a short recess.

25                (A recess was had.)

```
 1              THE CLERK:  Everyone please rise.

 2              Court is reconvened.

 3              THE COURT:  All right.  Let's proceed.

 4              MR. BORGES:  Thank you, Your Honor.

 5                   CROSS EXAMINATION

 6    BY MR. BORGES:

 7         Q.    Mr. Paloian?

 8         A.    Yes.

 9         Q.    Mr. Paloian, when asked about your

10    motion to convert, you indicated that the main

11    reason was that you didn't think there was a

12    confirmable plan.  That was the first thing that

13    you said.  That you could not confirm this plan.

14    That this is not a feasible plan.  Something to

15    that nature.

16              MR. SOWKA:  Objection, Your Honor.  He's

17    mischaracterizing the witness' prior testimony.

18              MR. BORGES:  Well, I'd like to ask you.

19              THE COURT:  Response to the objection?

20              MR. BORGES:  I'll rephrase it, Judge.

21              THE COURT:  All right.

22    BY MR. BORGES:

23         Q.    Mr. Paloian, what was the main reason

24    you said this case should be converted, that this

25    11 should be converted to a 7?
```

1     A.     There was more than one reason.

2     Q.     What was the first reason?

3     A.     I don't recall the order in which I

4  recited them, but there is no good faith proponent.

5     Q.     And that is based upon some of the

6  claims that have been made?  Some of the proofs of

7  claims that have been submitted --

8     A.     No, it's --

9     Q.     -- and the income?

10    A.     No, no.  It's not the proofs of claims

11 submitted.  It's based upon Mr. Kowalski's theft of

12 estate monies.  His failure to disclose.  He simply

13 never turned over a rent roll in the case.  This

14 has been a go hunt, go fish, go find.  How is he --

15 how is that a debtor who is cooperating?

16           There's much more.

17    Q.     Yeah, there's much more.

18    A.     So there is much more, so just because

19 that's my statement here, I don't want to

20 filibuster and fill 20 minutes.

21    Q.     All right.

22    A.     I'd rather try to address your

23 questions.

24    Q.     Okay.  So you just think there is a

25 totality of reasons why this is not -- could not be

1    done in good faith?

2        A.    Very many.

3        Q.    Now, Mr. Kowalski had another attorney

4    at one time?  Mr. Cohen?

5        A.    I believe so.  Earlier in the case.

6        Q.    Earlier in the case.

7              Well, you testified to a number of -- a

8    number of things here, some being brought to my

9    attention for the first time, but one of the

10   concerns was some of the outstanding proofs of

11   claim, is that correct?

12       A.    (Indicating).

13       Q.    One that you mentioned was -- is it fair

14   to say that you certainly couldn't have a

15   confirmable plan if you couldn't afford it?

16       A.    Correct.

17       Q.    Yeah.  So you mentioned some claims

18   outstanding by the City of Chicago, right?

19       A.    Yes.

20       Q.    And do you know whether those have been

21   adjudicated as yet or are they just claims or what?

22       A.    They are claims, and they are

23   presumptively fact valid.

24       Q.    There's a presumption that they're

25   valid.

1        A.      Correct.

2        Q.      But that might not be the final decision

3    by the City or administrative hearing officer or

4    what have you?  Right?

5        A.      Don't know.

6        Q.      Don't know.

7                There's outstanding water bills on some

8    of these properties, correct?

9        A.      Correct.

10       Q.      Do you know if Mr. Kowalski owns all of

11   these properties?

12       A.      As far as I know, he owns or controls

13   virtually all of them.  If there is one or two --

14   there could be more because he's never provided a

15   complete list of all of the properties in which he

16   has an ownership interest.

17               Like, for example, the Oak Lawn house

18   that he bought with Ms. Padilla (sic).  We just

19   discovered that for the first time today.  That's

20   never been disclosed.  Maybe that has a water bill,

21   too.

22       Q.      So but you don't know whether or if Mr.

23   Kowalski had a plan, whether he'd be able to pay

24   the property tax, the property bills, the water

25   bills that he owes.

1       A.      Was that a question?

2       Q.      Are those water bills --

3       A.      Was that --

4       Q.      -- do they go with the property or is he

5   personally responsible for those?

6       A.      Both.

7       Q.      Both?  He's personally responsible for

8   them?

9       A.      Sure.  If they're owned in his name,

10  he's certainly personally responsible.

11      Q.      But if they were sold, they might be

12  paid at the time of the sale, right?

13      A.      They would have to be because the City

14  won't issue transfer --

15      Q.      Without payment of the water bills.

16      A.      -- without payment of the water bills.

17      Q.      Exactly.

18              Also, you said there are some building

19  code violations and so forth.  $59,000 in building

20  code violations.  And have those cases been

21  adjudicated or is there just a presumption?

22      A.      You mean the proof of claim?

23      Q.      These proofs of claim.

24      A.      Yes, it's the same thing.  All proofs of

25  claim are presumptively valid.

1      Q.      But that may not be the case, though,

2    correct?  It's just a presumption, so it's a

3    rebuttable presumption?

4      A.      That's the case today.

5      Q.      I see.

6            There's also the marital matter, which

7    is substantial.  $1.7 million in addition to

8    63,000.  1.7 million plus 63,000.  Has that been

9    adjudicated or determined whether that's a judgment

10   amount to your --

11     A.      It's the same answer for all the proofs

12   of claim.

13     Q.      Okay.

14     A.      They're all presumptively --

15     Q.      So you don't know whether or not his

16   wife might end up owing him, do you?

17     A.      I don't know that, but I know the claim

18   is presumptively valid today as we stand in court.

19     Q.      All right.  So it's still in

20   litigation --

21     A.      They've been in state court --

22     Q.      -- in the state court.

23     A.      -- for four years.

24     Q.      Right.  Exactly.  So there must be

25   something on both sides, I guess, for this to be

1     going on this long.

2             Now, you indicated that Mr. Kowalski has

3     been uncooperative, not responded to some of your

4     requests, combative at a 2004 meeting.

5             And Mr. Kowalski has brought five boxes

6     in today.  I've been told that he can bring in all

7     of the materials today by 5:00 o'clock?

8        A.     Is that a question?

9        Q.     Yeah.  Would that be of some

10    satisfaction to your requests?

11       A.     Not today.

12       Q.     No?

13       A.     No.

14       Q.     Why not?  What else do you want?

15       A.     Because we need him to identify all of

16    the properties in which he has an interest.  We

17    need a rent roll.  We need the rents that he's

18    collected turned over.  We need to recover the

19    monies that he has stolen from the estate.

20             A rent roll is a pretty simple thing.

21    You know, it's November 1, and we haven't seen a

22    rent roll.

23       Q.     When would you like that?  When would

24    you like that?

25       A.     I wanted it a month ago, two months ago.

1      Q.    That's in the past.

2      A.    No, it's not in the past.  It's part of

3   the record in this case, and it's part of the basis

4   for the motion to convert.

5      Q.    When would you like it now, though?

6      A.    Right now.  This instant.

7      Q.    Okay.  How about tomorrow?

8      A.    Not soon enough.

9      Q.    Not soon enough.

10     A.    Could you tell me what the address is of

11  the property in Oak Lawn that he purchased just in

12  the last month or two?

13     Q.    Probably could inquire.

14     A.    Ask him.

15           MR. BORGES:  Your Honor?

16           THE COURT:  Go right ahead.

17                (Pause.)

18           MR. BORGES:  6821 West 96th Street.

19           THE WITNESS:  That's a start.

20           MR. BORGES:  All right.  That's a start.

21           THE COURT:  6821?

22           MR. BORGES:  6821?

23           MR. KOWALSKI:  Yes.

24           MR. BORGES:  West 96th Street?

25           MR. KOWALSKI:  Yes.

1          THE COURT:  What municipality is that?

2          MR. KOWALSKI:  Oak Lawn.

3     BY MR. BORGES:

4          Q.    Now, you accuse Mr. Kowalski of stealing

5     money from the estate, is that correct?

6          A.    Yes.

7          Q.    And is he entitled to keep any money

8     from operating his business for the various LLCs

9     that he has --

10         A.    No.

11         Q.    -- to your knowledge?

12               None of it?

13         A.    No, not after my appointment.

14         Q.    No operating expenses?

15         A.    No, because he shouldn't be operating

16    the businesses.  They're assets of the estate.

17         Q.    So the LLCs and all the LLCs are all

18    assets of the estate?

19         A.    Yes.

20         Q.    Do you know if Mr. Kowalski had a clear

21    understanding of that?

22         A.    Yes.  I sent him an e-mail.

23               That's why I sent him the e-mail.  To

24    avoid exactly this suggestion of confusion.

25         Q.    I guess he'd been advised otherwise --

1          A.     Is that a question?

2          Q.     -- by his attorneys.

3                 THE COURT REPORTER:  I'm sorry?

4    BY MR. BORGES:

5          Q.     I guess he'd been advised otherwise by

6    other attorneys.  He was under a misunderstanding

7    is what he's telling me.

8                 MR. SOWKA:  Objection, Your Honor.

9    There's no evidence of that that's been submitted

10   on that point in this case.

11                THE COURT:  Objection sustained.

12   BY MR. BORGES:

13         Q.     Do you know how much money is collected

14   from this estate or from the LLCs or the various

15   properties at least that you know of on a monthly

16   basis?

17         A.     You mean historically?

18         Q.     Historically.

19         A.     No, because he's not disclosed that

20   information.

21         Q.     Do you know how much is being collected

22   now?

23         A.     I don't have personal knowledge.  The

24   manager did.

25         Q.     Okay.  And you don't have any knowledge

1    as to how much is coming in?

2        A.    Some rents have been collected, but

3    little.

4        Q.    And what about these FDIC claims?

5    $25 million.  Would you explain that to me?

6        A.    They're not my claims.

7        Q.    All right.  None of those.  You don't

8    know anything about those.  Do you have any

9    knowledge of those?

10        A.    I have the knowledge of the fact that

11    they've been filed and are presumptively valid.

12        Q.    And those are claims that could be

13    objected to?

14        A.    Objections can be filed, yes.

15        Q.    So it's possible that Mr. Kowalski might

16    not owe $25 million.  Is that possible?

17        A.    You would think that if that were the

18    fact, he would have produced documents showing the

19    payment of those claims, but to my knowledge, no

20    such documents have been produced.  It certainly

21    would have been in his interests to produce those

22    documents.

23        Q.    So you've shown that you have given --

24    you sent e-mails to Mr. Kowalski, and you've even

25    sent e-mails to my office.

1      A.     The same e-mails I sent to him, I

2   forwarded to you.

3      Q.     You forwarded to me.

4      A.     So you would be in the know and could

5   help him comply.

6      Q.     But I've never talked to you over the

7   phone, have I?

8      A.     And haven't helped in the compliance.

9      Q.     And you don't know that I received those

10  e-mails, do you?

11     A.     Well, I know you received e-mails --

12     Q.     The e-mails --

13     A.     -- because I sent you an e-mail about

14  the retainer you received from Ms. Kowalski's

15  client trust --

16     Q.     That was a couple days ago.

17     A.     -- account, and you responded -- your

18  office responded to those.  So I sent --

19     Q.     But the e-mails that were brought up

20  just a few minutes ago you don't know about, do

21  you?

22     A.     I do because I sent them to the very

23  same e-mail, and none --

24     Q.     You don't know --

25     A.     -- and none of them --

1    Q.    -- that I received it, though, do you?

2    A.    I know that --

3          THE COURT REPORTER:  Excuse me.

4          THE COURT:  One at a time.  One at a

5    time.

6    BY MR. BORGES:

7    Q.    You don't know that I received it,

8    though, do you?

9    A.    I know that --

10   Q.    The e-mail that you talk about earlier?

11   A.    Can I answer?

12   Q.    Sure.

13   A.    I know that they were successfully sent,

14   and they never bounced back, and they were sent to

15   the same e-mail addresses as the one in which I

16   asked you for the source of the retainer that came

17   from the Jan Kowalski client trust fund account.

18   Q.    Which I provided to you.

19   A.    You provided an affidavit but not an

20   answer as to where the monies came from.

21   Q.    I provided you what I had.

22   A.    You don't know where the monies came

23   from, do you?

24   Q.    Ms. Kowalski indicated to me that it's a

25   client privilege.

1          But Mr. Kowalski has responded to you in

2     the past by e-mail?

3          A.     He only responded to me to cancel --

4          Q.     One time?

5          A.     -- in that chain of e-mails to tell me

6     he would not provide access to me to his office to

7     view the volume of documents.

8          Q.     He indicated that his girlfriend had

9     been sick on one occasion?

10         A.     It's in an e-mail chain.

11         Q.     Do you have any reason to doubt that?

12         A.     I do.

13         Q.     You do?  Why?

14         A.     Because I believe he's not honest.

15         Q.     I see.

16         A.     Because he has lied in multiple

17    occurrences, and he actually lied to the judge

18    today about the events that occurred at his

19    examination at Mr. Rein's office.

20         Q.     That's your -- well, you know, that's

21    your perception.

22         A.     It's not my perception.  It's a fact.

23    I'm not the only person who was there.  If you

24    would like to find out more about it, call Mr.

25    Rein --

1     Q.     You're the one who stood up.

2     A.     Hold on.  Just call Mr. Rein to the

3  stand if you would like to have further

4  corroboration of what happened.  If that's

5  important to your case, do it.

6     Q.     It's part of it.

7            You said he was combative, correct?

8     A.     Correct.

9     Q.     You said that Mr. Kowalski was

10  combative?

11     A.     Yes.

12     Q.     He was interrogated by Mr. Rein, and you

13  think he got a bit upset, and he walked towards

14  you --

15     A.     He did.

16     Q.     -- at which time, you stood up, right?

17  In his face?

18     A.     In my -- I stood up in my space.

19     Q.     In your space?

20     A.     Would you like a demonstration -- an

21  example of what I did?

22     Q.     I'd love to see it.

23     A.     That's what I did (indicating).

24            And he walked from where Mr. Sowka is

25  sitting right up to my face, and he got right in my

1   face literally touching nose to nose without

2   touching.  That's how close it was.

3        Q.   So I'm walking towards you, and then you

4   stand up (indicating)?

5        A.   No, no, no.

6        Q.   It seems like a challenge to me.  I'm

7   just walking to get some water (indicating).

8        A.   No, no.  He came much closer.

9             And, Mr. Borges, if you wanted the

10  water, it was over there (indicating).

11       Q.   Is that why you felt that it was

12  necessary to go to the chief judge and get an

13  emergency executive order against him?

14       A.   I didn't do that.

15       Q.   I see.

16            You knew about it?

17       A.   No, I didn't know about it until I

18  walked into court this morning.

19       Q.   So for any number of reasons, you

20  would -- you would think that Mr. Kowalski's case

21  should be converted, that he should not have the

22  opportunity to file a plan and handle his financial

23  affairs through a Chapter 11?

24       A.   He's a dishonest debtor.  He has

25  committed bankruptcy crimes.  He is not entitled --

1    he cannot be a good faith plan proponent.

2        Q.    I see.  That's your opinion.

3            MR. BORGES:  Okay.  Thank you.  No

4    further questions.

5            THE COURT:  Any other questions of this

6    witness?

7            MR. SOWKA:  I'd like a redirect, Your

8    Honor.

9            THE COURT:  Go right ahead.

10                REDIRECT EXAMINATION

11   BY MR. SOWKA:

12       Q.    Mr. Paloian, Mr. Kowalski's counsel

13   implied that perhaps Mr. Kowalski didn't understand

14   that he wasn't authorized to operate his LLCs after

15   the appointment of the trustee.  Do you recall that

16   line of questioning?

17       A.    Yep.  I do.

18       Q.    Do you recall having a discussion with

19   Mr. Kowalski about this very issue at the meeting

20   of creditors?

21       A.    I did.

22       Q.    Would you please turn to Exhibit 16 of

23   the book?

24       A.    Yes.

25       Q.    And if we look at page 298, this is a

1   transcript of the meeting of creditors that took

2   place on September 6th, is that correct?

3        A.    It is.

4        Q.    And please turn to Page 302.

5        A.    Yes.

6        Q.    And can you read the very last -- the

7   instance where it says Gus, the last two lines, Gus

8   and then Robert?

9        A.    I see it.

10             Okay.  You have no further right to act

11   on behalf of those LLCs because you're 100 percent

12   ownership interest is an asset of this estate which

13   I control as the trustee, and I do not consent to

14   you taking any action as it relates to those LLCs.

15   Do you understand my direction?

16        Q.    And what was Mr. Kowalski's response?

17        A.    I -- I heard what you said, yes.

18             MR. SOWKA:  Your Honor, I move that a

19   copy of the transcript marked as Exhibit 16 be

20   admitted into evidence.

21             MR. BORGES:  No objection, Your Honor.

22             THE COURT:  Exhibit 16 is admitted.

23   BY MR. SOWKA:

24        Q.    Moreover, Mr. Paloian, if we look back

25   to Exhibit 22 to which you testified earlier, after

1    the meeting of creditors, you then sent a followup

2    e-mail reiterating that very point, is that

3    correct?

4        A.    I did.  It's Exhibit 21.

5        Q.    I'm referring to Exhibit 22, that you

6    are hereby -- oh, you terminated him in his

7    capacity as any officer, director in the LLCs, and

8    that was issued on September 6, 2018?

9        A.    I did.

10            But prior to that date, on August 9, I

11   e-mailed Mr. Kowalski and told him that regardless

12   of his appeal of the order appointing me, that he

13   is not authorized to collect rents, and that any

14   rents that he has collected need to be turned over

15   to me immediately, and I asked him to provide the

16   tenant's name and the related property for

17   collection.

18       Q.    And that's the e-mail marked as

19   Exhibit 21 dated August 9th?

20       A.    That's correct.

21       Q.    Now, there was some discussion between

22   you and Mr. Borges with respect to the retainer

23   paid to Mr. Borges?

24       A.    Correct.

25       Q.    So you sent Mr. Borges a series of

1    e-mails after he was retained, but you previously

2    testified that he didn't respond to any of those,

3    is that correct?

4         A.    That's correct.

5         Q.    And then after Mr. Borges filed the

6    disclosure of compensation, you sent him a

7    subsequent inquiry, is that correct?

8         A.    I did.  To the same e-mail address.

9         Q.    And he responded to that one?

10        A.    He did.  I believe his office manager

11   responded on his behalf.

12        Q.    Please turn to what has been marked as

13   Exhibit 8.

14        A.    Yes, I see that.

15        Q.    And this is the disclosure of

16   compensation filed by Mr. Borges, is that correct?

17        A.    It is.

18        Q.    And what about this triggered the

19   inquiry from you?

20        A.    Well, this was filed by Mr. Borges just

21   a handful of days ago.  On October 24, it indicates

22   he received $10,000, and the source is identified

23   as Jan Kowalski's client trust fund account.

24   That's Mr. Kowalski's sister who is here often.

25   And I asked him to confirm the source of those

1    funds.

2         Q.    And is Jan Kowalski an attorney?

3         A.    She is an attorney as I understand.

4         Q.    And this indicates that she paid funds

5    out of her client trust account?

6         A.    Well, that's what this disclosure says.

7    That's what Mr. Borges is telling the court and

8    everybody else.

9              MR. SOWKA:  Your Honor, I move that

10   Exhibit 8 be admitted into evidence.

11             THE COURT:  Any objection?

12             MR. BORGES:  No objection, Your Honor.

13             THE COURT:  Admitted.

14   BY MR. SOWKA:

15        Q.    Mr. Paloian, please turn to Exhibit 9.

16        A.    Yes.

17        Q.    Are you familiar with these documents?

18        A.    I am.

19        Q.    And what are these documents?

20        A.    This is a cashier's check that Mr.

21   Borges directed to be sent to me in response to my

22   inquiry about the source of the funds, and the

23   first is allegedly a copy of a check for $10,000

24   remitted from the Jan Kowalski Client Trust Fund

25   dated September 5, 2018, which I note is a month

1    earlier, more than a month earlier than his

2    disclosure, and attached to it is an affidavit

3    allegedly from Ms. Jan Kowalski.

4         Q.    And that's the following page?

5         A.    That's the second page.  That's Trustee

6    Bates Number 96.

7              And the last paragraph of the affidavit

8    says:  To the best of my knowledge, information and

9    belief, the source of the funds for the cashier's

10   check to Mr. Borges was not from Mr. Kowalski,

11   individually.

12             And I have asked Mr. Borges to find the

13   source of those funds, that this is inadequate for

14   disclosure purposes, and he has not been able to

15   provide the exact source of the funds.

16        Q.    And just to be clear, how did you come

17   into possession of this affidavit from Ms. Jan

18   Kowalski?

19        A.    It came from Mr. Borges in response to

20   my e-mail to him to the same e-mail address about

21   disclosing the source.  What is the ultimate source

22   of these monies?  Simply can't hide behind a client

23   escrow account.

24        Q.    And so Paragraph 4 says it's not from

25   Mr. Kowalski, individually?

1          A.     Yeah, sure.   But as we've seen all day

2     today, he's playing games with monies from the

3     LLCs.

4               So where did the monies come from?   We

5     still don't know.

6               Mr. Borges is here.   He claims not to

7     know.

8               But these are monies that have probably

9     been stolen from the estate.

10              MR. SOWKA:   Your Honor, I move that

11    Exhibit 9 be admitted into evidence.

12              THE COURT:   Any objection?

13              MR. BORGES:   No objection, Your Honor.

14              THE COURT:   Exhibit 9 is admitted.

15              MR. SOWKA:   No further questions, Your

16    Honor.

17              THE COURT:   Any other questions of this

18    witness?

19              MR. BORGES:   Yes, Your Honor.

20                   RECROSS EXAMINATION

21    BY MR. BORGES:

22         Q.     So you sent some e-mails to my office,

23    right, and they were responded to by my office

24    manager?

25         A.     Let's be clear.   None of those responses

1    included rent rolls, tenant identification.  The

2    only responses from your office related to the

3    retainer.

4        Q.    Correct.  Correct.

5              And those were sent to myself and to Mr.

6    Wu, correct?  Those requests that you sent were

7    directed to me and to Mr. Wu?

8        A.    I think the first one may have been to

9    Mr. Wu.

10       Q.    And did you hear from Mr. Wu?

11       A.    No.  The only person I heard from was

12   from your office manager, and it was only by

13   e-mail.

14       Q.    Okay.

15             Now, you asked about the retainer fee,

16   and I immediately contacted Ms. Kowalski, and she

17   provided an affidavit which I provided to you,

18   correct?

19       A.    Are you testifying?

20       Q.    I beg your pardon?

21       A.    Are you testifying?

22             You provided me an e-mail.

23       Q.    I provided --

24       A.    The rest of it I really don't know

25   anything about it.

1       Q.     You asked me -- you asked me a question.

2       A.     I did send an e-mail.

3       Q.     You asked me a question.

4       A.     I did.

5       Q.     You sent me an e-mail, right?

6       A.     I did.

7       Q.     I responded.

8       A.     You did.

9       Q.     And you asked me to determine the

10  source.

11      A.     I did.

12      Q.     And to your knowledge, did I do that?

13      A.     No, you didn't.

14      Q.     And, see, I don't have any investigatory

15  powers.  I don't have a badge or anything.  I'm not

16  law enforcement.

17             I did ask the question.  I will tell you

18  that.

19      A.     Your client is right here.  You just ask

20  him where the monies came from.  He's right here.

21  He's right next to you.

22      Q.     I didn't get the money from him.

23      A.     I know you didn't get the money from

24  him.

25      Q.     He indicated to me he did not.

1          A.    He knows where the money came from.  You

2     simply don't want to ask him, and that's okay.

3          Q.    I can ask him right now.

4                MR. BORGES:  Your Honor, would you like

5     me to ask him?

6                     (Pause.)

7                MR. BORGES:  What he indicated to me was

8     that it was a retainer fee.  A retainer fee.

9                THE WITNESS:  What does that mean?

10                MR. BORGES:  Not that I'm on the stand

11     here.

12                THE WITNESS:  Yeah.  What does that

13     mean?

14                MR. BORGES:  I don't know.  I would

15     prefer for Ms. Kowalski to be here if you would

16     like her to be a witness because she's the one who

17     provided it.  She is the one who provided it.

18                THE WITNESS:  I don't understand what

19     you mean by retainer fee.

20                THE COURT:  I think we've gotten all the

21     answers we're going to get.

22                Do you have any other questions, Mr.

23     Borges?

24                MR. BORGES:  Let me see if I have any

25     further questions.

1           I have no further questions of Mr.

2    Paloian.

3           THE COURT:  All right.  Does anyone else

4    have questions of the trustee?

5           Thank you for testifying.

6           THE WITNESS:  Thank you, Judge.

7           THE COURT:  Any further witnesses, Mr.

8    Sowka?

9           MR. SOWKA:  Your Honor, can I confer

10   with my client very briefly?

11          THE COURT:  Very briefly.  It's almost

12   5:00 o'clock.

13               (Pause.)

14          MR. SOWKA:  Your Honor, we have a few

15   questions for Mr. Kowalski.

16          THE COURT:  I'm sorry, you want to call

17   Mr. Kowalski?

18          MR. SOWKA:  We would like to call Mr.

19   Kowalski.

20          THE COURT:  Please take the witness

21   stand.

22          MR. BORGES:  He's been -- I don't know.

23   Your Honor, Mr. Kowalski would like to testify in

24   his case.  If he's commanded to testify at this

25   time, I imagine he will.

1          THE COURT:  He's just been called as a

2    witness.

3          MR. BORGES:  Okay.

4          THE CLERK:  Raise your right hand.

5              (Witness sworn.)

6       ROBERT KOWALSKI, WITNESS, DULY SWORN,

7              DIRECT EXAMINATION

8    BY MR. SOWKA:

9       Q.    Mr. Kowalski, you were in the courtroom

10   when Ms. Lira testified, correct?

11      A.    I have been, yeah.

12      Q.    And you heard her testify that the two

13   of you purchased a house in Oak Lawn, Illinois,

14   correct?

15      A.    I did hear her say that.

16      Q.    And have the two of you purchased the

17   home in Oak Lawn, Illinois, in the past month?

18      A.    No, I have not purchased the home in Oak

19   Lawn.

20      Q.    What is the house at 6821 West 69th

21   (sic) Street?

22      A.    It's a home at 6821 West 96th Street.

23      Q.    And who owns that home?

24      A.    I do not own that house.

25      Q.    Who owns the home?

1      A.      I do not own that house.

2      Q.      That's not the question I asked.  The

3  question I asked is who is the owner on title of

4  that house?

5      A.      I don't know who the legal holder of

6  title is.

7      Q.      What is your relationship with the

8  house?  You provided the address to your attorney

9  not less than 30 minutes ago.

10      A.      The relationship is my girlfriend -- I

11  have a relationship with my girlfriend.

12      Q.      What does that have to do with the

13  house?

14      A.      My girlfriend testified that she owns a

15  house at that address.

16      Q.      No, she testified that you bought a

17  house at that address.  She said she is not the

18  owner.

19      A.      She's mistaken.

20              She did not say that by the way.  You

21  said -- a minute ago you said "we."  Now you are

22  saying that "I."

23              Let's be quite clear.  I do not have any

24  legal or equitable interest in that home.

25      Q.      Who does?

1          A.     I do not know.

2          Q.     Who would know?

3          A.     You would have to check the records on

4     the house.

5          Q.     Who helped facilitate the purchase of

6     the house?

7          A.     I don't know who helped facilitate the

8     purchase of the house.

9          Q.     So somehow you came to own a house, and

10    you have no idea how?  Is that your testimony here

11    today?

12         A.     That's not my testimony.

13         Q.     What is your testimony?

14         A.     I do not own a house at that address.

15         Q.     How did the house come to you and your

16    girlfriend's possession and control?

17         A.     It did not come to my possession or

18    control.

19         Q.     Have you ever been to the house?

20         A.     I have been in the house.

21         Q.     How did you get in?

22         A.     I walked in the door.

23         Q.     Who has the keys?

24                THE COURT:  I'm sorry?  You walked in

25    the door?

```
 1              THE WITNESS:  Yes.
 2    BY MR. SOWKA:
 3         Q.    Who has keys to the house?
 4         A.    My girlfriend does.
 5         Q.    Your girlfriend.  Is she the only person
 6    who has keys to the house?
 7         A.    I don't know.
 8         Q.    So you don't have keys to the house?
 9         A.    I do not have keys to the house.
10         Q.    Have you ever possessed a key to the
11    house in your entire life?
12         A.    No, I have not.
13         Q.    No.
14               And how many times have you been to the
15    house?
16         A.    Several times.
17         Q.    Several times.
18               How did you get in each time?
19         A.    I walked through the front door.
20         Q.    With whom?
21         A.    With my girlfriend.
22         Q.    So every time you've been there, she
23    brought you there?
24         A.    No.
25         Q.    Well, then who else were you in the
```

1     house with?

2           A.      I was there by myself.

3           Q.      How did you get in if you don't have a

4     key?

5           A.      A key was not required.

6           Q.      So the door is unlocked?

7           A.      Apparently so.

8           Q.      So you are just walking in the house?

9     That's your testimony?

10          A.      That is my testimony, yes.

11          Q.      So how did it come to be that you

12    started showing up at this unlocked house that you

13    have no idea who owns?

14          A.      My girlfriend testified that it's her

15    house.

16          Q.      No, she didn't testify that it's her

17    house.  She testified that you are buying it and

18    going to renovate it, and she said hoarders lived

19    there, and she didn't want to be there until you

20    fixed it up.

21          A.      Yes, I didn't quite understand that

22    either.

23          Q.      Maybe we'll have to call her back again

24    and clarify what her testimony was with respect to

25    who bought the house and how she found out about it

1    because you are testifying that --

2         A.    Is that a question or are you just

3    browbeating me here?  I'm not really quite sure.

4    Was there a question there?

5              THE COURT:  He's not browbeating you,

6    Mr. Kowalski, and that's a definitive judicial

7    ruling.  He's asking you questions.

8    BY MR. SOWKA:

9         Q.    Mr. Kowalski --

10             THE COURT:  Please answer them.

11   BY MR. SOWKA:

12        Q.    -- is it your testimony that you had no

13   knowledge of the house until your girlfriend

14   brought you there?

15        A.    That's correct.

16        Q.    So you knew nothing about it and had

17   never been there?

18        A.    That's right.

19        Q.    Out of the blue, she drove you there one

20   day and showed you the house.

21        A.    That's right.

22        Q.    And indicated she is the owner of the

23   house.

24        A.    Yes.

25        Q.    So she brought you there and said, I own

1    this house.

2         A.    Yes.

3         Q.    And what else did she tell you about the

4    house?

5         A.    It needs work, and there had been

6    hoarders living in the house, and there was quite a

7    bit of debris in the house.

8         Q.    Did she tell you how she came to

9    purchase the house?

10        A.    No.

11        Q.    No.  So you have no idea?

12        A.    I did not purchase the house.

13        Q.    That's not what I asked.

14              I said do you know how she purchased the

15   house?

16        A.    No, I do not.

17        Q.    You do not?

18        A.    No.

19        Q.    Did you ever ask?

20        A.    I did not, no.

21        Q.    So you live together, but you didn't ask

22   how she purchased the house?

23        A.    No, it was not my business to.

24        Q.    Does she have a job?

25        A.    Not at the moment, no.

1      Q.    Did you provide any assistance to Ms.

2    Lira with respect to her acquisition of the home?

3      A.    No.

4      Q.    So you didn't help advise her with

5    respect to the contract?

6      A.    No, I did not.

7      Q.    The purchase price?

8      A.    No.

9      Q.    The title work?

10     A.    None.

11     Q.    The notary?

12     A.    No.

13     Q.    Have you ever seen any of the documents

14   with respect to the acquisition of the home?

15     A.    No.

16     Q.    Do you know if the home is purchased by

17   an LLC?

18     A.    I do not.

19     Q.    Do you know if it was purchased by a

20   land trust?

21     A.    I do not.

22     Q.    Please turn to Exhibit 15.

23          MR. SINHA:  Your Honor, we would ask for

24   all other witnesses to be excluded at this time.

25          THE COURT:  You'd ask what?

1          MR. SINHA:  We'd ask for other

2    witnesses, specifically Ms. Lira, to be excluded

3    from the courtroom at this time.

4          THE COURT:  Who?

5          MR. SINHA:  Ms. Lira.  Natalie Lira.

6          THE COURT:  Any objection?

7          All right.  She's excluded since she's

8    probably going to have to testify again.

9          You have to step out in the hall, young

10   lady.

11         Let's proceed.

12   BY MR. SOWKA:

13       Q.    Mr. Kowalski, do you see the page marked

14   294?

15       A.    Yes, I do.

16       Q.    And this is a cashier's check that you

17   drew on August 13, 2018?

18       A.    It has my name on it as the remitter.

19       Q.    Are you saying you've never seen this

20   check before?

21       A.    I didn't say that.

22       Q.    Did you cause this check to be drawn?

23       A.    It looks like I did.

24       Q.    What was this check drawn for?

25       A.    This was drawn for -- I don't recall.

1    Q.    You don't recall drawing a check on

2  August 13 for $64,084.35?

3    A.    No.  If I recall, your question was do

4  you recall what -- it was a different question.

5    Q.    Why did you have this cashier's check

6  drawn?

7    A.    I don't recall.

8    Q.    What was this cashier's check used for?

9    A.    I don't think it was used.

10    Q.    Do you see the notation below that says

11  it was deposited on 10-1 and deposited into a Bank

12  of America account?

13         That was the testimony from the

14  representative of Byline Bank.  You were in the

15  courtroom for that testimony.

16    A.    I see your notation, your 10-1-2018.

17    Q.    That's not my notation.  That's Byline

18  Bank's notation indicating the date of deposit of

19  the cashier's check.

20    A.    It doesn't say that's the date of

21  anything.  It's just a date.

22    Q.    Mr. Kowalski, the bank representative

23  already testified to that effect.

24         Please tell me everything you know about

25  this cashier's check and the use of the funds with

1    respect to the cashier's check.

2         A.    I don't recall.  Is there one question

3    in there to answer?  I don't know.

4         Q.    Well, tell me what you do recall with

5    respect to the $64,000 that was spent last month?

6         A.    I don't recall spending 64,000 last

7    month.

8         Q.    You don't recall?

9         A.    No.

10        Q.    Do you recall having this cashier's

11   check drawn?

12        A.    My name appears here, yes.

13        Q.    And then let's turn the page.  This is

14   another cashier's check pay to the order of Premium

15   Title, correct?

16        A.    It's something.  It's not a check.

17        Q.    It says cashier's check.

18        A.    It says cashier's check bank credit

19   copy.

20        Q.    Correct.  And it says not cashed as of

21   10-11-2018.  Do you see that?

22        A.    I do, yes.

23        Q.    Where is this cashier's check?

24        A.    I do not know.

25        Q.    Did you draw this cashier's check?

```
 1          A.      I do not recall.

 2          Q.      Have you delivered this check to anyone?

 3          A.      Not that I'm aware of, no.

 4          Q.      Let's turn the page again.

 5                  See the cashier's check?  Remitter it

 6     says Robert Kowalski?  Pay to the order of Robert

 7     Kowalski?

 8          A.      Yes, I do.

 9          Q.      And that's your name, correct?

10          A.      Yes.

11          Q.      And that's for $4,500?

12          A.      Yes.

13          Q.      And this was deposited on 9-28?

14          A.      I don't know that that's the case.

15          Q.      It's paid out to your name, correct?

16          A.      It is, yes.

17          Q.      And what were these funds used for?

18          A.      I don't recall.

19          Q.      Do you recall any of your financial

20     transactions in the past 60 days?

21          A.      I'm sure I would.  I don't specifically

22     recognize this one.

23          Q.      How can you confirm a Chapter 11 plan if

24     you can't recall a $64,000 check that was deposited

25     30 days ago?
```

1    A.    Let me tell you why.  Because I have had

2    so many transactions I --

3    Q.    But the trustee has been appointed.  You

4    shouldn't be --

5    A.    I have had so many -- I can confirm a

6    plan because I'm dealing with fraudulent claims by

7    the FDIC.  There is no reason why you should have a

8    claim that has amounts that I paid over 10 years

9    ago.  Not just one time, not just two times, but at

10   least three times.

11        You can't let a bank hot wire my

12   companies by taking them and saying that I owe a

13   preposterous amount, $900,000, when an original

14   mortgage amount was 135,000.

15        You can't tell me that my property that

16   I own on Bissell Street, which is a million-dollar

17   house, had a million-dollar mortgage by Washington

18   Federal.  I have the payoff letter from Washington

19   Federal.  And then your claim comes and says, oh,

20   it's 590, which coincides with the amount of the

21   original mortgage.

22        I'll tell you why.  I worked my whole

23   life to provide for my family.  And these claims

24   that the FDIC is asserting is just preposterous.

25   They're fraudulent.  And there's no reason why

1     these claims should just continue to be brought

2     through this courtroom.

3              I have other people that will testify of

4     their same experiences at Washington Federal.

5     We're talking about 27, 26 million.  I don't know

6     how many millions or zillions we're talking about.

7     But they're ridiculous.

8              And that's why my plan should be

9     confirmed.  Because I've been victimized here.  I

10    can't feed my family.  I can't even get a divorce

11    case done for God sake.  This is terrible.

12        Q.   When is the last time where you engaged

13    in a banking transaction?

14        A.   I don't exactly know what you mean by

15    banking transaction.

16        Q.   When is the last time you made a deposit

17    at the bank?

18        A.   I don't recall the last date, I'm sorry.

19        Q.   When is the last time you withdrew money

20    from the bank?

21        A.   Well, I know for a fact that all my

22    accounts that I had with Indomitable, Piorun and

23    Burros Blancos were all recently frozen, so it's

24    beyond my -- I don't -- I couldn't recall an exact

25    date.

1          Q.      Approximately, when is the last time you

2     withdrew money from the bank?

3          A.      At least upon learning that the trustee

4     had frozen all these accounts.

5          Q.      And when was that?

6          A.      It's been quite a while.

7          Q.      Was that after the trustee was

8     appointed?

9          A.      Yes, it was.

10         Q.      So you were banking through the bank

11    accounts after the trustee was appointed, is that

12    your testimony?

13         A.      Yes, that is my testimony.

14         Q.      So you --

15         A.      Until those accounts were frozen.

16         Q.      So you were continuing to engage in

17    financial transactions after the trustee was

18    appointed?

19         A.      With these LLCs, yes.

20         Q.      How did it come to be that your sister

21    paid a retainer for your legal representation?

22         A.      I think it was from excess retainer that

23    had been provided to her previously.

24         Q.      Excess retainer from whom?

25         A.      Well, from me.

1    Q.    You paid her a retainer?

2    A.    Well, yes.

3    Q.    For what?

4    A.    She had represented one of these LLCs in

5    an easement issue.

6    Q.    Okay.  So the money belonged to the LLC?

7    A.    At one time, yes.

8    Q.    And it was an excess retainer payable

9    back to the LLC?

10   A.    That's a difficult question because, of

11   course, a retainer is paid for an attorney, and

12   it's earned over the course of a representation.

13   Q.    And you testified these were excess

14   proceeds that were not earned by Jan Kowalski?

15   A.    Perhaps.  I'm not quite sure.

16   Q.    How did it come to be that she wrote him

17   a check?

18   A.    Well, she had a client funds account.

19   Q.    Who asked her to write a check?

20   A.    Well, she knew that I needed assistance

21   with counsel.

22   Q.    How did she know that?

23   A.    She has -- she's been helping me with

24   this bankruptcy proceeding.

25   Q.    And did you ask her to write the check?

1    A.    No, I didn't.

2    Q.    How did she know how much she had to

3 pay?

4    A.    She's been actively helping me with my

5 bankruptcy case.

6    Q.    So how did she know the payment

7 instructions?

8    A.    I don't understand the question.

9    Q.    How did your sister obtain the payment

10 instructions to pay a check to your attorney?

11    A.    I don't understand what you mean payment

12 instructions.

13    Q.    She wrote a check to Mr. Borges,

14 correct?

15    A.    Yes.

16    Q.    How did she know to do that?

17    A.    She's been helping me with this through

18 this bankruptcy ordeal.

19    Q.    And did you know that she did this?

20    A.    Yes, I did.

21    Q.    And so did she talk to you before she

22 did it?

23    A.    Oh, yes.  We always --

24    Q.    So you did talk to her before the check

25 was cut?

1      A.      Absolutely, yes.

2      Q.      So you had discussions with her and knew

3   she was going to do this?

4      A.      I knew she wanted to help me retain the

5   best counsel I could.

6      Q.      And what did she tell you was the basis

7   for the source of the payment?

8      A.      It was her client trust account.

9      Q.      What about this LLC of yours that had

10  excess funds sitting around?

11     A.      I don't understand your question how

12  about.

13     Q.      You testified earlier that there were

14  unearned retainer proceeds, correct?

15     A.      Perhaps.

16     Q.      Perhaps?  How did you come to this

17  understanding?

18     A.      I didn't come to a misunderstanding.  I

19  said perhaps.  I'm not quite sure.

20     Q.      You testified to this previously.

21     A.      Again -- again, this is my -- Jan

22  Kowalski's client trust account.  It's not mine.

23  So my answer is not flippant.  Perhaps it is or

24  perhaps it's not.

25     Q.      How many retainers have you paid your

1    sister in the last three years?

2         A.    I paid her a retainer for this

3    representation, or Piorun Properties did, rather.

4         Q.    For what representation?

5         A.    For this easement case that we had with

6    the Chicago Housing -- Chicago Transit Authority.

7    There's an issue.

8         Q.    And how much did you pay her?

9         A.    I don't recall.

10        Q.    And has she earned the rest of the funds

11   that you paid her?

12        A.    As I sit here, I don't know.

13        Q.    So we don't know.  So we need to issue a

14   subpoena to your sister to find out?

15        A.    As you wish.

16        Q.    Let's turn to Exhibit 14, please.

17        A.    May I ask for some water?  Really, it's

18   been a long day for me.  I didn't have any lunch or

19   anything.

20             THE COURT:  All right.  We'll see if we

21   can find some.

22   BY MR. SOWKA:

23        Q.    Mr. Kowalski, do you see this check here

24   on Page 290?

25        A.    Yes, I see it.

1    Q.    And this is -- the remitter is Robert

2    Kowalski, and it's pay to the order of Natalie

3    Lira, correct?

4    A.    Yes.

5    Q.    And Natalie Lira is your girlfriend?

6    A.    Yes, she is.

7    Q.    And this is a cashier's check for

8    $11,000?

9    A.    Yes.

10   Q.    And it's dated July 24th?

11   A.    It is.

12   Q.    And it was deposited on July 26th?

13   A.    I frankly don't understand the notation.

14   Q.    Underneath the check, it says 2-26-2018,

15   correct?

16   A.    That's not the same as being deposited,

17   though.  I'm not quite sure if it's that or if --

18   Q.    The numbers below the check say

19   2-26-2018 (sic), correct?

20   A.    Moreover, I'm not the bank.  I am not

21   sure when or if it was deposited.

22   THE COURT:  7-26?

23   MR. SOWKA:  Yes.

24   BY MR. SOWKA:

25   Q.    7-26-2018, is that what it says under

1     the check?

2          A.     It does.  In the left-hand corner.

3          Q.     Thank you.

4                 What was the purpose of giving your

5     girlfriend $11,000?

6          A.     Well, we had some problems at 1707

7     Newberry, and she was very helpful in coordinating

8     the remediation efforts we had to undertake.

9          Q.     And what was the source of these funds?

10         A.     These must have been from one of the

11    LLCs.

12         Q.     And so contrary to her testimony, this

13    wasn't for baby things?

14         A.     You know, I don't know what she -- what

15    she did with the funds.  But we had a problem at

16    1707 Newberry with the porch that was very

17    dangerous.

18         Q.     What does that have to do with this

19    check?

20         A.     May I complete my answer?  Please?

21         Q.     Proceed.

22         A.     We had some problems at 1707 Newberry

23    that the -- this porch was collapsing, and we

24    remediated it.  We had to place concrete.  We had

25    to do electrical work.  We had to do carpentry

1    work.  We had to truck in a great deal of stone.

2    And my girlfriend undertook to help me with this.

3         Q.    Is she a real estate professional?

4         A.    No.  She's a very hard worker.

5         Q.    She's a very hard worker.  And how many

6    months pregnant was she at the point in time in

7    July?

8         A.    She became pregnant in, I think,

9    February, so four to five months.

10         Q.    So four to five months, and she was

11    handling this heavy real estate construction work

12    herself?

13         A.    No.  No.  That's not it at all.  She

14    engaged her brothers, her father, and between all

15    of us, we solved this problem in our house.

16         Q.    So why do you pay a check to Natalie

17    Lira?

18         A.    Well, because she was paying for the

19    various materials that we needed.  She paid for the

20    labor to accomplish things.

21         Q.    So her testimony that she used this

22    check as funds from you to pay her back for prior

23    proceeds to buy things for the baby is false?

24         A.    That was not her testimony.

25         Q.    Her testimony had nothing to do with

1    remediation of the house.  It was to buy things for

2    the baby.

3          A.    I think you're misquoting her testimony.

4          Q.    Let's turn the page.  And this is

5    another $5,000 postbankruptcy that you gave to your

6    girlfriend, correct?

7          A.    Yes.

8          Q.    Why are you using cashier's checks

9    instead of regular checks for these transactions?

10         A.    Well, I don't have a banking account.  I

11   have -- I don't trust the banks.

12               I've had several foreclosures, and they

13   have been -- the banks have been very disingenuous

14   to their borrowers, and I don't trust the banks.  I

15   don't want to have anything to do with the bank.

16               And the experience I am having right now

17   with the FDIC is entirely wrong.

18         Q.    So you're saying you individually don't

19   have accounts?

20         A.    That's correct, yes.

21         Q.    But your LLCs do?

22         A.    Formerly they did, yes.

23         Q.    So you just engage in cash transactions,

24   is that --

25         A.    That's been very effective for me, yes.

```
 1          Q.     And where do you store your cash
 2     currently?
 3          A.     I have whatever cash I have on me.
 4          Q.     Right now?
 5          A.     Not right now, no.
 6          Q.     Where is your money right now if you
 7     don't have it on you right now?
 8          A.     Well, I gave my sister my wallet this
 9     morning because I was fearful of going to jail.
10          Q.     And other than the money in your wallet,
11     do you have control over any other funds or cash?
12          A.     No, I do not.
13          Q.     So that's it?  That's all the money you
14     have?
15          A.     I'm unemployed.  I think I should apply
16     for public assistance.  And I -- I don't know what
17     to do myself.  I have got a child on the way, and
18     things aren't -- things aren't very good.
19                 I've been an attorney for like 30 years,
20     and I could never imagine this drama that's
21     unfolding.  It's not -- it's too much.
22          Q.     So as an attorney, you don't have any
23     current clients?
24          A.     I have people that trust me.  I have
25     clients.  I think you subpoenaed most of them.
```

1      Q.      So you're not unemployed then?

2      A.      I don't think my -- no.  I don't have

3    any active representations where I'm charging a

4    fee, and I -- although I would like to.

5              I think you subpoenaed all of my clients

6    that I have.  I deal with ambitious people that

7    like to do real estate projects.  That's my forte.

8    And I know everything about renting and leases and

9    how to fix and renovate a building, and I pass that

10   along to people, along with, like, my knowledge of

11   zoning law and everything.  But I can't do that

12   because you've subpoenaed them all here.

13     Q.      Do you have any current clients as an

14   attorney?  Yes or no.

15     A.      Well, yes, I do.

16     Q.      And how are they paying you?

17     A.      Right now nobody is paying me anything.

18     Q.      Are you actively representing these

19   clients?

20     A.      I thought I was.  I meet with my clients

21   occasionally.

22     Q.      When is the last time you met with a

23   client?

24     A.      I met with a client yesterday.

25     Q.      And when is the last time that client

1    paid you?

2         A.    I don't recall.  It's been quite a

3    while.

4         Q.    Do you have a client trust account?

5         A.    I do not.

6         Q.    How do you obtain funds when the clients

7    pay you?  Where do you put them?

8         A.    Well, when I would undertake a

9    representation, I would either -- I wouldn't take a

10   retainer.  I would get paid on work if and when it

11   was completed.

12        Q.    So you never took retainers?

13        A.    No, I have not.

14              Well, most of my work, too, is like --

15   pertains to, again, the real estate industry.  So I

16   would help people get through a closing.

17              A lot of times, though, I've had a lot

18   of property.  Many that I represent and I help,

19   they also work for me, so there is a certain barter

20   economy that's going on, too.  You know, a lot of

21   my clients, they know somebody who is a plumber,

22   you know, so there's like a little referral

23   network.  So it's not always just simply a cash

24   transaction.  It's kind of exchange of knowledge in

25   a way.

1    Q.    Please turn to Exhibit 13A.  Please turn

2    to Page 244 of that exhibit.

3         The check on the bottom right-hand

4    corner is a check from Eric Hibbard payable to you,

5    Robert Kowalski, in the amount of $4,450, correct?

6    A.    It looks to be, yes.

7    Q.    And the memo notation is rent for

8    August, correct?

9    A.    Yes.

10   Q.    And Mr. Hibbard is the tenant at 1742

11   North Bissell, correct?

12   A.    He is, yes.

13   Q.    And that's a property that you

14   personally own?

15   A.    No.  No, that would be incorrect.

16   Q.    Who owns that property?

17   A.    I think that's either Indomitable, LLC,

18   or it's Invincible, LLC, actually.  One of the two.

19   Q.    And this is a bank account held by

20   Indomitable, LLC, correct?

21   A.    I don't understand your question.

22   Q.    This bank account that this check was

23   deposited into is an account for Indomitable?

24   A.    From the page you drew my attention to,

25   I cannot tell you.

1   Q.   Let's turn to Page 241.  What's the name

2   of the account holder for this account?

3   A.   Indomitable, LLC.

4   Q.   And you're the sole signatory for this

5   account?

6   A.   No, I'm not.

7   Q.   Who else is the signatory?

8   A.   I believe William Kowalski is as well.

9   Q.   So when you say you don't have any bank

10  accounts, you didn't mean you don't really have any

11  bank accounts.  You just mean not in your name.

12  But you have accounts in your businesses, right?

13  A.   Well, you asked me a specific question.

14  If I, meaning Robert.  If you wanted to ask about

15  Indomitable or --

16  Q.   How many bank accounts are you a

17  signatory for currently?

18  A.   Zero.

19  Q.   Zero.  So you're not a signatory for

20  this account any longer?

21  A.   On this account does not existent any

22  longer.

23  Q.   Because this account is frozen.  It

24  exists.

25  A.   I think you're mistaken.  Officially

1      it's been closed by the bank.

2           Q.     In the last year, how many bank accounts

3      were you signatory on?

4           A.     Three.

5           Q.     Name them.

6           A.     Well, Indomitable, Piorun Properties and

7      Burros Blancos.

8           Q.     And there are no other accounts in the

9      past year which you've been a signatory on?

10          A.     No.

11          Q.     So you haven't had any access to deposit

12     or withdraw funds on any bank accounts anywhere

13     except for these three accounts?

14          A.     Yes, that's correct.

15          Q.     So all of your banking would come

16     through these accounts.

17          A.     (Indicating).

18          Q.     And let's go back to Page 244 and look

19     at that check again from Mr. Hibbard.

20                 So this check is dated August 1st,

21     correct?

22          A.     It appears to be, yes.

23          Q.     So that would have been after the date

24     of the order appointing a trustee, correct?

25          A.     It would, yes.

1    Q.    Why were you depositing checks after a

2    trustee was appointed?

3         A.    Because this did not belong to me

4    personally.  I have a personal bankruptcy, and

5    these LLCs are not me legally.  They're not part of

6    me.  They're separate entities.

7         Q.    Who owns the -- this entity?

8         A.    I am the member that owns this entity.

9         Q.    So you're the sole owner?

10        A.    Yes.

11        Q.    So the bankruptcy estate is now the sole

12   owner of this entity?

13        A.    I'm sorry?  What?

14        Q.    So the bankruptcy estate is the sole

15   owner of this entity now, correct?

16        A.    Yes.  They are, yes.  But I'm just a

17   member.  I'm the managing member.

18        Q.    Approximately how much money have you

19   withdrawn from these three accounts since the

20   trustee was appointed?

21        A.    I don't -- I don't know.  I'd have to

22   look at the bank statements.

23        Q.    Would you say more or less than a

24   hundred thousand dollars?

25        A.    I wouldn't say anything unless I saw

1   the -- we have the statements here.  Do you want

2   to --

3        Q.    Well, I'm asking you for your best

4   recollection.

5        A.    I'm sorry.  It seems like your question

6   calls for speculation.

7        Q.    Let's turn to Page 256.  Do you see the

8   check marked Check Number 158 from Jorge Sanchez

9   payable to you --

10       A.    Yes.

11       Q.    -- in the amount of 5,000?

12             What was this check for?

13       A.    I don't recall.

14       Q.    Who is Jorge Sanchez?

15       A.    Jorge Sanchez is a client of mine.

16       Q.    Is his wife's name Jennie?

17       A.    No.

18       Q.    What's his wife's name?

19       A.    I don't know.

20       Q.    You don't know his wife?

21       A.    I do know his wife.

22       Q.    What is his wife's name?

23       A.    I don't know her name.

24       Q.    You can't remember her name?

25       A.    No.  You're not giving me a chance to

1    answer.  I want to answer --

2            THE COURT:  He's given you chances to

3    answer.  Answer the question, please.

4    BY THE WITNESS:

5        A.    She has an Indian name, and I'm not very

6    familiar with it.

7    BY MR. SOWKA:

8        Q.    Does your wife refer to her as Jennie?

9        A.    I don't know what my wife refers to

10   her --

11       Q.    What about your girlfriend?

12       A.    Yes.  She may, yes.

13       Q.    Your wife -- your girlfriend refers to

14   Jorge Sanchez's wife as Jennie?

15       A.    Yes.

16       Q.    Did you help your girlfriend purchase a

17   Mercedes Benz from the Sanchezes?

18       A.    No, I did not.

19       Q.    Did your girlfriend purchase a Mercedes

20   Benz from the Sanchezes in the last year?

21       A.    I think her testimony was she purchased

22   it from Jennie Sanchez, Mrs. Sanchez.

23       Q.    And what was your involvement in that

24   transaction?

25       A.    I didn't have any involvement other

1    than, obviously, the relationship that was created

2    between me and Jorge was also Natalie knew them,

3    and that was it.  We're friends.  We're social

4    friends as well by the way.

5         Q.     Did you provide Natalie with any

6    financial assistance to purchase the vehicle?

7         A.     I did not, no.

8         Q.     And what types of services do you

9    provide for Jorge Sanchez as a client?

10        A.     Well, I help him in a lot of different

11   ways.  I help him as an attorney.  I try to -- I'll

12   review his loan documents.  I'll help him with a

13   closing.  I will help him on a job site.  With

14   excavation or whatever the trade might be, I'll

15   help him with that.

16            I help him with his legal troubles.  He

17   is also embroiled with a problem with the FDIC

18   where he refinanced a property through Washington

19   Federal, and Washington Federal never filed a

20   release.

21            MR. SOWKA:  Objection, move to strike as

22   nonresponsive.

23            THE COURT:  Response to the objection?

24            I'll overrule that objection.

25   BY THE WITNESS:

1    A.    I helped Mr. Sanchez with that case, and

2  I advised him to do -- that his -- I advised him

3  with his loan documents.  And then I told him where

4  he could work with the title company to get his

5  documentation from that refinance.  I told him it

6  was outrageous that the FDIC, despite having

7  documents, was not providing a release and letting

8  him sell his property.

9         The problems that I'm experiencing with

10  the FDIC are not just limited to me.

11         I also helped him -- I'll help him with

12  anything.  He's a really good friend.  I'll help

13  him clean out his garage.  He's really a great

14  fellow.  He's a -- I've come to -- I really admire

15  him.

16  BY MR. SOWKA:

17    Q.    He's a really good friend?

18    A.    Absolutely, yes.

19    Q.    What's his wife's name?

20    A.    His wife's name is -- she has an Indian

21  name.

22    Q.    You don't know his wife's name.  Your

23  really good friend's wife's name you don't know

24  what it is.

25    A.    You asked me a specific question.  I

1   know you called her Jennie.  But do I know her

2   name?  I -- there's a lot -- what her true name is?

3   Could be a lot of different names.

4        Q.   Let's turn to Exhibit 13C.

5        THE COURT:  How much longer will you be,

6   sir?

7        MR. SOWKA:  I can finish up in five more

8   minutes, Your Honor.

9        THE COURT:  All right.  Let's proceed.

10   BY MR. SOWKA:

11        Q.   Page 267.

12        Actually, let's look at the prior page

13   first, 266.

14        This is a Piorun Properties account, is

15   that correct?

16        A.   No, it's Piorun Properties.  Polish

17   name.

18        Q.   Piorun?

19        A.   Piorun.

20        Q.   Piorun Properties.

21        And you're a signatory on this account?

22        A.   I was, yes.

23        Q.   Up until when?

24        A.   Up until the time that Byline Bank

25   closed the account.

1    Q.    Which was approximately when?  After the

2  trustee was appointed?

3    A.    It was some time after that, yes.

4    Q.    So perhaps September?  The trustee was

5  appointed in August.

6    A.    I think -- I think he was appointed in

7  July.

8    Q.    July 26th the court ordered the

9  appointment of the trustee, but Mr. Paloian was

10  appointed as a trustee on August 6th, correct?

11    A.    I don't recall actually.  I don't have

12  the record in front of me.  I don't have the order

13  with me.

14    Q.    Okay.  But you're a signatory on this

15  account, right?

16    A.    I had been.

17    Q.    And this account is dated May 31, 2018?

18    A.    Yes.

19    Q.    And that's after the bankruptcy?

20    A.    It is, yes.

21    Q.    And what's the purpose for having this

22  account?  What's it used for?

23    A.    It's Piorun Properties' account.  Piorun

24  Properties owns rental properties.  We build

25  properties with Piorun Properties.  It's our bank

1    account.

2          Q.    Do you run your personal expenses

3    through this bank account?

4          A.    Not typically.

5          Q.    Not typically?  But sometimes?

6          A.    Yeah, sometimes.

7          Q.    Sometimes you run your personal expenses

8    through here.

9                Let's turn to the next page.  There are

10   two transactions dated 5-29 and 5-30 for the Grand

11   Geneva Resort.  Do you see those?

12         A.    Yes, I do.

13         Q.    What was that for?

14         A.    We took a trip to Grand Geneva Resort.

15         Q.    So this was you running your personal

16   expenses through a business account during the

17   bankruptcy, correct?

18         A.    Yes.  It's a legitimate business

19   expense, yes.

20         Q.    Who is "we"?

21         A.    I went there with Natalie.

22         Q.    How is that a business expense?

23         A.    It was very therapeutic to go there.  I

24   am under a great deal of stress with this

25   bankruptcy.

1      Q.    So vacations with your girlfriend, in

2  your mind, constitute a business expense?

3      A.    Yes.  I'm under a great deal of stress,

4  yes.

5            MR. SOWKA:  Nothing further, Your Honor.

6            THE COURT:  Any other questions of this

7  witness?

8            MR. BORGES:  Yes, Your Honor.

9            THE COURT:  Very quickly, sir.

10                  CROSS EXAMINATION

11  BY MR. BORGES:

12      Q.    Mr. Kowalski, seeing that these LLCs --

13  right?  You had a number of LLCs in the last year,

14  right?

15      A.    Yes.

16      Q.    Yes.  And what was your understanding as

17  to how you could use the monies that came into the

18  LLCs --

19      A.    Well --

20      Q.    -- before and after the filing of the

21  bankruptcy?

22      A.    I have to operate these properties.  And

23  there's a lot of expenses.  I'm one man, and I --

24  from time to time, I'll hire contractors.  I'll pay

25  a water bill from time to time or any kind of bill

1    for that matter.  And I -- it's just very difficult

2    for me to maintain a checking account, but I have

3    receipts for the monies I expended.

4         Q.   And so many of these expenditures that

5    you made or checks that you cashed, you were under

6    the impression that you were able to use that money

7    for the running of the business or the operation of

8    the LLC?

9         A.   Well, yes.  I wanted to keep the LLC

10   going.  It was becoming difficult with these tax

11   bills and water bills increasing, but I was trying

12   to provide service to people.  I wanted to keep the

13   apartments rented out.  It's a full-time job for

14   me.  It's not a hobby.

15        Q.   So you're not a bankruptcy attorney, are

16   you?

17        A.   No, never.

18        Q.   But you had a bankruptcy attorney before

19   you hired our firm, is that correct?

20        A.   Yes.

21        Q.   Were you advised that you could use that

22   money?

23        A.   Yes.  He encouraged me to.

24        Q.   Did he --

25             MR. REIN:  Objection, that's hearsay.

1          THE COURT:  Response to the objection?

2          MR. BORGES:  Your Honor, it's been

3   brought up that Mr. Kowalski has used this money

4   repeatedly as part of the basis for asking for

5   their motion to convert.  And he's been called a

6   liar.  He's been called dishonest.  He's been

7   called all of these things here today.  I would

8   like Mr. Kowalski to have the opportunity to

9   explain --

10         THE COURT:  I'll overrule the objection.

11  But it's getting late.  We may have to come back

12  tomorrow.

13         Answer the question, please.

14  BY THE WITNESS:

15     A.    Yes, my prior attorney encouraged me to

16  keep those properties going and to continue

17  operating the businesses, that those businesses

18  were separate entities, and I had filed a personal

19  bankruptcy.

20  BY MR. BORGES:

21     Q.    I see.  So you thought you could operate

22  the LLCs outside of yourself, that they were

23  separate entities from your personal self, and you

24  felt that you personally filed bankruptcy, is that

25  correct?

1          A.     That was my understanding, yes.

2          Q.     And that the LLCs were not part of your

3    personal bankruptcy.  That was your understanding.

4          A.     Yes.  Yes.

5                 MR. BORGES:  Judge, you want to continue

6    this tomorrow or --

7                 THE COURT:  How many more questions do

8    you have?

9                 MR. BORGES:  I would like -- in that we

10   are seeing some of these exhibits for the first

11   time, Your Honor, I would like the opportunity to

12   review some of them.  It's a lot --

13                MR. SOWKA:  Your Honor, I'm objecting.

14   He's not seeing them for the first time.  We

15   provided them to them yesterday in accordance with

16   the terms of the trial scheduling order.  They've

17   had them and --

18                THE COURT:  I'll give you five more

19   minutes to ask questions, Mr. Borges.  Go ahead.

20                MR. BORGES:  Okay.

21                THE COURT:  Unless you don't think

22   that's enough, we can come back and finish later.

23                MR. BORGES:  I think we should have an

24   opportunity to come back.

25                THE COURT:  All right.  What's best for

```
 1    all concerned to come back?
 2              MR. BORGES:  My wife has been
 3    hospitalized for a month.
 4              THE COURT:  Sorry to hear that, sir.
 5              MR. BORGES:  And she's still in the
 6    hospital.
 7              THE COURT:  Very sorry to hear that.
 8              MR. BORGES:  And I walked out without my
 9    telephone.
10              THE COURT:  I'm very sorry to hear that.
11              I'm thinking Monday afternoon.  Monday
12    morning I have about 500 Chapter 13s.  The rest of
13    the week I don't know whether I will even be
14    around.
15              MR. BORGES:  Monday afternoon?
16              MR. SOWKA:  Monday afternoon is fine,
17    Your Honor.
18              THE COURT:  Probably 1:30 Monday.  And
19    we'll make that a status hearing on the contempt
20    order, too.
21              All right.
22              MR. BORGES:  Judge, may I address the
23    court as to Mr. Kowalski's detention?
24              Mr. Kowalski is --
25              THE COURT:  Has there been compliance
```

```
1    with the --
2              MR. BORGES:  We have all the boxes here
3    and --
4              MR. SOWKA:  Your Honor --
5              THE COURT:  I have to see that there's
6    been compliance and give them a chance to look at
7    them.
8              MR. SOWKA:  Your Honor, nothing
9    additional has been produced.
10             MR. BORGES:  If I can make a short phone
11   call, she's delivering them right now to Mr. Rein's
12   office.
13             THE COURT:  I'm going to give you a
14   status hearing on that Monday.
15             MR. BORGES:  Your Honor --
16             THE COURT:  In fact, prepare a written
17   order that the incarceration is set for status on
18   Monday at 1:30.
19             Anything further?
20             MR. BORGES:  Can we review this
21   tomorrow, Judge?  I mean --
22             THE COURT:  Tomorrow?
23             MR. BORGES:  -- tomorrow is Friday.
24             THE COURT:  There's been no compliance.
25   You have to show me -- I want you to file a
```

1    document that says there's been compliance and to

2    request a hearing.

3           MR. BORGES:  I can do that tomorrow.  I

4    can do that tomorrow.

5           THE COURT:  File your document, and I'll

6    look at it, and I'll -- we'll see where we are.

7           MR. BORGES:  Thank you.

8           THE COURT:  But you have to convince me.

9    You have to give the information to these

10    gentlemen.  You can't tell me it's on the way.

11           MR. BORGES:  They will have it if they

12    don't have it already.

13           THE COURT:  I'm waiting for compliance.

14           MR. BORGES:  Thank you, Judge.

15           THE COURT:  I'm going to ask the marshal

16    to bring Mr. Kowalski back Monday at 1:30.

17           Thank you all very much.

18           THE CLERK:  Everyone please rise.

19           Court is adjourned.

20              (Which were all the proceedings had

21               in the above-entitled cause,

22               November 1, 2018, 9:30 a.m./10:30

23               a.m./2:15 p.m.)

24

25    I, MARY C. KELLY, CSR, DO HEREBY CERTIFY THAT THE
FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.(f)