IN  THE  UNITED  STATES  BANKRUPTCY  COURT
FOR  THE  NORTHERN  DISTRICT  OF  ILLINOIS
EASTERN  DIVISION


Robert M. Kowalski,              )  No. 18 B 09130
                                 )  Chicago, Illinois
                                 )  11:00 a.m.
                      Debtor.    )  November 5, 2018


TRANSCRIPT  OF  PROCEEDINGS  BEFORE  THE
HONORABLE  JACQUELINE  P.  COX


APPEARANCES:

Trustee:                    Mr. Gus Paloian;

For the Trustee:            Mr. James Sowka;

For the Debtor:             Mr. Ernesto Borges;
                            Mr. Michael Burr;

For the FDIC:               Mr. Eric Rein;
                            Mr. Jason Torf;

For Javier Espana and
Jorge Sanchez:              Mr. Jeffrey Gutman;


Court Reporter:             Amy Doolin, CSR, RPR
                            U.S. Courthouse
                            219 South Dearborn
                            Room 661
                            Chicago, IL  60604.

2

# **I N D E X**

| Witness: | DX | CX | REDX | RECX |
|---|---|---|---|---|
| Robert Kowalski | | 6 | 34 | 59 |
| | | | | 85 |
| Javier Espana | 106 | 116 | 124 | |
| Jorge Sanchez | 127 | 131 | 154 | |
| | | 153 | | |

1            THE CLERK:  Taking up the 11:00

2  o'clock continued trial, Robert Kowalski.

3            MR. SOWKA:  Good afternoon, Your

4  Honor.  James Sowka, counsel for Chapter 11 trustee,

5  Gus Paloian.

6            MR. BORGES:  Good afternoon, Your

7  Honor.  Ernesto Borges on behalf of Robert Kowalski.

8            MS. PORTER:  Karen Porter on behalf of

9  Martha Padilla.

10            MR. PALOIAN:  Your Honor, Gus Paloian,

11  case trustee.

12            MR. REIN:  Rick Rein and Jason Torf on

13  behalf of FDIC as receiver.

14            MR. GUTMAN:  Jeff Gutman on behalf of

15  a subpoenaed party, Jorge Sanchez, who is in the rear

16  of the room.

17            THE COURT:  All right.  Where are we

18  in this matter?

19            MR. BURR:  And Mike Burr also

20  appearing on behalf of the debtor.

21            MR. BORGES:  Well, Your Honor --

22            MR. SOWKA:  Judge, we were in the

23  middle of the debtor's testimony when we adjourned.

24  Mr. Borges was intending on taking his direct

25  examination of the debtor.

1              THE COURT:  Let's proceed.

2              MR. GUTMAN:  Judge, if just may ask,

3    I'm really not sure if Mr. Sanchez is intended to be

4    called as a party today.  I mean --

5              THE COURT:  Who subpoenaed him?

6              MR. BORGES:  I did.  I did, Your

7    Honor.

8              THE COURT:  Well, why don't you ask

9    the lawyer --

10              MR. BORGES:  We're --

11              MR. GUTMAN:  Yeah, I did ask --

12              MR. BORGES:  We're --

13              MR. GUTMAN:  -- and they were going to

14    get back to me.

15              MR. BORGES:  If we might have a

16    moment, Judge.  I was -- I thought my client would be

17    here released for this hearing.

18              THE COURT:  Oh, he's not here?

19              MR. BORGES:  No, he's not.

20              MR. SOWKA:  Mr. Kowalski --

21              THE COURT:  Oh, I couldn't see behind

22    you, Mr. Borges.  I didn't realize he wasn't in the

23    chair.

24              MR. BORGES:  No.

25              THE COURT:  Well, I'll take a

1    two-minute break.  Call the Marshal.

2                    MR. SOWKA:  Thank you, Your Honor.

3                    MR. BORGES:  All right.  Thank you.

4                    (Brief recess.)

5                    THE CLERK:  Court is reconvened.

6                    THE COURT:  Let's proceed.

7                    (No response.)

8                    THE COURT:  Let's proceed.

9                    MR. BORGES:  Okay.

10                    THE COURT:  Is the debtor returning to

11   the witness stand at this point?

12                    MR. BORGES:  We left off with him

13   under -- yes, if you can have a seat.

14                    Yes, I think you need to return to the

15   witness stand.

16                    Have you finished everything in your

17   examination?

18                    MR. SOWKA:  Yes, we had concluded

19   our --

20                    MR. BORGES:  You had concluded your --

21   okay.

22                    THE COURT:  So the record is complete,

23   it's now -- who is -- anyone -- will anyone ask this

24   witness any more questions?

25                    MR. SOWKA:  We were -- the debtor --

6

1   my understanding was Mr. Borges was going to cross or

2   redirect the debtor.

3                      THE COURT:  Any questions, Mr. Borges?

4                      MR. BORGES:  Yes.  We had --

5                      THE COURT:  Have a seat, please.

6                      MR. BORGES:  Sir --

7                      THE WITNESS:  Excuse me.

8                      Before we start, Your Honor, I am not

9   well.  I have been incarcerated for the last five --

10  I don't know how many days.  I haven't taken a bath.

11  I'm not shaven.  I smell terribly.  And my eye is

12  hurting terribly.  I have a stye.  And I believe I

13  need medical attention.

14                     THE COURT:  I will ask the Marshals to

15  make sure you get that.

16                     Let's proceed.

17                     (Witness sworn.)

18           ROBERT KOWALSKI, WITNESS, SWORN

19                     CROSS-EXAMINATION

20  BY MR. BORGES:

21      Q    Mr. Kowalski, would you please state your

22  name for the record and spell your name.

23      A    My name is Robert Michael Kowalski.

24      Q    And what is your profession, Mr. Kowalski?

25      A    I do several things.  I'm an attorney.  I

7

1  am a builder/developer.  I own real estate.  I'm

2  primarily real estate and housing focused.

3              THE COURT:  Is there a need for an

4  order of exclusion for the young man who has been

5  subpoenaed to testify?

6              MR. PALOIAN:  We should probably do

7  that, Your Honor.

8              THE COURT:  I'll enter an order

9  excluding.

10             You have to wait outside the courtroom

11  until you're asked to testify, sir.

12             Let's proceed.

13  BY MR. BORGES:

14     Q    And where do you -- how long have you

15  practiced law, Mr. Kowalski?

16     A    I have been an attorney since 1990.

17     Q    And where do you office?

18     A    Presently at 1918 West Cermak, Chicago,

19  Illinois, 60608.

20     Q    Okay.  And where do you live?

21     A    I live at 1707 South Newberry Avenue,

22  Chicago, Illinois, 60608.

23     Q    Okay.  And, Mr. Kowalski, you own a number

24  of -- you filed a Chapter 11 bankruptcy earlier this

25  year, March of this year; is that correct?

8

1      A     Absolutely.

2      Q     Okay.  And what was the purpose of you

3  filing a Chapter 11?

4      A     The purpose was to -- these claims I have

5  with a failed bank, Washington Federal Bank, total

6  $27 million.  They're entirely wrong.  And it puts

7  everything in my life upside down.  I can't buy real

8  estate.  I can't sell any real estate.  I can't get a

9  credit card.  My life is stuck with these bogus

10  loans.

11      Q     And so the purpose of filing Chapter 11 --

12  did you consult with -- did you consult with an

13  attorney before doing that?

14      A     Yes -- yes, I have.

15      Q     And the purpose of filing this was to do

16  what?

17      A     I was hoping to find a forum where these

18  claims could be handled economically.  I can't

19  litigate with the United States government in over 20

20  something foreclosure matters.  There is a claim that

21  has been propounded upon me.  It's like properties

22  that I have sold like several years ago, nonetheless

23  are still on the claim.

24      Q     And so their claim is approximately

25  $27 million?

1       A     After a certain point --

2       Q     Yeah --

3       A     -- it's just arithmetic.

4       Q     And did you borrow $27 million?

5       A     You know, I borrowed many dollars from that

6  bank.  I think I borrowed the same dollar perhaps

7  27 million times.  But I do not owe that amount to

8  the bank.  And the claim includes amounts that are

9  clearly paid.  I provided closing statements.  I've

10 provided proof in the form of photographs of projects

11 that were never completed.  I provided pay-off

12 letters from Washington Federal.  And everything is a

13 grossly distorted number.

14              My pay-off letter from Washington

15 Federal from last fall indicates one million

16 fourteen.  All of a sudden on this claim it's

17 590,000.  And I think my business is more just pin

18 the tail on the donkey, just come up with a number.

19      Q     So let's get back to Washington --

20      A     I --

21      Q     -- Washington Federal is -- that's a bank

22 that you borrowed money from, Washington Federal?

23      A     Correct.  Over a 27-year period, yes.

24      Q     To your knowledge, is that bank still in

25 existence?

1    A    I am absolutely certain they are not in

2  business.  They failed apparently from the wrongdoing

3  and fraudulent activities of the now deceased

4  president of that bank.

5    Q    And those -- approximately how many

6  properties did you borrow money -- you said you

7  borrowed money over the last 27 years from that bank?

8    A    Absolutely.  I had a family to feed, and I

9  was busy buying -- buying vacant lots usually.  I

10  would develop a house, and I would sell the house.

11  Then I would repeat the project -- the process all

12  over again.  I can't tell you how many homes I've

13  built.  Perhaps in the hundreds now.

14    Q    Okay.  And so you were searching for a

15  forum in which to reconcile all of these -- these

16  differences --

17    A    Yes, that's correct.

18    Q    -- with the --

19    A    That's right.  I have a property through

20  Indomitable, LLC.  It's at 4547 South Union.  And

21  when I went to the bank in January, I was given a

22  list and told that I had a loan of 914,000 and some

23  odd dollars.  However, the original mortgage that I

24  recall signing was for 135,000.  But there's no way

25  it could be 900,000.  I don't know where that number

1   came from.

2        Q    Okay.

3        A    It's not even close to being accurate.

4        Q    Now, when you talk about Indomitable,

5   Indomitable is a -- what is it now?

6        A    It's an LLC entity.  It's an Illinois LLC,

7   limited liability company, that I formed, my brother

8   and I, for purposes of developing real estate.

9        Q    And do you have any other LLCs?

10        A    I think I have three, maybe four others.

11        Q    And what are those names?

12        A    Alta Vista, LLC, Invisible, LLC, Piorun

13   Properties, LLC, and Burros Blancos, LLC.

14        Q    And these are all LLCs wherein you are a

15   member of that LLC?

16        A    Yes, that's correct.

17        Q    And are there any other members of any of

18   these LLCs?

19        A    Not presently.

20        Q    So you're the sole member for each of those

21   LLCs?

22        A    I am now, yes.

23        Q    How many properties would you say that you

24   -- that those LLCs own?

25                So you're the managing member, sole

1    member, managing member, of those LLCs, correct?

2         A    Maybe two dozen properties at the moment.

3         Q    Okay.

4         A    Earlier I had owned quite a bit more.

5         Q    Now, the -- the monies that were -- those

6    properties have tenants, correct?  Are these rental

7    properties?

8         A    Every property I had has been renovated in

9    some fashion, and consequently all the properties are

10   sought after.  They're typically not exactly luxury

11   properties.  But all the properties are in good

12   condition, have seen extensive work within the last

13   five years.

14        Q    And have you been tending to these

15   properties?  Do you have someone take care of these

16   properties for you, property managers or --

17        A    No.  This has been my life's work.  And so

18   I -- from a young child my parents owned a -- several

19   apartment buildings.  And this has been my life's

20   work to build.  My father was an engineer, and he had

21   a love of building things.  And I want to follow in

22   his footsteps.

23        Q    So who is responsible for the upkeep of

24   these properties?

25        A    Well, like the farmer and his field, I take

13

1   care of the upkeep, and I –– I'm at my properties on

2   a daily basis, and I maintain a relationship with my

3   clients who are my tenants.  And we try to make a

4   nice –– nice living environment for people.

5        Q    Okay.  Now, I just want to skip over to you

6   were asked to produce certain documents by the

7   trustee.

8                   Initially you were the debtor in

9   possession in this Chapter 11 case ––

10       A    Yes.

11       Q    –– is that correct?

12                  And that changed, and you no longer

13  were the debtor in possession; is that correct?

14       A    That's correct.  I'm unemployed right now.

15       Q    And you're unemployed.

16                  And you were asked to produce certain

17  documents and records by the ––

18       A    Yeah.

19       Q    –– trustee's office?

20       A    Yes.

21       Q    And have you produced those documents?

22       A    I understand there's not a shred of

23  information in my office presently.

24       Q    Okay.  So, can you tell us why you didn't

25  earlier provide some of these documents that the

1    trustee had requested.

2        A    Well, for one, I'm overwhelmed.

3                Number two, there's quite a bit of

4    documents to produce.

5                Three, there may be client confidences

6    within those -- within that information, which I

7    don't think I'm -- my attorney will not allow to me

8    share with other people.

9                And also there may be proprietary

10   information in there consisting of the plans and

11   ideas that we had to repair properties and build

12   properties.

13       Q    So, it's your understanding at this point

14   in time that you have tendered -- do you have -- that

15   you have tendered all of the information to -- absent

16   -- and you did bring boxes to this courtroom last

17   week --

18       A    Yes.

19       Q    -- is that correct?

20                And do you see those boxes in the

21   courtroom?

22       A    Yes, I do.

23       Q    Okay.  And it's your understanding than an

24   additional 14 --

25                THE COURT:  For the record, the

1   witness looked behind him and said yes, he sees the

2   boxes.

3                    MR. BORGES:  Okay.

4   BY MR. BORGES:

5       Q    And have you been informed that there's

6   been another 14 boxes --

7                    MR. REIN:  Objection.  That calls for

8   hearsay.

9                    THE COURT:  Response to the objection.

10                    MR. BORGES:  Well, Judge, Mr -- Mr.

11  Kowalski has been locked up.  It's been difficult for

12  him to -- for information to be shared between him

13  and me.  I did try to go visit him this weekend.

14  They closed early on Friday.  I tried visiting him

15  yesterday.  They closed at 3:00 o'clock.  His sister

16  tried to visit.  They would not let her in the

17  office -- she shares an office with him.

18                    And, Judge, we're just trying to get

19  to the bottom of this as to whether he's been

20  informed.  So all I'm asking is that you --

21                    THE COURT:  What he's been informed

22  about what?

23                    MR. BORGES:  About the delivery of

24  boxes to Mr. Rein's office.

25                    THE COURT:  I'll overrule the

1 objection.

2          THE WITNESS:  Yes, I'm aware that a

3 considerable number of boxes were delivered.  I

4 thought I heard the number 44.

5 BY MR. BORGES:

6     Q     Forty-four boxes.

7          You've heard 44 boxes have been

8 delivered to Mr. Rein's office?

9          MR. REIN:  Judge, I will stipulate

10 that as of the close of business Friday that 36 boxes

11 had been produced to me.  And apparently there are

12 now five more sitting over here.  So that would bring

13 it to a total of 41 boxes.  I have no idea what's in

14 the boxes.  I didn't get a summary of what was in the

15 boxes.  And I haven't gotten a certification or

16 stipulation that production is complete.

17          THE COURT:  All right.

18          MR. BORGES:  Your Honor, if I may,

19 Friday I appeared here and --

20          THE COURT:  I'm sorry, I can't hear

21 you.

22          MR. BORGES:  I was here Friday trying

23 to get the five boxes that are here.  And we also had

24 to box up some things and deliver it to Mr. Rein's

25 office.  Because of the inability to talk to Mr.

1  Kowalski, and then Your Honor was not here, and Your

2  Honor said everything should remain in the courtroom,

3  I was trying to get these boxes over to Mr. Rein's

4  office on Friday.

5                    We would ask Your Honor to indulge us

6  that we have attempted to deliver --

7                    THE COURT:  I'm sorry, indulge what?

8  I'm not clear.

9                    MR. BORGES:  In terms of trying to

10 meet all the requirements in terms of turning

11 everything over to Mr. Rein that was requested, all

12 boxes, documents and so forth.  But --

13                   THE COURT:  So what are you asking me

14 to do?  I'm not clear.

15                   MR. BORGES:  Well, we -- we had wanted

16 -- wanted Your Honor to take into consideration that

17 there are five boxes here that we did try to deliver

18 on Friday.  But the --

19                   THE COURT:  Why weren't they delivered

20 on Friday?

21                   MR. BORGES:  It was my understanding

22 they had -- the Marshal's office had contacted you,

23 and you asked that everything --

24                   THE COURT:  The Marshal's office did

25 not contact me.

1             MR. BORGES:  No?

2             THE COURT:  No.  Why would they ask me

3    for anything?

4             MR. BORGES:  I spoke to your clerk,

5    Judge.  She attempted to provide me with the boxes.

6    Even -- we went to the Marshal's office, she and I.

7    The Marshal came out and said that they had contacted

8    you and that you had said --

9             THE COURT:  The Marshal's office did

10   something in my courtroom without my knowledge,

11   without my permission.  I have no idea what happened.

12   I was told later something with some boxes, without

13   my knowledge, without my input.

14            MR. BORGES:  The Marshal --

15            THE COURT:  Was I asked for some boxes

16   and the Marshals did something?  I don't know.

17            MR. BORGES:  I was --

18            THE COURT:  I didn't -- I didn't ask

19   anybody to do anything.

20            MR. BORGES:  Okay.

21            THE COURT:  By the time something was

22   done, I was told the -- after the fact.  I did not

23   inquire, I did not investigate, and I'm not going to

24   investigate now.

25            MR. BORGES:  All right.  I'm just

1   saying what was told me by the Marshal --

2                   THE COURT:  Well, I regret -- I regret

3   your misunderstanding.

4                   MR. BORGES:  I couldn't even get my

5   brief case.

6                   THE COURT:  I regret your

7   misunderstanding.

8                   MR. BORGES:  Well --

9                   THE COURT:  I still don't understand

10  what you're asking me.

11                  MR. BORGES:  Well, Judge, we just want

12  you to take into consideration that we're trying to

13  comply --

14                  THE COURT:  Take what into

15  consideration?

16                  MR. BORGES:  That Mr. Rein does not

17  have these five boxes in his office --

18                  THE COURT:  Mr. Rein, do you have

19  those five boxes in your office?

20                  MR. REIN:  No.

21                  THE COURT:  Thank you.

22                  Let's proceed.

23                  MR. BORGES:  Okay.

24                  We -- Mr. -- I'm at a little

25  disadvantage, Judge, because I have been unable to

1   talk to my client over the weekend.  We have done the

2   best we can to comply with the --

3            THE COURT:  Are you asking Mr. Rein to

4   take possession of these boxes?

5            MR. BORGES:  Well, he has indicated he

6   will not.  We will deliver them to him.

7            THE COURT:  Let's proceed.

8            MR. BORGES:  Okay.

9            Judge, what I'm asking is that we be

10  allowed -- Your Honor entered an order stating that

11  Mr. Kowalski was in civil contempt and to be

12  incarcerated.  That has caused us an extreme

13  disadvantage here in continuing with some of the

14  questioning of Mr. Kowalski.

15           THE COURT:  I see you filed some kind

16  of pleading this afternoon at 1:08 --

17           MR. BORGES:  Yes, I did --

18           THE COURT:  -- p.m.

19           MR. BORGES:  -- motion to purge the

20  civil contempt and to vacate it.  We are at a

21  disadvantage here.  Mr. Kowalski has boxes that --

22  with information belonging to other clients.

23           THE COURT:  You file a privilege log.

24  If he has something he doesn't want to disclose to

25  them, he could file a privilege log, explain what the

1  document is, why it's privileged.  I will look at it,

2  conduct an in camera inspection, examination of it,

3  and decide whether or not it's discoverable and

4  whether it is privileged.

5              MR. BORGES:  Well, that's why we would

6  need Mr. Kowalski to be available to do that.  He

7  is --

8              THE COURT:  Mr. Kowalski is a lawyer.

9  He could probably do it on his own.

10             But go ahead.

11             MR. BORGES:  Well, we've got a number

12 of boxes at Mr. Rein's office.  We've got boxes that

13 are here.  Mr. Kowalski has been incarcerated since

14 Thursday of last week, and we would ask that Your

15 Honor entertain our motion to vacate this civil

16 contempt.

17             THE COURT:  It's your position that he

18 has now complied with his obligations?

19             MR. BORGES:  Yes, he has, Judge.  He's

20 answered questions --

21             THE COURT:  So he's fully disclosed

22 records?

23             MR. BORGES:  He has -- every record

24 in his office has been either delivered or is in this

25 courtroom right now.  And we'd ask that he be

22

1  permitted to go through these things.  And I would be

2  -- have an opportunity to speak to him.

3  Unfortunately, I have been under some personal

4  matters with my -- the hospitalization of my wife.

5  I've got --

6              THE COURT:  I'm sorry to hear that.

7              MR. BORGES:  -- I was unable to talk

8  to him.  I did not know they close at 3:00 o'clock.

9  We're at a great disadvantage in talking to my client

10  and going over the materials to continue with our

11  case here, Judge.  We ask that he -- that his

12  contempt order be lifted.

13              THE COURT:  Was he held in contempt

14  simply because he didn't produce boxes or was he also

15  held in contempt because he refused to answer

16  questions?

17              MR. BORGES:  I think --

18              THE COURT:  I don't recall.  I don't

19  have the order right in front of me.

20              MR. BORGES:  There's some questions

21  that were asked of him that he was a little, I don't

22  know, fuzzy with.  Maybe he didn't -- it wasn't to

23  the satisfaction of the trustee or Mr. Rein.  That's

24  why I would like the opportunity to go over some of

25  this with him, so that he could be adequately

23

1  represented.  With him being incarcerated, with all

2  of these boxes of materials that I have not seen,

3  he's not seen -- he's got -- I remember, Judge, when

4  the FBI came in, Judge Anthony Walker, and they took

5  all of his materials.  He was an attorney at the

6  time.  And they took all of his records.  And there

7  was a reversal.  And that was something.

8              And here we've got an instance where

9  the Justice Department has all of his records.  He's

10 a lawyer.  He's got other things involved.

11             THE COURT:  He can file a privilege

12 log.  He can file a privilege log and explain what

13 records should not be given to them.  I will look at

14 the privilege log, look at the records, and make --

15 considering the issues -- the matters in dispute, the

16 matters that are relevant to this bankruptcy case,

17 and decide whether or not they're privileged.

18             MR. BORGES:  Okay.  Well, he would

19 like the opportunity to -- you know, he's been

20 practicing law a long time.  He's got tons and tons

21 of records here, Judge.  I just ask that Your Honor

22 consider releasing him so that he might be able to go

23 through these documents.  It's quite difficult and in

24 some sense unfair for him to be able to represent --

25 to be adequately represented when I have not seen

24

1  documents, he's not seen documents.  He doesn't know

2  what's -- what's what, and something 20 years ago,

3  something unrelated.

4              We'd like an opportunity to go to Mr.

5  Rein's office, go through the documents, be able to

6  put an adequate defense up for whatever he's being

7  charged with.  Last week he was called a liar, a

8  thief, everything else.  And he's locked up.  And I

9  understand.  I was a criminal defense attorney, so I

10  know it's difficult sometimes to represent a --

11  somebody who is locked up in county jail.  But this

12  is -- there's a lot of things that he has to deal

13  with, Judge, and witnesses that have to be talked

14  to.

15              THE COURT:  All right.  So you're

16  asking that he be released for compliance?

17              MR. BORGES:  Yes, Judge.  He's --

18              THE COURT:  All right.  Response to

19  that request.

20              MR. REIN:  Yes, Your Honor.  Your

21  order on November 1 was he could purge his contempt

22  by tendering all documents requested and answering

23  all questions posed.  You recognized on November 1st

24  that we needed to review the documents first in order

25  to be able to pose all of the questions.

1              Now they have produced 34 -- it will

2    be 41 boxes of documents that I need to review in

3    order to --

4              THE COURT:  Does that 41 count the

5    ones behind on the --

6              MR. REIN:  Yes.

7              THE COURT:  Okay.

8              MR. REIN:  Forty-one with them all

9    once we get them in order to pose questions.

10             Number two, I asked him at his 2004

11   exam on October 22nd to identify who his clients are.

12   He refused to do so on the basis of attorney-client

13   privilege.  That's not privileged.  It's not a

14   communication with them.  All I asked was for him to

15   identify the clients themselves.  He has refused.

16             We also know that he was disbarred --

17             THE WITNESS:  No.

18             MR. REIN:  -- suspended for misuse of

19   trust funds for a period of time in 2018, and he just

20   paid to be reinstated in July.  So he had no clients

21   for a period of time.  If he did, he was practicing

22   law without a license.

23             THE COURT:  Well, he wasn't licensed

24   to practice law for a period of time, I see what

25   you're saying.

1              MR. REIN:  Right.  So, in order for us

2     to conduct -- and, by the way, we've been asking for

3     documents since May 25th.

4              THE COURT:  So what do you suggest?

5              MR. REIN:  I am suggesting that we

6     come back -- this is a motion to convert and all of a

7     sudden we're discussing the contempt proceeding.

8              THE COURT:  I was about to say that.

9              MR. REIN:  I mean, one has nothing --

10             THE COURT:  I was about to say that

11    because --

12             MR. REIN:  One has nothing to do with

13    the other.  I am happy to address it when you want,

14    and we can discuss how to deal with the order to show

15    cause and the contempt order.

16             THE COURT:  So you object to him being

17    released now?

18             MR. REIN:  Absolutely.

19             THE COURT:  Have you seen those boxes?

20             MR. REIN:  No.  I haven't seen

21    anything he produced.  I have 36 --

22             THE COURT:  You have certain boxes in

23    your office?

24             MR. REIN:  Thirty-six boxes.

25             THE COURT:  When were they delivered?

1          MR. REIN:  I got a total of 11

2   delivered to me on November the 1st, right after the

3   hearing that we -- when we finished it was delivered

4   that evening.  And I got 25 more boxes on Friday

5   evening.  That's 36.  And now there is five more.  I

6   haven't had time to look at any of them.

7          THE COURT:  I see.

8          MR. REIN:  So we can discuss coming

9   back for status after reviewing the documents.  I

10  don't know what's there.  I didn't -- I wasn't given

11  a summary.  I wasn't given a breakdown.  Is it by

12  properties?  Is it just a data dump and I've got to

13  piece my way through it all?  I have no idea.

14         MR. BORGES:  Your Honor, that's just

15  the point.  There is so much involved here, which

16  impacts the motion to convert that -- we tried to

17  begin our compliance on Thursday when we brought

18  these five boxes here.  We since delivered 36 more

19  boxes.  I also have a list of properties, of names

20  and --

21         THE COURT:  Why couldn't all of this

22  stuff have been done --

23         MR. BORGES:  Your Honor --

24         THE COURT:  -- before we got to the

25  contempt stage?

1              I mean, that's relevant as -- what's

2    going on?  I mean, why couldn't Mr. Kowalski have

3    complied initially?  Why does it have to go this far?

4              MR. BORGES:  I didn't represent him

5    from the very beginning, Judge, and I --

6              THE COURT:  I'm not talking from the

7    very -- why couldn't he produce stuff and answer

8    questions at the exam?  Now, I have to admit the

9    transcript that I got was not the complete

10   transcript.  It appeared to be partial.  But he just

11   won't answer questions.

12             MR. BORGES:  Judge --

13             THE COURT:  That's as egregious as not

14   turning over the records.

15             MR. BORGES:  Judge, I will be with

16   him.  We will answer every single question --

17             THE COURT:  Well, we'll just do it

18   here.

19             MR. REIN:  Well, we have to because

20   he's been barred from appearing at my building by

21   security.

22             THE COURT:  I forgot about that.

23             MR. REIN:  So he has to be examined

24   here.  And we've got to make arrangements, and he's

25   got to be accompanied now through --

29

1            THE COURT:  Well, someplace with

2    security.

3            MR. REIN:  Exactly.

4            And let me point out, again, we have

5    been asking for this since May.  He was served with a

6    subpoena the beginning of August.  He knows we've

7    been looking for documents.

8            THE COURT:  He basically did nothing

9    until --

10           MR. REIN:  He did nothing --

11           THE COURT:  -- the --

12           MR. REIN:  Exactly.

13           THE COURT:  And that was the date the

14   contempt order -- rule for contempt was returned.

15           MR. REIN:  He produced two boxes on

16   October 22nd.

17           THE COURT:  I see.

18           MR. BORGES:  And five before the

19   contempt order was entered.  Judge, the solution --

20   let's get to the solution and --

21           THE COURT:  Well, the solution has to

22   be driven by the circumstances.  You can't just pull

23   something out of the air on a wish --

24           MR. BORGES:  Well --

25           THE COURT:  It has to be --

30

1              MR. BORGES:  Judge, all those things

2    are --

3              THE COURT:  -- based on common sense.

4    I'm wondering whether Mr. Kowalski has any interest

5    in cooperating and answering the questions.

6              MR. BORGES:  Judge, I think he's

7    learned his lesson.

8              THE COURT:  I don't know.  The other

9    day when we were -- when Mr. Kowalski was testifying,

10   there was reference to a check from a tenant that was

11   $499.  Where is that in the exhibits?  I want to ask

12   a couple questions about it.

13             MR. SOWKA:  It would be Exhibit 13.

14             THE COURT:  Exhibit 13?

15             MR. SOWKA:  Yes.

16             THE COURT:  I have an Exhibit 13, but

17   I can't --

18             MR. SOWKA:  One of the checks is on

19   page 244.

20             THE COURT:  244.

21             MR. SOWKA:  Correct.

22             THE COURT:  I see.  A check from

23   Almeda Gardner.

24             MR. SOWKA:  As well as the check below

25   that's from Mr. Eric --

1              THE COURT:  Mr. Kowalski, Almeda

2     Gardner, what kind of apartment does she rent from

3     you?

4              THE WITNESS:  She's a tenant at 6500

5     South Drexel on the first floor.

6              THE COURT:  How large is that

7     apartment?

8              THE WITNESS:  It's a three-bedroom,

9     one bath unit on the first floor, Your Honor.

10             THE COURT:  Three bedrooms, one bath.

11    What is her monthly rent?

12             THE WITNESS:  She's a -- well, that's

13    -- the portion that you see there is her subsidy

14    portion that she's responsible --

15             THE COURT:  That's exactly what I was

16    about to ask you.  That figure sounded very low to

17    me.  I was -- my next question is is her rent

18    subsidized?

19             THE WITNESS:  Yes, it is.

20             THE COURT:  By whom?

21             THE WITNESS:  She's a Section 8

22    client, Your Honor.

23             THE COURT:  Section 8 client.  So you

24    get money from the government to subsidize her rent?

25             THE WITNESS:  Piorun Properties does.

1   Piorun Properties owns that building.

2                   THE COURT:  I see.  And you have an

3   interest in Piorun Properties; is that correct?

4                   THE WITNESS:  Absolutely, yes.

5                   THE COURT:  Who subsidizes that rent?

6                   THE WITNESS:  Well, that's part of the

7   Section 8 program.

8                   THE COURT:  From whom do you get that

9   check, sir?

10                  THE WITNESS:  Your Honor, it's never a

11  check.  It's a wire -- wire --

12                  THE COURT:  From whom do you get the

13  money, sir?

14                  THE WITNESS:  I want to say it's from

15  the Chicago Housing Authority.

16                  THE COURT:  You don't know?

17                  THE WITNESS:  I think they administer

18  a federal program.  But as far as the --

19                  THE COURT:  How much money -- how much

20  subsidy money per month do you get for that apartment

21  alone?

22                  THE WITNESS:  I don't know

23  exactly, but I think it's between a thousand and --

24  she has a son that lives with her who is partially

25  disabled as well.  And she is a senior citizen.  And

33

1  I think it's between, like -- it's, like, a thousand

2  fifty to $1100.  It's like ten eighty-three or

3  something --

4           THE COURT:  That's what you get a

5  month?

6           THE WITNESS:  Okay.

7           THE COURT:  Subsidy --

8           THE WITNESS:  Yes.

9           THE COURT:  How many apartments do you

10  get subsidy monies -- do you get Section 8 monies

11  for?

12           THE WITNESS:  I think -- I think 18

13  units.

14           THE COURT:  Total out of the whole

15  state of Illinois?

16           THE WITNESS:  How many do I have?

17           THE COURT:  Yes.  How many

18  apartments -- how many of your apartments get Section

19  8 subsidy money every month?

20           THE WITNESS:  You know, 12, 16,

21  Your Honor.  I'd have to look at my list of

22  properties.

23           THE COURT:  All right.  Any questions

24  about that from anybody?

25           MR. SOWKA:  Yes, Your Honor.

1                    REDIRECT EXAMINATION

2     BY MR. SOWKA:

3          Q     Into what bank are the Section 8 rent funds

4     deposited into each month?

5          A     I'm sorry, which month are we talking

6     about?

7          Q     Into which bank account are they deposited

8     into?

9          A     Right as we speak?

10         Q     Yes, currently.

11         A     I have no idea.  I do not have a bank

12    account.

13         Q     Your entities have bank accounts, correct?

14         A     They had, yes.

15         Q     And your most recent knowledge of where the

16    Section 8 dollars were being deposited, into which

17    bank account were they being deposited into?

18         A     Those bank accounts that I formerly had.

19         Q     For which entities?

20         A     For -- there's only two.  It's Piorun

21    Properties and Indomitable had Section 8 clients.

22         Q     And for how long have those Section 8 funds

23    been deposited into the bank accounts held by those

24    entities?

25         A     How long?

35

1             It's hard to say.  It's not a

2    client-by-client basis.  I think the first client we

3    accepted was in 2004.  So I have -- I've been doing

4    this for a while.

5        Q    And did you collect Section 8 rent during

6    the pendency of the bankruptcy?

7        A    Yes, those companies have, yes.

8        Q    And how many of those dollars did you turn

9    over to the trustee after he was appointed?

10       A    I didn't turn any dollars over to the

11   trustee.

12       Q    And where are the dollars now?

13       A    I have no idea.  Those accounts have been

14   closed.

15       Q    The accounts -- and you were the sole

16   signatory on those accounts up until the time they

17   were closed, correct?

18       A    No.

19       Q    Who else was a signatory?

20       A    I think my brother William was a signatory

21   on one of the accounts.

22       Q    So you and your brother are the sole

23   signatories on those accounts?

24       A    Let me be very clear.  Me and my brother

25   had an interest in Indomitable, and that bank was

36

1   very old.  So I don't think I was the only signatory

2   on that.  But Piorun Properties had a -- we started

3   an account -- once my account -- I had a Piorun

4   Property account at Washington Federal.  And shortly

5   after Royal Bank took over from the failed bank, they

6   terminated my relationship.

7          So those funds were -- they were

8   undeposited for quite a while.  I don't know what

9   happens.  Because it's not a check deposit.  It's a

10  wire deposit.  So I don't have an account.  I only

11  have a closed account.  I don't know what happens to

12  that money at all.

13         You'll have to -- I'm not sure the

14  trustee in the course of his due diligence, take care

15  of his fiduciary duty, he'll know how to track those

16  monies down, but I don't have them.

17     Q    And what efforts have you taken to assist

18  the trustee to locate and acquire those funds so that

19  they could be deposited into a bank account held by

20  the estate?

21     A    I'm available for the trustee if he has any

22  questions.  But it's -- much of our relationship is

23  rather hostile.  He has not asked me any questions.

24  He's not reached out to me.

25     Q    He's not reached out to you during the

37

1  pendency of the bankruptcy case, is that your

2  testimony?

3       A    Quite earlier he did once upon a time, but

4  he has not been very interested in reaching out to me

5  either by email or text or anything.

6       Q    And when he reached out to you, how did you

7  respond?

8       A    I responded that at that particular time

9  when he asked for an appointment, my girlfriend asked

10 me to take her to the hospital, if we could

11 reschedule.  But I wasn't really keen on him doing a

12 drive-by through all my records in the office.  And

13 that seems -- that's why -- what he wanted to do, was

14 just come through my office and see the volumes of

15 things.

16      Q    So you refused access to your office to the

17 trustee?

18      A    Well, I had something that was more

19 important.  I have a child on the way, and I wanted

20 to be responsive and faithful to my girlfriend.

21      Q    In the 44 boxes of documents you turned

22 never to the FDIC, were they at that office located

23 -- that you refused access to the trustee?

24      A    They were at the office, yes, they were.

25           MR. SOWKA:  Just a moment, Your Honor.

38

1           May I approach the witness, Your

2    Honor?  I have an additional exhibit binder.

3               THE COURT:  Go ahead.

4               (Document tendered.)

5               THE COURT:  What did you hand to

6    Mr. Kowalski?

7               MR. SOWKA:  I handed an additional

8    exhibit binder the trustee had.  And I handed up two

9    copies.  They're up on the bench, Your Honor.

10               THE COURT:  Let's proceed.

11   BY MR. SOWKA:

12        Q    Please turn to what's been marked as

13   Exhibit 30, Mr. Kowalski.

14               And this is a copy of the complaint

15   you filed against Mountain Duck Properties; is that

16   correct?

17        A    That's what the caption reads, yes.

18        Q    And according to the file date stamp, this

19   was filed on October 3rd of 2017?

20        A    Yes.

21        Q    And that was after the bankruptcy filing,

22   correct?

23        A    That was before the bankruptcy filing.

24        Q    So that was before the filing.

25               Please turn to -- I'm using -- the

1   Bates label page numbers.

2        A     Could I ask for some water, please.

3        Q     Please turn to page --

4              THE COURT:  We'll find some.

5   BY MR. SOWKA:

6        Q     Please turn to page 493.

7              Those are two copies of your signature

8   on this page, correct?

9              THE COURT:  I'm sorry, that's?

10  BY MR. SOWKA:

11       Q     Two copies of your signature on this page;

12  is that correct?

13       A     It could be.

14       Q     Does it appear to be your signature?

15       A     Sort of.

16       Q     Let's turn back to page 49.

17             Please read paragraph 9.

18       A     (As read)

19             "Robert placed naked title only to

20  these real properties, land trust, limited liability

21  companies, in the name of Angelica, as a nominee or

22  straw person."

23       Q     Who is Angelica?

24       A     Angelica is my adult daughter.

25       Q     Please read paragraph 10.

40

1      A     (As read)

2              "These real properties, land trust and

3      limited liability companies, were not gifts to

4      Angelica."

5      Q     Please read paragraph 14.

6      A     (As read)

7              "These real properties, land trusts

8      and limited liability companies were in place in

9      Angelica's name to shelter them from actual and

10     contemplated litigation and potential creditor claims

11     against Robert."

12     Q     Did any of the properties you transferred

13     include properties that received Section 8 rent

14     funds?

15     A     I did not transfer any properties to her.

16     Q     You did file this complaint, right, on

17     behalf of Mountain Duck?

18     A     I did.  I did not transfer properties to

19     her.  That was not -- this --

20     Q     Let's turn --

21     A     -- transaction --

22     Q     Let's turn to the first page of the

23     complaint --

24     A     There are other transactions.

25     Q     And Robert M. Kowalski is listed as the

1  plaintiff here, correct?

2      A    Yes.

3      Q    And that's you, correct?

4      A    I am Robert M. Kowalski.

5      Q    And you filed this lawsuit, correct?

6      A    It was filed on my behalf, yes.

7      Q    And did you disclose this lawsuit in your

8  bankruptcy petition?

9      A    Yes, I did, because this very same issue

10 was disclosed in another place because we were

11 pursuing the very same properties in my divorce case.

12     Q    Let's turn to Exhibit 6 in the big trial

13 book.

14              MR. BORGES:  Is this the same book?

15              MR. SOWKA:  It's the same book.  Same

16 book from the trial on the 1st.

17 BY MR. SOWKA:

18     Q    Please turn to Exhibit 6.

19              This is the Schedule AB property filed

20 in your bankruptcy case; is that correct?

21     A    It would appear to be.

22     Q    And based on the date stamp on top, this is

23 document 52 filed on June 13th, 2018?

24     A    Yes.

25     Q    Go ahead and show me where the Mountain

1  Duck lawsuit is disclosed as one of your assets,

2  please.

3      A     They're not my assets.  There is -- it's an

4  inchoate -- inchoate issue.  I would like those

5  properties back.  I believe they are my properties.

6  However, they're owned and they've always been owned

7  by my daughter.  And she does not allow me to manage

8  these properties.  I have no involvement with these

9  properties for -- I want to say since the pendency of

10  my divorce.  My daughter sided with my wife for

11  reasons that hurt me greatly.

12     Q     And in the lawsuit, you seek return of the

13  properties, correct?

14     A     Yes.

15     Q     And in your schedules, you didn't disclose

16  the existence of the lawsuit, did you?

17     A     I did through the divorce case because we

18  were pursuing the very same issue through the divorce

19  case.

20     Q     In the schedules --

21     A     You could file a motion in that case, same

22  motion as recited in this complaint, for those

23  properties to be returned to me.

24     Q     In Exhibit 6, do you disclose the existence

25  of this lawsuit?

1      A     I'm quite certain that my divorce case was

2   in here.  I don't know -- I don't know what part of

3   the section of -- my divorce case was.  And it was --

4   substantively it was in there.

5      Q     But you don't disclose this lawsuit in the

6   bankruptcy, correct?  Just -- your argument is you

7   disclosed the divorce proceeding, correct?

8      A     Well, this very same matter -- the

9   substance of this matter is the very same matter as

10  in my divorce case, hence we have provided notice and

11  the existence of this matter through our divorce

12  by -- thereby fulfilling the requirement.

13     Q     So the only way the judge would know about

14  this lawsuit is if she read the entire substance of

15  the file of your divorce proceeding, is that your

16  testimony?

17     A     That's where the information is.  And it

18  was disclosed through there.  So, yes, absolutely.

19  It was a public record.

20             MR. SOWKA:  Your Honor, I move that

21  Trustee's Exhibit 6 be taken into evidence.  This is

22  a copy of the debtor's amended schedules.

23             THE COURT:  Any objection?

24             MR. BORGES:  No objection, Your Honor.

25             THE COURT:  Exhibit 6 is admitted.

1           MR. SOWKA:  Judge, and as a

2    housekeeping matter, going back, I'd also move that

3    Trustee's Exhibit 30, which is a copy of the Mountain

4    Duck complaint, be taken into evidence.

5                  THE COURT:  Any objection?

6                  MR. BORGES:  No objection.

7                  THE COURT:  I'm sorry?

8                  MR. BORGES:  No objection, Your Honor.

9                  THE COURT:  Exhibit 30 is admitted.

10   BY MR. SOWKA:

11       Q    Please turn to Exhibit 31, Mr. Kowalski.

12                This is a copy of the Illinois ARDC

13   attorney registration public disciplinary record for

14   you; is that correct?

15       A    It appears to be that, yes.

16       Q    Please turn to the second page.

17                At the top, this is the suspension of

18   your license to practice law that Mr. Rein referenced

19   earlier; is that correct?

20       A    I'm sorry.  I didn't understand your

21   question.

22       Q    Mr. Rein previously referenced to the court

23   that your license to practice law had been suspended.

24   Do you recall that?

25       A    I recall he said that my license was

45

1    disbarred.  My license had not been disbarred.

2        Q    And according to your record, this

3    indicates that your license to practice law was

4    suspended, correct?

5        A    It was, yes.

6        Q    And the end date of this disposition was

7    July 2nd, 2018?

8        A    I think that was the date, yes.

9        Q    Have you taken on any clients to practice

10    law since July 22nd, 2018?

11        A    Well, yes, I -- yes, I have.

12        Q    You have taken on new clients since then?

13        A    I tried to.  I've spoken to people.  I've

14    delivered legal counsel.  I made a whole bunch of

15    friends on my way to court today, so yes.

16        Q    Have you entered into any written

17    engagement letters with any clients since July 2nd,

18    2018?

19        A    No.  I never have entered into any written

20    agreement with anybody for representation.

21        Q    Have you accepted any retainers since

22    July 2nd, 2018?

23        A    No, I have not.

24        Q    And looking at the second page under the

25    information section, this indicated that you were

46

1  suspended because you misappropriated $2,500 in

2  escrow money that you held in connection with a real

3  estate sale; is that correct?

4      A    Not exactly -- absolutely, no.  It was a

5  very difficult matter.  The contract provided that

6  the purchaser's attorney was going to hold the escrow

7  money.  And, yes, this $2500 that they did find that

8  I was supposed to handle it, I misappropriated it,

9  even though I believe it was an honest mistake.

10              MR. SOWKA:  Your Honor, I move that

11  Exhibit 31 be admitted into evidence.

12              MR. BORGES:  No objection.

13              THE COURT:  Admitted.

14  BY MR. SOWKA:

15      Q    Mr. Kowalski, please turn to Exhibit 32.

16              And this is a synopsis of the review

17  board report and recommendation regarding your

18  suspension; is that correct?

19      A    That's what it's entitled.  I don't know

20  what the body of the document...

21      Q    And this is captioned In the Matter of

22  Robert Michael Kowalski.  That's you, correct?

23      A    Yes, that is me.

24      Q    Let's turn to page 503, Bates label TE

25  0503, please.

1          You see the heading aggravating and

2     mitigating evidence?

3          A     Yes.

4          Q     Go ahead and read the last two sentences on

5     that page and finish the sentence on the following

6     page.

7          A     (As read)

8               "ARDC investigator Jack Pelle

9     testified that he made 20 to 25 phone calls to

10    respondent, sent him additional emails and text

11    messages, and made four different appointments with

12    respondent to pick up a complaint at ARDC's office."

13         Q     Please read the following sentence.

14         A     (As read)

15               "Respondent did not show up for any of

16    the appointments."

17         Q     And looking to the next heading, hearing

18    board's findings and sanction recommendation, go

19    ahead and read those two full paragraphs.

20         A     (As read)

21               "The hearing board found that

22    respondent committed serious misconduct by failing to

23    safeguard the real estate tax escrow funds in

24    dishonestly converting them to his own use.

25               "It also found significant aggravation

48

1  noting his extreme delay in paying restitution, his

2  failure to accept responsibility or show remorse, his

3  failure to fully cooperate in the proceedings, and

4  his precarious financial situation.  It found minimal

5  mitigation.

6              "Making these findings, the hearing

7  board essentially rejected respondent's version of

8  events, finding him not credible in all his

9  testimony.  In contrast, it found Mr. Silver, Ms.

10  Thomas, and Mr. Kelly testified credibly.  It also

11  found that documentary evidence supported the other

12  witnesses' testimony and contradicted respondent's

13  testimony."

14              MR. SOWKA:  Your Honor, I move that

15  the court accept Exhibit 32 into evidence.

16              THE COURT:  Any objection?

17              MR. BORGES:  Well, I would object.  I

18  don't know if counsel -- if this has anything to do

19  with the case at hand.

20              THE COURT:  Response to the objection.

21              MR. SOWKA:  Your Honor, there is a

22  pattern of conduct here with respondent not producing

23  documents, providing false testimony, and

24  fraudulently diverting funds, and not answering

25  questions about his financial affairs and

49

1  transactions.

2           This is a public document that the

3  court can take judicial notice of.  This is a

4  decision regarding Mr. Kowalski's suspension from the

5  practice of law due to his misconduct.  We're here

6  again today on a motion to convert the case due to a

7  series of allegations by the trustee against

8  Mr. Kowalski of his misconduct.

9           This prior ruling is relevant to the

10  outcome of the proceeding.  Moreover, I also assert

11  to the court that it's relevant to the request to

12  purge the ongoing contempt.

13           THE COURT:  Mr. Borges, anything else

14  in support of your objection?

15           MR. BORGES:  No, Your Honor.  I would

16  just say that this doesn't deal directly with the

17  matter at hand.

18           THE COURT:  I will overrule the

19  objection.

20  BY MR. SOWKA:

21     Q    Mr. Kowalski, please turn to Exhibit 34.

22           THE COURT:  Exhibit 32 will be

23  admitted.  I will take judicial notice of it.  He

24  cannot -- it cannot -- it doesn't appear to be in

25  dispute.

1   BY MR. SOWKA:

2       Q    This is a copy of the special warranty deed

3   for 6821 96th Street, Oak Lawn, Illinois; is that

4   correct?

5       A    I don't know.  I have to review the

6   document.

7                    May I please have some water?

8                    THE COURT:  Hold on.

9                    Let's proceed.

10                   Mr. Borges, do you have any bottles of

11  water with you?

12                   MR. BORGES:  I do not, Your Honor.

13                   THE COURT:  Let's proceed.

14                   I'm sorry, did you ask him to look at

15  something?

16                   MR. SOWKA:  Yes, Your Honor.  I asked

17  him to verify that this is a special warranty deed

18  for 6821 96th Street.

19                   THE COURT:  What exhibit are you --

20                   MR. SOWKA:  Exhibit 34, Your Honor.

21                   THE COURT:  All right.

22  BY MR. SOWKA:

23      Q    Are you reviewing Exhibit 34, Mr. Kowalski?

24      A    Yes, I am.

25                   THE COURT:  What is number 34,

1    Mr. Kowalski?

2              THE WITNESS:  It purports to be a

3    special warranty deed.

4    BY MR. SOWKA:

5        Q    And what is the real property affected by

6    the warranty deed?

7        A    6821 96th Street, Oak Lawn, Illinois.

8        Q    And that's the property on November 1st Ms.

9    Madeline (sic) Lira testified you acquired for her,

10   correct?

11       A    I don't recall her testimony.

12       Q    You don't recall her testimony?

13       A    I do not specifically, no.

14       Q    Do you recall answering questions regarding

15   this property last Thursday, Mr. Kowalski?

16       A    Vaguely, yes.

17       Q    And this special warranty deed indicates

18   that the property is titled in a land trust at First

19   Midwest Bank; do you see that?

20       A    Yes, I do.

21       Q    It's a trust dated July 26, 2018, known as

22   trust number 9435; do you see that?

23       A    Yes, I do.

24       Q    Did you assist with establishing this land

25   trust?

52

1      A      I did, yes.

2      Q      Go ahead and tell me about that.

3      A      Just that.

4      Q      Who is the beneficiary of land trust?

5      A      Natalie Lira, I guess.

6      Q      Natalie Lira.

7             And who is the holder of the power of

8      direction on the land trust?

9      A      Natalie Lira.

10     Q      And you helped execute those documents?

11     A      Of her land trust, yes.

12     Q      So you titled this property in her name; is

13     that correct?

14     A      No.  No, she -- she did the closing, and

15     she purchased this home.

16     Q      And what funds did you use to acquire this

17     property, Mr. Kowalski?

18     A      I'm sorry.  I didn't quite understand the

19     question.

20     Q      What funds were used to acquire this

21     property?

22     A      I understand Natalie handled the details of

23     the closing.

24     Q      Well, Natalie previously testified that you

25     handled it and she was unaware.

53

1      A      My testimony is -- it was not my funds.  I
2  did not own this house.
3      Q      Did you supply any funds at all for the
4  purchase or acquisition of this property?
5      A      I have not.
6      Q      Did you supply any funds for the renovation
7  of this property?
8      A      No.
9      Q      Did you transfer any funds to Premium Title
10  with respect to the acquisition of this property?
11      A      I did not.
12      Q      What was the source of funds used with
13  respect to the acquisition of this property?
14      A      I think that was asked and answered.
15              THE COURT:  What is the answer?
16              THE WITNESS:  Ms. Lira's funds were
17  used to purchase her home.
18  BY MR. SOWKA:
19      Q      And what do you know about those funds?
20      A      I don't know anything about those funds.
21      Q      She lives with you, correct?
22      A      Yes.
23      Q      And she's going to have your children
24  shortly, correct?
25      A      I believe so, yes.

1    Q    And she bought a house and you have no idea

2    how, that's your testimony?

3    A    Yes.

4    Q    Have you ever spoken her about the source

5    of funds she used to acquire this house?

6    A    I have not.

7    Q    Whose idea was it to title the house in the

8    land trust?

9    A    I like title in a land trust.  It's a

10   wonderful vehicle to own a home.  It provides

11   privacy.

12   Q    So that was at your suggestion?

13   A    Yes.

14   Q    So you instructed her to do so?

15   A    No, I didn't instruct, but I would counsel

16   that, yes.

17   Q    And did you counsel her to acquire this

18   home?

19   A    Not particularly.  I'm not from Oak Lawn,

20   and I -- her mother lives out there.  So did I

21   counsel her that particular house?  No.

22   Q    How did she come to be aware of this house?

23   A    I really don't know.  Maybe it was because

24   her mother or her family live out there.

25   Q    Since July 26th, 2018, have you been

55

1  involved in the acquisition of any other real

2  properties, whether for your benefit or the benefit

3  of another person?

4      A    I have been looking to see what might be

5  out there, but, no, I have not purchased anything.

6      Q    You mean other than this property?

7      A    Yes -- I did not do anything with this

8  property, but have I been looking to continue my

9  livelihood?  Absolutely.  I don't quite know how, but

10  I want to be -- stay current with what the market is,

11  absolutely.

12      Q    Have you assisted any third parties in

13  acquiring real property since July 26, 2018?

14      A    I think I may have.  I mean, I might have

15  provided advice and counsel.

16      Q    Please tell me about it.

17      A    I have certain clients that always are

18  buying houses.  And I try to encourage them where

19  possible if they have a prospective transaction.

20  Whether they purchase the property or not, I don't

21  know.  I have not -- my services aren't -- at the

22  moment I have been exercised from practicing what I

23  love to do.

24      Q    Have you participated in the documentation

25  of any real estate transactions since July 26, 2018?

1      A      No, I have not.

2      Q      You mean other than this property?

3      A      No, no.  Again, I did help with the

4  preparation of the trust agreement, but that was the

5  extent of my...

6      Q      Have you assisted with the preparation of

7  any other trust agreements with respect to the

8  transfer of any other title to real property since

9  July 26, 2018?

10      A      I can't recall, no.

11      Q      You can't recall?

12      A      Was that a question or a statement?

13      Q      That other than this one you can't recall

14  how many others?

15      A      I'll just repeat my prior answer.

16      Q      So it could have been ten; you don't

17  recall?

18      A      No, it was not ten properties.  I'm

19  certain --

20      Q      Maybe 20.

21      A      I'm sorry, I didn't quite understand your

22  question.

23      Q      Maybe 20 transfers of property?  How many

24  do you think?

25      A      Maybe 20 transfers of what?

1      Q     Of real property.

2      A     You lost me.  Have I personally bought 20

3  pieces?  No.

4      Q     No.  I'm referring to assist in executing

5  last trust documents to transfer title to real

6  property since July 26, approximately how many

7  instances other than this one have you been involved

8  in?

9      A     I don't think there's been any.

10     Q     So just this single incident?

11     A     I think that was before July 26th.

12     Q     The warranty deed is dated October 4, 2018,

13  isn't it?

14     A     Yes.

15     Q     And this was recorded on October 22nd,

16  2018, correct?

17     A     What is that date referring to?

18     Q     Exhibit 34.

19            What was the date of the recording of

20  this deed?

21     A     This was recorded, it appears, on

22  October 22nd, 2018.

23     Q     Have you assisted, provided any advice with

24  respect to renovation of this property?

25     A     Yes, I have.

58

1      Q      Go ahead and tell me about that.

2      A      Just simply my expertise in fixing things.

3   Yes, I've -- I think I've tried to help generally,

4   yes.

5      Q      And what did you do to help?

6      A      I helped clean the house out.  I helped

7   demo the bathroom.

8      Q      What else?

9      A      That's all I've done so far.

10      Q      That's all you've done so far?

11      A      Yes.

12      Q      So what is the current state of the

13   renovation of the house?

14      A      It's incomplete.

15      Q      And have any contractors been engaged with

16   respect to repairing the property?

17      A      I have no idea what Natalie has done.

18      Q      Have you engaged any contractors with

19   respect to the property?

20      A      I do not own the property, so no.

21              MR. SOWKA:  No further questions, Your

22   Honor.

23              THE COURT:  Any questions of this

24   witness?

25              MR. REIN:  I do.

1           THE COURT:  Go ahead, Mr. Rein.

2           MR. REIN:  Just one quick point before

3    I start asking questions sort of piecemeal.  But is

4    counsel finished with his cross of his client?

5           THE COURT:  Mr. Borges?

6           MR. REIN:  Because if he isn't, I'll

7    wait.

8           THE COURT:  Mr. Borges, any other

9    questions?

10          MR. BORGES:  I have no questions.

11          THE COURT:  Mr. Rein, go ahead.

12              RECROSS-EXAMINATION

13   BY MR. REIN:

14     Q    Let me go sort of in reverse order as to

15   questions you were just asked.

16              So on the Oak Lawn property, where was

17   the closing held?

18     A    I don't know.

19     Q    Did you assist Natalie with the closing

20   documents?

21     A    I did not.

22     Q    You didn't review any of the closing

23   documents?

24     A    I did not.

25     Q    Did you see the closing statement?

60

1      A     I have not.

2      Q     Was it closed at a title company?

3      A     I do not know.

4      Q     Do you know who has the closing statement?

5      A     I presume Natalie does.

6      Q     And why do you presume that?

7      A     Because I see a warranty deed here and most

8  transactions are closed through a title company.

9      Q     Was this transaction closed at a title

10 company?

11     A     I don't know.

12     Q     Was it closed at Premiere Title?

13     A     No.

14     Q     How do you know that?

15     A     Because it wasn't closed at Premiere Title.

16 There's no indication on this deed where it was

17 closed at.

18     Q     But you emphatically said no.  So why do

19 you think it was not at Premiere?

20     A     Because I have been a real estate attorney.

21 I've participated in many closings, and typically

22 there's notations on the deed from the various title

23 companies.

24     Q     And typically you closed your transactions

25 at Chicago Title, right?

1      A    Yes.  Absolutely, yes.

2      Q    That was the only title company you used,

3  correct?

4      A    No.

5      Q    What other title companies?

6      A    I think I closed transactions at every

7  title company in Chicago.

8      Q    What other title company?

9      A    I don't quite understand your question.

10     Q    Other than Chicago Title, where else did

11 you close transactions at title companies?

12     A    Oh, closed them a Ticor, American Title

13 Guaranty, closed them at PNTN.  It begins with an R.

14 Republic Title?  There is one a Taylor Street, I

15 think.  I can't think of the name of that.

16     Q    Was the Oak Lawn property closed at Chicago

17 Title?

18     A    I do not know.

19     Q    Was it closed at Ticor, correct?

20     A    I don't know.

21     Q    Was it closed at American Title Guaranty?

22     A    I don't know.

23     Q    Was it closed at PNTN?

24     A    I don't know.

25     Q    Was it closed at Republic Title?

62

1      A     I don't know.

2      Q     Have you seen the land trust documents

3   after you opened -- helped to establish the land

4   trust?

5      A     No.

6      Q     Did you assist Natalie in executing the

7   land trust documents?

8      A     No.

9      Q     So when you said you went to establish --

10  what did you do to establish the land trust at First

11  Midwest?

12     A     I completed the document.

13     Q     You what?

14     A     I completed the trust agreement.

15     Q     What -- how did you go about completing the

16  trust agreement?

17     A     Well, you go online, and you complete the

18  online form.

19     Q     Did a physical written document come to be

20  executed?

21     A     Yes.  It gets printed, yes.

22     Q     And did you assist in that?

23     A     Printing a document?  Yes, I did.

24     Q     So you completed the document, you filled

25  in the blanks, you printed it out and, what, you gave

1    it to Natalie to sign?

2        A    Yes.

3        Q    And then what did you do with the document?

4        A    It was taken to First Midwest Bank.

5        Q    Who took it to First Midwest Bank?

6        A    I don't know how it was taken there.

7        Q    So you don't know how it went from Natalie

8    signing the document to First Midwest?

9        A    Nope.

10       Q    You didn't do it?

11       A    I didn't do it.

12       Q    You didn't ask somebody to do it?

13       A    I did not, no.

14       Q    Did Natalie?

15       A    I have no idea what she may or may not have

16   done.

17       Q    You then were talking about that you opened

18   files or had clients since July 2 of 2018; do you

19   recall that testimony?

20       A    I may have, yes.

21       Q    Did you create a written file for these

22   clients?

23       A    No.

24       Q    So in all the boxes of documents you

25   produced, there's no written file for any of the

64

1  clients from July 2, 2018, correct?

2      A    I'm sorry, July 2?

3      Q    2018.

4      A    Two twenty -- I didn't quite understand

5  your date.

6      Q    I'll ask you again.

7              In the 41 boxes, and 36 in my

8  possession and the five that are sitting behind you,

9  there is no written file for any client that was

10 opened since July 2, 2018, correct?

11     A    Yes, that's correct.

12     Q    In the 41 boxes of documents, can you

13 identify one client whose files are in those boxes?

14             MR. BORGES:  Your Honor, I object.

15 Mr. Kowalski did not put the 41 boxes together

16 because he was in incarceration.  I think the five --

17 but the other 36, I don't know that he knows what's

18 in those boxes.

19             THE COURT:  Response to the objection.

20             MR. BORGES:  It's speculation.

21             MR. REIN:  He produced the documents.

22 He's saying I want to be purged because I produced

23 documents responsive to the 2004 exam.  I'm presuming

24 that he knows what's in those boxes.

25             THE COURT:  I'll overrule the

65

1    objection.  If he doesn't know, he doesn't know.

2                    THE WITNESS:  Please repeat the

3    question.

4    BY MR. REIN:

5        Q    In any of the 41 boxes, 36 in my office,

6    five behind you, can you identify one client whose

7    files are in those boxes?

8        A    Jorge Sanchez.  Javier Espana.  Washington

9    Federal.  I'm certain there's others.

10       Q    Is there one or more than one file for

11   Jorge Sanchez?

12       A    Several.  We participated in transactions

13   together.  We've been good friends for quite a while.

14       Q    Not friends, as a lawyer.

15                   Are there legal files in those boxes

16   pertaining to Jorge Sanchez?

17       A    I would imagine absolutely, yes.

18       Q    Yes or no, not what you imagine.

19                   Is there?

20       A    I didn't say imagine.  You're misquoting.

21                   Yes.

22       Q    Is there one or more than one?  That's what

23   I asked.

24       A    I suspect there's more than one.

25       Q    Are they pertaining to specific properties?

1        A      I imagine they would be, yes.

2        Q      What specific properties?

3        A      They would be pertaining to properties that

4   Jorge has purchased.

5        Q      What specific properties?

6        A      Jorge had a property on 19th Street.  I

7   don't remember the address.  Jorge purchased some

8   rental properties.  I was there.  Jorge purchased a

9   lot.  I was there.  We did some business transactions

10  together too.  We purchased a large building on North

11  Avenue together.  We formed a company to develop a

12  parcel on North Maplewood, which was ironically

13  developed, closed and sold.  But it's still on your

14  list.  And that property was sold about 2012, so I

15  think that property -- I think the address was 5857,

16  5859 North Maplewood.  And also I believe I

17  participated in the creation of some of his LLCs.

18       Q      What about Javier Espana?  How many files

19  are there?

20       A      Quite a few.

21       Q      For what specific properties?

22       A      He had a property at 50 -- 6232 and 6234

23  North Keating.  I assisted him in the sale of those.

24  He purchased the property at 5006 South Elizabeth.

25  He purchased a property at 5321 South Wolcott.  He

1  bought one at 543 -- I might be off on the address,

2  but near 5347 South Racine.

3            I bought a building at 7954 South

4  Manistee.  And we've always helped Javier with, like,

5  landlord/tenant issues, and things of that nature,

6  like evictions or help with leases if he needs it.

7     Q    Are any of those files responsive to the

8  request from the FDIC concerning your 2004 exam?

9     A    I'm not quite sure.

10    Q    Why aren't you sure?

11    A    It's part of my legal work.  I'm not sure.

12  I don't have the subpoena in front of me.

13    Q    Were you -- well, you want to see the

14  subpoena?

15    A    It might be helpful.

16            MR. REIN:  If I may I approach the

17  witness?

18            THE COURT:  Go right ahead.

19  BY MR. REIN:

20    Q    I'll show you the subpoena and see if it

21  refreshes your recollection.

22            THE COURT:  Is this a good time to

23  take a break?  I need to take a five-minute break.

24            MR. REIN:  Sure.

25            THE COURT:  We're going to take a

68

1    break.

2                    (Brief Recess.)

3                    THE CLERK:  Continuing with the matter

4    of Robert Kowalski.

5                    THE COURT:  Let's proceed.

6    BY MR. REIN:

7        Q    During the break, did you get a chance to

8    review the subpoena?

9        A    I did not.  I was unable to look.

10       Q    Does it refresh your recollection?

11       A    What about?  You lost me.

12       Q    I asked you if the documents produced were

13   those that have been requested in the subpoena.

14       A    Yes.  Yes, absolutely.

15       Q    Were the documents concerning Jorge Sanchez

16   documents that have been requested pursuant to the

17   subpoena?

18       A    It was Section 8.  Related to -- I don't

19   think that would qualify.

20       Q    And the documents concerning Javier Espana

21   were responsive to the subpoena?

22       A    Yes.  The subpoena suggests directly or

23   indirectly.

24       Q    In the documents that were produced, did

25   you include wire transfers and checks of loan

69

1   payoffs?

2        A     I think there were some in there, yes.

3        Q     For what properties?

4        A     I'm quite sure the one at 1742 Bissell,

5   1746 North Bissell, and 1748 North Bissell.  They

6   were from Washington Federal.  They were cited in an

7   amount of roughly a million 14,000 apiece.  And they

8   were attached to our objection to your claim.  And

9   that -- and apparently your claim is for a

10  significantly less amount, $590,000.  So, yes, those

11  payoffs are in there.  They're definitely in there.

12  But typically at a real estate closing, it's not a

13  document that I'll ordinarily retain.  The issue --

14  the documents are provided to the closer.  And it

15  becomes used in the course of the transaction.  And I

16  don't really know what becomes of most of them.

17       Q     You admitted at the Section 341 meeting

18  that the FDIC had a mortgage at 2120 North Lockwood,

19  correct?

20       A     No.  The FDIC does not have a mortgage.

21       Q     You admitted at the 341 meeting that 4547

22  South Union had a mortgage remaining on that

23  property?

24       A     No, I don't believe so.  I don't believe so

25  because that mortgage was used fraudulently.  The

70

1    documents that I was tendered, and I think your claim

2    is likewise, that the mortgage is actually $914,000,

3    which is a considerable disparity.

4         Q    That's not what I asked.

5              You testified at the Section 341

6    meeting that the FDIC still held mortgages on

7    properties of the estate, correct?

8         A    One, the FDIC does not.  Washington Federal

9    had mortgages on those properties.  So, yes, quite a

10   few mortgages from Washington Federal First Savings.

11        Q    And there were still mortgages from

12   Washington Federal on 11 pieces of property in your

13   bankruptcy petition, correct?

14        A    Mr. Gembara had a pattern of not releasing

15   mortgages.  So to the extent, there's no release,

16   there was a mortgage, yes.

17        Q    There was a mortgage on 2120 North

18   Lockwood, right?

19        A    There was, yes.

20        Q    There was a mortgage on 4547 South Union,

21   correct?

22        A    There was, yes.

23        Q    There was a mortgage on 851 East 63rd

24   Street, correct?

25        A    I'm sorry.  What was the address again?

1        Q     851 East 63rd.

2        A     That's the condominium building.  Is there

3   a particular unit that you want to refer to?  I'm

4   not --

5        Q     I think units 1 and 3 remain as property of

6   your estate.

7        A     That property was -- is owned by

8   Indomitable, LLC.

9        Q     Okay.  So Indomitable still owns units 1

10   and 3?

11       A     I don't know what you -- lost something

12   through a tax deed, and I'm not sure which.

13       Q     But Indomitable still owns several units at

14   851 East 63rd, correct?

15       A     I hope more than one, yes.

16       Q     And there's a mortgage that Washington

17   Federal had been given on that property, right?

18       A     Yes, there had been.

19       Q     And Washington Federal had a mortgage at

20   1742 North Bissell?

21       A     Yes.

22       Q     Washington Federal had a mortgage at 1746

23   North Bissell?

24       A     Yes.  They had one, yes.

25       Q     Washington Federal had a mortgage at 6411

72

1   South Maryland?

2        A     Likewise, that is a condominium building.

3   I'm not quite sure --

4        Q     There's still units that you own?

5        A     I hope, yes.  I'm very worried about the

6   tax deeds being issued.

7        Q     Washington Federal had a mortgage at 1946

8   South Canalport, right?

9        A     Yes.

10       Q     Washington Federal had a mortgage on

11  6835-37 South Merrill, right?

12       A     Yes.

13       Q     Washington Federal had a mortgage at 6500

14  South Drexel, right?

15       A     I believe so, yes.

16       Q     Washington Federal had a mortgage at 6555

17  South Greenwood, right?

18       A     Yes.

19       Q     Washington Federal --

20       A     That property was lost to a tax deed.

21       Q     Washington Federal had a mortgage at 1512

22  West Polk, right?

23       A     I don't recall that one.

24       Q     That used to be your home, right?

25       A     It used to be my home, yes.  It was --

73

```
1        Q      And that's where --

2        A      -- my formal marital residence.

3        Q      And that's where Martha Padilla's family

4    resides?

5        A      I do not know where she currently resides.

6        Q      Washington Federal had a mortgage on that

7    property, right?

8        A      I don't recall that one, no.

9        Q      And you told the U.S. Trustee at the

10   Section 341 meeting that Washington Federal has

11   mortgages on these properties that I've listed, you

12   were just contesting the amount, right?

13       A      Oh, absolutely, yes.

14       Q      All right.  In the document that you

15   produced --

16       A      Let's be clear, the mortgage is always

17   tantamount to notes.  So we're not -- you haven't

18   told me anything about the value of such mortgage or

19   if the mortgage still exists because its through

20   documents.

21       Q      Other than the two properties on Bissell

22   you just testified about.

23       A      Pardon me, there's three properties on

24   Bissell.  Oh, excuse me, in your claim you list

25   another property, 1738 Bissell, which was sold, I
```

74

1  must say, in 2011.  And that one was –– I think your

2  claim is for $900,000, but that one was sold.

3      Q    Mr. Kowalski, please listen to my question.

4              Other than the two properties at 1742

5  and 1746 North Bissell, and those properties I just

6  listed that are listed in your estate, in the

7  documents you produced, is there any evidence of a

8  wire transfer or a check paying off those mortgages?

9      A    Let's be quite clear.  I started building

10 on those properties.  That mortgage for 590 was the

11 amount of the stated mortgage.  It was a construction

12 loan.

13             However, that loan was never drawn

14 upon.  Mr. Gembara refused to issue any funds.  And

15 if you go there right now, you'll notice several

16 things.  That I have permits, because the permit is

17 displayed on the fence.  There was a building that

18 was torn down.  I've seen two foundations in the

19 ground.  And that was the extent of the improvements.

20 And Mr. Gembara had refused to advance any

21 construction funds on that property, and, therefore,

22 the project spun to a halt.

23             So the mortgage should not be –– is

24 590.  The amount owed on those mortgages should be

25 zero because nothing was ever disbursed.

1       Q     Apparently you didn't understand my

2  question, so let me try again.

3              I said other than the two properties

4  on Bissell, 1742 and 46, the other nine properties

5  that we went through that you identified at the 341

6  meeting, is there any evidence in the documents that

7  you produced of wire transfers or checks showing loan

8  payoffs?

9       A     I imagine there are checks in there that

10  would evidence loan payoffs, yes.

11      Q     For which properties?

12      A     Actually, all of them to some extent.

13      Q     So there's a wire transfer or a check for

14  each of those 11 properties?

15      A     There's information on payments for each of

16  those properties, yes.

17      Q     Payoff of those mortgage loans?

18      A     There could be.  I'm not quite sure if

19  there were --

20      Q     Okay.  You're not quite sure.  Okay.  Let's

21  move on to something else then.

22              You talked about Section 8 subsidies

23  that you're getting currently for 12 to 16

24  properties; is that my understanding?

25      A     Well, the client is subsidized.  They

76

1    subsidize the rent to whatever extent.

2        Q    Did Piorun and Indomitable during 2018,

3    during your bankruptcy, is receiving subsidies for 12

4    to 16 properties?

5        A    I think that was the number.  I'm not quite

6    sure of the number, though.  But, yes, that generally

7    is correct.

8        Q    And in order to qualify for Section 8

9    subsidies, there's a requirement to have written

10   leases, correct?

11       A    Initially, yes.

12       Q    Do you have written leases for those 12 to

13   16 properties that are being subsidized under Section

14   8?

15       A    I think the question you want to ask me is

16   when we first started with the tenant, if we had a

17   current lease.  And the answer is yes, we did.  And

18   we provided that to -- to CHA.

19       Q    These 12 to 16 properties are currently

20   being subsidized --

21       A    It's --

22       Q    There are no --

23       A    May I make a correction?  It's not --

24       Q    It's for me to ask the questions.

25       A    I want to clarify that.  There's not --

1              THE COURT:  Wait for another question,

2      sir.

3      BY MR. REIN:

4          Q    The 12 to 16 properties that are currently

5      supposedly being subsidized under Section 8, there

6      are no written leases in 2018, correct?

7          A    That's exactly the clarification I want to

8      make.  There's not 12 or 16 properties.  Maybe

9      there's 12 or 16 clients and apartments that have

10     Section 8 clients in them.

11              Yes, we have been getting Section 8 --

12     a lot of our clients, they enjoy our service.  They

13     like that we're hands-on with our properties.  And I

14     had a lot of -- I kind of want to promote this too --

15     a lot of continuity with my tenants.

16         Q    There are no written leases that you have

17     that meet the requirement for those 12 to 16 people

18     who are being subsidized for 2018, right?

19         A    I think the answer is no because otherwise

20     I wouldn't be receiving the -- the subsidy.  I've

21     done everything with the -- for the benefit or for

22     the --

23              THE COURT:  Are there written leases,

24     Mr. Kowalski, yes or no for --

25              THE WITNESS:  Other than --

78

1              THE COURT:  Can I finish the question?

2              Are there written leases, yes or no,

3    for these apartments for which there's subsidies?

4              THE WITNESS:  Your Honor, there had

5    been.  I think all the leases --

6              THE COURT:  Are there now written

7    leases?

8              THE WITNESS:  I don't know of any

9    current written lease, Your Honor.

10   BY MR. REIN:

11       Q    You also talked about the Indomitable

12   account at Byline, and that you and your brother,

13   William, are on that account?

14       A    I think we are, yes.

15       Q    And you -- have you been on that account

16   since -- has he been on that account since November

17   11, 2014?

18       A    I think -- I don't think any change was

19   made.

20       Q    You entered into a settlement agreement

21   with your brother, correct?

22       A    Yes, we have.

23       Q    On November 11, 2014, right?

24       A    I don't recall the date, but we have one.

25              MR. REIN:  Well, if I may I approach

1    the witness?

2                    THE COURT:  Go right ahead.

3    BY MR. REIN:

4        Q    I'm showing you a confidential settlement

5    agreement and release of claims.

6                    MR. BORGES:  Do you have another copy,

7    counsel?

8                    MR. REIN:  Wait, here, I'll give it to

9    you.

10                   THE COURT:  Is there an exhibit number

11   or --

12                   MR. REIN:  Actually, I'm just

13   refreshing his recollection.

14                   THE COURT:  Go ahead.

15   BY MR. REIN:

16       Q    Does this refresh your recollection on the

17   date?

18       A    Well, the front page does recite the date

19   of the 11th day of November 2014.

20       Q    Does it refresh your recollection that you

21   entered into a settlement with your brother on

22   November 11, 2014?

23       A    This is the document.  The document does

24   reflect the 11th day of November.

25       Q    And does it refresh your recollection that

80

1  that's the date that you entered into this agreement?

2      A    That's the date that's recited.  Is it the

3  date that it --

4      Q    Yes or no --

5      A    -- executed, I don't know --

6      Q    -- is your memory refreshed or not?

7      A    I mean, it could have been the date.  I

8  guess the answer is I don't think my memory has been

9  -- this is what the document reflects.  I don't

10  recall that date.

11      Q    And under the settlement with your brother,

12  he resigned from all limited liability companies in

13  which the two of you were members, correct?

14      A    I think in paragraph 7 it does.

15      Q    Okay.  And one of those limited

16  liabilities -- companies was Indomitable, correct?

17      A    I think it would be, yes.

18      Q    So as of November 11, 2014, your brother

19  was no longer on the account at Byline or

20  Indomitable, correct?

21      A    No, I think he still is on that account.  I

22  don't think any change was effected.

23      Q    So you didn't inform Byline that he was no

24  longer a member and had agreed to resign from the

25  company?

1      A      I did not.

2      Q      Since November 11, 2014, did he authorize

3  any transactions in the Indomitable account?

4      A      I do not recall.

5      Q      Did he violate his settlement agreement by

6  authorizing transactions in any of the limited

7  liability accounts in which he was to resign?

8      A      I don't recall any.

9      Q      Have you sought to enforce this

10 confidential settlement agreement against your bother

11 because he violated it?

12     A      Without -- I would -- it's a seven-page

13 document.  It's hard for me to answer that question

14 without really reading everything.

15              THE COURT:  How much time do you need

16 to read it, sir?  Maybe 10 or 15 minutes?

17              THE WITNESS:  Something like that,

18 yes.

19              THE COURT:  We'll take a 15-minute

20 break.

21              (Brief recess.)

22              THE COURT:  All right.  Let's proceed.

23              MR. REIN:  Your Honor, I'd like the

24 record to reflect that the witness, sitting in the

25 witness chair with a question pending, conferred with

82

1   counsel during the break.

2   BY MR. REIN:

3       Q    I have a question pending.  You said you

4   wanted to review the settlement agreement.

5               My question was is your brother in

6   violation?

7       A    I don't have any problem with my brother.

8       Q    Okay.  And since 2018, your brother did not

9   authorize any transactions in the Byline account of

10  Indomitable, correct?

11      A    I am not aware of any.

12      Q    Since 2018, your brother did not authorize

13  any transactions --

14              THE COURT:  2018 or 2014?

15              MR. REIN:  2018.  Since 2018.

16              THE COURT:  This year?

17              MR. REIN:  This year.

18  BY MR. REIN:

19      Q    Your brother did not authorize any

20  transactions in the Piorun account?

21      A    None that I'm aware of.

22      Q    And since 20 -- since November 11, 2014,

23  your brother did not authorize any transactions in

24  the Piorun Properties --

25      A    I'm not aware of any.

83

1    Q    Since November 11, 2014, your brother did

2  not authorize any transactions in the Indomitable

3  account, correct?

4    A    No.  None for those two that I'm aware of,

5  those two accounts.

6    Q    Okay.  You're aware that as a Chapter 11

7  debtor, you have the duty to make full and complete

8  disclosure of your financial affairs, correct?

9    A    That's my understanding.

10    Q    And as part of that duty, you are to file

11  monthly operating reports, correct?

12    A    Yes.

13    Q    And you filed a monthly operating report

14  for April, correct?

15    A    It's my understanding we did, yes.

16    Q    You filed a monthly operating report for

17  May, correct?

18    A    I believe my counsel did, yes.

19    Q    You filed a monthly operating report for

20  June, correct?

21    A    Yes.

22    Q    And as of today, you have not filed a

23  monthly operating report for July, correct?

24    A    It's my understanding that's the trustee's

25  duty to do so.

1      Q     You didn't answer my question.

2            As of today, you did not file a

3    monthly operating report for July, correct?

4      A     No.

5      Q     And you did not disclose to the creditors

6    and the trustee the rents that you collected in July

7    of 2018, correct?

8      A     I think they would be part of the operating

9    agreement, so -- the operating statement.  So I guess

10   I have not.

11     Q     And you did not disclose other income to

12   the estate that you earned in July of 2018 to either

13   creditors or the bankruptcy trustee, correct?

14     A     I don't believe so as of yet.

15     Q     And you have not disclosed to the

16   creditors or the bankruptcy trustee any

17   disbursements or expenses that you made in July of

18   2018, right?

19     A     We have not as of yet.

20           MR. REIN:  I have no further

21   questions.

22           THE COURT:  Any other questions?

23           (No response.)

24           THE COURT:  Mr. Borges.

25           MR. BORGES:  Thank you, Judge.

85

1              RECROSS-EXAMINATION

2      BY MR. BORGES:

3          Q     Mr. Kowalski, we talked about or you were

4      questioned about leases that you might have had with

5      Section 8 housing.

6          A     Yes.

7          Q     And you indicated that you did not have any

8      2018 leases?

9          A     Right.  That's correct.

10         Q     Yes.  How does that work?  Do you have to

11     have a lease each year?

12         A     Not unless you asked for a rent increase.

13     I like continuity in my apartments, and I have not

14     asked for any rent increases.  So, therefore, there

15     was -- it did not trigger a new lease requirement.

16         Q     But as you indicated, you did --

17     there were -- monies were transferred to you?

18         A     You know, I'm not quite -- well, yes --

19         Q     To the LLCs, excuse me.

20         A     Yes, up until the point where the account

21     was frozen, I don't know what became of those --

22     those funds.  If anything was transferred, I don't

23     know, if it went back to CHA.  Typically, it's my

24     understanding that if a bank account is closed, you

25     can still obtain those funds.  It just went -- I

86

1  don't know where it went, it went back the wire.  I'm

2  not quite sure.

3      Q    Okay.  All right.  So you indicated that

4  you thought that the -- as to the monthly

5  disclosures, that you did not file one for -- or

6  report for July of this year?

7      A    Yes.

8      Q    Okay.  And why was that?

9      A    Well, it was my understanding I was

10 divested of management as of the time when the

11 trustee was appointed.

12     Q    All right.  But you could file?  In fact,

13 if you were the one responsible for filing that, you

14 could do that?

15     A    Yes.

16     Q    Okay.  And how long would it take for you

17 to provide that?

18     A    Probably a morning of work.

19          MR. BORGES:  Okay.  I have no further

20 questions.

21          THE COURT:  Any other questions of

22 this witness?

23          MR. SOWKA:  No.

24          MR. REIN:  No questions.

25          THE COURT:  Thank you, sir, for

87

1   testifying.

2                    (Witness excused.)

3                    THE COURT:  Any other witnesses?

4                    MR. SOWKA:  The trustee has no further

5   witnesses, Your Honor.  Just as a housekeeping

6   matter, I lost track up at the stand and I wanted to

7   check on the admission of several exhibits.

8                    THE COURT:  Are you offering

9   something?

10                    MR. SOWKA:  I lost track, so to the

11   extent that I hadn't offered Exhibit 34, which is the

12   Oak Lawn deed, I'd like to offer it into evidence.

13                    THE COURT:  Just a second.

14                    (Brief pause.)

15                    THE COURT:  Any objection?

16                    MR. BORGES:  Which, I'm sorry?

17                    MR. SOWKA:  The deed, the special

18   warranty deed for the Oak Lawn property.

19                    MR. BORGES:  No objection.

20                    THE COURT:  Exhibit 34 is admitted

21   into evidence.

22                    MR. SOWKA:  Thank you, Your Honor.

23                    MR. BORGES:  Judge, just as a matter

24   so that we -- so that we know where we are.  We -- I

25   got interrupted with this to be heard -- with our

1  motion to vacate the -- or purge Mr. Kowalski's

2  contempt.  I do have witnesses continuing with the

3  motion to --

4             THE COURT:  How many witnesses do you

5  have?

6             MR. BORGES:  I have at least two.

7  And, you know, the problem here, Judge, is that there

8  is so much involved here.  It is -- I would ask Your

9  Honor to give us an opportunity to put our case

10  together.  There's so many properties involved here,

11  there's so many issues involved here, some of which

12  are just coming up today, that it's very difficult.

13             THE COURT:  What just came up today?

14  I'm not clear.

15             MR. BORGES:  Well, there were -- there

16  was exhibits that were brought up that -- that

17  counsel provided me with, not that they're all

18  admitted into evidence.

19             THE COURT:  You mean the ones in this

20  smaller binder?

21             MR. BORGES:  The smaller -- the

22  smaller binder.

23             THE COURT:  So what are you -- I'm not

24  clear.  What are you asking?

25             MR. BORGES:  Well, I'm asking for --

1  you know, you want to talk about unusual

2  circumstances, that might be a reason as to not

3  convert this case.  Analysis of how much -- you know,

4  that there's some claims that are certainly -- we

5  feel they're bad claims that -- we're talking --

6              THE COURT:  Has an objection to a

7  claim been filed?

8              MR. BORGES:  That -- that objections

9  need to be filed.  There are some claims that are

10 certainly exorbitant.  There are banking matters here

11 that have not been explored sufficiently.  He's got

12 $30 million in claims on -- there's, obviously, been

13 fraud that's occurred here.  And we don't know

14 that -- Mr. Kowalski, it seems that he's being

15 charged with all of this, this $30 million --

16             THE COURT:  I'm not clear what he's

17 being charged with.  All I know is claims have been

18 filed, objections to those claims stating how --

19 what's wrong with them or they should be lower or

20 there should be no claim at all from that creditor.

21             MR. BORGES:  Well, that's what we

22 would like to do.  There are objections that need to

23 be filed to some of these claims because there's

24 obviously some fraud that has occurred here.  And

25 Mr. Kowalski was simply trying to get some resolution

90

1   to his problems with these fraudulent claims, came to

2   this venue, and this forum, and was -- is seeking

3   that.  That's why he ended up in Chapter 11, not

4   to -- you know, I guess he could have handled it in

5   another forum.

6             And now it appears that what the

7   government wants to do is to take all of his life's

8   work and liquidate and -- even though there has been,

9   obviously, fraud to the extent that somebody has

10  committed suicide, and there's all kinds of things

11  going on.  And there's 20 some boxes that -- 44

12  boxes, Judge, that I would need an opportunity to go

13  over with my client.

14            THE COURT:  So what are you asking

15  for?  Are you asking for a continuance?

16            MR. BORGES:  Yes, Judge.  I need a

17  continuance on this matter.  I need my client to be

18  released so I can talk to him and we can map this all

19  out, put it all on a spreadsheet, every single

20  property, every single question.  Let's get to the

21  bottom of this and not just punish him.  You know,

22  he's been a little evasive.  I would admit he's been

23  a little evasive in some of this questioning.  And I

24  wold like the opportunity to sit down with him, put

25  everything in order, bring it before Your Honor, and

1  do this in --

2                  THE COURT:  The Marshals won't give

3  you access to meet with him?

4                  MR. BORGES:  I beg your pardon, Judge?

5                  THE COURT:  The Marshals won't let you

6  meet with him?

7                  MR. BORGES:  I went to -- I went to

8  see him on Friday.  I did not realize that -- this

9  takes time -- that they close at 6:45, or whatever.

10 I couldn't visit him.  I had to visit my wife

11 yesterday.  I went and they closed at -- after about

12 quarter to 3:00.  And they gave me access to him.

13 They said attorney's visits are over at 3:00 o'clock.

14 And it's just been difficult to be able to represent

15 somebody in such a complicated case dealing with

16 millions of dollars in such a short period of time.

17                  I would just ask, Judge, that he

18 be released so that we can go through these boxes,

19 put everything in an organized fashion, provide it to

20 the -- to all parties concerned, and -- so that we

21 have some fairness here, as opposed to just stripping

22 him of everything.  I mean, that's the easy way out.

23                  THE COURT:  Response --

24                  I'm sorry, Mr. Borges, were you --

25                  MR. BORGES:  Yes, I just think, you

1  know, this court has some equitable powers, and I

2  would ask that Your Honor afford him some opportunity

3  to adequately defend himself.  And I know he's had

4  time, but our office is involved with it now.  And

5  would we just like an opportunity.  Thank you.

6          MR. SOWKA:  Your Honor, the parties

7  appeared before the court on October 17, at which

8  time the debtor asked for additional time to object

9  to the motion.  This was -- the motion was served on

10  21 days notice.  So it was already 21 days notice.

11  the debtor did not timely object.  The debtor asked

12  for additional time.  The court agreed to do it, and

13  the parties mutually agreed upon the trial schedule

14  that we're here on today.

15          They filed their objection.  They

16  issued no discovery.  They had several weeks of time.

17  This motion was filed in late September, Your Honor.

18  This is --

19          THE COURT:  This motion to convert?

20          MR. SOWKA:  Yes, Your Honor.  This

21  motion to convert has been on the docket since last

22  September.  This is not a surprise.

23          Your Honor, I would add that Exhibit 9

24  that's been admitted to the record shows that Mr.

25  Borges' firm received a retainer check on September

1  5th in the amount of $10,000.  So they have had

2  almost two months now of time in the case to get up

3  to speed.  Halfway through trial where the trustee is

4  prepared to rest his direct case is not a time to ask

5  for a continuance and an opportunity to issue

6  discovery.

7          We're halfway through a trial, Your

8  Honor.  The estate is incurring costs on this.  The

9  debtor has testified that he has transferred funds,

10  failed to turn over funds.  There's no money in the

11  estate right now.  And the debtor, throughout the

12  inception of the case through today has been playing

13  a delay game, driving up costs on the estate.

14          Your Honor may recall, he asked for

15  additional time to object to the financing motion,

16  which Your Honor gave, set a special evidentiary

17  hearing date during your vacation, and he never

18  showed up to prosecute his objection.  Your Honor has

19  been incredibly patient with the debtor, but this is

20  an opportunity -- the court should conclude this

21  trial, issue a ruling on the motion to convert the

22  case.

23          THE COURT:  Ms. Porter.

24          MS. PORTER:  I agree with counsel for

25  the trustee, Your Honor.  We have been -- I have been

1    involved in this case since June.  This case has been

2    complicated since June.  The debtor is the master of

3    his complexity.  He is also the party that is in

4    control of his compliance.  His compliance was due

5    not today, it was due after he received notices and

6    subpoenas and an opportunity to participate fully in

7    his 2004 examination.

8                    THE COURT:  Mr. Rein.

9                    MR. REIN:  We're somewhat mixing up

10   apples and oranges.  One, we have the motion to

11   convert.

12                   THE COURT:  Yes.

13                   MR. REIN:  The other is the order to

14   show cause.

15                   THE COURT:  Yes.

16                   MR. REIN:  And one is not tied to the

17   other.

18                   THE COURT:  No overlap?

19                   MR. REIN:  No overlap in terms --

20   there is overlap in terms of the fact that he didn't

21   produce documents to the trustee or allow the trustee

22   to go and visit the premises to see what was there so

23   he could try to understand the wealth and complexity

24   of the documents of the estate.  That's -- that's the

25   overlap.

1          What we also hear is the overlap of

2     the noncooperation, the refusal to answer, the

3     skirting of the issues.  You know, counsel claims he

4     keeps learning -- he keeps learning of documents, you

5     know, in the little book that was public record

6     that -- that we did our own investigation and

7     discovered.  He could have too.  He's trying to

8     educate himself as we go on the motion to convert,

9     but he had plenty of time to file a response.

10         So on the motion to convert, let's

11    finish.  Let them put on their witnesses and let's be

12    done.

13         On the order to show cause, he hasn't

14    fully purged himself of the --

15         THE COURT:  How do you suggest we

16    proceed to allow him to purge?  What do you suggest?

17         MR. REIN:  I suggest that we come back

18    for status in a couple of weeks to allow us time to

19    look at the 41 boxes of documents to see if he has --

20    by the way, there was no electronic -- as far as I

21    know, there's been no electronic production, emails.

22    We're in the email age.  We're not just keeping paper

23    records.

24         This was for all communications

25    concerning these properties, not just this written

1  piece of paper I have in my file.  I don't know

2  what's in that file.  Maybe he's copying emails and

3  putting them in the file.  Perhaps.  I don't know.

4  But I need to look at 41 boxes of documents and then

5  be able to fully examine them.  And as you hear, he

6  doesn't answer the questions to begin with, so we

7  need plenty of time in order to examine him about the

8  complexity --

9            THE COURT:  So I think he should be --

10            MR. REIN:  -- that he created.

11            THE COURT:  You want me to hold him in

12  custody while you conduct --

13            MR. REIN:  Yes, I do.  He's had five

14  months to produce records, and only on the cusp of

15  custody, and then when he was in custody did he come

16  and produce records.  And we don't even know if

17  that's full and complete production.  We don't even

18  know if it's responsive.  He doesn't even know what

19  his sister delivered.  And all they did was attach an

20  affidavit to the motion to purge from his sister

21  saying I produced records.

22            And that's all we know.  I produced

23  boxes.  Is there an affidavit of completion -- of

24  completeness?  No.  Is there somebody saying this is

25  a summary of the records, I produced records on this

1  property and that property?  No.  I don't know what

2  it is.

3                    THE COURT:  There's no affidavit of

4  completion.

5                    MR. REIN:  None.  It's a data dump.

6                    THE COURT:  Which the rules require, I

7  think, for production.

8                    MR. REIN:  Correct.

9                    THE COURT:  To satisfy production

10 requests.

11                   MR. BORGES:  Judge, his sister is here

12 now.  She could -- I think maybe she didn't have an

13 opportunity to sign the affidavit that she submitted.

14                   MR. REIN:  It's not for her to sign

15 it.

16                   MR. BORGES:  And a lot --

17                   THE COURT:  That's true.  The party is

18 supposed to --

19                   MR. REIN:  The party signs the

20 affidavit.

21                   THE COURT:  The party is supposed to

22 certify completion.

23                   MR. BORGES:  Well --

24                   THE COURT:  Under oath, I think.

25                   MR. BORGES:  I understand, Judge.  The

1  problem --

2              MR. REIN:  Your Honor, in the

3  schedules, he shows he has a computer.  So there must

4  be emails on that computer or has he purged that

5  computer?  And then that's another basis for

6  contempt, because he -- he purged it post-bankruptcy.

7  I don't know.  I'm just surmising.

8              THE COURT:  Well, can they -- can

9  Mr. Borges be allowed to consult with his client in

10 custody?

11             MR. REIN:  Of course.

12             THE COURT:  Can the Marshals and the

13 security staff explain it?

14             MR. REIN:  Absolutely.

15             THE COURT:  He said --

16             MR. PALOIAN:  No, no, Judge, I think

17 what he said was he didn't appear during the

18 permitted --

19             THE COURT:  Hours.

20             MR. PALOIAN:  -- attorney viewing

21 hours.  That's what happened.  It's not as if the

22 Marshals are saying you can't talk to him while he's

23 in custody.  It's just a matter of following the

24 rules.

25             THE COURT:  Mr. Rein, I think two

1  weeks is too long.

2                    MR. REIN:  Okay.  I don't know if I'll

3  be able to -- I'll come back and give a status.  It

4  is 41 boxes --

5                    THE COURT:  I'm going to take a

6  five-minute break.  I think two weeks is too long.

7                    MR. REIN:  Thank you, Your Honor.

8                    THE COURT:  I'll take a five-minute

9  break.

10                   (Brief recess.)

11                   THE COURT:  With respect to the rule

12 to show cause, I am going to enter and continue that

13 to Friday, the 9th.  And I am going to keep the

14 debtor in custody, considering all the circumstances,

15 especially -- even including his answers today.  Way

16 too evasive.  So I'm going to enter an order that

17 makes that clear.  And hopefully -- well, we'll see

18 where we are on Friday.

19                   MR. SOWKA:  What time, Your Honor?

20                   THE COURT:  Make it 11:00 o'clock.

21 That's the 9th.

22                   And you will bring your other

23 witnesses back at that time?

24                   MR. GUTMAN:  Judge, if I may --

25                   THE COURT:  Have you talked to the

1   lawyer who subpoenaed your client?

2                 MR. GUTMAN:  Yes, I have.  He said

3   they -- I'm not sure if he needs him on Friday.  I

4   don't know their plans.  But, you know, we were

5   here --

6                 THE COURT:  Is your -- is your

7   witness -- is your client a long witness or maybe

8   half an hour or what?

9                 MR. GUTMAN:  You know, counsel has not

10  told me --

11                MR. BORGES:  I would say at least a

12  half an hour.

13                MR. SOWKA:  Your Honor, the witness is

14  irrelevant to the motion to convert, not with respect

15  to the order of contempt, so they wouldn't be

16  necessary to appear.

17                With respect to the witnesses on the

18  motion to convert, if you want to separately address

19  witnesses going forward and scheduling --

20                THE COURT:  How many witnesses will

21  there be on the motion to convert?

22                MR. SOWKA:  The trustee is prepared to

23  rest his case.  He has no further witnesses.  It's

24  just a matter of who the debtor intends to proffer

25  that's on his exhibit list.

1          THE COURT:  How many --

2          MR. BORGES:  We have about 10 to 12

3   witnesses, Judge.

4          THE COURT:  10 to 12 witness?

5          MR. BORGES:  Yes.

6          THE COURT:  You think -- hopefully I

7   would be available Friday.

8          MR. SOWKA:  Your Honor, the trustee

9   has numerous objections to the proposed witnesses

10   regarding their qualifications, as well as the

11   relevance of their testimony.  So to the extent --

12          THE COURT:  Are they expert witnesses

13   or what?

14          MR. SOWKA:  Well, some of them appear

15   to be back door experts.

16          THE COURT:  Appear to be what?

17          MR. SOWKA:  Well, they do appear to be

18   eliciting expert testimony from two of them

19   without -- it's unclear that they're qualified to do

20   so, and I actually believe it's both of his clients.

21   The debtor is attempting to elicit testimony

22   regarding the opinion of properties, and net sale

23   proceeds that would result from the sales.  I think

24   we may have something to object to, the involuntary

25   expert testimony and their qualifications to give

1  that.

2            MR. GUTMAN:  Well, we haven't been

3  told what properties they are or what information

4  they are seeking from my clients.  So, you know, what

5  I would prefer, Judge, is if my clients could be

6  excused.  You can take up the objections on these

7  people.  If you go forward with them, let me bring

8  them at that time.

9            THE COURT:  I won't allow any experts

10  without prior disclosure.  Any expert -- any opinion

11  that's going to be given has to be disclosed at least

12  72 hours beforehand.  So if somebody is going to

13  testify on Friday, that opinion better be disclosed

14  on --

15            MR. GUTMAN:  My --

16            THE COURT:  Can I finish talking?

17            MR. GUTMAN:  My apologies.

18            THE COURT:  The opinion had better be

19  disclosed by noon tomorrow, otherwise they won't be

20  allowed to just come up with --

21            MR. REIN:  In addition, Your Honor --

22            THE COURT:  It's one thing to be a

23  fact witness.  It's another to start opining.  There

24  has to be prior disclosure.  That is going to apply

25  to both sides.

1          MR. REIN:  Let me also point out, Your

2   Honor, there are four FDIC people on the witness

3   list.  Three of them are in Texas, so...

4                THE COURT:  On the motion to convert?

5                MR. REIN:  Yes.  So they're not

6   subpoenable.  They're outside the jurisdiction, more

7   than a hundred miles away.  And there was a subpoena

8   dropped off at security yesterday --

9                THE COURT:  By the debtor?

10               MR. REIN:  By the debtor --

11               THE COURT:  Oh, I thought you were

12   saying you couldn't get your own clients.

13               MR. REIN:  No, no, they are not my

14   witnesses.  It's the debtor who dropped off subpoenas

15   at security for the FDIC as if it was good service of

16   a subpoena.

17               THE COURT:  I think you have to serve

18   people personally.

19               MR. REIN:  I know they do, and three

20   of them are in Texas.  So, the fact -- he doesn't

21   have nine or ten witnesses for this hearing.  At most

22   there might be Mr. Kowalski and two, three, four,

23   people.

24               MR. GUTMAN:  Judge, it leaves me --

25               THE COURT:  I'm sorry?

1            MR. GUTMAN:  It leaves me not knowing

2    whether I have to bring my people on Friday or not.

3            THE COURT:  Who are your clients?

4            MR. GUTMAN:  Jorge Sanchez and Javier

5    Espana were subpoenaed by the debtor.  I mean, if the

6    court --

7            THE COURT:  Mr. Borges.

8            MR. BORGES:  Well, they may not

9    testify as to those expert witness -- as to that

10   portion, but they are factual --

11           THE COURT:  Do you want them here

12   Friday?

13           MR. BORGES:  Yes, I do, Judge.

14           MR. GUTMAN:  I mean, Judge, if the

15   court has time, maybe we can hear them now and be

16   done with them.

17           MR. BORGES:  I would prefer, Judge --

18   the problem is that my client is incarcerated and

19   he's shackled and he's handcuffed when you -- he

20   can't even write.  It is incarceration.  When he is

21   brought out, he is in shackles.

22           THE COURT:  Any objection to hearing

23   at least one of these witnesses today?

24           MR. SOWKA:  No, Your Honor.  I think

25   we should proceed.

1          THE COURT:  It's Mr. Borges' witness,

2    so he's got to interrogate him.

3          MR. SOWKA:  He subpoenaed the

4    witnesses today, Your Honor.  It would be the

5    trustee's preference to conclude the motion today

6    with the witnesses that they have brought forward.

7    We need to get finality on this.  We can't drag this

8    out.  Every time we have to come back, it increases

9    the cost to the estate of this motion.

10         MR. BORGES:  We can start today,

11   Judge.

12         THE COURT:  Can you finish one witness

13   today?

14         MR. BORGES:  If I might have five

15   minutes, I think I can at least finish with at least

16   one witness.

17         THE COURT:  In five minutes?

18         MR. BORGES:  Yes.

19         No, I think if I may have five minutes

20   just to talk to the witness, I'm sure we would be

21   finished --

22         THE COURT:  Go ahead and talk to him.

23   We'll wait.

24         MR. BORGES:  All right.

25         (Brief pause.)

1           MR. BORGES:  Okay.  Thank you.

2           THE COURT:  Who is this?

3           MR. BORGES:  Sorry.

4           THE COURT:  You called a witness?

5           MR. BORGES:  I did not.  Counsel put

6   him -- seated him.

7           THE COURT:  All right.  At least

8   announce who he is.

9           MR. BORGES:  Yes.  Javier Espana.

10           THE COURT:  Swear the witness,

11   please.

12           MR. BORGES:  I call the witness to the

13   stand.

14           (Witness sworn.)

15           THE CLERK:  Thank you.  Please state

16   your name and spell it for the record.

17           THE WITNESS:  Javier, J-a-v-i-e-r,

18   E-s-p-a-n-a.

19           THE COURT:  Have a seat.

20           JAVIER ESPANA, WITNESS, SWORN

21              DIRECT EXAMINATION

22   BY MR. BORGES:

23      Q    Mr. Espana, do you -- where do you live,

24   Mr. Espana?

25      A    At 5301 --

1          THE COURT:  Speak into the microphone.

2          THE WITNESS:  5301 West Leland,

3    Chicago, 60630.

4    BY MR. BORGES:

5          Q    And what is your occupation?

6          A    I am self-employed.

7          Q    Self-employed.

8               What do you do?

9          A    Construction.

10         Q    Construction.

11              I would like to direct your attention

12   to approximately -- I don't have the exact date, but

13   sometime in 2006 did you have occasion to purchase

14   property or lots on Keating in Chicago?

15         A    That is correct.

16         Q    And what are those addresses?

17         A    6232 and 6234 North Keating.

18         Q    North Keating.

19              And that property -- when you

20   purchased that property, did you take out a loan?

21         A    Yes.

22         Q    And you took the loan out from -- where did

23   you get the loan from?

24         A    From Washington Federal Bank.

25         Q    Washington Federal?

108

1      A     Yes.

2      Q     Okay.  What was the loan amount?  Were they

3  separate for these two properties or did you just get

4  one loan for both properties?

5      A     I understand it was one loan for each

6  property.

7      Q     One loan for each property?

8              And how much was that, approximately?

9      A     Roughly -- I think it was 125 per lot.

10     Q     Per lot.  125,000 per lot.

11              Is that all the money that you

12  borrowed on these properties?

13     A     For the acquisition, yes, but there was

14  also a loan for construction.

15     Q     There was a construction loan also?

16     A     Yes.

17     Q     Okay.  How much was the construction loan

18  or loans?

19     A     I think it was 300 -- 300,000 per property.

20     Q     300,000 per property?

21     A     Yes.

22     Q     And could you describe these properties

23  when you purchased them.

24     A     I built single family homes on both --

25     Q     So you purchased a lot initially or...

 1     A     Correct.  It was developed.  Each lot was

 2  developed.

 3     Q     So you purchased the properties to develop

 4  them and build homes?

 5     A     Yes.

 6     Q     Okay.  And did you do that?

 7     A     Yes.

 8     Q     Yes.  Okay.

 9            And then at some time did you sell

10  those homes?

11     A     Yes, both properties were sold.

12     Q     Both properties were sold?

13            And you sold them to whom, different

14  purchasers or...

15     A     It was two different families.

16     Q     Two different families.

17            And was there -- when you say sold,

18  was there a closing?

19     A     Yes.  Both properties had a closing at the

20  title company.

21     Q     A formal closing with each property?

22     A     Correct.

23     Q     Okay.  At which time you conveyed transfer

24  of title to the purchaser?

25     A     Yes.

1    Q    And at some time later did it show on

2  your -- did it come to your attention that you still

3  owed money on these properties?

4    A    Yes.  When I noticed that Washington

5  Federal Bank was taken over by the FDIC, I went to

6  meet with them, the FDIC person.

7    Q    And so you met with the FDIC?

8    A    Yes.

9    Q    And when was this, do you know?  Do you

10  remember or...

11    A    Few months ago.

12    Q    Approximately a few months ago?

13    A    Right after Washington Federal Bank was

14  closed.

15    Q    Let me just backtrack a second.

16         When you sold these properties, did

17  you sell them about the same time or approximately

18  the same time?

19    A    No.  It was like a year, one year

20  different.

21    Q    One was 6232 North Keating.  Do you

22  remember when you sold that property?

23    A    Roughly 2009.

24    Q    And what about the property located at 6234

25  North Keating?

1       A     2010.

2       Q     About the same time?

3       A     Yes.

4       Q     Okay.

5       A     One year later.

6       Q     All right.  Did you ever get -- and,

7    obviously, this was -- this was done at a closing,

8    and, obviously, a closing officer was present.  Do

9    you remember what closing -- when the closing

10   occurred?

11      A     The exact date?  I don't remember exactly,

12   but --

13      Q     But to your understanding, you developed

14   the properties, you built the -- you built the homes

15   and you sold them?

16      A     That's correct, yes.

17      Q     And you didn't owe any other money to

18   Washington Mutual, was that your understanding?

19      A     That's my understanding --

20      Q     Washington Federal --

21      A     Yeah.

22      Q     And you were later contacted by the FDIC?

23      A     I went to talk to them.

24      Q     Why was that?

25      A     Because I noticed that Washington Federal

1  wasn't there any longer so --

2      Q     They what?

3      A     Washington Federal Bank wasn't there any

4  longer.  When I drove by, there was -- bank is not

5  there anymore.  So I stopped by, and I ask questions

6  and they sent me to the FDIC office.

7      Q     And why did you need to go to Washington

8  Federal?

9      A     Because, obviously, I needed to find out

10  what was going on.

11      Q     Well, I mean, why would you suspect

12  something was going on?

13      A     The sign wasn't there anymore.  There was

14  no sign of Washington --

15      Q     Did someone say that you owed money to

16  Washington Federal?

17      A     I had an interview with two FDIC officers.

18  They didn't mention their names --

19              MR. REIN:  Objection.  That calls for

20  hearsay.  Washington Federal is not on trial here.

21  This is not about Washington Federal.  This is about

22  a motion to convert and whether the case should be

23  converted or not.  There are a number of claims, not

24  just Washington Federal, that are at issue, like the

25  IRS.  You've got Padilla.  You've got the University

1  of Chicago.  You've got the brother, Bill Kowalski.

2  I think we heard -- there is evidence of at least

3  $3 million-plus in claims.

4                    THE COURT:  All right.

5                    MR. REIN:  So this is irrelevant, and

6  it calls for hearsay.

7                    THE COURT:  Response to the objection.

8                    MR. BORGES:  Judge, this is not

9  irrelevant.  The Bankruptcy Code allows for unusual

10  circumstances as a reason why a case should not be

11  converted.

12                    We have here a gentleman who has also

13  been victimized by Washington Federal and/or FDIC.

14  And I'm trying to get to the point that he also is --

15  claiming that he owes a considerable amount of money

16  on property that he had already sold.  And I think we

17  need to establish that there is -- there are unusual

18  circumstances regarding this case.

19                    THE COURT:  I'll overrule the

20  objection, and I will give the testimony the

21  appropriate weight.

22                    MR. SOWKA:  Your Honor, if I may, with

23  respect to the argument, Section 1112(b)(2) provides

24  that unusual circumstances establishing that

25  converting the case is not in the best interests of

1  creditors is the defense, not solely unusual

2  circumstances.  If the witness' testimony doesn't tie

3  into to the best interests of creditors, it's not

4  relevant.  It has no application --

5                  THE COURT:  I can't make that

6  determination without hearing it.  I'll overrule the

7  objection.

8                  Let's proceed.

9  BY MR. BORGES:

10      Q    Mr. Espana, is it your understanding that

11  you owe money on property that was sold?

12      A    That was my understanding after the

13  interview with the FDIC.

14      Q    And how much money?

15      A    Roughly a million dollars for both

16  properties.

17      Q    So you're stating that a million dollars --

18  did you ever look on your credit report?

19      A    Yes.  There was a lot of information from

20  Washington Federal Bank that was damaging my credit.

21      Q    Affecting your credit?

22      A    Yes.

23      Q    A million dollars?

24      A    Yes.

25      Q    On property that had already been sold.

115

1          Can you explain that?

2     A    I have no explanation.  I didn't even get

3 it from the FDIC officers.  I asked them that they

4 should really review my case because it wasn't right.

5 I mean, I have a closing on those properties.  The

6 funds should be wired to Washington Federal Bank

7 right away at the closing time.  And later on I find

8 out that my loans are still open, and I still owe a

9 million dollars on the properties.  There is

10 something wrong, really wrong.

11     Q    Okay.  All right.  Have you paid that

12 million dollars?

13     A    No.

14          THE COURT:  Who was supposed to send

15 that money to Washington Federal, do you know?

16          THE WITNESS:  I don't know.

17          THE COURT:  What was the name of the

18 title company?

19          THE WITNESS:  Chicago Title.

20          THE COURT:  Chicago Title, okay.

21 BY MR. BORGES:

22     Q    Have you contacted the title company?

23     A    No, I have not.

24     Q    Have you ever bought other properties and

25 fixed them up?

1      A     Yes.

2      Q     You ever had a problem like this before?

3      A     No.

4            MR. BORGES:  I have no further

5   questions, Your Honor.

6            THE COURT:  Any examination of this

7   witness?

8                 CROSS-EXAMINATION

9   BY MR. REIN:

10     Q     5301 West Leland, are you renting there?

11     A     Yes.

12     Q     Do you have a lease?

13     A     No.

14     Q     Do you pay rent?

15     A     Yes.

16     Q     How much do you pay on a monthly basis?

17     A     About a thousand dollars.

18     Q     Thousand dollars a month.

19           How long have you been there?

20     A     Four years.

21     Q     Four years.

22           Did you pay rent in July?

23     A     No.

24     Q     Did you pay rent in June?

25     A     No.

117

1    Q    When was the last time you paid rent?

2    A    About a year ago.

3    Q    A year ago?

4    A    Yes.

5    Q    Who is your landlord?

6    A    Bob Kowalski.

7    Q    Bob Kowalski?

8    A    Yes.

9    Q    It's a property he owns?

10    A    Yes.

11    Q    You've been living there rent free for over

12    a year?

13    A    I haven't paid rent.

14    Q    Okay.  Why?

15    A    Because I do some work for Bob sometimes.

16    Q    So he told you in exchange for doing some

17    work for Bob, you don't have to pay a thousand

18    dollars a month for over a year?

19    A    That's correct, yes.

20    Q    So, did you do $12,000 worth of work?

21    A    I believe so.

22    Q    When was the last time you did work?

23    A    For Bob?  About a month ago.

24    Q    What kind of work you doing?

25    A    I check his properties.

118

1    Q    I'm sorry, what?

2    A    I check his properties.

3    Q    Chase?

4    A    Check.

5    Q    Check his properties?

6    A    Yes.

7    Q    What do you do to check the properties?

8    A    I usually would check the buildings to see

9 if there are any problems, work with guys to maintain

10 those buildings.

11   Q    Do you oversee the maintenance?

12   A    Sometimes, yes.

13   Q    Do you collect the rents?

14   A    Sometimes I do.

15   Q    Do you collect the rents in cash?

16   A    Yes.

17   Q    When was the last time you collected the

18 rents in cash?

19   A    About a year ago.

20   Q    So you haven't gone to collect -- checks,

21 have you collected rent in checks?

22   A    Sometimes, yes.

23   Q    When was the last time you got checks for

24 these properties?

25   A    About a year ago.

1    Q    So within the last year, you haven't

2  collected any rents?

3    A    No.

4    Q    And within the last year have you done any

5  physical work at these properties?

6    A    No.

7    Q    Have you done any maintenance at these

8  properties?

9    A    No.

10    Q    Have you gone to check these properties?

11    A    I drive by sometimes.

12    Q    Just drive by?

13    A    Yes.

14    Q    In 2018 all you did was just drive by the

15  properties?

16    A    Yes.

17    Q    And for driving by the properties, you get

18  excused from paying a thousand dollars a month in

19  rent; is that right?

20    A    (No audible response.)

21    Q    Are you familiar with an entity called Alta

22  Vista Properties, LLC?

23    A    That's my company.

24    Q    That is still your company?

25    A    No, it was dissolved back in 2010.

1       Q     The secretary of state said it was

2    dissolved in 2008; is that correct?

3       A     That's when I think, yes.

4       Q     Okay.  And you were the registered agent

5    and the member at the time, right?

6       A     That is correct.

7       Q     Showing that you lived at 1702 South

8    Newberry, Unit No. 2.

9       A     Right.

10      Q     And since then you've moved to one of

11   Mr. Kowalski's properties?

12      A     No.

13      Q     You moved somewhere before?

14      A     Yes.

15      Q     Okay.  And how long have you been at 5301

16   West Leland?

17      A     Close to four years.

18      Q     Four years.

19            Did you ever pay rent?

20      A     I think one or twice.

21      Q     One month or one year?

22      A     One or two months.

23      Q     So for the four years you paid $2,000?

24      A     Yes.

25      Q     So when the secretary of state shows that

1   Alta Vista Properties, LLC, was reincorporated on

2   August 13, 2012, and the registered agent is Robert

3   Kowalski --

4               MR. GUTMAN:  Objection.  That's

5   hearsay.  If there's question of this witness other

6   than to confirm the hearsay of the --

7               THE COURT:  Response to the objection.

8               MR. REIN:  It's a public record.  I'm

9   asking him about the public record.

10              THE COURT:  I'll overrule the

11  objection.  We'll see what he knows.  I'll give it

12  the appropriate weight.

13  BY MR. REIN:

14      Q    The secretary of state shows on June 11th,

15  2018 -- I'm sorry, on August 13, 2012, that Alta

16  Vista Properties, LLC, was incorporated.

17              Are you familiar with that?

18      A    No.

19      Q    Are you familiar with that?

20      A    No.

21      Q    Are you familiar that Robert Kowalski

22  became the registered agent?

23      A    No.

24      Q    Are you familiar with you became the

25  managing member?

1       A     No.

2       Q     August 13, 2012, did you live at 1745 West

3    18th Place?

4       A     Yes, I did.

5       Q     Okay.  Did you ever terminate yourself as

6    the member of Alta Vista Properties, LLC, that was

7    incorporated on August 13th, 2012?

8       A     No, because the company was dissolved, so I

9    didn't do anything.  I didn't --

10      Q     So you didn't know that Mr. Kowalski was

11   operating Alta Vista Properties, LLC, after you

12   thought it was dissolved?

13      A     Correct.

14      Q     You didn't know?

15      A     I didn't know.

16      Q     Did you ever do any business for Alta Vista

17   Properties where -- after August of 2012?

18      A     No.

19      Q     What kind of business was Alta Vista

20   Properties?

21      A     It was real estate development.

22      Q     And why did you terminate it?

23      A     After the 2008 crisis, I just didn't

24   continue working as a developer.

25      Q     Have you done any work for Mr. Kowalski's

1  companies, Indomitable?

2     A    I'm not aware of the names of

3  Mr. Kowalski's companies.

4     Q    You're not aware?

5     A    I'm not aware.

6     Q    Okay.  So you thought you were driving by

7  for Mr. Kowalski?

8     A    Yes.

9           MR. REIN:  No further questions.

10           CROSS-EXAMINATION

11  BY MR. SOWKA:

12     Q    Do you have a written lease agreement for

13  5301 West Leland currently?

14     A    No.

15     Q    And do you have any understanding or

16  agreement with Mr. Kowalski on how long you could

17  live there rent free?

18     A    No.

19           THE COURT:  How large is that

20  apartment?  How many bedrooms and bathrooms?

21           THE WITNESS:  It's two bedroom.

22           THE COURT:  How many bathrooms?

23           THE WITNESS:  Two bathrooms.

24  BY MR. SOWKA:

25     Q    Have done any work on a property at 6821

1   96th Street in Oak Lawn, Illinois?

2       A    No.

3       Q    And as you've testified here today, do you

4   have any knowledge about whether or not converting

5   Mr. Kowalski's case to Chapter 7 would be in the best

6   interest of creditors?

7       A    Can you repeat the question.

8       Q    Do you have any personal knowledge of

9   whether converting Mr. Kowalski's bankruptcy case to

10  a Chapter 7 liquidation would be in the best interest

11  of creditors?

12      A    I'm not aware of the specifics of Chapter 7

13  or how -- the best interest, I am not understanding.

14              MR. SOWKA:  No further questions.

15              THE COURT:  Anyone else have any

16  questions for this witness?

17              Mr. Borges, you have some follow-up?

18              MR. BORGES:  Yes, Judge.

19                  REDIRECT EXAMINATION

20  BY MR. BORGES:

21      Q    Mr. Espana, you indicated that you only

22  paid rent for a couple of months during the four

23  years?

24      A    Yes.

25      Q    You also indicated that you've done some

125

1    work for Mr. Kowalski?

2        A    That is correct.

3        Q    Are you -- so are you related to

4    Mr. Kowalski?

5        A    I have known him to -- through his wife.

6    My wife's cousin is Martha.

7        Q    Oh, I see.  So you're family?

8        A    Yes.

9        Q    I see.

10            THE COURT:  Sorry.  What was the

11    connection?

12            THE WITNESS:  Martha Kowalski, Bob's

13    wife, is my wife's cousin.

14            THE COURT:  I see.

15    BY MR. BORGES:

16        Q    Okay.  So you've got a two bedroom, two

17    bath home?

18        A    Correct.

19        Q    Okay.  And who do you live there with?

20        A    My wife.

21        Q    Okay.  The two of you.  Okay.

22            And you also indicated that you didn't

23    do any work on this Woodlawn property, 6821 West 96th

24    Street?

25        A    That is correct.

1           THE COURT:  Oak Lawn.

2           MR. BORGES:  Oak Lawn.  I'm sorry.

3    I'm back in Hyde Park.  Oak Lawn.

4           Okay.  Thank you.  No further

5    questions.

6           THE COURT:  Any other questions of

7    this witness?

8           (No response.)

9           THE COURT:  Thank you for testifying,

10   sir.  Thank you very much.  You're excused.

11           (Witness excused.)

12           MR. GUTMAN:  We still have Mr.

13   Sanchez.

14           THE COURT:  Is he a ten-minute

15   witness?

16           MR. GUTMAN:  They would know better

17   than me.

18           MR. BORGES:  I need three or four

19   minutes.

20           THE COURT:  I'll wait.

21           MR. BORGES:  Okay.

22           (Witness sworn.)

23           THE CLERK:  Please state your name and

24   spell it for the record.

25           THE WITNESS:  My name is Jorge

127

1    Sanchez, J-o-r-g-e S-a-n-c-h-e-z.

2                    JORGE SANCHEZ, WITNESS, SWORN

3                        DIRECT EXAMINATION

4    BY MR. BORGES:

5         Q    Mr. Sanchez, where do you live?

6         A    I live at 1700 South Des Plaines.

7         Q    South Des Plaines?

8         A    Chicago.

9         Q    And your occupation?

10        A    I buy property, sell property, I build, I

11   rehab.

12        Q    So you build and sell property.

13                  Are you familiar with a property

14   located at 1947 South Kedzie?

15        A    Yes.

16        Q    And are you also familiar with a property

17   located at 4152 South Wells?

18        A    Yes, I am.

19        Q    And are those properties that you own?

20        A    Yes.

21        Q    And did you ever take out a loan or a

22   refinance regarding those properties?

23        A    Yes.  I took an original loan, and then --

24   the property got refinanced about a year ago or so.

25        Q    So you refinanced those properties with

1  what financial institution?

2       A    Washington Federal.

3       Q    And how much did you do -- did you do this

4  together, one loan or did you --

5       A    Yes, both properties were combined in one

6  loan.

7       Q    Both properties.

8            And how much was that loan?

9       A    I believe one was -- I'm not sure, but I

10 think it was 150 and the other was 40, so they were

11 combined.

12           THE COURT:  I'm sorry, one was what?

13           THE WITNESS:  I don't recall exactly

14 the exact amount.  I think one was 150, and the other

15 one was -- might have been like 90,000 for Wells, and

16 150 for Kedzie.

17 BY MR. BORGES:

18      Q    Okay.  And so about $240,000?

19      A    Roughly, yes.

20      Q    Okay.  And did you discover that -- and so

21 you thought that that was your new amount that you

22 owed, the 240?

23      A    Yes, that's what I was refinancing for.

24      Q    Was it -- did you ever discover that you

25 owed additional monies on that property --

1     A     Yes --

2     Q     Those properties?

3     A     Yes.  Currently we have -- we have a

4   dispute on an extra $70,000 on that loan, both loans

5   combined.

6     Q     So an additional $70,000?

7     A     Right.

8     Q     Owed to whom or what --

9     A     Well, Washington Federal got taken over by

10   the FDIC.  And practically speaking, I don't even

11   know who actually holds the loan.  I assume it's the

12   FDIC.

13     Q     I see.

14           So how did you become aware of this

15   additional $70,000 that you didn't know about?

16     A     I went to make my payment in December of

17   last year, and I was told that -- I had the property

18   under contract.  I was going to sell the property.

19   So I requested a payoff letter.  And it came up an

20   extra $70,000.

21     Q     An additional 70 that you didn't know

22   about?

23     A     That I wasn't aware of.  And all of my

24   payments were based on the refinance amount.

25     Q     And this came as quite a shock I would

130

1   imagine?

2       A    Yeah.  Well, we lost -- we lost one deal.

3   My attorney here, we tried to work a deal and tried

4   to close the deal, and couldn't close the deal

5   because we couldn't get a payoff letter.

6       Q    And who were you asking for a -- the payoff

7   letter, you were asking it from whom?

8       A    Well, initially I had asked Washington

9   Federal.  But then it got taken over by the FDIC.

10  And now I'm sort of in limbo.  I think Midland is

11  servicing the loan.

12      Q    Midland.

13      A    But I haven't got a --

14      Q    I see.

15      A    -- a statement or anything in a very long

16  time.

17      Q    So you're unable to sell the properties?

18      A    Correct.

19      Q    Okay.  But you're still having to pay the

20  mortgage?

21      A    Yes, sir.

22      Q    Did the mortgage amount go up at all or

23  what?

24      A    Well, I'm paying the same as --

25      Q    The same --

131

1       A     -- as refinance.

2       Q     But there is the 70,000 that's hanging out

3   there?

4       A     Right.

5       Q     You don't know?

6       A     Yes.

7            MR. BORGES:  Okay.  Thank you.  No

8   further questions.

9            THE COURT:  Any questions of this

10  witness?

11           MR. REIN:  Sure.

12               CROSS-EXAMINATION

13  BY MR. REIN:

14      Q     Mr. Sanchez, you filed bankruptcy in 2013;

15  is that right?

16      A     Yes, sir, I did.

17      Q     And as part of that bankruptcy, you entered

18  into a reaffirmation agreement with Washington

19  Federal concerning your loan at 1947 South Kedzie,

20  right?

21      A     Yes.

22      Q     And the reaffirmation amount was $347,556?

23      A     I do not recall the amount.

24      Q     Let me show you the reaffirmation and see

25  if that refreshes your recollection.

132

1            THE COURT:  What number did you say?

2            MR. REIN:  I didn't.

3            (Document tendered.)

4  BY MR. REIN:

5       Q    How much was your reaffirmation amount?

6       A    Well, on this paper it says three hundred

7  forty-six -- forty-seven dollars fifty sixty-six and

8  nine cents (sic).

9       Q    Thank you.

10           So I thought you said that your

11 mortgages were 150,00 and 90,000?

12      A    Right.  That was after the refinance.  So

13 it was between that period and the refinance, which

14 was over a year ago that the loan got modified as to

15 -- it got refinanced for --

16      Q    So you were able to pay it down over?  Over

17 two years, you paid it down $200,000?

18      A    Whatever payments I was making, I don't

19 know what was going where.

20      Q    Well, the reaffirmation agreement that I

21 showed you -- I'm sorry.  I'll show it to you again,

22 but it showed what the payment schedule would be.

23           THE COURT:  So something got

24 reaffirmed in a Chapter 13 case?

25           MR. REIN:  It did.  Here we go.  On

1  June 6, 2014.  And the payments were $1844.01.

2  BY MR. REIN:

3       Q    Is that correct, paragraph 4?

4       A    I believe that's what I was paying prior to

5  refinance.

6       Q    Right.  So, are you saying that you were

7  able to pay $1844 for two years to reduce the

8  mortgage to $150,000?

9       A    What I said is I was paying that 1800 for

10 both properties until the property got refinanced.

11      Q    Now --

12      A    How much of the money got paid down to the

13 principal or interest, I am not aware.

14      Q    And am I correct that your dispute with the

15 FDIC, you filed a lawsuit against them, right?

16      A    Yes.

17      Q    And that was filed in 2018?

18      A    I believe so, yes.

19      Q    And that's been removed to federal court?

20      A    I believe so.

21      Q    Okay.  So, at the moment, it's a dispute as

22 to whether $70,000 is owed or not owed?

23      A    Yes, sir.

24      Q    Okay.  And that piece of litigation just

25 remains pending?

134

1     A     Yes, sir, to my knowledge.

2     Q     Have you done work for Mr. Kowalski?

3     A     Yes, sir, I have -- well, I have not worked

4  for him directly.

5     Q     What do you mean by that?

6     A     Well, he has sold me properties, I have

7  bought properties from him, and I have worked on the

8  properties.

9     Q     And what properties -- when was the last

10 time you bought a property from him?

11    A     Earlier this year.

12    Q     What property?

13    A     I bought vacant land at 4015 Evans.

14    Q     Was that 4522 South Evans?

15    A     Yes.

16    Q     And how much did you pay him?

17    A     I don't recall, but I think it was -- I

18 don't recall to tell -- because I have the paperwork

19 at the office.

20    Q     Is it $10,000 or more?

21    A     Yeah.

22    Q     More than 10,000?

23    A     It was somewhere around there --

24    Q     You --

25    A     I paid some back taxes.  It was a legal

1  complication.  I had to pay some back taxes.

2      Q    And when was this purchase?

3      A    I don't recall the exact date.  It was

4  earlier on 2018.

5      Q    So it was -- he filed his bankruptcy the

6  end of March.  Was it before or after his bankruptcy?

7      A    I don't know when he filed bankruptcy, and

8  I don't -- I don't remember the date.  I know it was

9  earlier this month -- this year.

10     Q    Let me show you a trustee's deed in trust.

11  It's dated March 21, 2018.

12              Does that refresh your recollection as

13  to when the transaction took place?

14     A    It seems about the right time, yeah.

15     Q    Okay.  So you bought the property from a

16  land trust that was Mr. Kowalski?

17     A    I assume it was his.

18     Q    And the property went to another land trust

19  that you're the --

20     A    I have a partner.  I have a partner.  I

21  don't own it a hundred percent.

22     Q    Who is the other partner?

23     A    Victor Alejandro Gonzalez.

24     Q    So the two of you are beneficiaries?

25     A    Yes.

1     Q     And the payment for the property, was that

2  by check?

3     A     Yes.

4     Q     One check, two checks?

5     A     It might have been -- a couple, couple

6  checks.

7     Q     Okay.  Other than that piece of property,

8  any other properties you have bought from

9  Mr. Kowalski within the last year?

10     A     Yeah.  I don't recall the exact address,

11  but I think there's one more, both 2018.

12     Q     Street?

13     A     I'm sorry?

14     Q     Can you give me a street?

15     A     Yeah, Hermitage.

16     Q     Armitage.

17     A     Yeah -- Hermitage.

18     Q     Hermitage?

19     A     Yeah.

20     Q     Hermitage and?

21     A     7006 -- 65, I believe, 65th, somewhere

22  around there.

23     Q     And when within the last year did you buy

24  that property?

25     A     I don't recall, but I know it was earlier

1  2018.

2      Q    Early in 2018?

3      A    Yeah.

4      Q    How much did you pay for that?

5      A    Well, I did a lot of work on the property.

6  And there was some back taxes that had to be done.

7  So, it didn't get -- you know -- 20,000.  I was

8  trying to get a loan on the property.

9      Q    Did you get a loan?

10     A    No, because there was a lot of back taxes

11 and currently I don't have money to fix it.

12     Q    So, did Mr. Kowalski transfer the property

13 to you in exchange for you paying the back taxes?

14     A    Yeah -- well, I had to pay back taxes and

15 give some money too.

16     Q    How much money did you give him?

17     A    I don't recall.  I'd have to go back and

18 look at my records.

19     Q    More than 5,000?

20     A    Could have been.

21     Q    More than 10,000?

22     A    No.

23     Q    So between 5 and 10?

24     A    Yeah, somewhere around there.

25     Q    In a check?

 1      A    I believe so, but I'm not a hundred percent

 2    sure.

 3      Q    To Mr. Kowalski personally?

 4      A    Whatever checks I wrote to him, yeah, were

 5    to him personally.

 6      Q    And he owned that property personally?

 7      A    I don't know.  I don't know how he owns his

 8    properties.

 9      Q    If you could -- there's a big binder in

10    front of you.

11                Turn to Exhibit 13B.

12                And you see there's Bates numbers at

13    the bottom right-hand corner.  It says TE, and

14    there's some numbers.

15      A    Oh, yes.

16      Q    If you can turn to TE 000256.

17      A    Yes.

18      Q    Do you recognize that check?

19      A    Yes.

20      Q    Number 158.

21      A    Yes, I do.

22      Q    That's a check from you?

23      A    Yes, my personal check.

24      Q    For 5,000.

25                So was that a partial payment for the

1  Evans property?

2      A    Yes.

3      Q    And that's a check you wrote on April 25,

4  2018?

5      A    Yes, sir.

6      Q    And what, you handed that to Mr. Kowalski

7  personally?

8      A    Yes, I did.

9      Q    And that was for partial payment on Evans?

10     A    Yes, sir.

11     Q    When did the second check -- was it before

12  or after?

13     A    I don't recall.  I know give two checks, I

14  believe, but I don't recall around what day.  So it

15  had to be around the same time.

16     Q    Besides Hermitage and Evans, any other

17  properties?

18     A    Not in 2018.

19     Q    Okay.  Did you own any properties together

20  with Mr. Kowalski?

21     A    Yeah, very long time ago.

22     Q    What property was that?

23     A    1750 West North Avenue.

24          THE COURT:  1750?

25          THE WITNESS:  Yes, 1750 West North

1   Avenue.

2   BY MR. REIN:

3       Q     And what happened to your ownership

4   interest?

5       A     We sold it.  We liquidated.

6       Q     Sold it when?

7       A     It was a long time ago.  It was probably

8   around '13, 2013.

9       Q     North Avenue was the only property you

10  jointly owned?

11      A     With him, yes.

12      Q     Did you ever sell any properties to him, to

13  Mr. Kowalski?

14      A     Not that I can remember.

15      Q     So were there other properties that he sold

16  to you?

17      A     Yeah, there was a couple other properties,

18  I think --

19      Q     What properties?

20      A     -- maybe three properties.

21      Q     Do you recall the addresses?

22      A     No, I don't.

23      Q     Streets?

24      A     Yeah, I think one was on Amarillo and 79th,

25  I think.

1      Q      What else?

2      A      Him personally?

3      Q      Or his companies.

4      A      Yeah, I bought two lots on Cullerton and

5  Oakley and Arthington and Western.  And then there is

6  a couple other properties, but I don't recall the

7  addresses.

8      Q      And the two lots on Fullerton and Oakley

9  you bought from whom?

10     A      From -- I think it was one of his entities.

11     Q      Do you recall which entity?

12     A      No.

13     Q      Did you ever do any business with

14  Indomitable?

15     A      No.

16     Q      Invisible?

17     A      No.

18     Q      Alta Vista?

19     A      No.

20     Q      Burros Blancos?

21     A      No.

22     Q      Piorun Properties?

23     A      No.

24     Q      Market Street Properties?

25     A      No.

1      Q      Gitano?

2      A      Gitano, that's a company that him and I

3  held North Avenue.

4                    THE COURT:  That you held -- I'm

5  sorry?

6                    THE WITNESS:  That we both held the

7  property on North Avenue under.  It was under Gitano

8  Enterprises.

9  BY MR. REIN:

10     Q      That was the property that was sold in

11  2013?

12     A      Somewhere around that time.  I don't recall

13  the exact time.

14     Q      Did Gitano Enterprises own any other

15  properties?

16     A      Not that I'm aware of.

17     Q      So it was an entity that just owned one

18  property?

19     A      Yes.

20     Q      Have you done any construction work for

21  Mr. Kowalski?

22     A      No, not directly for him, no.

23     Q      Any remodeling work for him?

24     A      No.  Last -- about two, three months ago I

25  helped him collect a little bit of rent on a property

143

1  he has on Colfax.  And I only did it for about two

2  months and stopped doing it.

3      Q    When did you stop doing the collection?

4      A    I don't remember.  I think it was like last

5  month or over a month ago.

6      Q    So --

7      A    I have to look -- I have to -- I have all

8  the pay stuff, all the payments that were -- that

9  came in and all the expenses.

10      Q    So how long did you collect rent on Colfax?

11      A    No more than two months.

12      Q    Two months.

13            And how much was the rent?

14      A    I don't recall.  They were all small

15  amounts, 600, 700 bucks a unit.

16      Q    Was this cash or checks.

17      A    Couple were money orders and a couple were

18  cash.

19      Q    And so you said a couple months ago you

20  stopped.  So we're on November 5.  So give me some

21  timeframe that you stopped collecting rents.

22      A    Somewhere in October, I assume.

23      Q    In October.  So that means you collected in

24  August and September?

25      A    Roughly.  Some people were not paying.

1    Only a few people were paying.

2        Q    Do you know who the tenants were?

3        A    No.  I have a management -- people work in

4    the office, and they keep track of all that.

5        Q    So why did you go to collect rent on Colfax

6    only?

7        A    Because he needed help to manage the

8    building.  The building was getting mismanaged.

9        Q    Who was managing the building?

10       A    Frankly, I don't think anybody was.

11       Q    So no one was managing?

12       A    Not that I -- not that I know of.  There

13   were a couple of people there they say they were in

14   charge, but...

15       Q    How was it being mismanaged?

16       A    People were not paying rent, stuff were

17   broken.

18       Q    What was broken?

19       A    Like the one lady had a broken washer and

20   dryer that I know, that I remember.  You know, some

21   people were just kind of squatting.

22       Q    How many units are there?

23       A    I believe there's ten.

24       Q    And how many -- from how many tenants did

25   you collect rent from?

1       A       I'm not sure.  I've to go back and look.

2       Q       You have records, though?

3       A       Yeah, I do have records.

4       Q       What did you do with the checks, the money

5  orders, the cash?

6       A       So I still hold -- I still hold a little

7  bit of money.  And there were -- one time I gave him

8  cash.

9       Q       You gave who cash?

10      A       Mr. Kowalski.

11      Q       How much cash did you give him?

12      A       About $800.

13      Q       And when was that?

14      A       When I first -- the first month I took over

15 the property.

16      Q       So August?

17      A       I'm not certain on the dates.

18      Q       Okay.  But you have records of that?

19      A       Yes, sir, I do.

20      Q       And the balance you're still holding?

21      A       Yeah, I hold about 1500, two grand.

22      Q       In cash and money orders or cash?

23      A       In cash.

24      Q       What happened to the money orders?

25      A       They got deposited to the management

1    company.

2          Q     Your management company?

3          A     Yes.

4          Q     What management company?

5          A     Fargo Group was doing the management.

6          Q     So that was, what, payment for your

7    management fee?

8          A     Well, I fixed some stuff on the place.   I

9    was not really trying to make money.   I was just

10   trying to help out.   You know, bring the place back

11   to life.   The place was really hard to work with, and

12   the people were almost impossible to work with.

13   So...

14         Q     Why were they hard or impossible to work

15   with?

16         A     They just don't want to pay.   They give you

17   the runaround.   You know, they always got a story.

18   And it was just -- it was just difficult.

19         Q     So the records that you kept, did you keep

20   the names of the tenants?

21         A     Yes.   Yes, I did.

22         Q     Okay.   And that's something you could turn

23   over to the bankruptcy trustee?

24         A     Absolutely.

25         Q     Fargo Group, do you also do business as

1   Fargo Development?

2        A     No, just Fargo Group.

3        Q     And Fargo Group is just a management

4   company?

5        A     It does management and general contracting.

6        Q     Did you ever do general contracting for

7   Mr. Kowalski?

8        A     I did the buildings on Lake and Halsted,

9   210 and 220 North Halsted, where Bob had an interest

10  on the property.  And William Kowalski had an

11  interest in the property, and a couple older

12  gentlemen.

13       Q     210 to 220 North Halsted?

14       A     Yes.

15       Q     Do they still have an interest in the

16  property?

17       A     I don't know.

18       Q     So, you were doing work for --

19       A     I was the GC -- I was the GC --

20       Q     GC for the Kowalski brothers?

21       A     Right.

22       Q     And who else?

23       A     Gage Development and my brother, Caesar

24  Sanchez.  And I own one building personally as well.

25       Q     And what happened to the property?

1        A     Well, I lost it.

2        Q     You lost it --

3        A     I sold it, you know --

4        Q     That's not losing it.   That's selling it.

5        A     Well, I sold it.

6        Q     So, you sold your property?

7        A     Yes.

8        Q     What happened to the properties the

9   Kowalski brothers owned?

10       A     I don't know.

11       Q     But --

12       A     I believe they sold it, but I -- that I

13   don't know.

14       Q     Do you know to whom?

15       A     No idea.

16       Q     Do you know for how much?

17       A     No idea.

18       Q     Do you know when?

19       A     No.

20       Q     Are you a long-time friend of Mr.

21   Kowalski's?

22       A     I know Mr. Kowalski for a long time, yes.

23       Q     How long?

24       A     If I was to guess, 2005, '04.

25       Q     How would you describe your relationship?

149

```
 1      A    He's an attorney.  He's done a couple

 2  closings for me.  And I have bought a couple

 3  properties from him.  He works every day.  He's a

 4  hardworking guy.  I never had any problems with him.

 5      Q    Do you describe your relationship as close?

 6      A    Not like super close, but...

 7      Q    Are you social friends?

 8      A    Not like going out and drinking or

 9  anything, but, yeah, we -- I talk to him a few times

10  a week.

11      Q    And your wife's name is Jennifer?

12      A    Yes.

13      Q    How long have you been married?

14      A    Five years, I think.

15      Q    Are you familiar with the sale of a

16  Mercedes?

17      A    Yeah.

18      Q    Can you tell me how that came about.

19      A    I don't know the details, but my wife sold

20  it to --

21              MR. BORGES:  Your Honor, I object.

22  This is going beyond the --

23              THE COURT:  Overruled.

24  BY MR. REIN:

25      Q    Go ahead.
```

1    A    My wife sold it to the lady that I believe

2 he's dating who is going to have her baby.

3    Q    Do you know how much she sold it for?

4    A    I don't recall.

5    Q    Do you have records?

6    A    I should have something, yeah.  I'm not

7 sure.  My wife sold it.  It was my wife's car.  It

8 was not my car.

9    Q    I understand, but you're married, so...

10    A    Yeah.  I should have something.  I have to

11 look.

12    Q    As to how much the sale price was?

13    A    Right.

14    Q    There is like a bill of sale or something?

15    A    I have to look.  I assume there is one.

16    Q    And do you recall whether the purchase was

17 by check?

18    A    No, it was a cash transaction.

19    Q    All cash?

20    A    Yeah.  I believe it was all cash.

21    Q    But you can't tell us how much cash was

22 paid?

23            MR. BORGES:  Judge, I'm going to

24 object again.  This is certainly beyond the scope of

25 the --

1                 THE COURT:  Response.

2                 MR. BORGES:  Beg your pardon?

3                 THE COURT:  Response to the objection.

4                 MR. REIN:  This is relevant because we

5     went into it with -- on the direct testimony and

6     cross-exam of the girlfriend.  She talked -- said

7     that she bought the car and that she operates the

8     car.  So the question is is the car property of the

9     estate, should it have been disclosed.  It's all

10    relevant to the conversion as to whether he was fully

11    disclosing assets of the estate.

12                THE COURT:  Anything else, Mr.

13    Borges?

14                MR. BORGES:  You know, I thought his

15    cross-examination would be limited to the content of

16    the examination.  Counsel is going far afield.  I

17    understand what --

18                THE COURT:  It's not too far --

19                MR. BORGES:  -- piece together --

20                THE COURT:  -- it is a bit far, but

21    it's not objectionable.

22                The objection is overruled.

23    BY MR. REIN:

24        Q    Do you know how your wife learned that the

25    girlfriend wanted to buy the car?

1       A    I think they were looking for a car.  It

2   was just comments.

3       Q    Well, did Bob Kowalski raise it to you?

4       A    I was looking for a bigger car because I

5   needed an SUV for our son.

6       Q    Okay.  And so the two of you, Mr. Kowalski

7   and you, had a conversation and then you put Jennifer

8   in touch?

9               MR. GUTMAN:  Judge, this is hearsay

10  here.

11              MR. REIN:  No, it's not hearsay.

12              THE COURT:  It's overruled.  The

13  objection is overruled.

14              THE WITNESS:  I don't recall.

15              MR. REIN:  Okay.

16  BY MR. REIN:

17      Q    Okay.  The year of the car, 2015?

18      A    I think it's older.

19      Q    Do you know what model it was?

20      A    I know it was an E350.

21      Q    E350.

22              MR. REIN:  Thank you very much.

23              THE COURT:  Any other questions of

24  this witness?

25              MR. SOWKA:  Yes, Your Honor.

1                    CROSS-EXAMINATION

2  BY MR. SOWKA:

3        Q     Mr. Sanchez, have you ever performed any

4  work at 6821 96th Street in Oak Lawn?

5        A     No.

6        Q     And do you have any knowledge as to whether

7  converting Mr. Kowalski's case to Chapter 7 would be

8  in the best interest of creditors?

9        A     I don't get involved in his business.

10       Q     So you don't have any knowledge?

11       A     No.

12                    MR. SOWKA:  Thank you.

13                    MR. GUTMAN:  Judge, I just have two

14  questions for Mr. Sanchez?

15                    THE COURT:  Do you have an appearance

16  in this case?

17                    MR. GUTMAN:  I don't.

18                    THE COURT:  You won't be allowed to

19  ask him any questions.

20                    Anything further, Mr. Borges?

21                    MR. BORGES:  Yes, I do.

22                    REDIRECT EXAMINATION

23  BY MR. BORGES:

24       Q     Mr. Sanchez, you're not a bankruptcy

25  attorney, are you?

1     A     No.

2     Q     So when they ask you these questions about

3   the best interest of creditors and so forth, do you

4   really understand what they're talking about?

5     A     Not really.

6     Q     Now, you mentioned that -- did you know --

7   so you had dealings with this bank, Washington

8   Federal, correct?

9     A     Yes.

10     Q     Did you know mister was is it Gembara?

11     A     Yes.

12     Q     Now, you had to sign a reaffirmation

13   agreement.

14          MR. BORGES:  Can I get a copy of it?

15   I'm sorry.  I showed it to my client, the

16   reaffirmation agreement.

17          MR. REIN:  It's not an exhibit.

18          THE COURT:  I'm sorry.

19          MR. BORGES:  It's not an exhibit.

20          MR. REIN:  It's not.

21          MR. BORGES:  There was what's called a

22   reaffirmation --

23          MR. REIN:  Here you go.

24   BY MR. BORGES:

25     Q     Do you know what a reaffirmation agreement

1   is?

2        A    Yes, I have a rough idea.

3        Q    What is it?

4        A    You affirm the loan you previously had

5   prior to bankruptcy.

6        Q    I'm just trying to get some clarification

7   for myself because you said there were two loans and

8   you reaffirmed 340 --

9        A    Yes --

10       Q    What --

11       A    -- my bankruptcy for six months.

12       Q    Pardon?

13       A    Because of that reaffirmation, he would

14   hold my bankruptcy for six months.

15       Q    Who did?

16       A    Mr. Crowley and essentially the bank.

17   Crowley was the attorney for Washington Federal.

18       Q    So, they told you you needed to sign this

19   in order to proceed?

20       A    Pretty much.  They -- I was a little kind

21   of forced to do it.

22       Q    You felt somewhat coerced?

23       A    Well, yeah --

24              MR. REIN:  Objection, Judge.

25              THE COURT:  What's the objection?

 1            MR. REIN:  He's putting words in the

 2    witness' mouth.

 3            THE COURT:  The objection is

 4    overruled.

 5            MR. BORGES:  He said coerced --

 6            MR. REIN:  He said forced.

 7            MR. BORGES:  It's pretty close to me,

 8    forced and coerced.

 9            THE COURT:  The objection is

10    overruled.

11            Ask another question.

12            MR. BORGES:  Thank you, Judge.

13    BY MR. BORGES:

14        Q    So, do you feel that you signed this

15    actually not owing this amount?

16        A    No, not necessarily.  What I'm saying is

17    that he -- you know, I was trying to put my life

18    together.  My wife -- I was about to get married.

19    And I couldn't work, I couldn't get any loans, I

20    couldn't do anything.  Actually, until today's date,

21    I'm trying to -- you know, that's what I do.  I do

22    real estate.  I don't have a pile of money that I go

23    buy property and flip it.

24        Q    I see.

25        A    So he holds me back six months.  It was

157

1    very, very difficult.

2         Q     And did you get a discharge?

3         A     I got a chapter -- yes, I got discharged,

4    but I had to reaffirm the loan.

5         Q     Okay.  I see.

6                   MR. BORGES:  I think I'll leave it

7    there, Judge.

8                   THE COURT:  May I see this document?

9                   MR. BORGES:  Beg your pardon?

10                  THE COURT:  This reaffirmation

11   agreement.  Is that what it is?

12                  MR. BORGES:  If I may approach?

13                  THE COURT:  I don't think it's been

14   identified, Mr. Rein.

15                  MR. REIN:  No.  I just -- I didn't

16   introduce it as an exhibit, Your Honor, just to

17   refresh his recollection.

18                  THE COURT:  And what exactly was

19   reaffirmed?

20                  THE WITNESS:  The two properties from

21   Kedzie and Wells, ma'am.

22                  THE COURT:  You say you were forced to

23   reaffirm it?

24                  THE WITNESS:  I wasn't necessarily --

25   nobody told me, hey, if you don't sign it, but he

158

1   would -- he was holding my bankruptcy for six months.

2   I had to do something because I couldn't get loans.

3   I couldn't do anything.  And I'm out of work.  I

4   can't --

5              THE COURT:  I don't understand how you

6   were forced to do something.

7              THE WITNESS:  He was holding -- they

8   were just giving me extensions and extensions and

9   extensions.  And it took six months literally for the

10  attorney to draw the reaffirmation agreement.

11             THE COURT:  All right.

12             THE WITNESS:  So I wanted, you know,

13  to rebuild my life, but I couldn't.  It was holding

14  me back.

15             THE COURT:  All right.  You can have

16  your exhibit back, Mr. Rein.

17             MR. REIN:  Thank you.

18             MR. BORGES:  If I may, Judge.

19  BY MR. BORGES:

20     Q    So you were trying to get a discharge?

21     A    Yes --

22             THE COURT:  And just for the record --

23  let me see that.  What Mr. Rein has given me is a

24  reaffirmation agreement in case number 13 B 48289.

25  And it says Chapter 7.

1            THE WITNESS:  Yes, ma'am.  I did a

2    Chapter 7.

3            THE COURT:  I thought somebody said

4    Chapter 13.

5            MR. BORGES:  That was said earlier.  I

6    was mistaken.

7            THE COURT:  Chapter 7.

8            All right.  Let's proceed.

9            Well, that's what the document says.

10   BY MR. BORGES:

11       Q    So, you were trying to get a discharge and

12   move on with your life?

13       A    Yes, sir.

14       Q    And you're saying that you were trying to

15   get a reaffirmation agreement?

16       A    Yeah.  Well, my attorney kept calling their

17   attorney to get the reaffirmation agreement.  And Mr.

18   Cohen was --

19       Q    Was there a dispute as to the amount of the

20   reaffirmation agreement?

21       A    I don't recall.  No, I don't think so.  I

22   don't recall.

23       Q    Was it higher than you thought it should

24   be?

25       A    I don't recall the amounts.

160

1      Q      Okay.  The reason I ask you is because you
2  said you had a loan of 240,000 --
3      A      Yeah, I had two properties combined --
4      Q      And how did --
5      A      -- and they combined both loans --
6      Q      How did it get up to 347,000?
7      A      (No response.)
8      Q      You don't know?
9      A      I don't know.
10                MR. BORGES:  No further questions.
11                THE COURT:  Any other questions of
12  this witness?
13                MR. REIN:  No, Judge.
14                THE COURT:  Thank you for testifying,
15  sir.
16                THE WITNESS:  Thank you.
17                (Witness excused.)
18                THE COURT:  All right.  I think it's
19  time to take a break.  Anything further?  Any other
20  witnesses anybody plans to call at the next hearing?
21                MR. BORGES:  At the next hearing?  I
22  would like to review some of the objections that I
23  had -- that were made regarding my witnesses and
24  expert witnesses, et cetera, which I would file by
25  tomorrow, if need be.

 1                    THE COURT:  Do you have other

 2    witnesses?

 3                    MR. BORGES:  No, not today.

 4                    THE COURT:  Do you have other

 5    witnesses?

 6                    MR. SOWKA:  No, further witnesses,

 7    Your Honor.

 8                    THE COURT:  Okay.  And this is on the

 9    motion to convert?

10                    MR. SOWKA:  That's correct.

11                    THE COURT:  All right.  What do you

12    suggest?

13                    MR. SOWKA:  Well, we're back at 11:00

14    a.m. on Friday for --

15                    THE COURT:  Probably not.  Apparently

16    the Marshals have something mandatory --

17                    MR. SOWKA:  Ah --

18                    THE COURT:  It's best that they not be

19    tied up on Friday.  So I'm thinking Thursday, if I'm

20    available.  If I'm not, you all will hear from me.

21                    MR. REIN:  Your Honor, I will tell

22    you, I'm out of town tomorrow and Wednesday, so I'm

23    going to have no opportunity to look at the documents

24    certainly by Thursday.  By Friday I'll have a day at

25    least to see what's there.  But coming back on

1    Thursday, we're not going to accomplish anything.

2    Mr. Torf is out of town --

3                    UNIDENTIFIED SPEAKER:  Your Honor, we

4    just need a little time.  11:00 o'clock would be a

5    little tight.  If we could --

6                    THE COURT:  So what do you mean, the

7    afternoon would better?

8                    UNIDENTIFIED SPEAKER:  The afternoon

9    would be just fine on Friday.

10                   THE COURT:  All right.  That's

11   assuming that I'm available.  For security reasons, I

12   won't say where I might be.  But if I'm not

13   available, you all will know probably Thursday

14   morning.  All right.

15                   MR. BORGES:  Judge, could we --

16                   THE COURT:  But let's shoot for Friday

17   at 1:00 p.m.

18                   MR. SOWKA:  Friday at 1:00 p.m., Your

19   Honor --

20                   MR. PALOIAN:  Thank you, Judge.

21                   MR. BORGES:  Your Honor --

22                   THE COURT:  I'm sorry?

23                   MR. BORGES:  Just in case, Your Honor,

24   could we reconsider.  Mr -- it is very difficult to

25   represent Mr. Kowalski when he's handcuffed.

 1                    THE COURT:  I hope that the Marshals

 2     will allow him a visit.

 3                    UNIDENTIFIED SPEAKER:  Yes, Your

 4     Honor.

 5                    THE COURT:  He said he's not taken a

 6     bath or anything.

 7                    UNIDENTIFIED SPEAKER:  While he's in

 8     the MCC, that's his own choice.

 9                    MR. KOWALSKI:  No.

10                    UNIDENTIFIED SPEAKER:  He has the

11     capabilities to do that.

12                    MR. KOWALSKI:  I'm in solitary.

13                    MR. BORGES:  But even when they bring

14     him --

15                    THE COURT:  Can you ask them for --

16                    UNIDENTIFIED SPEAKER:  Yes, ma'am.  We

17     will take care of it.

18                    THE COURT:  -- that he be allowed to

19     bathe and put on clean clothes?

20                    UNIDENTIFIED SPEAKER:  Yes, ma'am.

21                    MR. PALOIAN:  Your Honor, I think the

22     question has arisen about who Mr. Kowalski's client

23     (sic) is for this matter.  And I think that the

24     Marshals --

25                    THE COURT:  I'm sorry?

1              MR. SOWKA:  So, I think the Marshals

2   were looking for some clarification about who his

3   counsel is for purposes of this matter.  His counsel

4   for this matter, as I understand it, can go and visit

5   with him, but other third parties are showing up

6   saying that they're his counsel.

7              THE COURT:  Who?

8              UNIDENTIFIED SPEAKER:  Earlier today.

9              THE COURT:  If you know.

10              UNIDENTIFIED SPEAKER:  From what we

11   were told, that his sister was -- came up to the

12   lock-up and said that she was his attorney.

13              THE COURT:  Mr. Borges?

14              MR. BORGES:  She indicated she was an

15   attorney, Judge.  I don't know that she represented

16   she was his counsel.

17              THE COURT:  Has she filed an

18   appearance in this case?

19              MR. PALOIAN:  No.

20              MR. BORGES:  Not to my knowledge, but

21   she's still an attorney.

22              UNIDENTIFIED SPEAKER:  If she's not on

23   the case, she has no --

24              MR. BORGES:  I see.

25              THE COURT:  Have you filed an

1  appearance in this bankruptcy case?

2          MS. KOWALSKI:  Your Honor, I represent

3  him --

4          THE COURT:  Then I'm not going to tell

5  the Marshal that you filed an appearance for this

6  case.

7          MS. KOWALSKI:  Yes, I have an

8  appearance on file as appellate counsel.  There is

9  pending in case number 3064 -- he has a total of four

10 appeals in the domestic relations case, and one is a

11 TRO, which is --

12          THE COURT:  Anything further?

13          MS. KOWALSKI:  -- seven days.

14          THE COURT:  You do not have an

15 appearance in this bankruptcy case.  I am not going

16 to tell the Marshals that they have to do anything

17 other than beyond this case.

18          Anything further for any of you?

19          MS. KOWALSKI:  Leave to file my

20 appearance.

21          THE COURT:  There is no such motion in

22 front of me.  Friday at 1:00 p.m.  I'm going to

23 prepare an order ordering the Marshals to continue

24 custody.  I'll get it out as soon as I can.

25          MR. PALOIAN:  Thank you, Your Honor.

1                    THE COURT:  Basically I'll just update

2    the other order.

3                    UNIDENTIFIED SPEAKER:  Yes, ma'am.

4                    THE COURT:  We'll get it within the

5    next 15 minutes.

6                    MR. PALOIAN:  Thank you, Judge.

7                    THE COURT:  See you all Friday at 1:00

8    p.m.  Well, I won't say -- if I'm not available,

9    you'll all know by Thursday.

10                   (Which were all the proceedings had in

11                   the above-entitled cause, November 5,

12                   2018, 11:00 a.m.)

13   I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
14   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.

15

16

17

18

19

20

21

22

23

24

25