IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Robert Kowalski,              )  18 B 09130
                             )  Chicago, Illinois
                             )  9:30 a.m.
                             )  10:00 a.m.
                  Debtor.    )  November 15, 2018


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE JACQUELINE P. COX


APPEARANCES:

For the Debtor:                Mr. Ernesto Borges;
                               Mr. Xiaoming Wu;

For Martha Padilla:            Ms. Karen Porter;

For FDIC as Receiver:          Mr. Jason Torf;
                               Mr. Eric Rein;

The case trustee:              Mr. Gus Paloian;

For the Chapter 11
trustee, Gus Paloian:          Mr. Devvrat Sinha;
                               Mr. James Sowka;

For JPMorgan Chase Bank:       Mr. Todd Ruchman;

For the U.S. Trustee:          Ms. Gretchen Silver;

Court Reporter:                Jerri Estelle, CSR, RPR
                               U.S. Courthouse
                               219 South Dearborn
                               Room 661
                               Chicago, IL  60604.

# **I N D E X**

| Witness: | DX | CX | REDX | RECX |
|---|---|---|---|---|
| Ziff Sistrunk: | 31 | 36 | 57 | |
| | | 47 | | |

3

```
 1                THE CLERK:  Robert Kowalski.

 2                MS. SILVER:  Good morning, Your Honor.

 3   Gretchen Silver from the U.S. Trustee's office.  This

 4   matter is also up later on your calendar, so maybe we

 5   can just kick this to then.

 6                THE COURT:  All right.

 7                MS. SILVER:  Thank you.

 8                THE COURT:  That's not a problem.

 9   I'll pass it to hear it with the other matters.

10                MS. SILVER:  Thank you.

11                   (Matter passed.)

12                THE CLERK:  Robert Kowalski, along

13   with a 9:30 motion.

14                MR. SINHA:  Good morning, Your Honor.

15   Dev Sinha for the Chapter 11 trustee.

16                THE COURT:  From left to right, it's

17   sometimes easier for the court reporter.

18                Just hold on.

19                MS. PORTER:  Karen Porter on behalf of

20   Martha Padilla.

21                MR. TORF:  Good morning, Your Honor.

22   Jason Torf on behalf of FDIC as receiver.

23                MR. REIN:  Rick Rein also on behalf of

24   FDIC as receiver.

25                MR. SINHA:  Dev Sinha on behalf of the
```

4

1    Chapter 11 trustee.

2            MR. SOWKA:  Good morning, Your Honor.

3    James Sowka on behalf of Chapter 11 trustee Gus

4    Paloian.

5            MR. PALOIAN:  Your Honor, Chapter 11

6    trustee Gus Paloian.

7            MR. RUCHMAN:  And Todd Ruchman for

8    Chase.

9            MR. WU:  Xiaoming Wu from Ledford, Wu

10   & Borges.  I expect Mr. Borges to be here.  I'm not

11   here for that case, but he is one of the partners.

12           THE COURT:  You expect him?  How long?

13           MR. WU:  I don't know.  Your Honor, I

14   can call him right now.

15           THE COURT:  So you're asking me to

16   pass it until Mr. Borges gets here?

17           MR. WU:  Yes.

18           THE COURT:  Although you don't know

19   how long that is?

20           MR. WU:  Right.

21           THE COURT:  I'll give you five minutes

22   to call him.

23           MR. WU:  Okay.  Thank you.

24           THE COURT:  I'll pass it for a few

25   minutes, okay?  I'll take a five-minute break.

5

1                    (Brief recess.)

2                THE CLERK:  Recalling Robert Kowalski.

3                THE COURT:  From left to right.

4                MS. PORTER:  Karen Porter on behalf of

5    Martha Padilla.

6                MR. TORF:  Jason Torf on behalf of

7    FDIC as receiver.

8                MR. REIN:  Rick Rein also on behalf of

9    FDIC as receiver.

10               MR. BORGES:  Ernesto Borges on behalf

11   of the debtor Robert Kowalski.

12               MR. KOWALSKI:  I'm Robert Kowalski.

13               MR. SOWKA:  Good morning, Your Honor.

14   James Sowka on behalf of Chapter 11 trustee Gus

15   Paloian.

16               MR. SINHA:  Good morning, Your Honor.

17   Dev Sinha on behalf of Chapter 11 trustee Gus

18   Paloian.

19               MR. PALOIAN:  Your Honor, Gus Paloian,

20   case trustee.

21               MR. RUCHMAN:  Todd Ruchman for Chase.

22               THE COURT:  All right.  Let's proceed.

23   I have a motion on behalf of -- take an examination

24   of Bank of America.

25               MR. SINHA:  Yes, Your Honor.  We've

6

1  heard no objection so far for the 2004 motion.

2                 MR. BORGES:  No objection.

3                 THE COURT:  Motion will be granted.

4  I'm signing the proposed order.

5                 MR. SINHA:  Thank you, Your Honor.

6                 THE COURT:  All right.  Where are we

7  in this matter?  We have some objections.

8                 MR. TORF:  Are those the claim

9  objections, Your Honor, that you're talking about?

10                THE COURT:  The objection of -- the

11 objection at docket 148 to claim 20 of FDIC.

12                MR. BORGES:  That was an objection

13 filed --

14                THE COURT:  Right.

15                MR. BORGES:  -- some time ago.

16                I think we were continuing with the

17 motion to convert when we last left off.

18                THE COURT:  Mr. Torf.

19                I'm sorry.  Go ahead, Mr. Borges.  I

20 shouldn't have cut you off.

21                MR. BORGES:  Your Honor, we were

22 discussing last time we were here, last Thursday, but

23 a lot has happened since last Thursday.

24                When I -- when I took a look -- when I

25 opened my door on Friday, there was a -- the

1  headlines of the Sun-Times was regarding an

2  $82 million fraud that had occurred and the death of

3  a banker, and so forth.  And, you know, my thought

4  here, Judge, is that -- what's happening here is that

5  there's an effort here to -- to convert

6  Mr. Kowalski's case to a Chapter 7 and to liquidate

7  all of his assets.  There is massive fraud that has

8  occurred here that I think trumps everything.  There

9  seems to be an effort here to sweep everything under

10  the rug, simply roll up Mr. Kowalski's belongings

11  under a rug, or in a rug, and liquidate everything

12  and forget about what's the bigger elephant that's in

13  the room.  And there's a huge elephant in the room, a

14  fraud that is being perpetrated here.

15          There -- when I looked -- when I took

16  a look at everything, and I looked at this article

17  here in the Sun-Times, and a lot of things were

18  brought to my attention when I see this fraud,

19  $82 million, the next day after we left court.

20          And, so, there are a lot of things

21  going on here, the back examiners -- bank examiners

22  who were complicit in this and negligent in this

23  matter.  There were directors and officers complicit

24  in this matter.  FDIC didn't do their job.  And it

25  appears -- and everybody is trying to sweep this

1   under the rug and point the finger to Mr. Kowalski

2   like he's the bad guy.

3                THE COURT:  What does that have to do

4   with the matters on my court call?  I'm not clear.

5                MR. BORGES:  The matters are that this

6   should not go forward until I'm permitted to subpoena

7   people who were examiners, who came and looked at

8   these loans that occurred.  I haven't seen any of

9   this.  I'd like to talk to the examiners.  I'd like

10  to talk to the Office of the Comptroller of Currency

11  who went into the bank and to FDIC.  I need an

12  opportunity -- there seems to be some push to just

13  wipe this away and to take away all of his assets

14  without due process.

15               This -- you know, the argument is

16  made, well, the best interest of the creditors.

17  Well, we know about that, Judge.  There should be

18  judicial review as to this fraud that is occurring.

19  We've got reporters.  We've got the press that's

20  involved.  We've got people that want to get to the

21  bottom of this.  But these attorneys want to simply

22  wipe out all of Mr. Kowalski's assets, liquidate them

23  with all this $82 million, possibly a murder involved

24  or a suicide.  There's a lot of palace intrigue here,

25  Judge.  There's something rotten in the state of

1  Denmark.

2                THE COURT:  So what are you asking me

3  to do?

4                MR. BORGES:  I'm asking that I be

5  given an opportunity to bring witnesses in here to

6  testify as to what they saw on the books of this

7  bank, why Mr. Kowalski has all these liens on him for

8  $25 million, when he only borrowed a fraction of

9  that.

10               THE COURT:  Well, he filed objections.

11  That will get some information out, I suspect.

12               MR. BORGES:  Well, I -- you know, I

13  want to --

14               THE COURT:  I suspect that there's

15  going to be a response, if needed.  I'm not sure.  I

16  think the objections are in good form.  But if you've

17  got something to present, you can present it if we

18  have a hearing.

19               MR. BORGES:  Well, I'm concerned about

20  the --

21               THE COURT:  We're still in a hearing,

22  if I understand.

23               MR. BORGES:  I know.  And I just --

24               THE COURT:  Are you calling anybody as

25  a witness?

10

1          MR. BORGES:  We need -- no, I need

2    time to -- I don't even know who these people are,

3    Judge, that I need to call in.  I'm trying to

4    identify them.  Reached out to the press to try to

5    identify them to bring them into this court so that

6    Your Honor has an understanding to what's going on.

7    I don't know what's going on.  I know that bank

8    examiners looked at records, and they didn't do their

9    job.  And I would like to find out who they are.

10          THE COURT:  It sounds like that would

11   be a defense to some other kind of court action.  I'm

12   not sure it's a defense to a motion to convert.

13          MR. BORGES:  Well, when there's -- I

14   think that fraud trumps everything, Judge.  When

15   there's a huge, massive fraud, I think that

16   everything needs to stop, to slow down.

17          THE COURT:  We'll figure that out.

18          But, Mr. Torf, response.

19          MR. TORF:  Your Honor, I'm not sure

20   what we're speaking in response to.  Mr. Borges has

21   raised points that, as I see it, have no bearing upon

22   the matters that are up before the court today.  We

23   have a hearing that is in process on the motion to

24   convert.  And it seems that Mr. Borges is making an

25   effort to try to forestall a hearing in progress

1  based on something that is apparently totally

2  irrelevant.  It has nothing to do with the loans that

3  Mr. Kowalski took from the bank.  It has nothing to

4  do with his bad acts.

5          Mr. Kowalski is in bankruptcy.  The

6  bank is not in bankruptcy.  The FDIC is not in

7  bankruptcy.  Mr. Kowalski is in bankruptcy.  And it

8  is his bad acts that are being examined and that are

9  at issue in this hearing in order for this court to

10  determine whether the case should be converted.

11          I agree with the court that the issues

12  that Mr. Borges is raising might have something to do

13  with something else, but not the matters at hand

14  today.

15          As for the objections to FDIC's

16  claims, there are several issues.  Number one, there

17  are two claims that FDIC filed.  There are two

18  separate claims by two different divisions within the

19  FDIC and have separate bases.  The claims are

20  mutually exclusive.  One is claim number 20 by the

21  professional liability division of the FDIC.  And the

22  other is claim number 22.

23          As to claim number 22, Your Honor,

24  several months later we still don't have proper

25  service of process, so that claim objection cannot

1  even be entertained by this court.

2              THE COURT:  What's the difference

3  between the two claims?  I'm not clear.

4              MR. TORF:  Your Honor, one is by the

5  professional liability division.  We did not file

6  that claim.  We did file claim number 22.

7              Claim number 20, as I understand it,

8  is based on fraud in part by Mr. Kowalski and

9  improper use of collateral that was supposed to have

10 been held in trust.

11             Claim number 22 is based on loans that

12 Mr. Kowalski took from Washington Federal.

13             THE COURT:  And it's alleged that

14 they're unpaid?

15             MR. TORF:  That's correct, Your Honor.

16 So there are two different claims.  Claim number 22,

17 again, there has not been proper service of process.

18 This was raised several months ago.  Service needs to

19 be made in accordance with --

20             THE COURT:  Oh, I mean, service of

21 process of the FDIC.

22             MR. TORF:  Correct.

23             THE COURT:  I remember there was

24 somebody here saying --

25             MR. TORF:  Correct.  Correct.

1          THE COURT:  -- that it has to be

2    served a certain way under rule --

3          MR. TORF:  Correct.  It's Rule 3003, I

4    believe, Your Honor --

5          THE COURT:  I forget the --

6          MR. TORF:  -- which ties into Rule

7    7004.

8          THE COURT:  Four.  I remember vaguely

9    something very convoluted --

10          MR. TORF:  Right.  Exactly.

11          THE COURT:  -- but I don't --

12          MR. TORF:  And on its face it appears

13    that perhaps --

14          THE COURT:  Which one hasn't been

15    served?

16          MR. TORF:  That's claim number 22,

17    Your Honor.

18          THE COURT:  The repayment claim.

19          MR. TORF:  Exactly.  That's the larger

20    of the two claims.  It hasn't been served.

21          THE COURT:  So they haven't even been

22    back to court because they have -- oh, I see.

23          MR. TORF:  And as to both claims, Your

24    Honor, neither --

25          THE COURT:  So they stepped up on the

1  limited objection about service, and until they get

2  served, they're not coming back.

3               MR. TORF:  Right.  And neither has

4  even been noticed for a hearing, Your Honor, so I'm

5  not even sure how we're even before the court, quite

6  frankly.  They never noticed these things for

7  hearing.

8               THE COURT:  So I should strike number

9  22 --

10               MR. TORF:  I think you should strike

11  number 22, Your Honor.

12               THE COURT:  -- until they're served

13  properly?

14               MR. TORF:  I think that's right, Your

15  Honor.

16               THE COURT:  Mr. Borges?

17               I do remember a young lady and a young

18  man that came in and said something.

19               Hold on a second.  Hold on.

20               MR. TORF:  That's right.

21               THE COURT:  Number 22 is docket number

22  186.

23               Mr. Borges, has it been served?  They

24  did come in and sort of tell how to serve them, I --

25               MR. TORF:  That's right.

15

1           THE COURT:  Even if they didn't give

2    the details, they said there was noncompliance

3    with --

4           MR. TORF:  And --

5           THE COURT:  -- some grand scheme of

6    service --

7           MR. TORF:  -- in fairness, Your Honor,

8    that argument was in connection with claim number 20

9    because at the time the objection to claim number 22

10   had not been filed yet.  Service of the objection for

11   both is the same because they're both FDIC claims.

12           It appears, based on their certificate

13   of service, that they have served properly on claim

14   number 20 now.  But, still, claim number 20 hasn't

15   even been noticed for a hearing.  As to the objection

16   to claim number 22, they still have not served

17   properly.  There's no evidence in the record.

18           THE COURT:  Mr. Borges, why shouldn't

19   I strike these two claim objections until first I see

20   a certificate of service that they -- that the

21   objections have been properly served and then

22   properly noticed?

23           MR. BORGES:  Well, Judge, we've been a

24   little shorthanded.  Mr. Wu's actually interviewed

25   attorneys this week.  I've been a little ill.  I

1  don't move as fast as I used to.  I had a stroke and

2  only have vision in one eye.  Things are a little --

3  not moving quite as fast as I had prepared them to.

4            THE COURT:  Sorry to hear that.

5            MR. BORGES:  And, actually, I had a

6  doctor's appointment this morning, but I had to

7  cancel that.  But we just need a little more time,

8  Judge.  We don't have all the attorneys that --

9            THE COURT:  But they did make this

10 objection about service probably a month ago.

11           MR. TORF:  It's about three months

12 ago.

13           MR. REIN:  Three months ago.

14           MR. BORGES:  Three months ago?

15           MR. TORF:  It was before Mr. Borges

16 was involved.

17           THE COURT:  It kind of doesn't move

18 that quickly.

19           MR. BORGES:  Before I was involved,

20 Judge.  I can get with Mr. Wu this afternoon and have

21 that done properly.

22           THE COURT:  I'm going to strike --

23           MR. BORGES:  22?

24           THE COURT:  -- the objections at

25 dockets number 186, and I think it's 137 -- but hold

1    on.

2              The claim objection at docket number

3    186 is going to be stricken.  And I'll prepare the

4    order.  I'll explain it.

5              MR. BORGES:  That's for claim 22?

6              THE COURT:  Hold on.  Hold on.  I'll

7    prepare an order explaining.  Hold on.

8              That's 186, and then -- I'm sorry,

9    that was -- 186 is proof of claim 22.  I'll strike

10   the objection at 148, which deals with claim 20.  And

11   I'll prepare the orders.  I'll explain it.

12             MR. TORF:  Thank you, Your Honor.

13             THE COURT:  Hold on.  Hold on.

14             Those two are taken care of.

15             Now, we have the motion to convert.

16             MR. REIN:  We have that.  We have the

17   status on the contempt.

18             THE COURT:  Right.

19             MR. REIN:  Which I'm happy to address.

20             THE COURT:  Go right ahead.

21             MR. REIN:  There's been no compliance.

22   I sent Mr. Borges an e-mail on Monday telling him

23   there's been no compliance with the subpoena for the

24   Rule 2004 exam.

25             We busted our rump to go through 41

1  boxes of documents.  And I can tell the court that

2  99.5 percent of the documents in there are

3  nonresponsive.  It was just a document dump.  And I

4  explained in my e-mail to Mr. Borges that the

5  subpoena asked for evidence of consideration for the

6  deeds in lieu for 11 properties, both for the deeds

7  and then for the subsequent transfers.  There is no

8  documents with regard to that.

9            I had said in an e-mail to him in May

10  which properties -- or in October, after the initial

11  stomping out of the Rule 2004 exam, I identified the

12  properties that weren't included in the two boxes

13  that were brought to the exam.  One of those

14  properties, 5307 West Leland, was in the 41 boxes.

15  That's where about the point five percent of the

16  production applies.  And I explained to him that that

17  would be category number one in the subpoena.

18            And in category number two, we were

19  asking for documents with regard to 1512 West Polk,

20  which was the former marital residence.  There's no

21  documents produced on that.

22            We had also asked for 6806 West

23  Lafayette.  My understanding is that property has

24  been sold to satisfy Chase.

25            THE COURT:  5806 West Lafayette or

19

1   south?

2                   MR. REIN:  6806 -- 6806 --

3                   THE COURT:  If it's the City of

4   Chicago, I would think it would be south.

5                   MR. REIN:  Right.  6806 West

6   Lafayette.  I'm not looking for --

7                   THE COURT:  West Lafayette or south?

8                   MR. BORGES:  South.

9                   MR. REIN:  South Lafayette.

10                   I'm not looking for those documents

11   because that property has been sold to satisfy Chase

12   Bank's mortgage lien -- or Parkway Bank's mortgage

13   lien.  So there's been no compliance, zero.

14                   THE COURT:  And you have been able to

15   examine the contents?

16                   MR. REIN:  All 41 boxes of documents.

17   I can tell you what's in there.  It's totally

18   irrelevant.  There are files of properties that

19   aren't part of this estate.  There are boxes upon

20   boxes of his tax returns from the 1990s.  There's

21   bank account records for the late '90s, early 2000s.

22                   There's a number of boxes with regard

23   to the divorce proceeding.  I'm not interested in

24   that.

25                   There are boxes of documents with

20

1   regard to Fulton Street Markets, which he sold '14,

2   '15, '16, I can't remember.  Again, it's not property

3   of the estate.

4                   THE COURT:  '14, '15, '16 years ago?

5                   MR. REIN:  In 2014 -- 2014, 2015, or

6   2016, I can't remember the year.  It's not property

7   of the estate.  That's not our interest.  And the

8   subpoena detailed the specific 11 properties --

9                   THE COURT:  Do you have a copy of the

10  subpoena?

11                  MR. REIN:  I don't have --

12                  THE COURT:  I'm sure it's on the

13  docket.

14                  MR. REIN:  It is on the docket.

15                  THE COURT:  It might take me a minute.

16                  Go ahead.  Go ahead, I'm listening.

17                  MR. REIN:  While you're looking.

18  If -- we are also in the process of imaging, because

19  the FDIC needed to send a vendor in from DC that they

20  have a contract with.

21                  THE COURT:  I see.

22                  MR. REIN:  Okay.  We're imaging the

23  phone and the tower.  But I can tell you with regard

24  to the -- he gave us, remember, passwords.  He gave

25  us passwords both for his iCloud account and the

1   att.net account, which are all web-based.  We were

2   able to get into Apple.  The password he gave us for

3   at&t.net does not work, so he needs to give us a

4   valid password for -- for the att.net, and a valid --

5   we have two different e-mail accounts that he used,

6   and I don't know which one he was or wasn't using,

7   which one is the valid e-mail address, what the

8   password or passwords are for those.  But we've been

9   unable to access, and that was one of the provisions

10  of this court when he was released last Thursday.  So

11  there has been not full cooperation, full compliance.

12              THE COURT:  What do you suggest I do?

13              MR. REIN:  I suggest -- we need full

14  cooperation.  We didn't get it.  And you told the

15  debtor that he'd be released upon full cooperation.

16  He hasn't -- let's have the U.S. Marshal take him

17  back into custody.

18              There's been no compliance with the

19  subpoena, none.  There are no records with regard to

20  proof of payment at all.  And that's what we're

21  looking for, evidence of consideration for the

22  acquisition, for the disposition of properties, and

23  there is nothing.  And we went to the extra effort

24  over the last three days, because that's all we were

25  given for this status hearing, to look at the 41

1  boxes that they said here's all his documents.

2  Nothing there.

3              THE COURT:  Mr. Sinha, any response?

4              MR. SINHA:  To that, Your Honor?

5              THE COURT:  Anything you want to say

6  with regard to that?

7              MR. SINHA:  The Chapter 11 trustee has

8  nothing to add on that, Your Honor.

9              THE COURT:  Mr. Sowka, nothing?

10             Mr. Paloian, nothing?

11             Mr. Ruchman.

12             Ms. Porter.

13             MS. PORTER:  No, Your Honor, I have

14  nothing to add.

15             THE COURT:  Mr. Borges.

16             MR. BORGES:  Yes, Your Honor.

17             First of all, I -- Mr. Rein may have

18  sent something to my office -- I'm sorry --

19             THE COURT:  I'm sorry?

20             MR. BORGES:  I said Mr. Rein indicates

21  he had sent an e-mail to me on Monday.  I certainly

22  don't deny or dispute that.  I did not see it.  I was

23  unaware of it.  I apologize for that.

24             Mr. Kowalski was incarcerated when

25  these boxes were delivered.  I don't know, you know,

1   because his sister grabbed boxes that she saw or

2   files and put them in a box and delivered them.  He

3   did not have an opportunity to review them.

4              THE COURT:  Well, since he was

5   released, what has he done to get that information to

6   the FDIC?

7              MR. BORGES:  I don't -- I didn't know

8   there was a problem.  I -- you know, I don't dispute

9   that I was sent an e-mail, not at all.  But it

10  normally goes to my office manager, and I just was

11  not notified of that.

12             I'm sure we could solve this by today

13  when he gets out of court, out of divorce court.  He

14  can come over to my office, and I can get that to

15  Mr. Rein this afternoon.  I don't know how long he's

16  going to be in divorce court.  But he has his phone,

17  he has his computer.  I mean, it's not as if he

18  hasn't turned over anything.  The boxes, he had no

19  control over because he was incarcerated.  But he did

20  turn his phone over, he did turn over CPU, that, I

21  imagine, has information on there.

22             I will certainly get with him when he

23  gets out of a block away, from divorce court.  He

24  could come over to my office as soon as he finishes

25  there.  And I will be in touch with Mr. Rein to get

1   him everything we can get him that he may not have.

2   I was just totally unaware that he didn't have that.

3   And I do see the e-mail that he sent to me, and

4   I'm -- I think I need to give him maybe a different

5   address because it goes to my office manager and she

6   may not --

7            MR. PALOIAN:  Can you specify an

8   e-mail address for us to use in communicating with

9   you so this doesn't happen again during the course of

10  the case?

11           MR. BORGES:  Yes.

12  Ernestoborges@aol.com.

13           MR. PALOIAN:  Okay.

14           MR. BORGES:  That comes directly to

15  me.  Otherwise, it goes to the office manager, as

16  many of your e-mails did, and she didn't tell me

17  about the two of them that you had sent.

18           But, Judge, we can -- we can get on

19  that as early as, say 3:00 o'clock or 3:30 today.

20  And I just don't see the need --

21           THE COURT:  Mr. Rein.

22           MR. BORGES:  -- in locking him up

23  again because it would -- you know, we need to go

24  through this.  He needs to see what's missing here.

25  I'm unaware of what's -- I'll look at his e-mail, but

25

1  we'll address each and every issue that he has today.

2                    MR. REIN:  So the subpoena is

3  served --

4                    THE COURT:  Mr. Rein.

5                    MR. REIN:  -- the subpoena's served in

6  August.  The first exam was scheduled for September

7  the 18th, which he did not show up at.  The second

8  exam by court order was October 22nd.  At that point

9  he brought in two boxes.  He knew -- and Mr. Borges

10 was representing him at the time.  He brought five

11 boxes to court that sat here for over a week, so

12 he -- he was actually involved in, because he -- he

13 wasn't in the MCC at the time when he brought the

14 five, and the two.  So that's seven of the 41 that

15 were not responsive.  And, actually, that's 43 boxes

16 because I'm not counting the two that he produced

17 earlier.

18                    So there's been 43 boxes of

19 production, and 99 percent of it is totally

20 irrelevant, and none of it responds to the subpoena

21 that was served in August.  You know, we keep getting

22 more and more, I need more time, I need delay, I

23 need -- you know, I'll get you I don't -- you know, I

24 don't know.

25                    THE COURT:  So you want me to take him

1   back into custody?

2                   MR. REIN:  I do.

3                   THE COURT:  And he'll have another

4   excuse that I wasn't in -- I wasn't around to go

5   look -- although I'm not convinced, Mr. Borges.

6                   MR. BORGES:  Judge, that's not --

7                   THE COURT:  These are -- your client

8   is an adult.  If he wants to answer these questions

9   to get this information out so he can get the

10  bankruptcy relief he wants, he would do it.

11                  MR. BORGES:  Judge, we can submit

12  it --

13                  THE COURT:  Just a second.

14                  MR. BORGES:  -- to Mr. Rein today.

15                  THE COURT:  Mr. Paloian.

16                  MR. PALOIAN:  Your Honor, I want to

17  stay on this issue, but I want to address something

18  that Mr. Borges started with today.  This fraud, you

19  know, there's a fraud perpetrated on Mr. Kowalski.

20  The only fraud we've heard about in testimony are his

21  bankruptcy crimes during the course of this case.  So

22  there's a big delay going on here.  There's a stall

23  to complete the conversion hearing.  And there --

24                  THE COURT:  You want to finish that

25  today?

27

1              MR. PALOIAN:  Judge, I want it over.

2     I want it done.  I want that done.

3              THE COURT:  Oh, Mr. Borges, weren't

4     you supposed to have some witnesses today?

5              MR. BORGES:  Judge, witnesses are very

6     hard to get sometimes.  I -- you know, Judge --

7              MR. PALOIAN:  There has to be a --

8     there has to be a --

9              THE COURT:  I asked you a question.

10             MR. BORGES:  No.

11             THE COURT:  Do you have any --

12             MR. BORGES:  No, I do not.  I do not,

13    Judge.  I do not.  I need --

14             THE COURT:  I thought you had three or

15    four witnesses?

16             MR. BORGES:  I had -- I think Mr. --

17    has already testified.

18             THE COURT:  Well, you want to step

19    back there and talk to your witness?

20             MR. BORGES:  Yes, I do.

21             THE COURT:  Step back there.  I'll

22    wait for you.

23                  (Brief pause.)

24             MR. BORGES:  Judge, we have -- some of

25    the witnesses have not appeared.  I don't know if

28

1  there's a --

2                 MR. PALOIAN:  Who are the witnesses?

3                 MR. BORGES:  -- motion to compel.

4                 MR. PALOIAN:  Who are the anticipated

5  witnesses?

6                 MR. BORGES:  I have a list of about 12

7  witnesses that we subpoenaed, including -- I don't --

8                 THE COURT:  Do you have any witnesses

9  today?

10                 MR. BORGES:  I do.

11                 THE COURT:  Who?

12                 MR. BORGES:  Mr. Sistrunk.

13                 THE COURT:  Only one?

14                 MR. BORGES:  It seems that we just

15  have one witness here today.

16                 THE COURT:  Out of 12?

17                 MR. BORGES:  Out of 12.

18                 THE COURT:  Did you subpoena those

19  witnesses?

20                 MR. BORGES:  Yes, Judge, we did.  I

21  could give --

22                 THE COURT:  Any idea why --

23                 MR. BORGES:  I could give you that

24  list.

25                 THE COURT:  Any idea why they're not

1  here?

2           MR. BORGES:  One refused.  I know one

3  refused.  I can provide his name to you.  Said he

4  just wasn't going to come in.

5           And so we -- you know, we wanted to

6  subpoena witnesses.  Some were out of state, said

7  that they -- there's no jurisdiction over them, and

8  they would not come in and testify.  These were some

9  FDIC people that are, I guess, in Texas.  So there --

10  there are some people who just simply won't comply.

11           Our contention, we just want to

12  establish what happened with these loans.  I know

13  counsel wants to know about my client's repayment --

14           THE COURT:  Well, Mr. -- we know Mr.

15  Kowalski wouldn't answer questions about them at the

16  2004 exam.  Instead he's too busy trying to threaten

17  Mr. Paloian.  I'm not sure there's any real effort.

18  No records have been produced.  I'm not sure I'm

19  going to continue anything for witnesses.

20           MR. SOWKA:  Judge, I would just point

21  out that on November 6th, the debtor filed his

22  purported follow-up list of expert disclosures.  And

23  the two witnesses identified on this list are the

24  debtor's brother and sister, neither of whom are here

25  today to testify either.

1          The court clearly -- you set this

2    hearing for the final witnesses to come testify to

3    conclude the hearing today.  Their two experts, which

4    he failed to mention, are the debtor's relatives.

5    There's been no discussion of whether they were

6    subpoenaed, and why they're not here today.

7               THE COURT:  What are you asking me to

8    do today, Mr. Borges?

9               MR. BORGES:  His brother -- Judge, if

10   you could just set this over so I could provide Mr.

11   Rein with --

12               THE COURT:  Why don't I hear this one

13   witness you have, and then we'll proceed with the

14   motion.

15               MR. BORGES:  Okay.  Thank you.

16               THE CLERK:  Please raise your right

17   hand.

18               (Witness sworn.)

19               THE CLERK:  Please state your name and

20   spell it for the record.

21               THE WITNESS:  Ziff, Z-I-F-F.  Last

22   name is Sistrunk, S-I-S-T-R-U-N-K, Sr.

23          ZIFF SISTRUNK, SR., WITNESS, SWORN

24               DIRECT EXAMINATION

25

31

1   BY MR. BORGES:

2        Q     You can have a seat, Mr. Sistrunk.

3              So, Mr. Sistrunk, where do you live?

4        A     6522 South Ellis Avenue in Chicago,

5   Illinois.

6        Q     Okay.  And what kind of building is that?

7        A     A basement, first floor, second floor, so I

8   guess that would be considered a two-flat.

9        Q     And where do you live in the building?

10       A     On the second floor.

11       Q     And do you know Mr. Robert Kowalski?

12       A     Yes, I do.

13       Q     How long have you lived in that building,

14   first of all?

15       A     Probably about two years, close to two

16   years.

17       Q     Okay.  And in those two years, do you do

18   any work for Mr. Kowalski?

19       A     Yes, I do.  During the summer I do the

20   grass.  And then during the wintertime we do snow

21   removal.

22       Q     And you do that for the building in which

23   you live?

24       A     I do that for that one; 62 -- 6500 South

25   Drexel, and there's a condominium around 64th Street;

32

1   and there's another building on Ellis; and there's

2   one on South Constance, I think it is; and one in

3   Englewood, about six buildings.

4        Q    About six buildings.

5             And do you provide any service to --

6   does Mr. Kowalski -- to your knowledge, does he own

7   the building at -- on Ellis, where you live?

8        A    The building -- we got a letter, I think

9   yesterday or the day before yesterday, about a week

10  ago, saying that there's a company called North Star

11  that would be taking responsibility of the duties of

12  the building.

13       Q    I see.

14       A    So I guess no.

15       Q    And did you have any --

16            THE COURT:  I guess, what?  I'm sorry.

17            MR. BORGES:  But as to the ownership.

18            THE WITNESS:  I guess he wouldn't own

19  it because North Star sent us a letter saying -- a

20  letter from the court saying that there's a new owner

21  of the building.

22  BY MR. BORGES:

23       Q    A new owner of the building?

24       A    Or someone taking responsibility of the

25  building.

33

1     Q     Okay.  Ownership or management, do you

2  know?

3     A     Management, I think it said.

4     Q     Okay.  So what did you do in respect to any

5  services you might have provided at 6522 South Ellis?

6     A     I did snow probably.  I did grass once a

7  week, and snow removal as needed.

8     Q     I see.  Okay.  Anything else?

9     A     Maybe garbage, or I would inspect the place

10  if there's debris that needed to be picked up or

11  minor repair -- very minor repairs.

12     Q     I see, okay.

13             What about the other properties?

14     A     The same in all of those.

15     Q     So you would do the same for all of those

16  buildings?

17     A     Yes.

18     Q     And prior to that notice, do you know

19  whether the other properties received this notice

20  that you referred to earlier?

21     A     I know three of them had been complaining

22  about activities because I pass the buildings every

23  day coming from the 63rd Street "L".  And I saw a

24  young lady inside a condominium property on East

25  64th, and she was complaining about a lock or

1   something because I used to interact with that

2   building, so that's the reason I stopped.

3             And then I stopped on Ellis, and there

4   was a gentleman going in the back, and he was

5   noticing some of the debris and the grass hadn't been

6   cut.  And I told him that these buildings were in

7   court now, and that there will probably be some more

8   people -- or new people doing the grass and stuff

9   like that.

10     Q    Okay.  So you've noticed a difference as

11  far as the upkeep of the property?

12     A    Of course.  It's very visible, even in the

13  property that we're in.

14     Q    Would you say that the condition of the

15  buildings is not as good as it was prior to this

16  being turned over to the court?

17     A    Well, I wouldn't say as good or as bad.  I

18  would say that the property -- just take our property

19  for an example.  The grass is -- it's winter now, but

20  prior to that, it wasn't cut.

21             Then I went to a property on Ellis and

22  the gentleman was complaining about the lights or

23  something.

24             And then the young lady on -- the

25  young lady on East 64th, she had complained about a

1  lock or something like that, but I told her that

2  wasn't my responsibility, and I couldn't do

3  anything -- we weren't --

4       Q    She complained about being locked out?

5       A    She was complaining about the lock --

6       Q    I see.

7       A    -- on the gate.  And I told her --

8       Q    But previous to -- previous to this time,

9  you would take care of things such as that?

10      A    Anything that I had the ability to do, I

11  would do it.  But Bob had a guy named -- a Hispanic

12  guy, that he would jump on it like -- just like that.

13      Q    And make the repairs?

14      A    Yes.

15      Q    Okay.  What about the rents, did you ever

16  collect any of the rents?

17      A    No, I didn't.  That was -- excuse me, but

18  that was the benefit of working for Bob, we played --

19  we stayed rent free.

20      Q    You did, okay.

21      A    Yes, I did.

22      Q    And you didn't collect rent from any --

23      A    No.

24      Q    -- other tenants.

25           Okay.  All right.  So in return for

36

1  paying rent, you were the handyman, for lack of a

2  better word, or...

3      A    We were what?

4      Q    You were the handyman or --

5      A    Yes, we was.  That's exactly what it was.

6      Q    I see.  Okay.

7              MR. BORGES:  Thank you, Mr. Sistrunk.

8              THE COURT:  Any cross-examination?

9              MR. REIN:  I do, Your Honor.

10              CROSS-EXAMINATION

11  BY MR. REIN:

12      Q    Mr. Sistrunk, you said you moved into 6522

13  South Ellis two years ago.

14      A    I -- I would say two, it could be close to

15  three, but I have been interacting with Bob and his

16  sister two to three years.  Because the thing is is I

17  moved out of there once, and then I moved back in,

18  so...

19      Q    When did you move out?

20      A    About -- approximately about a year ago.

21      Q    So two to three years ago you moved in --

22      A    And moved out.

23      Q    -- and then moved out.  And why did you

24  move out?

25      A    There was another person that I gave the

37

1   property to to stay there while I had went out of

2   town for a minute.

3        Q     And who was that person?

4        A     We called him Minnesota because he lived in

5   Minnesota, and he played baseball with Ali (sic).

6   And I felt he would be responsible enough to stay in

7   the apartment while I wasn't there.

8        Q     Okay.  And how long was he there?

9        A     Probably about six months.

10       Q     And then you went back how long ago?

11       A     About six months.

12       Q     Okay.  So you've been there six months, so

13  sort of the beginning of 2018?

14       A     Probably the real beginning of the spring,

15  past spring.

16       Q     Okay.  So is it then your testimony since

17  the beginning of the spring of 2018 that you've been

18  cutting the grass there?

19       A     Oh, even when I wasn't in that apartment I

20  still did it.  So I would say I've been cutting the

21  grass since I've been connected to Bob.  One place

22  here or there.

23       Q     So when you moved in two to three years ago

24  you were cutting the grass?

25       A     From the moment I connected to Bob that was

38

1   one of the things that I was doing, learning

2   constructions, myself with others.  And that was one

3   of the things that we did.

4        Q    Did you have a written lease when you moved

5   in originally?

6        A    I don't think I did.

7        Q    Have you ever had a written lease?

8        A    I don't think I did.

9        Q    Have you ever paid rent?

10       A    If I did, it was when I first came there.

11       Q    How much did you pay?

12       A    I think I paid about 350.

13       Q    $350 a month?

14       A    But don't pin me on that.

15       Q    For about how long?

16       A    Very short.

17       Q    And since then you've paid no rent?

18       A    Not to Bob at all, no.

19       Q    To anybody else?

20       A    Nobody else, no.  Not for that apartment,

21   no.

22       Q    And you were excused from paying rent

23   because you took care of the grass and removed the

24   snow?

25       A    Yes.  I was the handyman for Bob's

1   property.

2       Q     And you said you did that at 6500 South

3   Drexel for how long?

4       A     Since I've been connected with him.

5       Q     So since the two to three years you've

6   been --

7       A     Ever since I've known him, I've done work

8   for him in some capacity.

9       Q     And what's the street address for the East

10  64th Street property?

11      A     It's on 60 -- I could tell you in a second.

12  About 800 because --

13      Q     800.

14      A     -- Langley is 700.  Cottage Grove is 800,

15  so go another block to Ellis.  That's 900, about 900.

16      Q     So it's 900 East 64th?

17      A     I don't know the exact.  But I used to live

18  on 43rd and Langley and that was 700 East 43rd.

19  Langley, Cottage Grove would be eight.  Ellis would

20  be nine and Drexel on the next, so about -- might be

21  11, might be about 1100 East.

22      Q     About 1100?

23      A     But I'm not sure on that.  I know Langley

24  is 700 East.

25      Q     And what kind of property is that?

40

1      A     It's a basement, a first floor, and a

2  second floor.

3      Q     And as far as you know, Mr. Kowalski owns

4  that property?

5      A     Well, there was a letter that came -- we

6  saw in the hallway -- that said that from here on

7  out, there's an organization called North Star or

8  something like that.  I read it, and I didn't think

9  it was for me because it was on the first floor, so I

10  laid it back down.  But I did look over it.

11      Q     And the property -- what's the street

12  address on South Constance?

13      A     I'm not sure.  It's about 7800, somewhere

14  up in there.

15      Q     And what kind of property is that?

16      A     I'm not sure, but most of Bob's properties

17  was one and two-flat buildings in Woodlawn.

18      Q     So this Constance is a Kowalski property?

19      A     I can't say that to be certain because --

20      Q     But you're doing work there on his behalf?

21      A     I wouldn't say that.  Based upon you saying

22  Constance, I wouldn't say that.  I would say any

23  properties that Bob had that was in Woodlawn, and one

24  in Englewood, I maintained.  But I wouldn't -- don't

25  pin me down on Constance because I'm not certain on

1  that.

2      Q    Okay.  So what properties in Woodlawn have

3  you been maintaining in 2018?

4      A    There's a property on -- there's a property

5  on 65th.  There's a property on -- in -- there's a

6  property on 6500, it's either Ellis or Drexel, but

7  I'm not certain on that.

8      Q    Okay.  And the street address on 65th?

9      A    6522 South Ellis.

10     Q    Okay.  So we've got 6522 South Ellis.

11     A    And other properties in the community that

12 I'm not certain of.

13     Q    But you said when you were examined that

14 you've been doing grass and snow removal at -- on

15 Drexel, on 64th, on Ellis, on Constance, and in

16 Englewood.

17     A    Let me walk you out of my house on 65th and

18 Ellis.  Now you go one block to East -- there's a

19 property there that I have been maintaining.

20     Q    What's that address?

21     A    It's near Ellis and Drexel.  Now, here's

22 what's interesting just listening to you.  I did the

23 grass.  I didn't actually own the building.

24     Q    Who told you to do the grass?

25     A    We have a maintenance man named Sanchez.

1       Q     Jose Sanchez?

2       A     Sanchez, I know is his name, but I don't

3  know his whole name.

4       Q     So Mr. Sanchez asked you to cut the grass

5  over --

6       A     No.  I usually work with Mr. Sanchez when

7  he does things.  And he usually comes by and picks me

8  up from 6522 when there's snow or grass.

9       Q     Okay.  So you're doing work for

10 Mr. Sanchez?

11      A     Not necessarily.  Mr. Sanchez has --

12 Mr. Sanchez has been working for Bob -- if it's

13 Sanchez -- Hispanic guy.  I'm not going to say

14 Sanchez.  I'm not going to say Sanchez.

15      Q     So the Hispanic person you're doing work

16 for who's doing work on behalf of Mr. Kowalski?

17      A      Mr. Sanchez picks me up if there's snow,

18 like today, at 6522, and he'll take me to some

19 properties.  Now, whether they were Bob's properties

20 or his properties, I can't say that to be certain.

21 But I can say it has been properties that I've

22 visited more than once doing snow with the Hispanic

23 guy.

24      Q     Are you paid by the Hispanic guy to do this

25 work?

1      A      Nope.

2      Q      So all this work, whether it's the Hispanic

3   guy or for Mr. Kowalski, what you're getting is free

4   rent?

5      A      Yes.

6      Q      Now, when was the last time you cut the

7   grass at 6522 South Ellis?

8      A      Probably about a year ago now.

9      Q      A year ago.  That's well before you got

10  this notice that this company was taking over the

11  property, right?

12     A      No.  But personally I knew Bob was in

13  litigation myself.

14     Q      So the grass has been growing on this

15  property for a year?

16     A      No.

17     Q      Anyone been cutting it?

18     A      During the summer it was being cut.

19     Q      By whom?

20     A      Probably somebody, but I wasn't there.

21  Remember, I told you that I just moved back.  And

22  so -- but I did visit it because I had to get my

23  mail.

24     Q      So when you moved back into 6522 South

25  Ellis about six months ago, have you been cutting the

44

1  grass?

2      A    That's when I noticed that the grass was

3  not being -- being cut.

4      Q    Okay.  I understand, but have you cut the

5  grass since you moved back in?

6      A    No.

7      Q    Okay.  So the grass has not -- the

8  properties are not being maintained by you or someone

9  else as far as you know?

10      A    It hasn't.

11      Q    And this is before you got this letter

12  about the property management being assumed by North

13  Star?

14      A    In concurrence, about the same time or a

15  little bit more -- a little bit more before because

16  we've been getting notice that it wasn't being cut.

17  Now, remember, my tenants and -- the Hispanic would

18  come by, and then that's when we always know that

19  there's duties that has to happen.  Because I don't

20  have the lawnmowers myself.  I don't have access to

21  them myself.  I don't have the keys to the basement.

22      Q    So one other.  How long have you known

23  Mr. Kowalski?

24      A    I would say about three, four years, if

25  that much.

45

1      Q     And you've know Jan Kowalski too?

2      A     Oh, yeah, I know Jan.

3      Q     How do you know Jan?

4      A     I ran her campaign once for election.

5      Q     You also are a co-plaintiff with her in

6  litigation, right?

7      A     I have been.

8      Q     Against the Cook County Electoral Board?

9      A     Yes, sir.

10      Q     And you became a co-plaintiff --

11                THE COURT:  I'm sorry, what was that

12  question?  Something about -- I'm sorry.

13                MR. REIN:  He's a co-plaintiff with

14  Jan Kowalski against the Cook County Officers

15  Electoral Board.

16                MR. BORGES:  Judge, I would object to

17  this.  He's going beyond the scope of my examination.

18                THE COURT:  Response to the objection?

19                MR. BORGES:  He's going down the --

20                MR. REIN:  It goes to his credibility.

21                MR. BORGES:  Credibility?

22                THE COURT:  Response to the objection.

23                Well, I'll overrule the objection.  It

24  does go to definitely bias, credibility.  The

25  objection is overruled.

46

 1            MR. REIN:  I forget my last question,

 2   but let me ask another.

 3            THE COURT:  Something about Cook

 4   County.

 5            MR. REIN:  Yes.

 6   BY MR. REIN:

 7       Q    So you and Jan are suing the Cook County

 8   Officers Electoral Board?

 9       A    Not me, but I could be a co-plaintiff in it

10   because I was involved in it in certain --

11       Q    You're a co-plaintiff with her, right?

12       A    My name is on it, yes.

13       Q    Complaining about her -- well, what's the

14   nature of the lawsuit?

15       A    The Board of Election denying opportunities

16   of certain people's petitions, whether or not they

17   were valid or not, their signatures were valid of

18   not.

19       Q    And whether she should be on the ballot?

20       A    No --

21            MR. BORGES:  Objection again.  This is

22   far --

23            THE COURT:  Just a second.

24            MR. BORGES:  -- beyond the scope.

25            THE COURT:  The objection has been

1  overruled.

2              I'm sorry, can you ask the question

3  again, Mr. Rein?

4              MR. REIN:  Sure.

5  BY MR. REIN:

6      Q    So the lawsuit has to do with the validity

7  of nomination papers and whether she should be on the

8  ballot?

9      A    The validity of whether or not if I sign my

10  name, Ziff Sistrunk, is that actually my name.

11  That's what the grounds of the argument was.

12              MR. REIN:  I have no further

13  questions.

14              THE COURT:  Any questions of this

15  witness?

16              MR. SOWKA:  Yes, Your Honor.

17                  CROSS-EXAMINATION

18  BY MR. SOWKA:

19      Q    You previously testified that you saw a

20  letter from an entity you believe was North Star,

21  correct?

22      A    Yes.  There was a letter in the hallway at

23  6522 that I picked up, and I looked at it and sort of

24  read it.  And then I put it in -- the first lady --

25  the first floor lady, I usually put her mail through

48

1   the door slightly.

2       Q    And what did it say?

3       A    I noticed in big bold it said something

4   about North Star that I saw.  And then when I saw her

5   name on it, I really stopped reading it.

6       Q    You had indicated something before about a

7   change in management though?

8       A    Yes.  It did say -- at the beginning of it,

9   it said something about a management firm.  It said

10  North Star.  And it said somewhere up on North

11  Michigan or North Milwaukee.  And then when it got to

12  her, then I stopped reading it because it wasn't for

13  me.

14      Q    Okay.  And did it have any discussion in

15  there regarding who rent should be paid to?

16      A    I didn't get to that part of the letter.

17      Q    And are you familiar with North Star?

18      A    No, I'm not.  Only insomuch as there was a

19  gentleman here that testified the other day.

20      Q    And you've been here for some of the

21  hearings in the case, correct?

22      A    Yes, I have.

23      Q    Okay.  So there's three books in front of

24  you.  Let's open up the big trial book and turn to

25  Exhibit 4.

1      A     Which, sir?

2      Q     Exhibit 4.

3                And the first page of that exhibit

4    is -- looking at the numbers on the bottom, it's TE

5    37; do you see that?  Very bottom right-hand corner.

6      A     Schedule A/B property?

7      Q     Yes.  And if you look at the bottom

8    right-hand side of the page, do you see numbering on

9    the bottom of the page that says TE and then it ends

10   on 37?

11     A     Yes.

12     Q     Okay.  This is a copy of the bankruptcy

13   schedule filed by Mr. Kowalski in this case.  Have

14   you seen this document before?

15     A     No.

16     Q     Okay.  Let's go and turn to page TE 47 of

17   this document.

18                Within Exhibit 4 --

19     A     Where are you --

20                MR. SOWKA:  Your Honor, permission to

21   approach the witness to help with the page?

22                THE COURT:  Go right ahead.

23   BY MR. SOWKA:

24     Q     Mr. Sistrunk, are you looking at page TE 47

25   now?

50

1      A     Yes.

2      Q     Okay.  And the top of this document is

3   titled list of land trusts; do you see that?

4      A     Um-hum.  Yes.

5      Q     And second from the bottom it says North

6   Star land trust 0911919; do you see that?

7      A     Um-hum.

8      Q     And it indicates it holds 6522 South Ellis

9   Avenue; is that correct?

10     A     Yes, North Star.

11     Q     And is this the same North Star that the

12  letter was from that you were indicating previously?

13     A     It says North Star.  I saw that name, North

14  Star.

15     Q     So the letter you believe you reviewed was

16  from North Star referenced here?

17     A     I did see the word north, and I did see the

18  word star.  It was in blue.

19     Q     And you previously testified you moved out

20  of this property for a while, correct?

21     A     Yes, I did.

22     Q     Where were you residing?

23     A     At that point when I moved out?

24     Q     Yes.

25     A     7039 South Sangamon.

51

1          THE COURT:  South what?

2          THE WITNESS:  Sangamon.

3    BY MR. SOWKA:

4        Q    And why did you move out?

5        A    I gave the apartment to one of my friends

6    from Minnesota.

7        Q    And did you have any discussions with

8    Mr. Kowalski about that?

9        A    Not necessarily.  Actually, I didn't let

10   him know that.

11       Q    You did or you did not?

12       A    Did not.

13       Q    You did not.  And why -- why was that?

14       A    Because the apartment was mine.  And as

15   long as it maintained itself, and I did my

16   responsibility, I didn't feel he needed to know

17   because he would --

18       Q    And why did you move back in?

19       A    Because they had left the building.  The

20   apartment got shot up.

21       Q    Who is "they?"

22       A    Minnesota.

23       Q    Is there someone else other than Minnesota

24   then?

25       A    Yeah, two of his roommates.

52

1  Q  And was Minnesota ever paying rent while he

2 was there?

3  A  No.

4  Q  You had indicated previously in maintaining

5 the property you dealt with a Hispanic individual you

6 referred to on occasion as Mr. Sanchez?

7  A  I know for certain now it was not Sanchez.

8  Q  How would he reach you to do the lawn

9 mowing and the other --

10  A  He would just come by the house.

11  Q  He would just come by the house.

12     Have you ever called him?

13  A  Not necessarily, no.

14  Q  Has he ever called you?

15  A  I am not going to say -- I would dare not

16 say who I've called and who I've not called in my

17 life.

18  Q  Do you have his phone number?

19  A  Not necessarily, no.

20  Q  Can you check in your phone?

21  A  I wouldn't have it in this phone because

22 I've never called him, and I've never had his number.

23  Q  So is it your testimony that the phone

24 number is not in your phone?  So if we got a subpoena

25 ordering you to turn over your phone, the phone

1    number would not appear in your phone?

2        A    Okay.  Let me say this:  The person who

3    comes to get me to take the snow and shovel, I do not

4    know his name to be certain.  I can tell you a

5    picture of him, I know.  Now, Sanchez is not his

6    name.  If you give me a second -- it's not Sanchez.

7    I know it's not Sanchez.  Jose.  No, it's not Jose.

8    I can't think of his name.  I can't think of his

9    name.  I just can't think of it, but I know it's not

10   Sanchez.

11       Q    Is it Espana?

12       A    No.

13       Q    What do you call him when you deal with

14   him?

15       A    What is his name?  Actually, I say Wueno

16   (phonetic).

17       Q    You say what?

18       A    Wueno.

19       Q    Wueno?

20       A    Yes.  That's a Hispanic term for my friend,

21   I think it is, or come here.  Wueno, or something

22   like that.

23       Q    Bueno?

24       A    Bueno.

25       Q    You previously testified regarding a

54

1   Mr. Martinez.

2       A    I think that might be his name.  I think

3   it's -- I think it is.

4       Q    And do you have Mr. Martinez's phone

5   number?

6       A    Not in this phone, but I have it in one of

7   my phones.

8       Q    And you have other phones?

9       A    I have two phones -- three phones.  This

10  phone here is my California phone.  It doesn't have

11  anything but California people.  I maybe have some

12  phones here, but it doesn't have my regular phone --

13  my regular people.

14      Q    So if we sent you a subpoena for

15  Mr. Martinez's phone number, you'd be able to provide

16  it to us?

17      A    If you asked me for Mr. Martinez's number,

18  I probably couldn't provide it for you.  And I'm not

19  going to say whether it's in my phone or not, but I

20  will check that phone.

21      Q    Well, I'm asking you if it's in your phone

22  or not, any of your phones?

23      A    I'm not certain.  I can't be certain.  I

24  can't tell you that is his name.

25      Q    Does Mr. Kowalski provide any of these

55

1  phones for you?

2      A    No, he does not give me any phones, but he

3  does help me with my phone bill.

4      Q    He pays your phone bill?

5      A    No.  The money that he'll give me for our

6  baseball team -- he'll occasionally help us with my

7  baseball team if I need a dozen of balls or something

8  like that.  So he'll give me -- every Saturday and

9  Sunday I need money for umpires in baseball.

10     Q    And how does he give you money?

11     A    Probably -- it's only $35.  So in the

12  summer, probably 35 bucks, or Jan or whomever.  Even

13  Ernesto Borges has given me money.

14     Q    And when is the last time Mr. Borges gave

15  you money?

16     A    About a year ago.

17     Q    About a year ago.

18          And when's the last time Mr. Kowalski

19  gave you money?

20     A    Baseball, he hasn't done anything in about

21  a year.

22     Q    And when is the last time Jan Kowalski gave

23  you money?

24     A    She bought me lunch yesterday.

25     Q    She bought you lunch.

56

1          And before that?

2     A    I can't say.  I only -- I don't have a car,

3  so I'll need carfare (sic).  If you're talking about

4  money -- if you're talking about -- to me carfare is

5  money.

6     Q    Sure.

7     A    As needed.  If I need carfare, I'll ask her

8  for carfare, two, three bucks, something like that.

9     Q    How often?

10    A    As needed.

11    Q    So once a week?  Twice a week?

12    A    Probably once every two weeks or something

13 because I have a card, and then when I don't have my

14 card --

15    Q    And how does she give you car money?

16    A    No, I have a card, a senior card.  And when

17 I don't have my card --

18         THE COURT:  A CTA card?  Are you

19 talking about some kind of transportation card?

20         THE WITNESS:  Well --

21         THE COURT:  I'm just trying to --

22         THE WITNESS:  -- senior card.

23         THE COURT:  Do you want to show it to

24 the --

25         Mr. Sowka, do you want to see that so

1   you'll know what kind of card he's talking about?

2                    THE WITNESS:  And the CTA withdrew

3   that from me once, so I did need carfare then.  But

4   it's a senior card.

5   BY MR. SOWKA:

6       Q    Okay.  So this is a CTA, Metra, Pace

7   combination regional transportation authority card?

8       A    Yes.  And at some point you have to renew

9   it, and then I didn't, so I needed carfare.

10      Q    And how did she provide those funds to you?

11      A    She go in her purse, and she take it out,

12  and she hand it to me.

13      Q    Cash or a new card?

14      A    $2, $3 cash.  Excuse me.

15                   MR. SOWKA:  No further questions, Your

16  Honor.

17                   THE COURT:  Any questions of this

18  witness?  Any other questions of this witness?

19                        (No response.)

20                   THE COURT:  Mr. Borges, any other

21  questions?

22                   MR. BORGES:  Yes.

23                    REDIRECT EXAMINATION

24  BY MR. BORGES:

25      Q    Mr. Sistrunk, you indicated that I had

58

1  given you some money about a year ago?

2       A    Yes.  You always donate for my birthday,

3  and normally today for Perry Small (phonetic)

4  birthday party.  But I didn't bug you today because I

5  knew I couldn't go to her party today, and you would

6  be --

7                 THE COURT:  I'm sorry, I can't hear

8  you.

9                 THE WITNESS:  I said he usually give

10 me money for our baseball team every year.  And he

11 usually donate today for Perry Small's birthday

12 party, which is today.  And neither him, nor I could

13 be at it today.  But I did everything yesterday,

14 decorate, but we didn't buy a cake and stuff because

15 I couldn't -- I didn't want to intrude on him for

16 that.

17 BY MR. BORGES:

18      Q    So what was your relationship with the

19 baseball team?

20      A    I was a bat boy for the White Sox in the

21 '70s.  And I've been running baseball for the last 30

22 years in Washington Park and Jackson Park.

23      Q    Okay.  So you -- and you ask for donations

24 for your baseball team; is that correct?

25      A    Yes.

59

1      Q     And I've contributed to your baseball team?

2      A     Yes, you have.

3      Q     So I didn't give money to you, but to your

4  baseball team?

5      A     To Green Slate Institute for Justice,

6  not-for-profit.

7                  THE COURT:  I'm sorry, what's the name

8  of it?

9                  THE WITNESS:  Green Slate Institute

10  for Justice.

11                  THE COURT:  Green Slate --

12                  THE WITNESS:  Institute for Justice.

13  It's a not-for-profit organization with the State of

14  Illinois, which we're about seven years old now.

15  BY MR. BORGES:

16      Q     And you ask for donations from other

17  people, right?

18      A     Yes, I do.  Billy Goat's, Jesse White,

19  people in business, and people who are -- do us a

20  goodwill.

21      Q     I understand, okay.  Thank you.

22                  I just want to get something straight

23  because I'm still a little confused when you moved in

24  and out of 6522 South Ellis.

25                  You lived there initially at what

60

1   time?

2          A      I've been there --

3          Q      When is the first time you moved in?

4          A      We met Jan on the "L" -- about three years

5   ago --

6          Q      Three years ago, okay.

7          A      -- to answer your question.  I met Jan, and

8   then I met Bob.  And then Bob eventually --

9          Q      All right.  So you moved in in 19 -- I

10  mean, 2 -- 19 -- 2015, or so?

11         A      It's going on three, maybe four years, but

12  I haven't been in the apartment four years straight.

13         Q      I see.

14         A      I haven't been in the apartment four years

15  straight.

16         Q      So you moved out?

17         A      Yeah.  Because he gave me an apartment, but

18  occasionally I'll move because my family owns

19  property on 70th and Sangamon, so occasionally I'll

20  move over there.

21         Q      I see, okay.  And you said your friend

22  Minnesota moved into that apartment --

23         A      Yes, he did.

24         Q      -- after he had moved back --

25                And you said the apartment was shot up

1  or something?

2       A    Yeah.  Bob have a friend named something

3  that found out that I wasn't there.  And then he

4  tried to get them out of there, and they would not

5  move, so they shot the apartment up.  And then they

6  moved the next day.

7       Q    Who shot the apartment up?

8       A    Some guys in the neighborhood.

9       Q    I see.  And then you moved back in there?

10      A    I moved back in because it was my

11 apartment.  I was responsible for it.  And I tried to

12 get to it before Bob found out about it.

13      Q    All right.  So now you said that you hadn't

14 cut the grass in about a year you think?

15      A    I left -- when Minnesota moved in, I left

16 the apartment.  I just come over occasionally to make

17 sure everything's okay.  So I know it's been about 6

18 months I've been back exactly.  Exactly.

19      Q    I see.  But it's fair to say that you think

20 the apartments that you -- Mr. Martinez, you think

21 his name is, fixed you up?  I mean, Mr. Bueno.

22      A    I call him Wueno, but I know it's not

23 Sanchez.  I just don't know his name.  I can't pull

24 his name out.

25      Q    All right.  So then he has you -- you take

62

1   snowblowers or --

2       A    Well, he usually have the equipment in the

3   back of the car.  And then he'll go take me to about

4   five or six properties, and we'll cut grass.

5       Q    I see.  Okay.

6            And you noticed a difference since you

7   used to do that?

8       A    Huge difference.

9       Q    Huge difference.  All right.  Thank you.

10           MR. BORGES:  No further questions.

11           THE COURT:  Any other questions of

12  this witness?

13               (No response.)

14           THE COURT:  Thank you for testifying.

15           THE WITNESS:  Thank you, ma'am.

16             (Witness excused.)

17           THE COURT:  Any other witnesses, Mr.

18  Borges?

19           MR. BORGES:  None that are here,

20  Judge.  I have other witnesses I would like to have

21  come and testify.

22           THE COURT:  What are they going to

23  testify to?

24           MR. BORGES:  They're going to testify

25  to --

1              THE COURT:  What are their names?

2   Have they been disclosed?

3              MR. BORGES:  I have -- I have a list

4   of about 11 or 12 people.

5              THE COURT:  Have they been disclosed?

6   Did I require that the parties exchange witness and

7   documents?

8              MR. SOWKA:  Yes, you did, Your Honor.

9              THE COURT:  Have those names been

10  disclosed, Mr. Borges?

11             MR. BORGES:  I thought they have,

12  Judge.  I thought they have.

13             THE COURT:  I think Mr. Sowka said you

14  only disclosed Mr. William Kowalski and Jan Kowalski.

15             MR. SOWKA:  That was a supplemental

16  disclosure regarding expert testimony they intended

17  to elicit, Your Honor.

18             THE COURT:  Did you disclose these

19  witnesses, Mr. Borges?

20             MR. BORGES:  I did disclose Mr.

21  William Kowalski, who has refused to honor the

22  subpoena, who is Mr. Robert Kowalski's brother.  And

23  he has refused to appear.  So that's --

24             THE COURT:  I asked you, you said you

25  had 12 other witnesses.

64

 1          MR. BORGES:  I had -- I do have other

 2   witnesses.

 3          THE COURT:  Have you disclosed them?

 4          MR. BORGES:  I thought I had, Judge.

 5   Maybe I hadn't, but I can supply those names.

 6          MR. SOWKA:  Judge, it would be helpful

 7   if he could run through the names as we're here

 8   today, and we can indicate whether --

 9          THE COURT:  I just asked that.  That

10   wasn't answered.

11          MR. BORGES:  I have them at my office,

12   Judge.

13          THE COURT:  I don't know if I'm going

14   to wait.  You won't say who these witnesses are.  You

15   don't tell me they've been disclosed, as I required.

16   I don't remember the exact day.

17          MR. REIN:  October 31st.

18          THE COURT:  I vaguely recall -- let me

19   just check.  For any contested hearing, that's an

20   order I enter just to make sure everybody is on the

21   same page about witnesses and exhibits.

22          MR. PALOIAN:  Your Honor --

23          THE COURT:  Wait, now let me just go

24   back to October 31.  I just --

25          MR. PALOIAN:  -- we've seen a witness

1    list, Judge.  It exists.

2                    THE COURT:  All right.

3                    MR. PALOIAN:  Your Honor --

4                    THE COURT:  Disclosure by the debtor.

5                    MR. PALOIAN:  Yes.  There was --

6                    MR. SOWKA:  It's document number 219,

7    Your Honor.

8                    THE COURT:  All right.  I see a number

9    of people on here.  When was -- was that a timely

10   disclosure?

11                   MR. PALOIAN:  Yes.

12                   MR. SOWKA:  Yes, it was, Your Honor.

13                   THE COURT:  Where are your witnesses,

14   Mr. Borges?

15                   I'm sorry, Mr. Paloian, you had

16   something to say.  I cut you off.

17                   MR. PALOIAN:  Your Honor, what I was

18   going to say is that the debtor did make two

19   disclosures, one a timely disclosure, and the second

20   one an untimely disclosure of -- of proposed expert

21   witness testimony.  One of those two people was Jan

22   Kowalski.  We doubt that either of them can

23   competently provide expert testimony.  There has been

24   no report.

25                   The other thing is is Jan Kowalski has

1    been in this court a number of times.  She's been

2    here when it serves Mr. Kowalski's purposes.  And

3    apparently it serves his purposes of delay today that

4    she not be here.  So this is one more -- this is

5    basically a four-corner stall.  This has been a

6    stall.  If -- we should take five minutes to go

7    through this list of witnesses because --

8                    THE COURT:  The one that was filed on

9    the 31st?

10                   MR. PALOIAN:  Yes.  Yes.  Because we

11   should hear what they're going to say.  Some have

12   testified.

13                   THE COURT:  Well, there's some

14   explanation in here.

15                   MR. PALOIAN:  Right.  Right.  Right.

16                   THE COURT:  You want to ask Mr. Borges

17   these questions, Mr. Paloian?

18                   MR. BORGES:  One thing about the

19   expert witnesses, I think there was a 72-hour

20   requirement that we move the court date up from last

21   Friday to Thursday, which wasn't sufficient time

22   because the court -- because the court date was

23   changed from Friday to Thursday.  It was my

24   understanding that we had to subpoena within 72 hours

25   prior to hearing, but we changed the hearing date

1    from Friday to Thursday.  So there was some

2    complication with that.

3                    THE COURT:  What would Mr. Kowalski

4    testify to?  And why isn't he here?  William

5    Kowalski.

6                    MR. BORGES:  He's indicated he doesn't

7    want to testify.

8                    THE COURT:  All right.  And you're not

9    asking me to compel.

10                   What about Andrzej Mastej?

11                   MR. BORGES:  Yeah, we would like you

12   to compel him, Judge, to --

13                   THE COURT:  I don't see any motion

14   before me to do that.

15                   MR. BORGES:  Okay.  All right.  I will

16   file motions for --

17                   THE COURT:  What about M-A-S-T-E-J?

18                   MR. BORGES:  Judge, I'd like to file a

19   motion to compel all of them to appear.  They've been

20   served, but they have not --

21                   THE COURT:  What would Mr. M-A-S-T-E-J

22   testify to?  And who is that person?

23                   MR. BORGES:  Judge, if I may have five

24   minutes just to go over this list.

25                   THE COURT:  I'll wait right here while

1   you look at what you've already provided.

2                     (Brief pause.)

3                     MR. BORGES:  Thank you, Your Honor.

4                     As to Mr. Andrzej Mastej.

5                     MR. REIN:  Mastej.

6                     MR. BORGES:  Mastej.  He would -- he's

7   another person that would testify that he had taken

8   out a loan with the bank, and the property was sold,

9   and that he is still owing enormous amounts of money

10  to the bank, even though the property was sold.  He

11  still --

12                    THE COURT:  I'm sorry, and what's the

13  relevance of that for this motion to convert?

14                    MR. BORGES:  Well, all this is about

15  unusual circumstances.

16                    THE COURT:  I don't want to hear all

17  of this.  I asked you why is this gentleman's

18  testimony relevant to the motion to convert?

19                    MR. BORGES:  Because the same thing

20  that's happened to Mr. Kowalski happened to this

21  gentleman, where these claims are being submitted,

22  these frivolous claims are being submitted claiming

23  that Mr. Kowalski owes money.  I just want to show

24  that other people are similarly situated, that they

25  are -- allegedly owed millions of dollars that they

1   don't owe either.  And so that's -- that's the

2   purpose of showing the pattern.

3                   THE COURT:  Well, I'd like to get some

4   information about Mr. Kowalski's circumstances before

5   we start talking about somebody else being similarly

6   situated.  We don't have any information about

7   Mr. Kowalski's circumstances, at least not from him.

8   You're telling me about something in a newspaper.

9   I'm trying to get information from Mr. Kowalski.  I'm

10  not going to start bringing in other people who were

11  similarly situated.  I don't know what his situation

12  is.

13                  MR. BORGES:  Well, and I understand

14  that, Judge.  And I understand Mr. Rein's concern.

15  And --

16                  THE COURT:  Let's proceed.  Let's go

17  down -- let's continue to go down to your list.

18                  MR. SOWKA:  Your Honor, just before we

19  move on, with respect to that testimony, I would

20  remind the court that they've already proffered two

21  witnesses, Mr. Espana and Mr. Sanchez, who have

22  already testified to a similar fact pattern.  I think

23  calling this witness for the same proposition that I

24  had loans with the bank and paid it off, and they say

25  I owe money is duplicative, unnecessary at this

1  point.  There's no -- there's no point in doing this.

2  We've already had two witnesses to this extent.

3  Three doesn't change anything on this.

4          THE COURT:  Let's continue to go down

5  your list, Mr. Borges.

6          MR. BORGES:  And, Judge, and I don't

7  know that two is enough to establish a pattern.  We

8  wanted more --

9          THE COURT:  Well, you're telling me

10  people are similarly situated to the debtor.

11          MR. BORGES:  Yes, I know.

12          THE COURT:  The debtor hasn't given us

13  any information.

14          MR. BORGES:  Well --

15          THE COURT:  Why are we talking about

16  other people similarly situated?  You have to

17  establish your reference point first.

18          MR. PALOIAN:  This is not a class

19  action, Your Honor.  This is Mr. Kowalski's

20  bankruptcy case.

21          MR. BORGES:  Yes.  And I understand.

22          THE COURT:  Let's go down your list.

23          MR. BORGES:  Okay.

24          THE COURT:  Your person number four.

25          MR. BORGES:  So this is Mr. Novak who

1   is a reporter for the Sun-Times who has information

2   concerning unusual circumstances who has been

3   investigating this for some time --

4                  THE COURT:  What is Mr. -- have you --

5   have you interviewed Mr. Novak?

6                  MR. BORGES:  I have not interviewed

7   him.  I just --

8                  THE COURT:  So you want to call him

9   because he's a reporter who may have written a story

10  someplace?

11                 MR. BORGES:  He's an investigative

12  reporter, Judge.  He has information.

13                 THE COURT:  What is it that he can

14  tell me that has some relevance for the motion to

15  convert?

16                 MR. BORGES:  That -- well, Mr. Novak's

17  the one who wrote the article in the Sun-Times.

18                 THE COURT:  What is his -- what is

19  it --

20                 MR. BORGES:  He had -- that's why I'd

21  like to talk to him, Judge.  That's why I'd like to

22  talk to him.  He's been investigating this for quite

23  some time, and he has relevant information.

24                 THE COURT:  What does he know that's

25  relevant to the motion to convert?

1                    MR. BORGES:  Well, that this has

2    happened to a lot of people.  And that -- I think

3    that fraud, Judge, is something that -- and I

4    understand what you're saying about Mr. Kowalski, and

5    that we need to get --

6                    THE COURT:  Is the trustee asking to

7    convert based on fraud --

8                    MR. BORGES:  I --

9                    THE COURT:  Can I finish?

10                   MR. BORGES:  Sure, Judge.

11                   THE COURT:  Is the trustee asking to

12   convert based on the FDIC's allegations?

13                   MR. BORGES:  Yeah, partly.

14                   THE COURT:  Did the trustee offer

15   testimony or exhibits that disclose some kind of

16   fraud between the debtor and the FDIC?

17                   MR. BORGES:  Well, the problem, Judge,

18   is that --

19                   THE COURT:  Yes or no?

20                   MR. BORGES:  That -- you're saying

21   that -- may I ask your question again?

22                   THE COURT:  I'm trying to figure out

23   the relevance because I don't remember seeing any

24   evidence, not only by -- I don't remember seeing any

25   testimony, specific testimony, or documents that

1   outline fraud between the FDIC and the debtor --

2             MR. BORGES:  And, Mr. Rein --

3             THE COURT:  -- in this motion to

4   convert.

5             MR. BORGES:  As to -- you're saying --

6   I'm not quite sure what your question is.

7             THE COURT:  I said where in this

8   motion to convert has it been alleged or shown

9   that -- this fraud between the FDIC and the debtor?

10  Why is it relevant for this motion at this time?

11            MR. BORGES:  On their motion to

12  convert?

13            THE COURT:  I've been listening to it.

14  I haven't seen any specifics.

15            MR. BORGES:  Well, Judge, we haven't

16  heard all of the testimony yet.  We haven't had all

17  the evidence.

18            THE COURT:  Do you expect to call any

19  other witnesses?

20            MR. BORGES:  Yes, I do.

21            MR. PALOIAN:  Your Honor, I'll answer

22  the question for him because he's having difficulty.

23  As the trustee in this case, I've not made any

24  allegations of fraud between Mr. Kowalski and the

25  FDIC.  It's not in the motion.  It's not --

74

1                    THE COURT:  Or Washington Federal?

2                    MR. PALOIAN:  Right.

3                    THE COURT:  What's the name of the

4    institution?

5                    MR. PALOIAN:  Right, Your Honor.  It's

6    not relevant to my motion.  What's relevant to my

7    motion are Mr. Kowalski's independent acts of fraud

8    and bankruptcy crime during this case.

9                    THE COURT:  Mr. Borges.

10                   MR. BORGES:  You know, Mr. Paloian has

11   made allegations, and I understand that, you know,

12   there's been a 2004 Examination.

13                   THE COURT:  That hasn't even really

14   begun because documents haven't been --

15                   MR. BORGES:  The 2004 exam --

16                   THE COURT:  The tender of documents

17   hasn't been complete.

18                   Go ahead, Mr. Borges.

19                   MR. BORGES:  There are -- there are a

20   lot of documents here.  There are 40-some boxes of

21   documents.  I never got an opportunity to go through

22   them.

23                   THE COURT:  All right.

24                   MR. BORGES:  I need -- you know --

25                   MR. PALOIAN:  This is delay.

1          MR. BORGES:  -- I could present this

2    to you tomorrow, Judge.

3          MR. REIN:  No.

4          THE COURT:  Okay.  You're number 5

5    person, Mr. Sistrunk, has testified.  What about your

6    number 6 person that --

7          MR. BORGES:  He testified also.

8          THE COURT:  Right.  I thought so.

9          What about number 7, Mr. Beck?

10          MR. BORGES:  Mr. -- Mr. Beck is

11   also -- is he a borrower?

12          Oh, he would be testifying as to the

13   condition of the property.  Now --

14          THE COURT:  What would that testimony

15   say?  What would that testimony --

16          MR. BORGES:  His testimony would say

17   that as a result of Mr. Kowalski being dispossessed

18   as a debtor in possession, that the property has gone

19   down.  The condition of the property has gone down.

20          THE COURT:  That would be his

21   testimony.

22          Any objection that that would be his

23   testimony?

24          MR. PALOIAN:  No, Your Honor.

25          MR. SOWKA:  No.

1             MR. PALOIAN:  No objection.

2             THE COURT:  What about Mr. Ciszek,

3    C-I-S-Z-E-K.  What would his testimony be?  Number 8.

4             MR. BORGES:  It's my understanding he

5    is -- he's an employee -- oh, he's another

6    borrower -- he's another borrower from Washington --

7    Washington Federal Bank who also has outstanding

8    balances owed for loans that were --

9             THE COURT:  That he disputes that he

10   owes.

11            MR. BORGES:  -- either paid or

12   property has --

13            THE COURT:  He says he doesn't owe the

14   money, right?

15            MR. BORGES:  He's saying he does not

16   owe it.  That this was another fraud that's been

17   perpetrated --

18            THE COURT:  Any objection that that

19   would be Mr. Zbignew Ciszek's testimony?

20            MR. PALOIAN:  No, Your Honor.

21            MR. SOWKA:  No, Your Honor.

22            THE COURT:  Mr. Borges, what about

23   number 9, John Conneely?

24            MR. REIN:  So when we get to the

25   FDIC -- we discussed this --

1            THE COURT:  And this is somebody who

2    address is the FDIC?

3            MR. REIN:  So the FDIC, if you recall

4    what I told the court, number one, subpoenas were

5    dropped off at security, so there wasn't proper

6    service.  So we discussed when we started this

7    hearing that there --

8            THE COURT:  Consistent with Rule 7004,

9    whatever they are.

10           MR. REIN:  It wasn't personal service.

11   And the other three subpoenas are for people in Texas

12   who are outside the hundred mile radius who weren't

13   properly subpoenaed.

14           THE COURT:  I think you would have to

15   open a miscellaneous action --

16           MR. REIN:  Yes.  Yes.  And go down --

17           THE COURT:  -- in the district court

18   where they live to --

19           MR. REIN:  -- to get their --

20           THE COURT:  -- enforce the subpoena,

21   or whatever.

22           MR. REIN:  -- and to get their

23   examination down there so that it's -- you know, he

24   can use it here in the hearing.  He hasn't done any

25   of that.  So --

1          THE COURT:  Mr. Borges, about

2    Mr. Conneely, what -- have you interviewed him?

3          MR. BORGES:  I have not interviewed

4    him, Judge.

5          THE COURT:  What would you ask him?

6          MR. BORGES:  I would ask him about the

7    examinations, the examination reports that the bank

8    examiners come out and review the books and the

9    records.  I would want to know what happened with

10   these loans that were made to Mr. Kowalski.  Were

11   they paid?  Were they not paid?  Did this banker put

12   the money in his pocket?

13          THE COURT:  I'm going to say -- I'm

14   going to rule that that would be relevant to the

15   claim objections that have been stricken.  It sounds

16   to me like you're trying to get into the particulars,

17   the specifics of all these transactions, who owes who

18   what, and that's not before me at this time.  So I'm

19   not going to -- so let's move on from Mr. -- now we

20   go to Jorge Sanchez.

21          MR. BORGES:  He testified, Judge.

22          THE COURT:  I'm going to overrule

23   your -- whatever you're asking me to do to enforce

24   Mr. Conneely, I think that has more to do with the

25   claim objection, which has been stricken.

1                    What about number 10?

2                    MR. BORGES:  He's testified, Judge.

3                    THE COURT:  I thought so.

4                    What about number 11, Steven B. Hall.

5                    MR. BORGES:  Another FDIC --

6                    MR. PALOIAN:  Beyond the court

7    subpoena powers, Your Honor.

8                    THE COURT:  Anything further,

9    Mr. Borges?

10                   MR. BORGES:  Twelve -- 12 and 13.

11                   THE COURT:  Have you interviewed

12   Mr. Steven Hall?

13                   MR. BORGES:  No, I have not, Judge.

14                   THE COURT:  And you would ask him what

15   are all these loans, and what are the payment

16   histories, and what are the specifics of the debt

17   between the FDIC and the debtor?

18                   MR. BORGES:  I would -- yes, I'd like

19   to testify -- I'd like him to testify to --

20                   THE COURT:  All right.  At this point

21   I'm going to -- that's not -- I don't think that's a

22   basis for the motion to convert.  I'm going to

23   overrule your request, if you're asking to force

24   him -- plus you'd have to go to Texas anyway.  At

25   this point I'm going to rule -- I'm not going to --

80

1  at this point, especially since there's nothing

2  before me, that he has to appear at this time.

3                    Number 12.

4                    MR. BORGES:  Twelve is another FDIC.

5                    THE COURT:  Same ruling.  I mean, that

6  person is in Texas, right?

7                    MR. BORGES:  Correct.

8                    THE COURT:  Have you interviewed

9  Mr. --

10                    MR. BORGES:  I have not.

11                    THE COURT:  All right.

12                    MR. BORGES:  As is number 13.

13                    THE COURT:  I'm going to assume that's

14  more relevant for the claim objection once it's

15  properly served and noticed.  And then we'll have

16  to -- we'll see what's going to happen with

17  Mr. Howitt.

18                    Stuart Tonkinson.

19                    MR. BORGES:  Same, Judge.  He's FDIC,

20  Texas.

21                    THE COURT:  Have you interviewed that

22  witness?

23                    MR. BORGES:  I have not interviewed

24  him.

25                    THE COURT:  All right.  I'm going to

1  make the same ruling, that that's probably more

2  relevant for a claim objection hearing.  I don't

3  remember hearing any specifics about the alleged debt

4  between the debtor and the FDIC.  So at this point it

5  just seems irrelevant all to me.

6            And what else do we -- any other

7  witnesses you thought you wanted to call that aren't

8  on that list?

9            MR. SOWKA:  The only other witness,

10 Your Honor, would be Jan Kowalski.  She was added to

11 the supplemental untimely disclosure report for

12 experts.

13           THE COURT:  Why isn't she here today,

14 if you know?

15           MR. BORGES:  She's an attorney, and I

16 don't know if she's here --

17           THE COURT:  She has been here quite a

18 bit.

19           MR. BORGES:  She has been here.  Yes,

20 she has.

21           THE COURT:  I can't -- I know I've

22 seen her out there because she did step up once or

23 twice.  She even asked informally at the end of a

24 hearing --

25           MR. BORGES:  She filed an appearance.

1          THE COURT:  -- she was trying to make

2   some representation because she's a lawyer.  I asked

3   her if she had filed an appearance.  She said no.

4   She asked leave to file an appearance, and I said it

5   wasn't before me, or something.  I don't know.  So I

6   know she's been here.

7          Anything further?

8          MR. BORGES:  Yes, Judge.

9          THE COURT:  What time is it?  Almost

10  noon.

11          Go ahead, Mr. Borges.

12          MR. BORGES:  Judge, I can supply more

13  information to Mr. Rein.  I'm not -- I wasn't -- I'm

14  sorry I wasn't aware that he hadn't received

15  everything.

16          THE COURT:  You didn't know that there

17  was very little in those 43 boxes?

18          MR. BORGES:  I did not know, Judge.

19  It was a voluminous turnover of materials.  I thought

20  it would be there.  I don't know.  As I said,

21  Mr. Kowalski was incarcerated at the time, but I can

22  certainly go over everything with him and go back --

23          THE COURT:  Why don't we just do the

24  final arguments on the motion to convert, and then

25  take lunch.  The debtor can go to the Daley Center.

1   Hopefully not -- well, let -- I'm going to take a

2   ten-minute break, and we'll do final arguments on the

3   motion to convert.

4              MR. PALOIAN:  Your Honor, just so you

5   know, Your Honor, I have my trustee meetings

6   scheduled this afternoon, so I won't be --

7              THE COURT:  At what time?

8              MR. PALOIAN:  They start at noon.  I

9   won't be able to be here, but it's okay --

10             THE COURT:  Oh, I see.

11             MR. PALOIAN:  -- to go forward with

12  the argument.  I just want you to know I won't be

13  here.

14             THE COURT:  I'll take a ten-minute

15  break.

16             MR. TORF:  Thank you.

17             (Brief recess.)

18             THE COURT:  Do you think your

19  argument -- do you need more than 25 minutes to

20  argue?

21             MR. SOWKA:  No, Your Honor.

22             THE COURT:  All right.  Let's see how

23  far we get.

24             MR. SOWKA:  Your Honor, you've -- for

25  over three days of trial now you've received

1   testimony and other evidence taken in the case that

2   sufficiently establishes cause to convert the case

3   under 1112(b).

4              Cause includes an enumerated list, and

5   it's nonexclusive under the Code, so it goes into

6   other factors.  But just to high-level walk the court

7   through what we believe establishes cause, and then

8   we'll get more granular as far as evidence and

9   witness testimony.

10              But, first, under 1112(b)(4)(A), we

11   believe we've established a continued loss or

12   diminution to the estate, as well as a failure of a

13   likelihood of rehabilitation here.

14              As far as the loss to the estate, the

15   trustee has elicited trial testimony and produced

16   exhibits regarding the diversion of rents and other

17   funds by the debtor for his own personal use to the

18   detriment of the estate.  We specifically showed

19   transactions where he was spending money for a

20   post-petition vacation with his girlfriend in Lake

21   Geneva.

22              And even today, there was additional

23   testimony regarding tenants that the debtor has in

24   the building that he doesn't require to pay rent to.

25              There's also testimony regarding

1  additional collection and diversion of rents

2  regarding Section 8 Housing.  You may recall, where

3  the debtor testified that Section 8 Housing checks

4  have been coming in and being paid.  To date, the

5  trustee has never received one dollar of Section 8

6  rents in this case.  And the debtor's testified that

7  all his accounts are now closed, and he has no idea

8  where any of the money is.  It's all been diverted

9  and dissipated.  The estate hasn't received one

10  dollar of any of those checks, and no cooperation

11  from the debtor with respect to future attempts to

12  collect any of those funds.

13          With respect to the debtor's inability

14  and likelihood of rehabilitation to confirm a plan,

15  we believe there is more than sufficient evidence in

16  this case to establish bad faith.  You know, the

17  primary evidence of this is the ongoing contempt that

18  the debtor is subject to with the court for his

19  willful failure to comply with court orders.

20          He has not produced documents or

21  information to the FDIC pursuant to court subpoenas,

22  court orders, nor has he produced any information to

23  the trustee with respect to rent-rolls, collection of

24  rent, ongoing operations or business that the debtor

25  has ongoing.

86

1          We also believe, based on the debtor's

2     plan and the other information in evidence, that the

3     debtor couldn't feasibly propose the confirmation of

4     any plan given the disclosed incomes versus the

5     liabilities, he's listed in his own schedules in this

6     case.

7          THE COURT:  Draw that out for me.

8          MR. SOWKA:  Certainly, Your Honor.

9     So, the debtor fails to list in his own schedules

10    numerous creditors, and we've moved those proofs of

11    claim into evidence.  For instance, the City of

12    Chicago filed a proof of claim for $187,000 for

13    unpaid water bills on the property.  The plan the

14    debtor filed doesn't address or deal with this, and

15    doesn't show any funds or ability to pay it.  The

16    City of Chicago filed a second claim for over $59,000

17    in ordinance violations with respect to deficiencies

18    on the properties.  That claim isn't dealt with in

19    the debtor's plan.

20         Ms. Padilla, his wife, has filed

21    proofs of claim in the case with respect to the

22    pending divorce.  Under the debtor's plan, the

23    proposed treatment of those claims is zero.  He

24    proposes to pay nothing to her under the plan with

25    respect to her claims under the divorce.  And

1    moreover, with respect to the FDIC's claims, if you

2    look at the debtor's proposed plan, again it lists

3    zero as the amount that the debtor proposes to pay to

4    the FDIC.

5              So he says he's got a plan that, you

6    know, all creditors are unimpaired and going to be

7    paid in full, but his idea of confirming a plan is

8    paying nothing to his creditors.

9              In addition, Your Honor, the IRS has

10   filed a proof of claim in excess of $450,000 for

11   failure to pay income taxes.  The debtor did not

12   schedule that, and he does not address that in his

13   plan.  None of this is dealt with.  There is no

14   feasibility.  The debtor couldn't possibly confirm a

15   plan.

16             With respect to additional factors for

17   cause to convert the case, the trustee believes he's

18   established gross mismanagement on behalf of the

19   debtor under 1112(b)(4)(B).  And the gross

20   mismanagement comes primarily in the form of the

21   diversion of post-petition rents with respect to the

22   testimony and evidence provided through the Byline

23   Bank accounts with respect to the debtor's accounts,

24   and his LLC accounts.

25             There was testimony regarding $21,000

1    in checks that were given to his girlfriend, Ms.

2    Natalie Lira, that she testified were gifts.

3                There was also a $64,000 check that

4    the debtor made out payable to Premium Title less

5    than three weeks ago.  And the debtor testified he

6    couldn't recall what the check was made out for and

7    had no evidence or testimony what it was used for.

8                Well, Your Honor, we have a good idea

9    what it was used for.  Ms. Natalie Lira testified

10   that they bought a house in Oak Lawn, so around the

11   very exact same time.  And, you know, he couldn't

12   seem to recall helping or having anything to do with

13   it, and then suddenly on the second day of his

14   testimony he did recall helping set up a land trust

15   through which Natalie Lira owns the property.

16               We also believe we've established

17   gross mismanagement through the testimony of the

18   trustee's property manager who testified regarding

19   the poor condition of the properties.  You may

20   recall, Your Honor, there was testimony regarding

21   water leaks causing ceilings to collapse and

22   mushrooms growing out of the carpeted basement floors

23   of the properties.  Several tenants have moved out of

24   the properties due to the failure for repairs to be

25   completed.  And while the trustee's property manager

1  is working to rectify these deficiencies and

2  maintaining the property, these were conditions that

3  the trustee inherited that were going on apparently

4  before and during the bankruptcy case.

5           The trustee also believes that we've

6  established the unauthorized use of cash collateral

7  in the form of rents, subject to any claims by the

8  FDIC, pursuant to 1112(b)(4)(D) regarding the

9  diversion of rents.  And if Your Honor recalls, the

10 Byline Bank checks show that there were certain

11 checks made payable to rent to Mr. Kowalski

12 personally that he then diverted into the bank

13 accounts of his LLCs and then subsequently wrote

14 checks payable to cash to himself, and we have no

15 idea where any of that money went.

16          Your Honor, further, the list under

17 1112(b)(4) is not exclusive.  And the trustee

18 believes that overall he's established sufficient

19 cause to convert the case based on the debtor's

20 failure to cooperate with the trustee.

21          We moved into evidence several e-mail

22 communications and the trustee's testimony regarding

23 of the debtor's willful failure to cooperate, refusal

24 to turn over books, records, provide rent-rolls,

25 other information, or access to his business

1   premises, where these records are kept.

2            To this day, you just heard argument

3   from the FDIC regarding the debtor's ongoing refusal

4   and failure to turn over books and records with

5   respect to the property of the estate.  And we still

6   don't know where rent dollars are going to this very

7   day, including Section 8 dollars.

8            Moreover, Your Honor, the debtor's

9   primary defense to the motion appears to be his

10  argument for unusual circumstances.  Well, under

11  1112(b) that simply isn't the test.  The test is

12  unusual circumstances establishing that it is in the

13  best interest of creditors that conversion of the

14  case is not in the best interest of creditors.  They

15  submitted no evidence or testimony regarding what is

16  in the best interest of creditors whatsoever and

17  simply tried to hide behind general allegations of

18  fraud and unusual circumstances.

19            The debtor's argument is that, look,

20  the news says that there was fraud involved with

21  respect to the bank's failure.  He doesn't -- the

22  debtor never argues that he actually paid his loans

23  down because he can't make that argument.  This is

24  the very information the FDIC has asked for that the

25  debtor hasn't produced.  The FDIC said if you are

1   saying you paid the loans, provide proof of payment

2   and we'll look at it.  The debtor is refusing to do

3   that, and instead saying I don't have to pay back the

4   loans because there was fraud.  He hasn't paid back

5   the loans.  The dollars remain liable.  This is the

6   evidence that came into the trial and from the

7   witnesses in the court.

8               Specifically, Your Honor, looking to

9   sum of the -- the testimony and evidence, the trustee

10  established that July and August rent collections

11  have not been turned over to the trustee.  The court

12  ordered an appointment of the trustee on July 27th.

13  And since then, from the time period July and August,

14  no dollars have been turned over by Mr. Kowalski.  He

15  testified he continued to collect rent or have

16  Mr. Sanchez collect rent.

17              The debtor failed to file a July

18  operating report.  To date this has not been

19  rectified.  You may recall Mr. Borges indicated at

20  the prior hearing that this would be remedied.  It

21  still has not been remedied.

22              The court took testimony from the

23  Byline Bank representative indicating contrary to the

24  debtor's testimony that the debtor, in fact, is the

25  sole signatory on the business bank accounts that he

1    established.  Despite the debtor's insistence to the

2    contrary that other people have access to the

3    account, he was the only signatory on those accounts.

4    So to the extent funds came out of those accounts,

5    the debtor was the only person that had the power to

6    move money out of those accounts.  So his explanation

7    he doesn't know what happened to the money, and

8    perhaps there were other signatories and people

9    taking it out, that was false, Your Honor.  He is the

10   sole signatory.  Byline Bank's representative

11   testified to that.  There was no cross-examination on

12   that point.

13           The court also heard testimony from

14   Mr. Kowalski's colleague and contemporary, Mr. Jorge

15   Sanchez, regarding Mr. Kowalski asking him to collect

16   post-petition rents from tenants.  You know, there

17   was -- and this was including time periods after the

18   trustee was appointed, when the trustee had indicated

19   to Mr. Kowalski he was removed from his position in

20   managing any of these properties and should not be

21   collecting rents.

22           To date, Mr. Kowalski has not turned

23   over rent-rolls to the trustee.  He has not turned

24   over copies of signed leases for any of the

25   properties, including properties purportedly

1  collecting Section 8 rents.

2          Your Honor, there is also the Mountain

3  Duck lawsuit, you may recall that the trustee filed a

4  removal action for.  This was a verified complaint

5  filed by the debtor prior to the bankruptcy case

6  where he alleges to protect properties from

7  creditors, he created an LLC and transferred title to

8  these properties into the LLC.  He apparently

9  continued to prosecute this cause of action

10 post-petition without disclosing this action in his

11 bankruptcy schedules.  The debtor himself testified

12 that he felt he made sufficient disclosures because

13 it was out there in a public filing, and he felt he

14 had no obligation to disclose it in his schedules.

15 This is evidence of intentional fraudulent transfers

16 and a failure to complete documents truthfully and

17 accurately that he signed under penalty of perjury.

18          To date, the debtor has not allowed

19 the trustee access to his business premises at 1918

20 West Cermak Avenue, yet he still hasn't produced the

21 documents.

22          Your Honor, Exhibits 14 and 15 of the

23 trustee's trial exhibits show that there were $21,000

24 in cashier's checks transferred post-trustee

25 appointment to his girlfriend, Natalie Lira.

1          And they also show -- Exhibits 13, 14,

2    and 15 show that he was depositing rents paid to him

3    personally into his business bank accounts to divert

4    it from the bankruptcy estate so he could spend it

5    outside the court's supervision, and spend it for his

6    own purposes and those contrary to the best interest

7    of creditors.

8          Your Honor also heard testimony from

9    Mr. Kowalski, and took exhibits regarding

10   Mr. Kowalski's prior bad acts, including the

11   misappropriation of funds from his own client trust

12   account that lead to suspension of his law license,

13   and the ruling from the ARDC that indicated he failed

14   to cooperate with that investigation and showed no

15   remorse and continued to deny most of the facts

16   regarding the underlying allegations that were found

17   and deemed to be truthful in the case.

18          Your Honor, in also reviewing the

19   trustee's witnesses in this case, Ms. Tammy DiMenna

20   testified regarding the unpaid real estate taxes with

21   respect to the property showing that there were

22   significant unpaid taxes on many of the properties

23   owned by the bankruptcy estate, which constitutes

24   continued evidence of mismanagement by the debtor.

25          And, Your Honor, the Byline Bank

1   statements establish tens of thousands of dollars of

2   post-petition and post-trustee appointment diversions

3   of funds by the debtor.  There was a June 18th check

4   to his girlfriend, Natalie Lira, in the amount of

5   $5,000.  Actually, there were two $5,000 transfers to

6   his girlfriend on that date.

7                Also, on 6/18 those bank records show

8   that there was a cash out till where Mr. Kowalski

9   took out cash in the amount of $2,990.

10                On August 13th there was transactions

11  where Mr. Kowalski had cashier's checks drawn up to

12  Phoenix Bond & Indemnity, as well as Ms. Padilla, and

13  then canceled those cashier's checks, diverted the

14  funds into a cashier's check made payable to Premium

15  Title in the amount of $64,084.35.  That cash was --

16  that check was cashed in October, and yet the debtor

17  testified he couldn't recall what the $64,000 was

18  used for.

19                There was an additional cashier's

20  check made payable to Premium Title on August 13th

21  in the amount of $3,000.  There were additional cash

22  out tills to the debtor in the amount of $662 on May

23  22nd, $993 on May 29th, $2,990 on June 18th, $494

24  on July 10th.  Of course, the $11,000 cashier's check

25  to Natalie Lira on July 24th.  And an additional

96

1   cash out till to the debtor on August 6th in the

2   amount of $6,599.  There was the rent check from

3   Mr. Eric M. Hibbard that was diverted to Mr.

4   Kowalski's personal account on August 6th in the

5   amount $4,450.  A cash out till on August 11th in the

6   amount of $1,990 taken by Mr. Kowalski.

7              Your Honor, based on all of this, the

8   trustee established -- believes he's established

9   sufficient cause for conversion of the case based

10  upon the debtor's bad acts, diversions of funds, and

11  actions taken in opposition of the trustee's attempt

12  to administer the estate in the best interest of

13  creditors.

14              Thank you.

15              THE COURT:  And for the record, I

16  think Ms. Jan Kowalski just stepped into and out of

17  the courtroom.

18              In any event, any argument,

19  Mr. Borges?

20              MR. BORGES:  Judge, may I have two

21  minutes, please.

22              THE COURT:  Go ahead.  I'll take a

23  break.

24              MR. BORGES:  Thank you.

25                    (Brief recess.)

1              MR. BORGES:  Good afternoon again,

2    Your Honor.

3              Your Honor, we listened to counsel's

4    argument as to why this case should be converted.

5    And he has some points.  I understand that.  And

6    there's some concerns.

7              One of the things, though, Judge, is

8    that Mr. Kowalski has turned over documents while he

9    was incarcerated.

10             He's turned over a computer and a

11   phone that counsel has requested.  Mr. Rein has

12   requested those items so that he could view them and

13   see what kind of information is on them.

14             So we can't say that he hasn't

15   complied.  We don't even know what's on it yet.

16   They've imaged it.  They have all of his

17   documentation on that computer.  They have his

18   telephone, which they haven't looked at as yet, so I

19   think it's a little premature because -- to decide it

20   or make the determination that he has not complied --

21   he has -- they have his CPU in their custody.  We can

22   provide whatever passwords they might not have.

23   That -- we know how it is today.  I have 20

24   passwords, some of which I don't know belongs to

25   what.  I have to reset them every week.  We could

98

1    certainly get to that so they could have access to

2    the computer and see whether Mr. Kowalski has, in

3    fact, complied with the subpoenas and the information

4    that was requested.

5              So that's -- that's something that we

6    don't know yet.  Everything may be on the computer.

7    Every transaction may be on the computer.  He kept

8    certain records on that computer.  That's why

9    Mr. Rein requested it.  And he turned it over.

10   Nobody's looked at it yet, so it's a little premature

11   to say he has not complied.

12             There is -- you know, counsel would

13   like to say, well, this fraud has no -- no bearing

14   here.  I would care to dispute that.  I take the

15   opinion that when there's fraud -- Judge, yes there

16   is a motion to dismiss, there are reasons.  Even if

17   you argue that it's in the best interest of -- even

18   if, say, they're unusual circumstances, if they are

19   unusual circumstances, Judge, then we have to take a

20   look and see what those unusual circumstances are.

21   And even if it is in the best interest of the

22   creditors, I would contend, Judge, that you as a

23   judge have -- you know, we have the legislature.  The

24   legislature writes its laws.  You know, the boys on

25   Wall Street write their laws and say it's in the best

1    interest of the creditors.

2                But, you know, we have -- we have a

3    judge here, we have a judiciary, which is an equal

4    branch of the government that says, look, I have the

5    right for a judicial review.  I mean, if you go back

6    to Marbury v. Madison, the court has the obligation

7    and certainly the power to look at matters and not

8    just the black letter law.  It says that in the best

9    interest of the creditors.

10                Well, if there's massive fraud here --

11    here we have a case where the Office of the Inspector

12    General, they've admitted that there's fraud here.

13    They admitted that bank examiners didn't do their

14    job, that this bank was used as a training ground for

15    putting their examiners in there because they thought

16    the bank had such a great record.  Millions and

17    millions of dollars have been lent by this bank.  The

18    government didn't do their job.

19                Mr. Kowalski filed a Chapter 11

20    thinking that well, let me get these liens -- let's

21    litigate this.  Let's see what's happening here.  He

22    files a Chapter 11.  Maybe he was ill-advised.  I

23    don't know, but he had another attorney.  From my

24    understanding, the trustee was upset the way that the

25    Chapter 11 was prepared, that there were all of these

1    LLCs that was somehow treated as separate entities.

2            And Mr. Kowalski indicates to me that

3    he was under the impression that these separate

4    entities, indomitable, et cetera, et cetera, Blanco

5    Burros was -- that these were separate entities, and

6    that he was able to use money from those to manage

7    the properties, and so forth.  And so he took some of

8    the money from the -- there's no argument about that.

9    He did use some of the money that came into these

10   entities for the purpose of maintaining the property.

11           Now, I don't know what happened with

12   his prior counsel and the understanding that he had,

13   but I guess there was some dispute as to that.

14   Mr. Kowalski is not a bankruptcy attorney.  If his

15   attorney advised him that he could set it up so that

16   he was an entity, he was a separate entity from the

17   LLCs, and he used money from the LLCs, maybe rightly

18   or wrongly, however it happened, I think this was

19   done with some level of innocence on his part.

20           You know, we can't ignore what is

21   going on here.  Counsel here would like to just

22   ignore everything and say, well, let's just settle

23   this by taking Mr. Kowalski's property.  Let's just

24   liquidate it, and we'll be done with that.  And I've

25   done my duty for my client, FDIC, and I have -- we've

1   gotten rid of $2 million of this $84 million debt.

2   This $84 million that he wouldn't even be here in

3   bankruptcy court.  He would not have ever filed this

4   had FDIC done their job.

5              They didn't.  He's been -- he's being

6   victimized here because he's -- he's ladened here

7   with $25 million that he never received.  He's got

8   liens on all of his properties.  It's difficult for

9   him to operate his business.  And he thought he would

10  come to this court -- he was advised by counsel to

11  file a Chapter 11, come into this court to get these

12  liens removed, these improperly placed liens.  Yes,

13  we need to take these liens.  We need to serve them

14  properly, the objections.  I understand there's a

15  problem with that.

16             There's a lot to do.  I don't have

17  eight -- there's eight attorneys on the other side,

18  and there's me.  Some of this takes a little time to

19  get this done.

20             Mr. Kowalski's girlfriend had a baby

21  yesterday.  He became a father yesterday.  He's been

22  a little unavailable to a certain degree, you know,

23  being a -- having a child born yesterday.  I'd like

24  the opportunity to spend a little more time with him,

25  be able to supply whatever is missing here.

1            We don't even know what's on the

2    computer.  It may be all on the computer.  And then

3    this point is moot, at least to that.

4            And I understand the -- the assets --

5    some of the assets that were taken by Mr. Kowalski, I

6    understand that.  I -- you know, we had testimony to

7    that.  And I'm not disputing that, Judge, that some

8    of these assets by the -- were taken by the LLCs and

9    done in certain ways.  That's -- I think that's been

10   established, and I don't disagree that some of that

11   happened.

12           It appears that Mr. Kowalski was under

13   the impression that he could use some of these monies

14   to maintain his property while he was the debtor in

15   possession.  Of course, it appears that even after he

16   was not debtor in possession, counsel made the

17   argument --

18           THE COURT:  And to date no rent-rolls

19   given to the trustee?

20           MR. BORGES:  I don't know of the rent

21   that he collects --

22           THE COURT:  The rent-roll.

23           MR. BORGES:  -- they may very well be

24   on the --

25           THE COURT:  A rent-roll.

1          MR. BORGES:  -- computer, Judge?

2          THE COURT:  A rent-roll identifying

3   every tenant, every apartment, every lease.

4          MR. BORGES:  That's right.  I have a

5   list of --

6          THE COURT:  I don't -- I haven't seen

7   that trustee hasn't gotten it.  Requested and not

8   received.

9          MR. BORGES:  Well, some of it is on

10  the computer, Judge.  That Mr. -- Mr. -- I've

11  asked --

12         THE COURT:  It wasn't disclosed before

13  the computer was given to Mr. Rein.

14         MR. BORGES:  Well, I know a lot of

15  this was requested before I came into the case.  And

16  I've had an opportunity, as has Mr. Wu, to explain to

17  Mr. Kowalski what is required by the court.  I have

18  done what I can to facilitate this.  And I would

19  ask -- you know, he was incarcerated, we've got a

20  holiday, he's had a child born, it's just a short

21  period of time, that we can provide these things.

22  And if I can't provide them within a few days, Judge,

23  I have no problem with the conversion, Judge.  I

24  think that we still --

25         THE COURT:  I don't think

1  incarceration impressed him.

2                    MR. BORGES:  Oh, I think it does.

3                    THE COURT:  A week ago he got out, and

4  nothing -- I don't see any more compliance.

5                    MR. BORGES:  Judge --

6                    THE COURT:  I don't see any rent -- a

7  simple thing, rent-rolls.

8                    MR. BORGES:  The computer was turned

9  over, his phone was turned over.  There's a lot of

10 the -- a lot of information on that computer.

11 There's information on his phone.

12                    THE COURT:  All right.

13                    MR. BORGES:  Those things need to be

14 looked at.  He's been a little -- you know, he had

15 complications with the delivery, and his child was

16 born yesterday.  He's just been a little -- you know,

17 the reality is that we're all human, Judge, and that

18 things do come up.

19                    I would simply ask, before Your Honor

20 makes a determination as to this, to allow us --

21 allow him to go back to my office today.  We'll start

22 today.  We'll go through each and every property, the

23 amounts that are owed, put it in a spreadsheet, and

24 we can turn it in tomorrow or Monday.  And I will

25 comply with everything that Your Honor has requested

1  and counsel has requested before Your Honor makes a

2  decision on this.

3              THE COURT:  All right.

4              MR. BORGES:  There's a lot of things

5  out there.

6              THE COURT:  Go ahead, Mr. Borges.

7              MR. BORGES:  You know, we were

8  concerned about the -- the property.  The trustee is

9  in charge of the property.  They have a management

10 company that's -- that said there's mushrooms growing

11 in the basement.  They're locking people out of their

12 apartment.  That's not a good thing to change

13 people's locks.  Maybe some people are not paying

14 rent because they're being locked out of their

15 apartments.

16              So that is, I think, a mitigating

17 factor here.  They talk about the diminution of the

18 estate.  Mr. Kowalski has been able to collect rents

19 throughout the years that he has owned these

20 properties.  Yes, he has some debts.  He has a debt

21 with the wife -- well, he has a claim, $1.7 million

22 claim.  That hasn't been established.  There's no

23 judgment as to that amount yet.  There's -- there

24 could be a dispute as to the IRS debt.

25              So, you know, our plan, Judge, is to

1  file an amended plan with our objections to the -- to

2  these claims, and show that he can pay back everyone

3  that he needs to pay back at a hundred percent.  That

4  is doable if he doesn't have a $25 million debt

5  hanging over his head that he shouldn't be held

6  responsible for.

7          This is a -- this is a doable plan.

8  It's a feasible plan.  We're going to show you --

9  excuse me -- show you where the monies are, where the

10 rent-rolls are, show you what kind of income is

11 coming into those apartments, the Section 8, whatever

12 money he gets from the government, and show what he's

13 received, just be very open and straightforward with

14 this so that there's no concealing of anything.

15          I'm going to insist upon that as his

16 attorney.  Mr. Wu is also going to do that.  And we

17 just need an opportunity to work with that.  We're a

18 little short staffed.  We have an attorney out of the

19 country.  We have one that left.  We're trying to get

20 some other attorneys, but we have other matters.  We

21 don't have a big firm, or seven or eight attorneys to

22 work on this.

23          I just ask for the opportunity to come

24 back with those things -- we can come back probably

25 Monday -- in a form that would be suitable to Your

1  Honor and to the court before you make a decision.

2  And we just ask for a little time to do that, and we

3  can start today.

4             THE COURT:  Did the FDIC join in the

5  motion to convert?

6             MR. REIN:  We did.

7             THE COURT:  Any argument?

8             MR. REIN:  We adopt the trustee's

9  argument.  I heard nothing from Mr. Borges addressing

10  the elements of conversion and why this case

11  shouldn't be converted, other than mea culpa, I need

12  more time to produce records.

13             The debtor's had five months to

14  produce records and don't make the excuse that they

15  have the computer or the phone.  It's his property.

16  He knows what's on there.  He knows what information

17  should be produced from there.  The FDIC, nor the

18  trustee knows.  And, when you produce records, you

19  need to designate and identify what right -- this is

20  not a fishing expedition for the FDIC to try to

21  discover where the information is.  Produce the

22  documents you're supposed to produce.

23             But that begs the issue.  That's not

24  what -- that's the contempt side of this.  And we

25  keep sort of losing focus.  This is a conversion

1 hearing, and there's been gross bad acts, gross

2 mismanagement, and what appears to arise as

3 bankruptcy fraud by stealing estate assets and

4 misusing them, by not disclosing assets, by

5 proceeding on lawsuits in Cook County with regard to

6 estate property during the bankruptcy and not

7 disclosing it.  The schedules are still inadequate.

8 The -- there is no full disclosure of on the

9 schedules his assets.

10              And it's no excuse that I was

11 advised -- I was advised differently.  I mean, I

12 heard a lot of statements from Mr. Borges that is not

13 evidence.  There's been no testimony from

14 Mr. Kowalski with regard to what -- why he did what

15 he did or why he didn't do what he did.  So that's

16 all irrelevant here.  The focus is whether the case

17 should be converted because the debtor has acted with

18 bad acts.

19              THE COURT:  Okay.

20              MR. REIN:  Has basically not acted as

21 a fiduciary, which he was as a Chapter 11 debtor in

22 possession.  He violated his fiduciary duties.  He's

23 never turned over rents from July.  He's never filed

24 an operating report.  He's never done what he was

25 supposed to do.  I'm sorry he didn't know when he

1   filed a Chapter 11 what the consequences were.

2   That's not the creditor's fault.  The creditors are

3   here to get the assets into the estate and try to get

4   whatever payment can be derived from that.  In the

5   best interest of the creditors, this case needs to be

6   converted.

7                    THE COURT:  All right.  Any reply?

8                    MR. BORGES:  Yes.

9                    THE COURT:  No, Mr. Sowka.

10                    Maybe you'll have a sur-reply.  I

11   don't know.

12                    MR. SOWKA:  Your Honor, I would just

13   add to avoid repetition that, you know, they've asked

14   for more time, and they've had plenty of time.  We've

15   been dragging this out since late September.  You

16   know, and Mr. Borges is urging the court, you know,

17   we don't know what's been produced.  Well,

18   Mr. Kowalski does.  He's just not telling us.  And

19   there's a court order in place that he should be

20   disclosing this, and he continues not to which is why

21   you and I, as we stand here today, don't know what's

22   been produced.

23                    You know, their urges for more time

24   fall on deaf ears.  They've had plenty of time to do

25   things that are important to them.  Since the

110

1   pendency of the motion to convert, they filed a

2   motion to purge the contempt.  They had plenty of

3   time to do that.  Late yesterday afternoon they filed

4   a motion to dismiss the bankruptcy.  They had plenty

5   of time to go file a new motion and submission

6   instead of focusing on the motion that's pending

7   before the court that was scheduled for conclusion

8   today.  And I would just urge the court that there's

9   no basis for any further delay or continuance.  And I

10  would urge the court to conclude this matter and

11  issue a ruling.

12                  Thank you, Your Honor.

13                  THE COURT:  Anything further,

14  Mr. Borges, a sur-reply?

15                  MR. BORGES:  Yes, Your Honor.

16                  Yes, we did file a motion to -- to

17  dismiss this case based on -- based on the fraud

18  that's occurred.

19                  You know, I don't know how many people

20  know what's --

21                  THE COURT:  I'm sorry, you filed a

22  what?  I'm sorry.

23                  MR. BORGES:  We did -- we did file a

24  motion to dismiss this case yesterday.

25                  Judge, I don't know how many people

1   know everything that's on their computer.  I don't

2   know if one could recite properties, 50, 60 units, 70

3   units, how much money you get, who you get it from,

4   and I think those are things that you keep on a

5   computer.  And to think that maybe they want him to

6   have a paper, do everything manually by paper, as

7   this banker, obviously, did -- and the way that they

8   talked mismanagement, the way the FDIC and the Office

9   of the Comptroller of Currency, and the bank

10  examiners allowed this banker to use paper, to keep

11  track of everything.

12            Mr. Kowalski doesn't necessarily do

13  that.  He puts things on a computer, as many of us

14  do.  To be -- to think that you can just extract that

15  out of your brain and say, well, I remember all these

16  properties, I know who the tenants are, I know how

17  much rent I get from them, I think is unreasonable.

18  We have a computer in the possession.  Mr. Kowalski

19  can go over to Mr. Rein's office, go through

20  everything with him, see what he's complied with, see

21  what we have before we get precipitous in converting

22  and taking all of his life's work and selling it for

23  a pittance.

24            I think that this can be

25  rehabilitated.  Yes, arguably, he has made some -- he

1 has made some mistakes.  Maybe he was ill-advised by

2 counsel or whatever, and we're trying to rehabilitate

3 anything that might have happened in the past and to

4 get everything in order for Your Honor and for

5 counsel.

6           I understand their position and --

7 more than they may realize, but all I'm asking is

8 that we can provide everything for them.  If it's not

9 here by Monday, Judge, then I certainly have no --

10 you know, have no ill-feelings, or I don't think

11 Mr. Kowalski would either if he were at least given

12 this opportunity.

13           He just -- he just had a kid.  He just

14 had a child.  This just happened.  He has information

15 he's provided.  We can reconstruct it.  We can set an

16 appointment with Mr. Rein.  He's got 2004 exams that

17 are scheduled where he is going -- I think we've

18 scheduled two or three of those.  He's going to

19 testify at those.  He's going to provide everything.

20 I'm going to be with him or my partner's going to be

21 with him to make sure that he's complied with

22 everything that he's asked to do.

23           I just think that for such a great

24 consequence to -- to destroy his dream in life, to

25 take all of his assets without knowing whether he's

113

1 provided everything or not would just be unjust, Your

2 Honor.  I'd like an opportunity to sit down with

3 Mr. Rein, go over the computer, give him everything

4 he needs, and have an explanation for any of these

5 monies that were taken by the LLCs, or that he

6 arguably converted or -- or have not been explained

7 as yet.  I want some explanations also.

8              And -- but he had a misunderstanding.

9 A lot of people don't understand when you file a

10 Chapter 11 or a Chapter 7 that even though you have

11 LLCs, they're separate entities that that belongs to

12 the estate also.  So I understand that, Judge, and

13 we're just asking for a short period of time to

14 provide everything that we need.

15              Thank you.

16              THE COURT:  All right.  Anything

17 further?

18              MR. SOWKA:  No, Your Honor.

19              THE COURT:  Thank you all very much.

20 I'll take the matter under advisement.  I'll get an

21 order out as soon as possible.  Let the record

22 reflect that I took that under advisement basically

23 at 12:59 p.m.

24              And what order are we -- should I

25 enter on the rule to show cause?

1          MR. SOWKA:  Your Honor, before we move

2    on from the motion to convert, I just wanted to

3    remind the court the trustee had filed a proposed

4    order.  And in there the trustee had requested --

5          THE COURT:  On the motion to convert?

6          MR. SOWKA:  On the motion to convert

7    the trustee had requested additional relief with

8    respect to authority to operate under 721 and a

9    waiver of the requirement to file a schedule of

10   unpaid debts.  So there were some additional relief

11   requested that we would ask that the court grant as

12   well.

13         THE COURT:  I'll be mindful of your

14   proposed order.

15         MR. SOWKA:  Thank you, Your Honor.

16         THE COURT:  Mr. Rein, what are you

17   asking for on the motion?

18         MR. REIN:  I'm asking for -- as this

19   court wanted, was full compliance and cooperation.

20   There's been nothing.

21         THE COURT:  And as of now, the 2004

22   exams are set for next week?

23         MR. REIN:  For the 20 -- no, the 25th

24   and --

25         THE COURT:  The week after.

1          MR. REIN:  Yes, 25 and 26.

2          THE COURT:  On a Sunday?

3          MR. REIN:  I'm sorry, I'm looking at

4    the wrong date.  The 26th and 27th.

5          THE COURT:  All right.

6          MR. REIN:  First of all --

7          THE COURT:  Go ahead.

8          MR. REIN:  -- Mr. Kowalski can't come

9    into my office.  He's been barred from --

10          THE COURT:  Yeah, it has to be here.

11   And then the U.S. Trustee --

12          MR. REIN:  Has to be present.

13          THE COURT:  -- is making a room

14   available.

15          MR. REIN:  Right.

16          THE COURT:  Which I recall.

17          MR. REIN:  Yeah, they've done that.

18   But there's not been full compliance.  Again, this is

19   his property.  He knows what he has.  He's had five

20   months to produce the information.  And now

21   Mr. Borges wants to look at the computer?  You know,

22   again, that's not full compliance.  There's never

23   been full compliance.  Where is the evidence of

24   consideration?  That's what was asked for.  Where are

25   the records on the four to five properties that I

1    identified in my e-mail to Mr. Borges at the end of

2    October and on Monday?

3              THE COURT:  So what are you asking me

4    to do with --

5              MR. REIN:  I'm asking --

6              THE COURT:  Let me finish.

7              MR. REIN:  Yes.  Yes.

8              THE COURT:  What are you asking me to

9    do with respect to this requested evidence of

10   consideration that you have not been given?

11             MR. REIN:  I'm asking that since

12   there's not been compliance that he be returned in --

13   to be in custody.

14             THE COURT:  Mr. Borges, he wants him

15   locked up right now because he -- they haven't

16   been -- these questions haven't been answered.

17             MR. BORGES:  Your Honor, as I

18   indicated, Mr. Kowalski fully understands that he has

19   to comply with this.  He has supplied a computer that

20   has all kinds of information on it.  He --

21             THE COURT:  So you're saying give the

22   computer and phone back, and I'll comply.

23             MR. BORGES:  Well, no, I --

24             THE COURT:  I'm asking you,

25   Mr. Borges, and you keep bringing up the computer.

1          MR. BORGES:  Well, yes --

2          THE COURT:  What does that mean?

3          MR. BORGES:  If Mr. Rein wants to keep

4  possession of the computer, that's fine.

5  Mr. Kowalski can come, and we can do this in this

6  building somewhere.

7          THE COURT:  I'm not sending Mr.

8  Kowalski to any office building with the improper

9  behavior towards Mr. Paloian.

10          MR. BORGES:  Well, Judge, if he could

11  return the computer and the phone to Mr. Kowalski --

12          THE COURT:  Mr. Rein.

13          MR. BORGES:  -- we will provide all of

14  the information.

15          MR. REIN:  So I'll be -- as I said

16  earlier today, I'll be finished imaging the phone and

17  the computer today I'm told, at least when I left the

18  office this morning.

19          THE COURT:  I see.

20          MR. REIN:  But we still don't have the

21  password to access the att.net account.

22          THE COURT:  What's that password, Mr.

23  Borges, right now?

24          MR. BORGES:  Att.net?

25          MR. REIN:  Yes.

118

1              THE COURT:  Give it to Mr. Rein.

2    Don't look at me.  Give it to Mr. Rein.

3              MR. KOWALSKI:  I haven't had access to

4    that account.  It was -- I --

5              THE COURT:  You've been out of custody

6    for a whole week.

7              MR. KOWALSKI:  Your Honor, I'm not --

8    I don't know what that password is.  I have no idea

9    whatsoever.

10             THE COURT:  So if I put you back in

11   custody, would that motivate you to look for it?

12             MR. KOWALSKI:  Your Honor, I lost it.

13             THE COURT:  I'm asking you a question.

14             MR. KOWALSKI:  No, I don't know --

15             THE COURT:  Is that what it's going to

16   take?

17             MR. KOWALSKI:  I don't know what the

18   password is.

19             THE COURT:  Mr. Rein.

20             MR. REIN:  Your Honor --

21             THE COURT:  Mr. Kowalski, you're

22   opening the cell door.

23             MR. KOWALSKI:  Your Honor, I have

24   not --

25             THE COURT:  You have to -- to tell me

1  you don't know.

2            MR. KOWALSKI:  Your Honor, I had a

3  SBC --

4            THE COURT:  A week in jail didn't

5  convince you to cooperate.

6            MR. KOWALSKI:  No, that's not the

7  case, Your Honor.  I haven't had access to that --

8            THE COURT:  Well, that's what it looks

9  like.

10            MR. KOWALSKI:  Well, there was a

11  reason why I had to switch over to this iCloud

12  account.  I lost access to that account.  It was SBC

13  Global, and I don't have -- I lost a lot of

14  information, several years of information.  I don't

15  have that password.  I couldn't even reset it if I

16  wanted to.

17            THE COURT:  What have you done to

18  reset that password?

19            MR. KOWALSKI:  I -- initially, I tried

20  to -- I contacted --

21            THE COURT:  What have you done since

22  you've been out of custody to reset that password to

23  allow access?

24            MR. KOWALSKI:  Your Honor, I think

25  it's futile.  I -- I've -- I started --

120

1          THE COURT:  So you've done nothing?

2          MR. KOWALSKI:  I think there's nothing

3    to be done.  When I first had this problem, I tried

4    to contact AT&T, but they could not resurrect the

5    account.  So I couldn't -- I didn't know what else to

6    do, except start a new iCloud account.

7          THE COURT:  Mr. Rein.

8          MR. REIN:  Your Honor, I -- I don't

9    know what to say.  He has to take the initiative to

10   get the --

11         THE COURT:  I'll see you all tomorrow

12   at noon.  If you don't give him that password and it

13   works, bring your toothbrush and your pajamas.

14   Tomorrow at noon.  Be ready to go back to jail if

15   they don't have password access by tomorrow at noon.

16         See you all tomorrow at noon.

17         MS. PORTER:  Your Honor?

18         THE COURT:  Yes.

19         MS. PORTER:  I have one housekeeping

20   matter, and that is the motion to modify the

21   automatic stay --

22         THE COURT:  That's right.

23         MS. PORTER:  -- for Martha Padilla.

24         THE COURT:  That was on the call

25   today?

1          MR. REIN:  Yes.

2          MS. PORTER:  Your Honor, I don't know

3    if it slipped from the call.

4          THE COURT:  It should have been on the

5    call.

6          MS. PORTER:  It should have been on

7    the call.

8          THE COURT:  I think -- I don't think

9    it is.  Hold on.  Hold on.

10         MR. REIN:  I thought it was set for

11   status.

12         MS. PORTER:  I thought it was --

13         THE COURT:  Go ahead, Ms. Porter.

14   What is --

15         MS. PORTER:  -- up for status.  But,

16   in any event, we need to set a hearing on the stay

17   relief as to the state court moving forward with the

18   distribution of the marital estate.  What I would

19   like to do is to set that hearing for December 6th.

20   That is the time that the debtor has --

21         THE COURT:  What's the docket number

22   of that motion again --

23         MS. PORTER:  The docket --

24         THE COURT:  -- because I don't think

25   it's on the call.  It probably should be today.  I

1  sort of --

2              MS. PORTER:  It is docket number 79.

3              THE COURT:  Somehow I guess with us

4  doing a lot of different motions and a lot of --

5              MS. PORTER:  Yes.  It's docket --

6              THE COURT:  Hold on.

7              MS. PORTER:  -- number --

8              THE COURT:  Hold on.

9              MS. PORTER:  -- 79.

10             THE COURT:  Hold on.  Hold on.  Hold

11  on.

12             What was the last order entered in --

13             MS. PORTER:  Your Honor, the court

14  enter an order granting partial relief on the motion.

15             THE COURT:  Yeah, I remember that.

16             MS. PORTER:  And that is docket number

17  132.  That order set a status --

18             THE COURT:  Hold on, let me find it.

19  Let me find it.

20             I'm looking -- August 14, apparently.

21             MS. PORTER:  And then there was a

22  status hearing set for September 26.  That status

23  hearing should have been continued because we did not

24  resolve all of the requests for stay relief.  We

25  entered an order that granted stay relief in some

1    capacity.

2                    THE COURT:  But not completely?

3                    MS. PORTER:  Not completely.

4                    THE COURT:  Hold on.  What day,

5    September 26?  Let me see what happened --

6                    MS. PORTER:  Yes.

7                    THE COURT:  -- September 26.

8                    MS. PORTER:  And I do believe that we

9    had multiple hearings on September 25th, and,

10   therefore, the September 26th date was stricken.

11                   THE COURT:  Or reset maybe?

12                   MS. PORTER:  I don't know if it was

13   reset.  What I do know is we have not completely

14   disposed of the motion for stay relief.

15                   THE COURT:  And you want it now set

16   for continued --

17                   MS. PORTER:  Hearing.

18                   THE COURT:  -- hearing on

19   December 6th?

20                   MS. PORTER:  Yes.

21                   THE COURT:  Any objection to that from

22   anybody?

23                   I'm sorry?

24                   MR. SOWKA:  Your Honor, I haven't had

25   an opportunity to discuss this with the trustee,

124

1   whether he would like to participate and is

2   available.  Since we're coming back tomorrow, perhaps

3   we could address this issue tomorrow?

4                    THE COURT:  Will you be available

5   tomorrow at noon, Ms. Porter?

6                    MS. PORTER:  Yes, Your Honor, I can

7   be.

8                    THE COURT:  Have an order, proposed

9   order.

10                    MR. REIN:  Your Honor, I just, if I

11   may.  I have one question.  I know we're coming back

12   tomorrow on the password.  What about the documents

13   that still have not been produced?  Is that going to

14   be continued to tomorrow?

15                    THE COURT:  Mr. Borges.

16                    MR. BORGES:  I think if Mr. Rein can

17   tell me exactly which documents that might be on the

18   computer that I don't know that Mr. Kowalski has --

19   he can recreate everything from memory.

20                    THE COURT:  Are you asking for the

21   computer back and the phone?

22                    MR. BORGES:  Yes.  Yes, Judge.

23                    THE COURT:  Mr. Rein.

24                    MR. BORGES:  So he could provide

25   everything.

125

1              THE COURT:  Mr. Rein.

2              MR. REIN:  I can return -- or he can

3    come and pick up the --

4              THE COURT:  He can send somebody.  I'm

5    not sending Mr. Kowalski.

6              MR. REIN:  No, no, no, Mr. Kowalski

7    can't come get it.

8              THE COURT:  I'm not sending Mr.

9    Kowalski.

10             MR. REIN:  Mr. Borges can send

11   somebody to pick up --

12             THE COURT:  When?

13             MR. REIN:  This afternoon.

14             MR. BORGES:  This afternoon.

15             THE COURT:  What time?

16             MR. REIN:  4:00 o'clock this

17   afternoon.

18             MR. BORGES:  4:00, okay.

19             THE COURT:  See if that happens.  I'll

20   see you all tomorrow at noon, right?  I said Friday

21   at noon.

22             MR. REIN:  Thank you, Judge.

23             MR. SOWKA:  Thank you.

24             THE COURT:  Thank you all very much.

25

126

1     (Which were all the proceedings had in

2     the above-entitled cause, November 15,

3     2018, 9:30 a.m.)

4 I, JERRI ESTELLE, CSR, RPR, DO HEREBY CERTIFY
 THAT THE FOREGOING IS A TRUE AND ACCURATE
5 TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
 ENTITLED CAUSE.  /S/

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25