**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re | ) | Case No. 18-09130 |
| | ) | |
| ROBERT M. KOWALSKI, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |
| | ) | Hearing Date: October 26, 2021, at 2:00 p.m. |

**REPLY IN SUPPORT APPLICATION OF NEAL H. LEVIN, AS
RECEIVER FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

NOW COMES Neal H. Levin, not individually but solely as the duly appointed Receiver (the "*Receiver*") of the Estate of Respondent Robert Kowalski ("*Respondent*") in Case No. 14 D 6997 currently pending in the Circuit Court of Cook County, Domestic Relations Division (the "*Domestic Case*"), and hereby submits this reply in support of his application for payment of administrative expenses (the "*Application*").[1]  In further support of the Application, the Receiver states as follows:

**A.   The Receiver Always Sought To Cooperate with the Trustee.**

1.   The communications between the Trustee and the Receiver show that the Receiver was cooperative and tried to help the Trustee find assets for the estate while he pursued his receivership duties.  However, the Trustee and counsel for the FDIC were not only unduly combative and completely unwilling to cooperate, but they also outright rejected all the intel the Receiver brought to them, to the detriment of the estate.

2.   This is not all clear from the Trustee's objection to the Application because the Trustee very selectively represented the facts in order to unfairly skew the record in his favor and make it appear as though the Receiver was trying to take assets away from the estate in order to

---

[1]   All defined terms used herein but not defined herein shall have the meanings given to them in the Application.

benefit one person (the Debtor's ex-wife). But the actual facts show that (a) the Receiver reached out to the Trustee multiple times in hopes of cooperating; (b) the Receiver recognized that he might uncover pre-petition assets that belong to the estate during his investigation and made it very clear that he would immediately notify the Trustee of any such discoveries and turn pre-petition assets over to the estate; (c) the Receiver did indeed find estate assets and attempted to turn them over to the estate, though the Trustee rejected those assets; and (d) the Receiver did not work for one individual but rather works for the state court in the Domestic Case, seeking to recover (non-estate) assets for the benefit of the Debtor's receivership estate.

3. The Receiver's background made him extremely qualified to find assets that the Trustee assumed did not exist and could not find. Neal H. Levin is the Team Leader of the Freeborn & Peters LLP's Global Fraud, Investigations and Asset Recovery Team. He is also the founder and leader of the Freeborn Peters Intelligence Unit (the "*FPI*"), which provides global intelligence gathering support and analysis.

4. Often compared to Mr. Wolf from Pulp Fiction, Mr. Levin is most notably summoned when the case "stinks." Known fondly as "The Fraud Guy," he contends with a litany of fraudsters and fraudulent transactions, including those stemming from bankruptcy fraud, occupational fraud, corporate governance fraud, government corruption, insurance fraud, bank fraud, mortgage fraud, asset concealment, so-called asset protection plans, offshore financial centers, bitcoins and other cryptocurrencies, art fraud and related thefts and Ponzi schemes. His practice is international in scope and he has appeared in dozens of different tribunals over the course of his 30+ year career.

5. Mr. Levin and his team leverage their success through use of progressive intel harvesting as well as an intensive study of the psychology of fraudsters and victims. Drawing on both his many years of experience as well as his B.A. in Psychology from the University of

Denver, Mr. Levin frequently lectures, writes and is interviewed on the psychopathy and sociopathy of a fraudster and victims as well as on Ponzi schemes, bankruptcy fraud, investigations and recovery practices. Mr. Levin also serves as an Equity Receiver in matters involving domestic and international fraud and financial crimes, as he has done here in the related Domestic Case.

6. Mr. Levin works hand-in-hand with the FPI that he established at Freeborn & Peters LLP and that includes on its roster a licensed private detective with 30 years of law enforcement experience in criminal investigations, legal considerations, and risk assessment strategies with an emphasis on financial crimes. The FPI utilizes actionable intelligence, which is well beyond traditional intelligence gathering. The FPI combines comprehensive harvesting of information with a tailored analytics system as well as psychological analysis and profiling to turn ordinary intelligence into better outcomes.

7. Beyond a mere "background check," actionable intelligence begins with uncovering and analyzing data from a broad range of international public and private data sources. This is where most other organizations stop. The FPI adds the unique steps of (a) completing an in-depth psychological profile, drawn from the latest techniques, including cognitive science, psychology, data analytics, online search, and behavioral economics; and then (b) developing the "story" to better understand fraudulent schemes, motivation, asset concealment and the location of key players in order to better prepare the matter for success. Creating actionable intelligence is an art as well as a science. The goal is to unveil the story behind what's visible on the surface. That can help organizations create more effective plans and strategies to approach transactions, litigation and other matters. The FPI uses "in the field" investigations, such as surveillance, site visits, interviews, and physical and digital document

recovery.[2]

8. This is not the first time that a Trustee has rejected Mr. Levin's assistance in his capacity as a state court receiver, only to see Mr. Levin find a smoking gun. In the matter of *In re Liou* (Bankr. N.D. Ill. Case No. 12-mp-90002), a disciplinary proceeding presided over by the Honorable Judge Black, Dean Harvalis himself was incensed that Mr. Levin had been appointed as the Receiver in Mr. Liou's state court domestic proceeding. Judge Black welcomed Mr. Levin's appointment. Not only that, but while the Office of the US Trustee had been attempting for months to find relevant information about Mr. Liou's law firm operations and personal financial condition, it was Mr. Levin and his team who quickly swooped in and found the smoking guns that would land Mr. Liou in jail and barred from practicing law. Mr. Levin also sold off assets that benefited Mr. Liou's creditors.[3]

9. With this background, the Receiver approached the Trustee shortly after his appointment in order to determine the proper course of action should he find pre-petition assets during his investigation. Indeed, the Receiver was cognizant of the fact that the Receiver Order appointed him as the Receiver over *all* assets of the Debtor. But the Receiver also knew that to limit his investigation to only post-petition assets would unduly hamper his investigation – to the detriment of all creditors. While on paper, it may be simple to say that the Receiver's investigation should be limited to post-petition assets, that is not how things work in the real world. As the Receiver asked the Trustee, "If I come upon assets and am able to determine that they are pre-

---

[2] Stunning to Mr. Levin is the fact that the FDIC's counsel is all too aware of Mr. Levin's qualifications as they have known each other for many, many years, have frequently dined together and Mr. Rein is familiar with Mr. Levin's work on many high-profile matters and his attendance and presentations at many bankruptcy and fraud-related conferences. Why Mr. Rein would now be so vocal against this level of expertise is baffling.

[3] Transcripts from the many proceedings before Judge Black, where he welcomed Mr. Levin's participation and routinely commended his work, and where the smoking guns were tendered to the US Trustee that would seal Mr. Liou's fate, were not available by the time of this writing, though the US Trustee's office would certainly affirm these facts if an evidentiary hearing were mandated in this matter. Needless to say, Mr. Harvalis and his team were ultimately quite pleased with Mr. Levin's work.

4

petition, and are assets that you knew nothing about, am I to put the assets back?" *See* E-mail Correspondence from Receiver dated July 27, 2020, a copy of which is attached hereto as <u>Exhibit H</u>.[4]

10. Nonetheless, the Trustee (and the FDIC, a creditor in this case) insisted that the Receiver seek entry of a modified receiver order drafted by the Trustee that severely impinged on the Receiver's ability to investigate the Debtor's assets at all. It was unrealistic in its strict boundaries that would essentially tie the Receiver's hands and result in the Receiver not being able to do his job. As the Receiver stated to the Trustee and FDIC, "I am having a difficult time understanding the logic. If I find assets, isn't that a good thing? Let me do so and then you all can sort out who owns what later. If I'm forced to make that determination in the field, then we might lose the asset." E-mail Correspondence from Receiver dated July 31, 2020, <u>Exhibit H</u>. The Receiver never intended to distribute pre-petition assets. He always intended to give any pre-petition assets he found to the Trustee, to be distributed to the Debtor's bankruptcy estate in accordance with the Bankruptcy Code. *See* E-mail Correspondence from Receiver dated July 31, 2020, <u>Exhibit H</u> ("I'm not out looking for pre-petition assets, I'm out looking for assets. If they happen to be pre-petition and you didn't know about them, isn't that helpful?"); As the Receiver stated:

> As I've been trying to say, let me seize first and sort later. You want me to put back assets that might be pre-petition. I can see where it will be extremely difficult to make that determination in short order. Let's just gather EVERYTHING and then we'll parse it all out.
>
> Again, I'm not trying to usurp anything. I'm a Receiver. I gather up and run stuff, much like you. Why not have 2 (or more) people do that?

E-mail Correspondence from Receiver dated August 6, 2020, attached hereto as <u>Exhibit I</u>. The Receiver made that clear to the Trustee and the FDIC over and over. *See* E-mail Correspondence from Receiver dated August 27, 2020, attached hereto as <u>Exhibit J</u> ("How will I know in the field if I am going after pre or post-petition assets. I will jeopardize the asset seizure if I have to 'put

---

[4] Exhibits to this Reply shall follow sequentially from the Exhibits attached to the Application.

it back.' My request is that you let us seize first and divvy up later. It's pretty simple."); E-mail Correspondence from Receiver dated August 27, 2020, attached hereto as <u>Exhibit K</u> ("In any event, how is what I propose to do jeopardizing the trustee or the estate? To the contrary, as I said many times before, it may only serve to help the trustee and the estate. We are pursuing assets currently that we are confident you know nothing about. You're also likely correct, those assets may very well have been purchased or acquired with pre-petition money, though if that's the case, won't you be better for it?"). Nevertheless, the Trustee and FDIC insisted on seeking to hamper the Receiver's efforts.

11.     The Receiver attempted many times to initiate a telephone conference with the Trustee in order to have a civil discussion about cooperating for the benefit of the estate, but the Trustee and FDIC absolutely refused to have any discussions whatsoever. *See, e.g.*, E-mail Correspondence attached hereto as <u>Exhibit H</u>.

12.     The Trustee sent a proposed modified receiver order to the Receiver, supposedly seeking the Receiver's input on the revised order. But it soon became clear – as is evident in the e-mail correspondence attached hereto as <u>Exhibit H</u> – that the Trustee would never agree to a single change to his proposed order because the Trustee never intended to cooperate with the Receiver for the good of the estate. Accordingly, even though the Receiver's aim was always to cooperate with the Trustee, the Trustee's intent was always the opposite. In this way, the Trustee remained closed-minded, which ultimately led to the loss of assets that had the potential to maximize the size of the bankruptcy estate. And now the Trustee is trying to blame the Receiver for his shortsightedness and mistakes.

13.     In his objection to the Application, the Trustee attached his letter to the Receiver dated September 4, 2020, but failed to mention that the Receiver responded to that letter on September 10, 2020, seeking to cooperate and explaining how the Receiver's involvement could

only benefit the estate:

> As you and your client, the Chapter 7 Trustee, are well aware, the Receiver understands that during his investigation of Kowalski per the various Orders relative to his appointment, he may come into possession of pre-petition assets, which will likely belong to the Chapter 7 Trustee. We have made the Receiver's understanding of this fact clear to the Chapter 7 Trustee and FDIC's counsel numerous times.
>
> . . .
>
> the Receiver agreed that he is not able to distribute pre-petition assets and that they will be subject to turnover to the Chapter 7 Trustee upon a determination that assets are in fact pre-petition assets.
>
> It is also disingenuous of you to accuse the Receiver of refusing to modify the order appointing him to reflect this fact. We were willing to work with you on appropriate language and indeed drafted revisions to the order of appointment, but your client (and the FDIC) clearly indicated that no modifications suggested by the Receiver would be acceptable and the only acceptable resolution would be entering the exact order proposed by the Chapter 7 Trustee, thereby rejecting the possibility of a consensual resolution.
>
> . . .
>
> If and when [the Receiver] does [find pre-petition assets of the Debtor], he will immediately advise the Chapter 7 Trustee as to his findings, as he has promised to do *ad nauseum*.
>
> . . .
>
> The Receiver continues to be baffled at why your client continues to clash with the Receiver when the bad actor in this case is clearly Kowalski. The Receiver was appointed to assist in uncovering assets that may benefit everyone. Our efforts are better spent seeking out those assets rather than infighting.

A true and correct copy of this letter is attached hereto as <u>Exhibit L</u>.

14. Despite all the Trustee's insistence that the Receiver Order impinged on his duties as Trustee and had to be revised, the Trustee never pursued his motion to intervene in the Domestic Case. In fact, the Trustee's motion to intervene in the Domestic Case has yet to be heard or decided by the state court even though it was filed more than one year ago. Accordingly, though the Trustee and FDIC yelled and screamed about the Receiver's involvement, they effectively allowed him to do his job. Because they knew it would benefit the

7

Trustee's work for the bankruptcy estate.

15.     In addition, for some reason, the FDIC often "spoke for" the Trustee and was the one corresponding with the Receiver and rudely telling the Receiver to step down.  The FDIC also joined in the Trustee's motion to intervene in the Domestic Case despite having no standing to do so as a single creditor in the bankruptcy case.  The Receiver found it odd that one creditor would speak for the Trustee when the Trustee is supposed to represent the interests of *all* creditors of the Debtor's estate.  One example of this intrusion by the FDIC is when the FDIC counsel sent the Receiver an e-mail on July 31, 2020, stating:

> You are not authorized by the estate nor the FDIC-R to search for pre-bankruptcy assets and we will not allow pre-bankruptcy assets to be used to pay any of your fees.
>
> We sent you revisions to the order and asked if those revisions were acceptable.  If not, please send your modifications.
>
> If you continue to refuse, then we will have to seek court intervention in the divorce court.  That hopefully will not be necessary.

E-mail Correspondence from FDIC Counsel dated July 31, 2020, Exhibit H.  A few days later, after the Receiver marked up the Trustee's proposed modified receiver order, the FDIC counsel was the one to respond:

> Your changes were not acceptable. The order we sent was the order we want entered. Apparently that is not agreeable and we will intervene in the divorce proceedings to ask the court to approve our order.

E-mail Correspondence from FDIC Counsel dated August 6, 2020, Exhibit H.  That same day, the Receiver inquired as to the FDIC's involvement:

> …and are you representing [the Trustee]?  You seem to only be concerned with his and not your client's position. . . . I've actually never heard of a creditor's attorney speaking for a Trustee.  We can play this game or instead get to something that will allow me to do my job which will potentially benefit everyone.  Once again, I work for a Court, not a creditor, much like [the Trustee], who does not work for you.

E-mail Correspondence from Receiver dated August 6, 2020, attached hereto as <u>Exhibit M</u>. On August 27, 2020, the Receiver again asked the FDIC – a single creditor of the estate – why he kept speaking on behalf of the Trustee, who represents the interests all creditors:

> Further, are you not representing a general unsecured creditor? I'm not really sure why you and I are continuing this dialogue and not sure how you have standing to intervene. Isn't the BK Estate the Trustee's domain?

E-mail Correspondence from Receiver dated August 27, 2020, <u>Exhibit J</u>.

16. Despite the efforts by the Trustee and the FDIC to interfere, the Receiver's investigation did indeed lead to the discovery of assets that the Trustee never found. As promised, the Receiver immediately notified the Trustee of this discovery. On November 16, 2020, the Receiver sent an e-mail to the Trustee to notify him that he discovered the Bar. *See* E-mail Correspondence dated November 16, 2020, attached hereto as <u>Exhibit N</u>. In particular, the Receiver notified the Trustee that there were likely pre-petition assets located at the Bar and indicated he would cooperate with handing those over to the Trustee:

> Of particular interest to you may be Robert's computer and the many files located onsite. The computer contained Robert's email account, the passwords for which we have obtained, and many of the files appear related to dozens of real properties.
>
> While it is possible that some of the assets that are gathered from our seizure will be post-petition assets, it is likely that most, as well as the data harvested, will relate to pre-petition assets and other pre-petition activity.
>
> Please let me know when we might discuss [an] orderly turnover of these items to the Trustee.

*Id.*

17. The Trustee and FDIC initially indicated interest in the assets but then decided not to act on any of the valuable intel brought to them by the Receiver. At one point the Trustee explained that the estate did not have sufficient "resources and [detection] capabilities" to utilize the Receiver's intel and suggested that the Receiver instead bring the intel to the federal government in connection with the Indictment. *See* E-mail Correspondence from Trustee dated

November 30, 2020, attached hereto as Exhibit O.

18. Again, on December 16, 2020, the Receiver informed the Trustee that he found additional pre-petition assets and he packaged up all the information the Trustee would need to pursue the assets for the benefit of the estate. *See* E-mail Correspondence from Receiver dated December 16, 2020, attached hereto as Exhibit P ("We have positioned this matter for recovery of what appears to be pre-petition assets and may lead to the discovery of additional pre-petition assets. Let's discuss a turnover plan at your earliest convenience."); *id.* ("Since this originated with pre-petition assets, we are handing this to the Trustee. Happy to develop a turnover plan to ensure continuity in the pending discovery and investigation. Certainly seems to be a substantial enough lead, especially since there are presumed to be hundreds of thousands of dollars still out there in cashier's checks, and that is the modality being used here.").

19. And again, the Trustee did nothing and – for unbeknownst reasons – rejected the Receiver's valuable assistance. And now the Trustee objects to the Receiver obtaining any payment for his administrative expense claim related to his investigation and discovery of estate assets, simply because the Trustee failed to do his job (first by not locating the assets, and second by rejecting the assets when someone else located them). The Trustee's failures should not result in denial of the Receiver's Application.

20. Indeed, the Trustee's argument does not even make sense. At first, the Trustee demanded that the Receiver stand down and consent to entry of an amended receivership order that would essentially entirely curtail his investigation. The Trustee claims that he did this because any assets the Receiver might find would be pre-petition assets that belong to the estate. However, the Trustee failed to pursue entry of his proposed modified order and essentially permitted the Receiver to do his job as he saw fit. And when the Receiver's investigation uncovered pre-petition assets that the Trustee had been unaware of – which the Receiver predicted over and over would

10

happen – the Trustee rejected the assets and then objected to the Application based on the fact that he did not want the Receiver finding assets he was unable to locate.

21.     The Receiver always sought to cooperate with the Trustee and brought valuable information to the estate but was rebuffed.  The Receiver should not be denied compensation simply because the Trustee unexplainably refused to use the information that the Receiver gift-wrapped for him.

**B.**     **The Trustee Is Misrepresenting the Facts.**

22.     Throughout his objection to the Application, the Trustee made clear misrepresentations of the facts in order to try and support his argument that the Receiver's Application should be denied.

23.     For example, the Trustee includes only selective excerpts from the e-mail correspondence between him and the Receiver to avoid including the numerous e-mail correspondence from the Receiver urging cooperation and making it clear that the Receiver had every intention of notifying the Trustee if he discovered assets of the estate.

24.     The Trustee does not want to admit that the Receiver did exactly what he said he would do: discover assets that the Trustee was not able to find.  The Trustee rejected the Receiver's assistance and then rejected the actual pre-petition assets that the Receiver found once it was clear that if the Trustee had accepted the Receiver's cooperation from the outset, it could have led to reduced expenses, greater efficiency and maximization of the value of the estate – all for the benefit of the creditors that the Trustee serves.  Because of the Trustee's rejection of the assets that the Receiver discovered, the Receiver was forced to abandon the assets.

25.     The Trustee also claims that "a modified order appointing the receiver was later entered" after the Trustee filed his reply in support of his motion for intervention in the Domestic Case on September 4, 202.  Trustee's Objection, at ¶ 24.

26. This is a blatant misrepresentation of the facts. The Receiver Order was never modified after the Trustee filed his motion for intervention. The last time the state court entered an amended Receiver Order was on July 24, 2020 – which was before the Trustee filed his motion to intervene. The July 24, 2020 order is attached as Exhibit A to the Receiver's Application and very clearly does not include any of the suggested revisions to the order that came from the Trustee or the FDIC. Indeed, it was the Receiver that sought entry of that amended Receiver Order for reasons entirely unrelated to the Trustee's concerns.

27. The Trustee was very clearly trying to convince this Court that the state court revised the Receiver Order based on the Trustee's concerns. But not only is that not the case, but the state court has never even heard the Trustee's motion to intervene and certainly has not entered any amendment to the Receiver Order based on the Trustee's request to do so.[5]

28. Again, the Trustee is distorting the facts in order to make it appear that the Receiver was acting in a rouge manner when his actions were clearly sanctioned by the state court in the Domestic Case and never truly even challenged there by the Trustee who failed to pursue his motion to intervene that was filed over one year ago.

29. Another example of the Trustee twisting the facts to suit his argument is when he claimed that the Receiver was appointed to be the "collection agent" for the Debtor's ex-wife. *See* Trustee's Objection, at ¶ 13. He later improperly argued that the Receiver's administrative claim should not be paid because rather than working for the estate, he "was acting as a

---

[5] Which begs the question: why did the Trustee allow his motion to intervene linger and why did he never seek to have his motion heard by the state court in the Domestic Case? Was it because despite his complaints about the Receiver's involvement, he recognized that the Receiver's assistance would be helpful in locating concealed assets of the Debtor? Pursuant to the paragraph 22 of the reply in support of the motion to intervene attached as Exhibit 9 to the Trustee's objection to the Application, the Trustee indicated that if the proposed modified receiver order was not entered by the state court, "Petitioners will be forced to seek relief in Bankruptcy Court to prevent the Receiver from violating multiple sections of the Bankruptcy Code." *See also id.* at ¶ 26 ("If the Petitioners' Motion to Modify is not granted, it will become necessary to pursue the Receiver under Sections 362 and 543 of the Bankruptcy Code in Bankruptcy Court"). Again, though the state court never heard the motion to intervene or modified the Receiver Order as requested by the Trustee, the Trustee never sought any relief in this Court related to the Receiver Order or the Receiver's investigation.

12

collection agent for a single creditor, Padilla." Trustee's Objection, at ¶ 65.

30. The Receiver does not work for a single creditor. He works for the state court on behalf of all of the Debtor's creditors. First, the motion filed by the Debtor's ex-wife clearly requested the appointment of a receiver over the estate of the Debtor. *See* Trustee's Objection, at Exhibit 2. More importantly, the Receiver Order itself clearly provides that the Receiver was appointed over all of the Debtor's income and assets. *See* Application, at Exhibit A. The Receiver works for the state court, just like the Trustee works for the Bankruptcy Court. Both the Receiver and the Trustee work on behalf of the Debtor's creditors as a whole and no single creditor.

C. **The Receiver Is Entitled To Payment of His Administrative Expense Claim.**

31. The Receiver is entitled to compensation of his administrative expense claim for his work that would have benefited the estate if the Trustee had not rejected the gift-wrapped intel that the Receiver provided for him.

32. The Trustee argues that section 503(b)(3)(C) of the Bankruptcy Code does not apply because the Receiver is not a "creditor." But the Receiver stands in the shoes of the Debtor as Receiver over his entire estate (both pre-petition and post-petition) assets. Accordingly, the Receiver is a creditor for purposes of section 503(b)(3)(C) of the Bankruptcy Code.

33. In addition, even if the federal government's Indictment against the Debtor was already filed at the time of the Receiver's appointment, that does not foreclose the possibility that the Receiver aided in that criminal prosection. Indeed, section 503(b)(3)(C) of the Bankruptcy Code provides for allowance of administrative expenses "in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor" and does not require that the expenses relate solely to the initial filing of the criminal case. Moreover, the federal government's case was clearly aided by the Receiver, and the Trustee cannot deny that the federal government subpoenaed the Receiver and took over eight boxes of documents from

the Bar and a flash drive with the Debtor's files. In addition, shortly after the Receiver discussed his findings regarding the Bar with the federal government, the Debtor's bond with respect to the Indictment was revoked due to his activities involving the Bar. That would not have occurred absent the Receiver's involvement and cooperation with the federal government.

34. The Receiver clearly incurred expenses "in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor" and should be compensated for those expenses with the allowance of its administrative expense claim.

35. Likewise, even though the Trustee knew that the Debtor and his sister regularly used her attorney trust account to conceal property of the estate, that does not mean that the Trustee knew that the Debtor and his sister employed this method of concealment *with respect to the Bar*. Indeed, the Trustee had no idea that the Bar existed nor its ties to the Debtor until it was discovered by the Receiver and brought to the Trustee by the Receiver.

36. Importantly, the intel provided by the Receiver would have benefited *all creditors* and not just one creditor, as explained above. The only reason that benefit was not actually realized by the estate is because the Trustee rejected the intel and refused to utilize any of the valuable information provided by the Receiver. Even if it could be argued that the Receiver was appointed as the Receiver only on behalf of the Debtor's ex-wife (which is not true), that does not mean that the pre-petition assets that could not be distributed in the Receivership due to their pre-petition nature and brought to the estate by the Receiver were only with respect to the payment of one creditor's claim. Indeed, the Receiver brought the information to the Trustee explicitly to hand over the assets to the Trustee for distribution to all creditors of the estate.

37. Finally, when seeking payment of attorney's fees under section 503(b)(4) of the Bankruptcy Code, retention under section 327 of the Bankruptcy Code is not required as the Trustee argues. *See* 4 COLLIER ON BANKRUPTCY ¶ 503.11[4] ("The professional does not need to

seek, nor is the professional able to seek, authorization of the professional's employment under section 327"). Indeed, counsel for the Receiver was engaged by the Receiver and not the estate. Accordingly, there was never a requirement for retention pursuant to section 327 of the Bankruptcy Code.

38. Again – and importantly – the only reason the estate did not receive the benefit of the Receiver's discoveries is because the Trustee rejected the Receiver's intel for no apparent reason and now seeks to use his rejection as the reason why the Receiver's Application should be denied. It is very convenient to the Trustee's argument that he alone was the arbiter of what he would act on and what he would unexplainably ignore. This Court should reject the Trustee's arguments and approve the Receiver's Application.

## CONCLUSION

The Receiver therefore seeks an order of the Court: (1) approving the Receiver's claim in the amount of $150,054.75 as an administrative expense claim pursuant to sections 503(b)(1)(A), 503(b)(3)(C) and 503(b)(4) of the Bankruptcy Code; (2) authorizing and directing the Trustee to pay the Receiver and F&P $150,054.75, representing all amounts owing on account of this Application; and (3) granting such other and further relief as is just and proper.

Dated: October 15, 2021

**NEAL H. LEVIN, NOT INDIVIDUALLY BUT SOLELY AS THE RECEIVER OF THE ESTATE OF ROBERT KOWALSKI**

By: /s/ Shira R. Isenberg

*Attorneys for Receiver*
Shira R. Isenberg
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: 312-360-6000
Facsimile: 312-360-6520
sisenberg@freeborn.com

15